IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____
                                    |
UNITED STATES OF AMERICA,           |
                                    |
            Plaintiff,              |
                                    |
vs.                                 |  NO. 2:23-CV-2099
                                    |
REAVES LAW FIRM, PLLC,              |
                                    |
            Defendant.              |
                                    |
_____


TRIAL, DAY 1

BEFORE THE

HONORABLE SAMUEL H. MAYS, JUDGE


MONDAY

MAY 5, 2025


POLLY WARDLAW, CCR, LCR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103

**UNREDACTED TRANSCRIPT**

# A P P E A R A N C E S

Appearing on behalf of the Plaintiff:

WILLIAM RYAN, ESQ.
JANELLE OSOWSKI, ESQ.
Donati Law Firm, LLP
1545 Union Avenue
Memphis, Tennessee  38104
(901) 278-1004
Billy@donatilaw.com
Janelle@donatilaw.com

Appearing on behalf of the Defendant:

JONATHAN C. HANCOCK, ESQ.
DEAN J. SHAUGER, ESQ.
Baker Donelson, Bearman, Caldwell & Berkowitz, PC
165 Madison Avenue
Suite 2000
Memphis, Tennessee 38103
(901) 526-2000
Jhancock@bakerdonelson.com
Dshauger@bakerdonelson.com

**UNREDACTED TRANSCRIPT**

3

# W I T N E S S   I N D E X

**WITNESSES:**

<u>FOR THE PLAINTIFF</u>

NEVA REAVES
        Direct Examination By Mr. Ryan................148
        Cross-Examination By Mr. Shauger:............195
        Redirect Examination By Mr. Ryan.............197
    HENRY REAVES
        Direct Examination By Mr. Ryan...............198

**UNREDACTED TRANSCRIPT**

4

# **E X H I B I T S**

Exhibit                                                        Marked


  Exhibit 1.......................................... 163
  Exhibit 2.......................................... 168
  Exhibit 3.......................................... 174
  Exhibit 4.......................................... 186

**UNREDACTED  TRANSCRIPT**

**MONDAY**

**MAY 5, 2025**

----------------------

09:28:52

**THE COURT:** Good morning to all. This is the case of *Andrea Jaye Mosby against the Reaves Law Firm, PLLC.* Mr. Ryan for the plaintiff, and Mr. Hancock for the defendant. Are you ready to go forward this morning, Mr. Ryan?

**MR. RYAN:** Yes, Your Honor.

**THE COURT:** What about you, Mr. Hancock?

**MR. HANCOCK:** We're ready to go, Your Honor.

**THE COURT:** All right. Well, I've dealt with summary judgment. I've dealt with the motions in limine, got the pretrial order entered. The pretrial order is your roadmap. We won't be going outside the pretrial order. I don't think I ever have. So nobody that's not on there is going to be testifying, and no document that's not on there is not coming in except, of course, for impeachment purposes.

Any other preliminary matters -- or any preliminary matters, Mr. Ryan?

**MR. RYAN:** No, sir.

**THE COURT:** How about you, Mr. Hancock?

**MR. HANCOCK:** I have a random request, Your Honor.

**UNREDACTED TRANSCRIPT**

**THE COURT:**  A random request.  You want lemonade?  09:43:44

**MR. HANCOCK:**  I did, but in addition to that, I  09:43:47
wondered if we could move that podium over here so we could  09:43:50
have somewhere to stand when we did opening statement.  09:43:55

**THE COURT:**  I think you can put the podium  09:44:00
anywhere you want.  Are you talking about right here in front  09:44:03
of the Court?  09:44:07

**MR. HANCOCK:**  That would be fine.  If we could  09:44:07
just put it somewhere so that we have a place to put papers  09:44:12
when we're speaking with the jurors.  09:44:17

**THE COURT:**  I thought you always worked from  09:44:21
memory, Mr. Hancock.  That podium.  Sure.  Why don't we move  09:44:24
it when you need it?  I suppose you're going to need it for  
your opening.  We have two incredibly strong individuals here  09:44:29
who were hired for their ability to move podiums.  09:44:34

I think that shows a certain preference to put  09:44:47
the podium exclusively on the side of the defendant.  I think  09:44:51
these incredibly strong individuals probably need to move it  09:44:58
to a different spot where it's more neutral.  My interior  09:45:03
decorating skills are incredibly limited, so you can't really  09:45:17
rely on me -- why don't you just turn it around there where  09:45:23
it is, and with luck, it won't be in the way of any witnesses  09:45:28
who might be coming forward.  It needs to face the jury so  09:45:32
Mr. Hancock's notes can be fully accessed but the rest of us  09:45:36
can't see them.  What do you think?  09:45:41

**UNREDACTED TRANSCRIPT**

**MR. HANCOCK:**  Perfect.  Thank you for that.

**THE COURT:**  Perfect.

**MR. HANCOCK:**  I appreciate it.

**THE COURT:**  I knew I could be perfect with something.  I just didn't know what it was.

Other preliminaries?  Well, here's a question.  When we met for the pretrial conference, the question was what damages is the plaintiff seeking -- or are the plaintiffs seeking.  The plaintiff is seeking damages.  Tell me what damages.

**MR. RYAN:**  Under all three retaliation claims we can seek economic damages in the form of backpay.

**THE COURT:**  You're seeking backpay.

**MR. RYAN:**  We're seeking backpay.

**THE COURT:**  All right.  What else are you seeking?

**MR. RYAN:**  And then you'll get a chance whether -- you can decide post-trial whether it's appropriate if there's any front pay to be awarded.  That's a judge decision.

**THE COURT:**  So you're also going to be seeking front pay.

**MR. RYAN:**  It's not a lot.  I think it's 100-something a week or something.  But we may end up seeking it for a modest period of time.  We can entertain that

**UNREDACTED TRANSCRIPT**

request if we get so lucky to get to that point.

THE COURT: So backpack, front pay.

MR. RYAN: Right. Now, with respect to noneconomic damages, compensatory damages and punitive damages are authorized under the Title VII claim --

THE COURT: You passed me by. Go back over it.

MR. RYAN: Compensatory damages are authorized under the Title VII claim, Title VII retaliation claim. They're authorized by *Moore versus Freeman* under the FLSA retaliation claim.

THE COURT: You don't need to lecture me on the law. Just tell me. You're looking for compensatories?

MR. RYAN: Compensatory damages.

THE COURT: And are you still seeking punitive damages?

MR. RYAN: Still seeking punitives.

THE COURT: All right.

MR. RYAN: And the one wrinkle in this case, which we discussed at the pretrial conference, under the FLSA's retaliation claim, which is 29 U.S.C. 215(a)(3), and it refers -- the actual statute is 216(b), 29 U.S.C. 216(b), specifically says liquidated damages. And they're to be automatically awarded under Sixth Circuit jurisprudence by you post-trial unless they prove that the violation was in good faith and reasonable. So that's a judge decision on

**UNREDACTED TRANSCRIPT**

liquidated damages.

THE COURT:  All right.  You're seeking backpay from the jury --

MR. RYAN:  Compensatory damages from the jury.

THE COURT:  Compensatories and punitives.

MR. RYAN:  Yes, sir.

THE COURT:  And you're seeking from the Court front pay and liquidated.

MR. RYAN:  Yes, sir.

THE COURT:  Under the FLSA.

MR. RYAN:  If we get that far.

THE COURT:  Those are all the damages you're looking for, right?

MR. RYAN:  Yes.

THE COURT:  Just trying to get us down to the limits.  Punitives we talked about.  They're not bifurcated.

MR. RYAN:  Not under the federal system.

THE COURT:  I can bifurcate them.

MR. RYAN:  You can.

THE COURT:  My question is are we seeking to have them bifurcated.  You're answer is no.

MR. RYAN:  I -- no.

THE COURT:  All right.  What about it, Mr. Hancock?

MR. HANCOCK:  I don't see any need for it.  This

**UNREDACTED TRANSCRIPT**

is going to be a pretty short trial.  I think we can proceed.

**THE COURT:**  You think you can put the punitives in in the original instruction to the jury and the verdict form?

**MR. HANCOCK:**  We can.

**THE COURT:**  So no bifurcation.

**MR. HANCOCK:**  We're okay without bifurcating.

**THE COURT:**  All right.

**MR. HANCOCK:**  We do take the position -- but we can pick this -- wait until trial if we need to.  We disagree a little bit about their entitlement to liquidated damages.  But that's not an issue we have to take up for the jury instructions or for the verdict form.

**THE COURT:**  Let's not decide anything we may not have to decide.

**MR. HANCOCK:**  My point exactly.  Thank you, Your Honor.

**THE COURT:**  I'm not looking for extra work today, and I don't think the parties are either.  You want an efficient trial, and I'll try to give you one.  So that covers that.

Other matters outside the presence of the jury?

**MR. RYAN:**  No, sir.

**THE COURT:**  Do you have -- I don't think you submitted.  Do you have any voir dire questions?

**UNREDACTED TRANSCRIPT**

**MR. RYAN:**  No.                                                09:49:58

**THE COURT:**  Here's how it works -- how I work it.  09:49:59
And maybe both of you know how I work it.  But basically what 09:50:03
I do is I run through my questions, and then you come up to 09:50:07
the sidebar and we go over two things.  One, are there 09:50:14
additional questions for an individual on the panel or the 09:50:19
whole panel.  And so you have that opportunity.  Two, is 09:50:20
there anyone who ought to be excused for cause. 09:50:23

Now, I've said probably already in this case that 09:50:26
cause is rare for me.  If someone tells me under oath I can 09:50:29
be fair, I believe that person.  So it has to be more than 09:50:34
just I don't like them.  You've each got three peremptories, 09:50:37
as I recall.  So anyway, there's that, but you'll have the 09:50:45
opportunity to submit questions.  And I usually go on for a 09:50:49
while, but not as long as some of my colleagues. 09:50:52

**MR. RYAN:**  I mean, if you follow the state court 09:50:56
rule, we might have a jury by 5 p.m. today. 09:50:59

**THE COURT:**  State court takes that long?  I've 09:51:04
slowed down.  I used be able to pick a jury in a civil case 09:51:07
with three peremptories each in an hour, but I can't move 09:51:12
that fast anymore. 09:51:16

**MR. RYAN:**  I'm probably guilty of asking too many 09:51:16
question in state court.  Maybe I've been to too many 09:51:19
seminars. 09:51:23

**THE COURT:**  Well, I do my own.  Some allow the 09:51:23

**UNREDACTED TRANSCRIPT**

parties to question the jury.  First time the jury will hear your voice is in the opening.  That's where we'll go.

Ms. Mosby is here on --

**MR. HANCOCK:**  Just quickly --

**THE COURT:**  Go ahead.

**MR. HANCOCK:**  We mentioned when we met at the pretrial conference that we would like, if you wouldn't mind, to ask the jurors questions about their experiences with lawyers.  This is a unique case in that a lawyer is the plaintiff and defendant.

**THE COURT:**  Yes, I'll ask about that.  You may have to remind me.

**MR. HANCOCK:**  No worries at all.  It's the one thing we had.

**THE COURT:**  I'm probably going to be asking more about their employment experiences and any adverse -- any discrimination, retaliation, that sort of thing.  I may ask in this case if any of them have ever worked for or have family members who've worked for Light, Gas, and Water because of Ms. Mosby's employment history.

**MR. RYAN:**  You can ask about HR.  Anybody worked in HR.

**THE COURT:**  I usually ask that.  But again, you can remind me.  You can get some interesting answers.  That's all I can say.  Yeah, I can ask about that.  I usually also

**UNREDACTED TRANSCRIPT**

ask if people have been supervisors.  You know, have you supervised anybody?  How many people do you supervise?  That sort of thing.  But as I go, I sort of feel my way based on the case as to some of the questions.

Now, Ms. Mosby is here on her own behalf. Mr. Reaves, is that you?

**MR. REAVES:**  Yes, Your Honor.

**THE COURT:**  Good morning.  Welcome to court. Welcome, Ms. Mosby.  Good to have both of you here today.

**MS. MOSBY:**  Thank you, Your Honor.

**THE COURT:**  And Mr. Reaves, I take it, is the corporate representative or the firm representative for the Reaves Law Firm, PLLC; is that right?

**MR. REAVES:**  Yes, Your Honor.

**THE COURT:**  So I'm also going to assume that no one else will be in the courtroom who's a potential witness who might be an employee of the company.

How do you want to be introduced to the jury? I'll start with you, Mr. Ryan.  I've had many opportunities to hear from lawyers about how they want to be introduced to the jury including super lawyer.  I've had defender of justice.  I've had a whole series of options.  What I'm really looking for is the name you want me to use.  You can be William B. Ryan.  You can be Billy Ryan.  You can be whatever you --

**UNREDACTED TRANSCRIPT**

MR. RYAN:  Billy.

THE COURT:  Billy Ryan.  All right.  A man of the people.  Okay.  And how about Ms. Osowski?

MS. OSOWSKI:  Janelle Osowski is fine.

THE COURT:  Janelle, J-A-N-E-L-L-E?

MS. OSOWSKI:  Yes, sir.

THE COURT:  That's how you want to be introduced?

MS. OSOWSKI:  Yes.

THE COURT:  Janelle Osowski.  Have I got your name pronounced right?

MS. OSOWSKI:  Yes, that's correct.

THE COURT:  All right.  Mr. Hancock, do you want to be Jonathan Hancock?

MR. HANCOCK:  I prefer that to John, if you don't mind, Your Honor.

THE COURT:  At your service.  Jonathan Hancock.  If my name were Jonathan Hancock, I'd probably prefer that too.  A king can read your signature without his glasses.

What about you, Mr. Shauger?  Have I got your name pronounced right?

MR. SHAUGER:  You have, Your Honor.

THE COURT:  Dean Shauger.  I'll probably spell you for the jury.  Dean Shauger.  And what about Mr. Reaves?  How should I introduce Mr. Reaves?

MR. REAVES:  Henry Reaves.

**UNREDACTED TRANSCRIPT**

THE COURT:  Henry Reaves.  And I am going to introduce -- I'll probably introduce Ms. Mosby by her full name, which is the name that appears on the complaint, unless Ms. Mosby, you prefer something else.

THE WITNESS:  Jaye Mosby.

THE COURT:  You prefer to be J-A-Y-E Mosby?

THE WITNESS:  Yes, sir.

THE COURT:  All right.  What about the court -- let me be fair.  How does the -- I've never asked this before.  How does the case manager want to be introduced to the jury?

THE CASE MANAGER:  Your Honor, I'm okay with Jairo Mendez.

THE COURT:  Okay.  Jairo Mendez.  I want to be fair.  How would the court reporter like to be introduced to the jury?

THE COURT REPORTER:  Polly Wardlaw.

THE COURT:  All right.  Nothing new there.  That's how I've always introduced them.  But I've been fair.  Let the record show I've been fair.

What else can I think of that we need to take up?  I'll get eight jurors in the box.  I'll run through the voir dire, you'll get up here on the sidebar, and that will be it.  We've got a number of people downstairs.  I thought originally we were going to start two cases this morning, but

**UNREDACTED TRANSCRIPT**

we're doing only one.  And then Judge McCalla starts on Tuesday.  And then we had it scheduled for Judge Norris to go on Thursday, but I think he continued.

Yes, Mr. Hancock?

**MR. HANCOCK:**  One thing.  In the order ruling on the motions in limine, the Court indicated that before we use the e-mail Ms. Mosby sent on June 2nd, that the Court wanted to see it.  We have that redacted and ready.  Is now when you would like us to pass that up?

**THE COURT:**  Why not?  Have the parties agreed on it?

**MR. HANCOCK:**  We have not had the chance.

**MR. RYAN:**  I'm sure it's -- we redacted the same stuff.  I'd be surprised if it's different.

**MR. HANCOCK:**  We redacted the curse words.

**THE COURT:**  What I meant was -- what I wanted redacted was basically the e-mail string from Ms. Mosby.  I don't think there were any objections to what Mr. Reaves or Mrs. Reaves sent, but I really wanted the e-mail to contain the three issues that I said could go to the jury because those three issues could speak to elements of the claim.  So I really wanted most of it redacted.  Maybe I wasn't very clear.

**MR. RYAN:**  We redacted most of it.  He can pass up ours with his.

**UNREDACTED TRANSCRIPT**

THE COURT: Did you agree or not on the redactions?

MR. HANCOCK: No. This is a lot more than we think Your Honor ordered.

THE COURT: What I ordered was most of it to be redacted. What I was interested in the three points that I thought were well taken by the defendant. And those were as related to these e-mails -- let's see where I addressed this. Basically I thought the defendant's points were excerpted portions that could come in.

There were statements that I call the only interest statement, this disloyal statement, and the real problem statement. And those seem to me to directly address elements of the plaintiff's burden. And that's what I wanted to come in. Most of the rest of it didn't seem to me, as it was presented to me, to be admissible for reasons I said. But you can pass up what you've got, and we'll try to knock it out right now.

MR. HANCOCK: Let me make sure I'm putting this together correctly. This is plaintiff's submission, and this would be defense's position.

THE COURT: This is the -- the reason I don't much care for the defendant's version is that it's somewhat obvious what's being redacted, if you think of it. And that wasn't my intention. My intention was to limit those

**UNREDACTED TRANSCRIPT**

portions to the offending -- that came in to those portions that were relevant, is what I'm trying to say.

MR. HANCOCK:  If I may, Your Honor, just one thing.  I'm not going to reargue the motions in limine, obviously.  One of the --

THE COURT:  No, you're not going to, but go ahead.

MR. HANCOCK:  We want to be able to ask -- to confirm that despite having 36 paragraphs in this e-mail, there's never any mention of retaliation.  And if we redact it to the point that we're not able to ask that, that's taking an enormous value away.

THE COURT:  You can ask the question.

MR. HANCOCK:  We can.  I'm not able to get into the fact that it's not there.  But can I use the rest of the unredacted e-mail to impeach her if she makes a statement that's not true?

THE COURT:  Well, let me begin with the adoption of the plaintiff's version is my version.  I mean, that's what's going to come in.  And I think that's fair enough.  If you can show me somewhere in here where something other than these three points might be covered -- I'll put it another way.

If you could show me where the plaintiff has redacted something that speaks to these three points, we can

**UNREDACTED TRANSCRIPT**

expand the portions of the e-mail or e-mails that would be entered. If Ms. Mosby takes the stand and you ask Ms. Mosby in these e-mails did you ever mention retaliation -- is that your issue that she never mentioned --

MR. HANCOCK: Among others. Really that goes to the first part of the second question too. If Ms. Mosby takes a position during her testimony that is inconsistent with this e-mail, can I use the unredacted portion to impeach that?

THE COURT: We'll talk about it.

MR. HANCOCK: Thank you, Your Honor.

THE COURT: We'll look at what the unredacted portion is and what's said and if further redaction is needed from whatever. You want to use -- what you want to do is use portions that have been redacted under the plaintiff's version if they're opened up by testimony of the defendant. And that's possible.

MR. HANCOCK: That's what I'm asking, Your Honor.

THE COURT: My view was -- basically at the end of the day on these e-mails I had 403 issues. And so, you know, you can always revisit those in the context of the case. But it seemed pretty clear to me that the probative value of what's in this particular e-mail was substantially outweighed by the danger of unfair prejudice in particular but also confusing the jury.

**UNREDACTED TRANSCRIPT**

I don't want the jury to take an e-mail that was written after the termination and then reason backward from that e-mail to some reason for the termination that appears in the subsequent e-mail.  That's my concern as far as the confusion of the issues.

As far as the unfair prejudice, it is what it is. I mean, once that stuff comes in, it's the elephant in the room, I think.  And I don't want to try it on that basis.  I want to try it on the basis of retaliation and what those elements that have become an issue are.  That's what lies behind it.  If there's an issue of impeachment and there's something in here you can show me, I'm going to use -- I want you to use the redacted version from the plaintiff, and then we'll go forward from there, Mr. Mendez.

Do you have other ideas, Mr. Hancock?

**MR. HANCOCK:**  The podium was my best idea.

**THE COURT:**  I think it was a star idea.

**MR. HANCOCK:**  Seriously, we did have some open issues about jury instructions.

**THE COURT:**  We'll get to those.  Once I hear the proof, I'll have a better position of the jury instructions. The jury instructions, I'll try to make them simple and clear.  The verdict form will probably be as simple as I can make it.  The most I would ever do on a verdict form other than general verdict would be putting the elements into the

**UNREDACTED TRANSCRIPT**

PageID 607

verdict form, which sometimes I would do.  But we're not going to go into all business, and we're not going to do all that.  It's not a function of the jury.

Go ahead, Mr. Ryan.

MR. RYAN:  Can we approach on one final matter?

THE COURT:  Sure.  Come on up.

(At sidebar on the record.)

MR. RYAN:  So this is really odd.  The one gentleman that's sitting in the back is Jaye's ex-husband.  She just turned around -- I didn't even know who he was.  She just turned around and saw that he's here, which is very odd and concerning to her.  I'm not suggesting that he was invited by the defendant or anything like that.

THE COURT:  This is an open court.

MR. RYAN:  They had a really contentious divorce.

THE COURT:  I can't exclude him unless there's some reason to fear for her safety.  I mean, a contentious divorce, how many do we know?

MR. RYAN:  They had a big child custody battle.  She ended up having to take a job in Atlanta, and to be able to take that job in Atlanta, she had to get Judge Wagner to order that she could remove the child from the jurisdiction in Tennessee.  So he's still salty about that.

THE COURT:  Is he a risk?

MR. RYAN:  I don't know.

**UNREDACTED TRANSCRIPT**

THE COURT: He came in, so he's absolutely unarmed. He would have come through the court security system. I've got a court security officer sitting next to him, by chance. What do you recommend? I have no reason to call him up and say you better behave. He's perfectly peaceful back there on the back row. I'm not aware of any threats he's made to her.

MR. RYAN: I'm not aware of any either, but it's just really weird.

THE COURT: There's a lot of weirdness in life. I don't have a suggestion when there's an open courtroom and anyone should be entitled to come into it without -- except a potential witness and we have the rule, which he's not. Anybody ought to be able to come in here. I mean, I don't know what to do.

MR. RYAN: If I add him to the witness list, can you invoke the rule?

THE COURT: It's too late. I've entered the pretrial order.

MR. HANCOCK: I do want to get it on the record we had no idea.

MR. RYAN: No, that's why I prefaced it with --

MR. HANCOCK: I just want to be real clear we didn't -- we don't take a position. We have no idea who he is.

**UNREDACTED TRANSCRIPT**

**MR. RYAN:** Okay.

**THE COURT:** Well, it's awkward because -- Ms. Mosby has testified in this court before. She's not easily intimidated. If there's an intimidation factor, I don't know what we do about that. I don't think she's going to be intimidated by her ex-husband being here.

**MR. RYAN:** Maybe he'll get bored and maybe he has something productive to do.

**THE COURT:** I can bore just about anybody. Maybe I'll use my boredom skills, but maybe he's here to find out if she gets some money. If you've got a better idea, let me know.

**MR. RYAN:** I don't. She wanted me to say something.

**THE COURT:** Well, I've heard it, and I think under the circumstances I need to let it alone, but I strongly believe in open courtrooms. Now, where he's going when the jury comes in, I don't know. There's a question. Because we've got 35 potential jurors.

**MR. RYAN:** He doesn't need to be sitting amongst them obviously.

**THE COURT:** I don't like that. I don't like that at all. But I don't like anybody to sit with the jury. We'll work our way through. I'll try to get him over to the side. I'll be giving the jury instructions about speaking to

**UNREDACTED TRANSCRIPT**

people, and I'm going to tell them don't speak to anybody about the case and so forth. And so he shouldn't have any influence on the jury. And jurors are good about following instructions in my experience, so we'll see.

MR. RYAN: Thank you, Your Honor.

(End of sidebar.)

THE COURT: We still think two days for the trial?

MR. RYAN: Yes, Your Honor. And I know you --

THE COURT: You said one, but I'm thinking two.

MR. RYAN: You never know. I'm going to be streamlined. I'm sure Mr. Hancock doesn't want to bore the jury either. But, yes, more likely than not we'll probably flow over to tomorrow morning.

THE COURT: Well, I've got to pick them, you've got to speak to them, we have to hear proof, somebody has to do a closing. We have to agree to have agreed -- we won't necessarily agree, but I have to decide on the instructions and the verdict form. And then you've got to close and I've got to instruct. We've got a good two days in us, I think, even though there may not be as much proof as you think. Okay.

Anyone want to invoke the rule?

MR. RYAN: Yes, we, I think, both do.

THE COURT: The rule has been invoked. Anyone

**UNREDACTED TRANSCRIPT**

who is a potential witness in this case should leave the courtroom at this time. Anyone who is a potential witness in this case should leave the courtroom at this time. Let's bring in the jury. The jury will be sitting out there in the back. And the jury will be sitting over on the right-hand side I think. We may have some extras because we have 30 potential jurors.

Can I see the court security officer for a minute? We're going off the record for just a minute.

(Off-the-record discussion.)

**THE COURT:** Let me see counsel for just a minute.

(At sidebar on the record.)

**THE COURT:** The court security officer told the husband to leave the courtroom. And he did not know he was the ex-husband. He said he was just an observer. But he told the man to leave the courtroom because the court security officer didn't think there was enough space for the jurors. So he told him he had to leave until the jury was selected.

I did tell him that that's the ex-husband and he needed to be observant. Not necessarily treat him any differently but he needed to keep an eye on him.

**MR. RYAN:** Thank you.

**THE COURT:** And the reason is it's not so much a safety issue, although it may be one, it's I don't want him

**UNREDACTED TRANSCRIPT**

talking to jurors.  Anyway, I don't think that's wise.  So the court security officer is not going to be talking to him about any of that.  Just he and the other court security officers will be alert to the fact that he's the ex-husband, and we don't want him talking the jurors.  Won't say it to him but will observe.  That's the best I can do.

MR. RYAN:  Thank you, Your Honor.

(End of sidebar.)

MR. HANCOCK:  Your Honor, does Mr. Reaves have time to run to the restroom real quick?

THE COURT:  Yes.  And Mr. Reaves, why don't you go to that door on the left and that will take you on the right to the restrooms that the jurors ordinarily use. Mr. Mendez will show you where to go.  I don't want him encountering jurors while he's out.

MR. HANCOCK:  It's too early for that.

THE COURT:  All the witnesses are here; is that right?  You're the one that has extra witnesses.

MR. HANCOCK:  And I do have them all circling, yes.

THE COURT:  Anyone in the witness room?

MR. HANCOCK:  No.  And we were going to ask about that.  Is it available?

THE COURT:  Yeah.

MR. HANCOCK:  We may have them come populate

**UNREDACTED TRANSCRIPT**

that.

(Prospective jurors entered the courtroom.)

THE COURT:  Good morning, everybody.  You might wish you can't hear me, but can you hear me now?  Good.  If you can't hear me, raise your hand because I want you to be able to hear me.

My name is Hardy Mays.  I'm a judge in this court.  I want to welcome each of you to the United States District Court for the Western District of Tennessee.  Ladies and gentlemen, this is a federal court, it is a trial court, and it is a court that hears both civil and criminal cases.  This morning we are going to begin the trial of a civil case.

I want to introduce you to two of the people who will be helping me during the trial of this case.  To my right here and directly in front of you is Mr. Jairo Mendez.  Mr. Mendez is the Court's case manager.  During the course of this trial he will be swearing witnesses, he will be keeping up with documents, numbering them and so forth, and he'll be trying to keep me out of trouble, which is a major job.

To my left and facing you is Ms. Polly Wardlaw.  Mrs. Wardlaw is the court reporter in this court.  This is a court of record.  Mrs. Wardlaw will be taking down all the testimony and all the comments we make, almost everything that we say on the record.  And she's taking down what I'm saying right now, for example.  It's important to have an

**UNREDACTED TRANSCRIPT**

accurate transcript.  Fortunately, Mrs. Wardlaw is an excellent -- why don't we turn off some of the other microphones.  That would be helpful.  Thank you.

Anyway, I was about to say she's an excellent court reporter.  But I want to emphasize to you that what you decide if you're chosen for a member of this jury will depend on what you see and what you hear and what you remember.  That's why it's important to pay close attention during the trial of the case.

You will not have access to the record in the case or what we sometimes call a transcript.  So if you're a member of the jury and you're deliberating in the jury room and you send me a note and you say, Judge, we want the testimony of witness Smith, the answer will be no because you won't have access to that record, and what will control is what you see and what you hear and what you remember.

I want to thank each of you for being here today.  I understand that it is inconvenient for most of you.  Some of you may have been looking forward to the possibility of juror duty your whole lives, but my experience is that most people have not.  So I appreciate your being here.  If you've served on a jury before, you may understand some of what I'm going to say, but if you haven't, you may not yet understand it.

Our basic freedoms depend upon a group of people

**UNREDACTED TRANSCRIPT**

who come into a courtroom and who decide cases. That's true in criminal cases, and it's true in civil cases. You are called to one of the highest duties and one of the greatest privileges of a citizen: The administration of justice in a free society. All our rights depend on that, even civil disputes between parties.

I am now -- I shouldn't admit it, I suppose, but it's probably obvious. I've been at the bar and on the bench now for over 50 years. I'm absolutely convinced that the considered judgment of eight people from all walks of life is greater than the wisdom I have or the wisdom of any judge I know. And that's why you're here, to share your wisdom with us in hearing and deciding this case.

Now we are going to proceed to what's called the voir dire administration. I used to think that was Latin, but a wise lawyer assures me that it's old French. It means you're going to have to tell the truth. You will be under oath through this process, and you will be obligated to tell the truth. And we'll talk about how that works as we go forward.

Right now I simply want to emphasize the oath and the opportunity for you to say what I'm going to ask you when you've taken the oath. So first off, Mr. Mendez, will you administer the voir dire oath.

**THE CASE MANAGER:** Yes, Your Honor. Will all

**UNREDACTED TRANSCRIPT**

possible jurors please stand and raise your right hand.

(The Jury was sworn.)

**THE COURT:** Now, ladies and gentlemen, my goal will be to have eight fair jurors in this case. In a criminal case we'd have 12. In a civil case in the federal system, we have eight. We expect this case to last about two days. That's a prediction. It's not a promise or a commitment. Sometimes it takes longer than two days. Sometimes it takes less than two days. It usually is more likely to take longer than to take less time. That's just how it seems to work.

So my question to you, to each of you individually is, would spending the next two days hearing and deciding this case create for you a personal or family emergency? I am not asking you if it is inconvenient for you to be here. I assume it is inconvenient for you to be here. That's why I'm so appreciative of your presence. But if spending two days hearing and deciding this case would create a personal or family emergency, please stand up, state your name on the record, and state the name of your emergency.

Mr. Mendez has the microphone which he's about to give to the court security officer. Would serving on this jury create a personal or family emergency for any of you? I hear no one. Ah, yes, here's someone.

**PROSPECTIVE JUROR:** My name is Bianca Ayers. I

have two children in school, and my husband is on call and works 24/7, 365 for the railroad.  So I have no one to take care of them to get them back and forth to school.

THE COURT:  So did you take them to school this morning?

PROSPECTIVE JUROR:  No, sir.  My husband was able to take them this morning because he got off at six a.m. from the train to be able to take them to school this morning so I could be here at eight.

THE COURT:  Sometimes he gets off at six, sometimes he doesn't; is that right?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  You don't know what his hours might be?

PROSPECTIVE JUROR:  No, sir.  He's always on call, 365.

THE COURT:  And what about you?

PROSPECTIVE JUROR:  I work 8 to 4:30.  So once I drop the boys off I'm able to come to work.

THE COURT:  So you drop the boys off before 8:00.

PROSPECTIVE JUROR:  7:30 because I have to be at work at 8.

THE COURT:  And then you pick them up at 4:30.

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Who else can take care of the

**UNREDACTED TRANSCRIPT**

children?

**PROSPECTIVE JUROR:**  No one.  My mother does not have a vehicle to get back and forth to pick them up, and my mother-in-law works.  She can't get them.  And everyone else -- that's the only two people that really help us with the children.

**THE COURT:**  So no one could pick the children up from school today or deliver them tomorrow?  Actually, we won't start in the morning here until approximately 9:30, so that shouldn't interfere with dropping the children off.

**PROSPECTIVE JUROR:**  It won't.  Will we be out by 4:30 or 4:00 so I can pick the kids up?

**THE COURT:**  No.  I can't promise you that.  Usually we go until 5 or 5:30 in the evening.  Sometimes I can adjust the trial schedule to accommodate individuals, but I doubt I would be about to promise you that we would be out by 4:30 for the next few days because otherwise the trial will go longer, if you're following me.  I want to try it as efficiently as possible consistent with the ends of justice.

But you have no one else to pick up the children?

**PROSPECTIVE JUROR:**  No, sir.

**THE COURT:**  Is there some daycare at the school where they can keep them?

**PROSPECTIVE JUROR:**  It stops at 5:00 every day.  My youngest -- they're at two separate schools in the same

**UNREDACTED TRANSCRIPT**

system.  My youngest is in aftercare until five.  My oldest catches the shuttle from the middle school back to the elementary, and he gets there at 4:30.

**THE COURT:**  So there's no alternative care for him after 4:30?

**PROSPECTIVE JUROR:**  No, sir.

**THE COURT:**  All right.  Well, you're excused.  I don't want your children to be left on the sidewalk.

**PROSPECTIVE JUROR:**  Thank you.

**THE COURT:**  Thank you for your service.  You may return to the jury room.

Is there anyone else for whom this service on this jury for two days would create a personal or a family emergency?  If so, speak up.

**PROSPECTIVE JUROR:**  My name is Olivia Chriswell.

**THE COURT:**  Tell me your name again.

**PROSPECTIVE JUROR:**  Olivia Chriswell.

**THE COURT:**  All right.

**PROSPECTIVE JUROR:**  And I have a five-month-old infant at home, and I'm the only one that can take care of him throughout the day.

**THE COURT:**  You have a five-year-old.

**PROSPECTIVE JUROR:**  Five-month-old.

**THE COURT:**  A five-month-old who's what?

**PROSPECTIVE JUROR:**  I'm the only one that watches

**UNREDACTED TRANSCRIPT**

him throughout the day.                                           10:41:42

        **THE COURT:**  Where is he now?                    10:41:44

        **PROSPECTIVE JUROR:**  He's with my mom.  She took   10:41:46
off work today.                                                  10:41:53

        **THE COURT:**  So your mother takes care of the      10:41:53
child periodically.  What about tomorrow?

        **PROSPECTIVE JUROR:**  Well, no.  She only took off   10:41:54
of work today to watch him, but I always watch him.             10:41:56

        **THE COURT:**  Do you work?                          10:42:01

        **PROSPECTIVE JUROR:**  I work at my parents' office   10:42:02
two days a week, but I'm able to bring him with me.             10:42:07

        **THE COURT:**  So your child is with you at all       10:42:10
times?                                                          10:42:14

        **PROSPECTIVE JUROR:**  Yes, sir.                     10:42:15

        **THE COURT:**  You're able to take the child to your  10:42:16
parents' work and your mother can't?                            10:42:21

        **PROSPECTIVE JUROR:**  Yes.  But I also have a       10:42:23
brother who's paraplegic and she's his full-time caregiver.     10:42:27
So she isn't about to watch my baby all day.                    10:42:34

        **THE COURT:**  So you go to the office, but you're    10:42:37
there with the child.  Your mother would be taking care of
your brother while she's at the office?  Is that what
happens?                                                        10:42:39

        **PROSPECTIVE JUROR:**  No.  She can go into the      10:42:39
office for about two hours a day, but she'd also be back home   10:42:41

**UNREDACTED TRANSCRIPT**

for my brother.

THE COURT: So ordinarily she's not working at the office, your mother?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: And your father, can he take care of the child?

PROSPECTIVE JUROR: He also -- it's my family's business, so he's working all day too.

THE COURT: All right. Well, I'm going to excuse you. You may return to the jury room.

Anyone else who would have a personal or family emergency as a result of serving for two days on this jury? Hearing no one else, we are going to proceed with the voir dire process.

What's going to happen is Mr. Mendez will be calling eight names. Those names have been randomly selected, and they're selected by a computer. I'm old enough to remember when there was a wheel, and you reached into the wheel and pulled names out. And when you pulled a name out, you knew you were being selected randomly because you could see it. Now we have to have faith in the computer, and I'm sure I do.

It will be random selection when your name is called -- if your name is called, I want you to come forward and take a position in the jury box , which is to my left

**UNREDACTED TRANSCRIPT**

right here behind the railing where the black seats are.  We will begin with the seat in the first row closest to where I am.  We will fill the next three seats.  So there will be four seats on the first row.  We will then begin on the second row, the seat closest to me, and we will fill those four seats.  So when your name is called, please come forward and take a position in the jury box.

Mr. Mendez.

**THE CASE MANAGER:**  Yes, Your Honor.  Courtney Brown.  Douglas Wilson.  Tammy Franks.  Jimmy Warren.  Anna Drake.  Francine Brown.  Noel Clark.  And Leon Brown.

**THE COURT:**  Welcome, ladies and gentlemen.  I mentioned at the outset you've been summoned here as potential jurors in a civil case.  I'm about to give you a free legal education for which you will no doubt be grateful.

A civil case is a dispute between two parties.  It is not a criminal case.  In a civil case, one party sues another and says that other party has acted illegally.  We have an eight-person jury in a civil case.  Sometimes a civil case is about an automobile accident or it can be any personal injury or it can be a contract or it can be a violation of someone's civil rights.  It can be invidious discrimination.  There's many bases for civil cases.

In a civil case the plaintiff has the burden of proof.  The plaintiff has to prove the plaintiff's case by a

**UNREDACTED TRANSCRIPT**

preponderance of the evidence, that is, more likely than not that what the plaintiff says is true.  We often say that the proof is like a scale.  It's balanced.  And if the scale tips in favor of the plaintiff even a little bit, the plaintiff wins.  If the scale is equally balanced or it tips in favor of the defendant, the defendant wins.  So that's essentially how a civil case works.  It requires a unanimous verdict.  All eight jurors have to agree.

A criminal case is very different.  In a criminal case, which this is not, the government usually brings the case.  Usually it the United States of America, or in a state court, it's the state.  In this district it would be the State of Tennessee.  And the government says someone has committed a crime.

The penalty there is potential loss of personal liberty.  That's a very serious matter and so we have a 12-person jury.  The jury has to be unanimous, and the burden of proof is beyond a reasonable doubt.  In other words, that's the highest burden of proof known to the law because your individual liberty is stake.

So this morning in this case what we have before us is preponderance of the evidence, an eight-person jury, and the issue is fundamentally about money.  The party bringing the case is Ms. Andrea Jaye Mosby, who is known as Jaye Mosby.  And Ms. Mosby is suing the Reaves Law Firm,

**UNREDACTED TRANSCRIPT**

PLLC, which is spelled R-E-A-V-E-S.  So those are the parties to the case.  Plaintiff brings it.  Defendant responds to it.

The people that you're going to be hearing from are sitting here in the courtroom today.  Representing the plaintiff is Mr. Billy Ryan of the Memphis Bar.  Also, Ms. Janelle Osowski of the Memphis Bar.  And between them is the plaintiff, Ms. Jaye Mosby.

Representing the defendant, Reaves Law Firm, PLLC, is Mr. Jonathan Hancock of the Memphis Bar, and along with Mr. Hancock, Mr. Dean Shauger, S-H-A-U-G-E-R.  And then closest to me also at the counsel table there is Mr. Henry Reaves.  Mr. Henry Reaves is the representative of the Reaves Law Firm.

Ladies and gentlemen, I want to say at the outset that I called this Reaves Law Firm, PLLC.  It's an entity.  It's not a corporation, but it's a distinct entity. An entity distinct from Mr. Reaves or his family or anybody who works there.  And that entity is entitled to the same consideration as an individual like Ms. Mosby.  In other words, you can't discriminate between them just because you're dealing with a company as opposed to an individual. You give each the same consideration, and you decide based on the fact as if they were natural persons, both human beings, even though one is an entity.  So please keep that in mind. It's very important.

**UNREDACTED TRANSCRIPT**

This case was brought by a complaint that was filed by the plaintiff against the defendant. And essentially, it's a case where the plaintiff says that she has been retaliated against for exercising her protected rights. And the defendant says that's not true. The defendant says it never retaliated against Ms. Mosby for exercising her legal rights. That's the essential case.

The proof probably will not take that long. And to the extent I'm summarizing the case, you can ignore my summary because you'll hear the proof, you'll decide the facts as members of the jury, and you may think the case is different from what I say it's about.

Ms. Mosby was employed by this particular entity, and she was terminated, and she says her termination was for her protected conduct, legally protected conduct. And the defendant says that's not true. We had other reasons to terminate her; and therefore, we say there was no retaliation.

Now, I'm going to ask you some questions during this process. You're under oath, so you're obligated to tell me the truth. And what I'm trying to do is find out whether you ought to be selected as a juror to try this particular case. It's no reflection on you if you don't fit the case. You may not. And I'll decide that in part myself. But as I said earlier, I want a fair jury. That's my sole goal here.

**UNREDACTED TRANSCRIPT**

I want a group of individuals who can approach this case with open minds and agree to keep their minds open until you reach a verdict.

I want a jury that is as free as humanly possible from any bias, from any prejudice, from any sympathy. I want a jury that will not be influenced by preconceived ideas about the facts of the case or about the law of the case. So you're undoubtedly qualified to be a juror or you wouldn't be here, but there may be some things that may disqualify you from hearing and deciding this particular case.

These questions are not designed to pry into your personal life. What I'm trying to do is find out whether you have any knowledge about this case outside this courtroom or whether you have any preconceived opinion that you couldn't lay aside that might affect your fairness as to one party or the other. So nevertheless, some of the questions will no doubt be personal, but what I have to do is assure that each party has an impartial jury and a fair trial.

There may be a reason for you not to serve on this case. If so, I can excuse you for cause. And in addition, each party has the right to exercise what we call peremptories. Each party has a right to excuse jurors for no reason at all. As I say, if you're excused, it's not a reflection on you personally in any way. I'm going to be asking the questions. Both parties have had the opportunity

**UNREDACTED TRANSCRIPT**

to submit questions to me, and they'll have further opportunities to submit questions.

If I ask you a question that makes you uncomfortable and you're not comfortable answering that question in a courtroom full of people, you can come up to the sidebar. Now, you will still be on the record because the court reporter will be taking down our conversation. The lawyers will be there and I'll be there. But there is some relative privacy instead of having 40 people listen to what you say if that's what you want. I want to emphasize that the question I ask might make no one else in the world uncomfortable, but if it makes you uncomfortable, that's sufficient. It's a purely subjective test.

If you're not seated in the jury box, ladies and gentlemen, listen closely to these questions because then if you're called up later for an excused juror, you'll have had the opportunity to think about your own answer to these questions. The questions I ask will generally not be original. In other words, they will continue to be the same question or the same sorts of questions I'm asking on the first time through.

Ladies and gentlemen, you've heard me introduce the parties to this case. Do any of you know these parties? Do any of you know the plaintiff in this case, Ms. Andrea Jaye Mosby? Does anyone know the plaintiff in the case?

**UNREDACTED TRANSCRIPT**

**PROSPECTIVE JURORS:** No.

**THE COURT:** Has anyone had any experience in the Reaves Law Firm? Have you been represented by the Reaves Law Firm? Has the Reaves Law Firm ever sued you? Have you ever worked there? Do you have family members or close friends who work or worked there? Does anyone have any association with that law firm? Do you know anything about that law firm? Anybody know anything about that law firm? I hear nothing. Thank you.

I've also introduced you to the lawyers in this case. For the plaintiff, Mr. Billy Ryan and Ms. Janelle Osowski. And for the defendant, Mr. Jonathan Hancock and Mr. Dean Shauger. Do any of you know any of those people? Any of you been represented by them, sued by them, encountered them, go to church with them, know anything about them?

**PROSPECTIVE JURORS:** (No response.)

**THE COURT:** Do you know any of the other potential jurors sitting in the jury box with you right now? Have any coworkers, friends, former friends, colleagues, cousins? Do you know anything about this particular case given what I've told you in a summary fashion? Anybody know anything about this case? Have you read anything, heard anything about the case?

There are some potential witnesses in this case,

**UNREDACTED TRANSCRIPT**

and they may or may not be called.  One is the plaintiff, `11:00:38`

Ms. Mosby, Andrea Jaye Mosby.  The others are people `11:00:46`

associated with the defendant in one capacity or another. `11:00:56`

Henry Reaves, Neva, N-E-V-A, Reaves, Tina Adams, Dwaun `11:00:59`

Hammond.  Do any of you know any of those people?  Also, Ted `11:01:07`

Cummins, Bill Walker.  Do you know any of those people? `11:01:16`

Ladies and gentlemen, have any of you ever been `11:01:28` involved in any civil litigation?  Have you ever sued `11:01:31` anybody?  Has anybody ever sued you?  Any kind of litigation: `11:01:36` Personal injury case, rent case, anything.  Have you ever `11:01:46` been sued or you eve sued? `11:01:50`

**PROSPECTIVE JURORS:**  (No response.) `11:01:57`

**THE COURT:**  Have any of you ever felt that you `11:02:00` were invidiously discriminated against in some way in your `11:02:05` employment, that you were treated unfairly in the workplace? `11:02:11` Have any of you had close friends or family members you felt `11:02:17` were treated unfairly in any way? `11:02:22`

Have any of you had an experience where you felt `11:02:28` you were retaliated in the workplace, where you did something `11:02:31` that was lawful that you thought was right, but somebody `11:02:37` treated you differently and unfair afterwards?  Have you had `11:02:40` any family members or close friends who experienced that sort `11:02:44` of treatment? `11:02:48`

Have any of you ever worked in a human resources `11:02:51` or HR department?  Have you ever worked in such a department? `11:02:54`

**UNREDACTED TRANSCRIPT**

Do any of you supervise other people, or have you ever in the workplace supervised other people?

All right.  Let's go down the front row. Mr. Wilson, you have supervised other people; is that correct?

**PROSPECTIVE JUROR:**  Yes.

**THE COURT:**  Do you still supervise other people?

**PROSPECTIVE JUROR:**  No.  Well, kind of.  I'm the sole supervisor at the church I'm at for the building and grounds.  So I have three people that kind of report to me, but it's a church setting.  It's very different than what I did before.  I used to work for the Shelby County School System, and I was a supervisor over the IT area for ten years.

**THE COURT:**  How many people reported to you?

**PROSPECTIVE JUROR:**  About 20.

**THE COURT:**  Did you ever have occasion to discipline anyone in that capacity?

**PROSPECTIVE JUROR:**  Oh, yeah.  We had some disputes.

**THE COURT:**  In those situations did people complain about you?

**PROSPECTIVE JUROR:**  Of course.  Because you have to be fair and not friendly.

**THE COURT:**  Were there any formal written

**UNREDACTED TRANSCRIPT**

complaints about you that --                                    11:04:21

**PROSPECTIVE JUROR:**  Not about me, no.           11:04:23

**THE COURT:**  Did anybody accuse you of being     11:04:26
unfair or discriminatory?                                       11:04:29

**PROSPECTIVE JUROR:**  Yeah.  We had to have some  11:04:31
disciplinary action called, and I was part of it, and of        11:04:33
course they didn't feel like I was being fair.  But it was      11:04:39
resolved.                                                       11:04:42

**THE COURT:**  Did you ever have any discipline    11:04:43
taken against you in your supervisory role?                     11:04:47

**PROSPECTIVE JUROR:**  No.                          11:04:54

**THE COURT:**  Anybody ever sue you for any of that?  11:04:57

**PROSPECTIVE JUROR:**  No.                          11:04:59

**THE COURT:**  Based on what I've been saying, do   11:05:00
you think you can be fair in hearing and deciding this case?    11:05:04

**PROSPECTIVE JUROR:**  Oh, yeah.                    11:05:05

**THE COURT:**  Who else has been a supervisor of    11:05:07
other people?  Anybody on the front row?  On the end,           11:05:13
Mr. Warren.  Mr. Warren, you've supervised other people.  Do    11:05:16
you do that now?                                                11:05:19

**PROSPECTIVE JUROR:**  No, sir.                     11:05:20

**THE COURT:**  How long has it been since you've    11:05:22
supervised other people?                                        11:05:24

**PROSPECTIVE JUROR:**  About a year, year and a     11:05:26
half.

**UNREDACTED TRANSCRIPT**

THE COURT: How long did you supervise?

PROSPECTIVE JUROR: Five years.

THE COURT: How many people did you supervise?

PROSPECTIVE JUROR: Twelve people.

THE COURT: And what was the nature of your supervision?

PROSPECTIVE JUROR: Basically, I was the ranger, chief ranger/park manager, and I supervised maintenance workers. I had some secretaries that I supervised as well as other employees.

THE COURT: Which park was it?

PROSPECTIVE JUROR: T.O. Fuller State Park.

THE COURT: And were you ever called on to discipline employees?

PROSPECTIVE JUROR: Was I ever called?

THE COURT: Poor question. Did you ever discipline employees?

PROSPECTIVE JUROR: Yes, sir, I did.

THE COURT: How many occasions would you say you had to do that?

PROSPECTIVE JUROR: I had to do that on a couple of occasions.

THE COURT: What was the result?

PROSPECTIVE JUROR: The end result, of course, was that the disciplinary action stood. And of course, as

**UNREDACTED TRANSCRIPT**

with any type of disciplinary action, you're going to get people feeling a certain way and that type of thing.  But, I mean, we did it on a fair basis.  We did it through documentation.  And the end result was that person was not terminated but put on suspension or whatever.

THE COURT:  Were there complaints about you in that context?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Never had any complaints.  Were you ever accused of invidious discrimination or retaliation?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Do you think based on what I've told you so far you can be fair in hearing and deciding this case?

PROSPECTIVE JUROR:  Yes, I could.

THE COURT:  Someone else raised their hand when I asked about supervisors.  Mr. Brown?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  You supervised people.  Do you supervise people today?

PROSPECTIVE JUROR:  No, sir.  I have done it in the past.  I was a manager at the Internal Revenue Service.  And my last position I was a section chief, and so I had managers that were working up under me.  So I probably had like approximately about 25 people in my branch.

THE COURT:  And how long did you supervise those

**UNREDACTED TRANSCRIPT**

people?

**PROSPECTIVE JUROR:**  In that particular position it was about four and a half years.

**THE COURT:**  And you supervised people in additional positions; is that right?

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  What would those have been, those other positions that you held?

**PROSPECTIVE JUROR:**  The other positions -- you're talking about --

**THE COURT:**  Did you make a career at the IRS?

**PROSPECTIVE JUROR:**  Yeah, I'm still there.  I have a total of 19 years in management, but that was like -- you know, there were like tax examiners.

**THE COURT:**  So you've supervised up to 25 people at a time, sometimes fewer?

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  And did you have occasion to discipline those people?

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  And what was the result of the disciplinary proceedings?

**PROSPECTIVE JUROR:**  It was mostly -- you know, by us working for the IRS, we have to -- there are certain things that we have to adhere to, you know, like filing your

**UNREDACTED TRANSCRIPT**

taxes, that automatically becomes like a labor case.  So I have to follow the guidelines, and, you know, when they don't file their taxes timely and they don't pay their taxes timely.  We did have a couple of situations where we had to terminate someone because of conduct issues also.

**THE COURT:**  Were you yourself ever accused of invidious discrimination?

**PROSPECTIVE JUROR:**  No, sir.  Not directly, no, sir.

**THE COURT:**  What do you mean not directly?

**PROSPECTIVE JUROR:**  My manager was, but I wasn't.

**THE COURT:**  You weren't but somebody else was.

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  Somebody who managed you was?

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  But you weren't.

**PROSPECTIVE JUROR:**  No, sir.

**MS. OSOWSKI:**  So no one ever accused you of wrongful termination or discriminatory actions or anything of that sort?

**PROSPECTIVE JUROR:**  No, sir.

**THE COURT:**  Do you think you can be fair in hearing and deciding this case?

**PROSPECTIVE JUROR:**  Yes, sir, I can.

**THE COURT:**  Anyone else supervise?  Yes, sir,

**UNREDACTED TRANSCRIPT**

Mr. Clark, do you supervise people today?

**PROSPECTIVE JUROR:** No, sir, but I did have two positions in the past where I was a manager and supervised a few employees.

**THE COURT:** How many people would you supervise at a time?

**PROSPECTIVE JUROR:** I think in the first position for about two years I supervised about four employees. And then in another position later on for about five years, I supervised two employees.

**THE COURT:** Did you have occasion to discipline employees?

**PROSPECTIVE JUROR:** I did not personally, but I would report to the owner of the company, and they would then, in some cases, discipline.

**THE COURT:** Would it be fair to say that you didn't have disciplinary authority even though you supervised?

**PROSPECTIVE JUROR:** Yes, sir.

**THE COURT:** Did anybody ever complain about your supervision and accuse you of discrimination or anything of that sort?

**PROSPECTIVE JUROR:** In my first position, I did have one employee that was let go as a result of my report to the owner, and they did call and accuse me of -- not of

**UNREDACTED TRANSCRIPT**

discrimination but of providing information that was not true.  And it didn't go anywhere beyond that, but I did have that one experience.

**THE COURT:**  You were never accused of invidious discrimination or anything of that sort?

**PROSPECTIVE JUROR:**  No, sir.

**THE COURT:**  Can you be fair?

**PROSPECTIVE JUROR:**  I believe so, yes, sir.

**THE COURT:**  Can you be more definitive?

**PROSPECTIVE JUROR:**  Absolutely.

**THE COURT:**  You can be fair.  All right.

Anybody else a supervisor?  The defendant in this case is a law firm.  Anyone ever have unpleasant experiences with lawyers?  A circumstance that stands out in your mind where you felt you were wrongly treated by a lawyer or someone in a law firm?  No one.  Anybody have a negative view of lawyers for whatever?

**PROSPECTIVE JURORS:**  (No response.)

**THE COURT:**  Ladies and gentlemen, this case will be decided solely based on the law.  At the end of the case, if you're selected as a members of the jury, I will give you some instructions on the law.  Is there anyone here, any of you sitting in the jury box today who cannot follow the law as I give you the law whether you agree with the law or not?  Can everyone follow the law as I give you the law even if you

**UNREDACTED TRANSCRIPT**

don't agree with the law?  We're all bound by it.  I'm bound
by it whether I agree with it or not.

THE COURT:  Ms. Brown, are you employed?

**PROSPECTIVE JUROR:**  Yes, sir, I am.

**THE COURT:**  What do you do?

**PROSPECTIVE JUROR:**  I'm a pediatric nurse.

**THE COURT:**  How long have you done that?

**PROSPECTIVE JUROR:**  I've been in nursing for
seven years now.

**THE COURT:**  And do you specialize in pediatrics?
Have you always specialized in pediatrics?

**PROSPECTIVE JUROR:**  Yes.  I tried geriatrics.  I
didn't like it.  Respectfully.

**THE COURT:**  I'm not asking you anymore questions
about that.  Are you married?

**PROSPECTIVE JUROR:**  Soon to be.

**THE COURT:**  You're engaged?

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  Is your fiance employed?

**PROSPECTIVE JUROR:**  Yes, sir, he is.

**THE COURT:**  What does he do?

**PROSPECTIVE JUROR:**  He's an electrician for
MLG&W.

**THE COURT:**  How long has he done that?

**PROSPECTIVE JUROR:**  He's been in electricity for

**UNREDACTED TRANSCRIPT**

six years with them.                                              11:14:56

THE COURT:  Have you served as a juror before?    11:15:00

PROSPECTIVE JUROR:  No, sir.                       11:15:02

THE COURT:  Can you be fair?                       11:15:04

PROSPECTIVE JUROR:  I believe so, yes.             11:15:05

THE COURT:  Can you be more definitive?            11:15:09

PROSPECTIVE JUROR:  Yes.                            11:15:10

THE COURT:  All right.  Mr. Wilson, are you        11:15:13
employed?                                                         11:15:16

PROSPECTIVE JUROR:  Yes, sir.                       11:15:19

THE COURT:  You're working at the church?          11:15:19

PROSPECTIVE JUROR:  I'm working at the church.     11:15:23
I'm the building and grounds supervisor, maintenance man.         11:15:23
Make sure everything gets done.                                   11:15:30

THE COURT:  How long have you done that?           11:15:31

PROSPECTIVE JUROR:  I retired from the school      11:15:33
system two years ago and started working for them.                11:15:33

THE COURT:  What did you do, again, at the school  11:15:37
system?                                                           11:15:40

PROSPECTIVE JUROR:  Pardon?

THE COURT:  What did you do at the school system?

PROSPECTIVE JUROR:  I was in the IT department.    11:15:40
I started out as an electrician.  An IBEW electrical              11:15:42
journeyman.  And went to the low voltage side and then stayed     11:15:49
there and then became a supervisor and rode that out for a        11:15:53

**UNREDACTED TRANSCRIPT**

while and then retired.

THE COURT:  How long were you with the schools?

PROSPECTIVE JUROR:  With the school system, 20 years.

THE COURT:  You still belong to the IBEW?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Is it still on Madison Avenue, the Union Hall?

PROSPECTIVE JUROR:  Madison, yes, sir.

THE COURT:  Are you married?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Is your spouse employed?

PROSPECTIVE JUROR:  Yes.

THE COURT:  What does she do?

PROSPECTIVE JUROR:  She is in HR at a company in Somerville.  I can't think of the name of the company.

THE COURT:  What does she do -- how many people work in the company?

PROSPECTIVE JUROR:  In her building, about 230 people.

THE COURT:  You don't remember the name of the company?

PROSPECTIVE JUROR:  They make Bath and Body Works stuff.  I can't think of the name of it.

THE COURT:  Maybe it's like my doctor says.  When

**UNREDACTED TRANSCRIPT**

I tell him I can't command names and facts as I used to, he tells me that my computer is intact, but my Google is slow. Maybe you need to work on your Google.

**PROSPECTIVE JUROR:** Yeah.

**THE COURT:** Tell me a little more about your wife's employment. How long has she worked for this company?

**PROSPECTIVE JUROR:** She does mainly payroll, but she also has to deal with disgruntled employees and such.

**THE COURT:** And so how long has she been there? How long has she worked at the company?

**PROSPECTIVE JUROR:** She's worked there four years.

**THE COURT:** How long has she worked in HR?

**PROSPECTIVE JUROR:** She's been in HR off and on most of her career. She was with Walmart for quite a while and worked HR with them. She worked for some family for a while and did the same thing.

**THE COURT:** What would be the length of her career, would you say, that she spent in HR?

**PROSPECTIVE JUROR:** She's probably been 20-plus years in that HR role.

**THE COURT:** Where she is today she works with payroll but also, as you say, with disgruntled employees.

**PROSPECTIVE JUROR:** Yes.

**THE COURT:** So does she have disciplinary

**UNREDACTED TRANSCRIPT**

authority?

**PROSPECTIVE JUROR:**  Yes, she does.

**THE COURT:**  So she can decide hiring and firing?

**PROSPECTIVE JUROR:**  She can suggest, yes, and then it goes to the next level.

**THE COURT:**  But she doesn't make the decisions?

**PROSPECTIVE JUROR:**  She doesn't do the final.

**THE COURT:**  And what about other forms of discipline?  Does she have authority for those, or does she recommend?

**PROSPECTIVE JUROR:**  She is like in the role where they come to her for -- she's like the third party when they need a suggestion for their work record because she's privy to do they come to work every day, are they on time, and all that.

**THE COURT:**  So who comes to her?  Management comes to her or the employees?

**PROSPECTIVE JUROR:**  Her boss.

**THE COURT:**  Her boss.  Who is part of the management of the company, right?

**PROSPECTIVE JUROR:**  Correct.

**THE COURT:**  All right.  Do you talk to your wife much about her work?

**PROSPECTIVE JUROR:**  Occasionally, but she's bound to not say anything.  It's kind of sketchy, so we don't talk

**UNREDACTED TRANSCRIPT**

about it much because it's we have something going on, but I can't tell you what it is right now.  That kind of thing.

THE COURT:  So basically she tells you nothing of substance about her work.

PROSPECTIVE JUROR:  No.

THE COURT:  Remember as I ask these questions I'm not trying to put words in your mouth, so if I say it wrong, tell me I'm wrong.

PROSPECTIVE JUROR:  Okay.

THE COURT:  I've got thick skin, so you tell me if I'm stating it wrong.  My understanding is you don't talk about her work.  She works in HR.  And do you know if she's ever had any problems personally working in HR, complaints against her or anything of that sort?

PROSPECTIVE JUROR:  No, she's never had any issues with any of the employees after the fact or anything, that we know of I mean.

THE COURT:  Have you served as a juror before?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Can you be fair?

PROSPECTIVE JUROR:  Pardon?

THE COURT:  Can you be fair?

PROSPECTIVE JUROR:  Oh, absolutely.

THE COURT:  Okay.  Ms. Franks, are you employed?

PROSPECTIVE JUROR:  No, sir.

**UNREDACTED TRANSCRIPT**

THE COURT: How long has it been since you were employed?

PROSPECTIVE JUROR: A month.

THE COURT: And where were you working a month ago?

PROSPECTIVE JUROR: Home Depot.

THE COURT: What were you doing at Home Depot?

PROSPECTIVE JUROR: A garden associate.

THE COURT: How did you happen to leave Home Depot?

PROSPECTIVE JUROR: Well, right now I'm taking care of my elderly aunt.

THE COURT: So you're a caregiver.

PROSPECTIVE JUROR: Yes, sir.

THE COURT: How long were you at Home Depot?

PROSPECTIVE JUROR: For five years.

THE COURT: Where did you work before?

PROSPECTIVE JUROR: If I'm not mistaken, I think I worked for a cleaning company, which was ABM.

THE COURT: Are you married?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: Is your spouse employed?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: What does he do?

PROSPECTIVE JUROR: Home Depot.

**UNREDACTED TRANSCRIPT**

THE COURT: He works at Home Depot?    11:21:21

PROSPECTIVE JUROR: Yes, sir.    11:21:22

THE COURT: Was this a marriage made at Home    11:21:25
Depot? You don't have to answer that question. That's an    11:21:26
irrelevant question. What does he do at Home Depot?    11:21:29

PROSPECTIVE JUROR: He's a loader. He unloads    11:21:35
trucks.    11:21:36

THE COURT: How long has he done that?    11:21:39

PROSPECTIVE JUROR: For four years.    11:21:39

THE COURT: What did he do before?    11:21:40

PROSPECTIVE JUROR: He was a construction worker    11:21:43
for apartments.    11:21:43

THE COURT: How long did he do that?    11:21:44

PROSPECTIVE JUROR: About two years.    11:21:46

THE COURT: Have you served as a juror before?    11:21:49

PROSPECTIVE JUROR: No, sir.    11:21:50

THE COURT: Can you be fair?    11:21:52

PROSPECTIVE JUROR: Yes, sir.    11:21:53

THE COURT: Mr. Warren, are you employed?    11:21:55

PROSPECTIVE JUROR: Yes, sir.    11:21:57

THE COURT: What do you do?    11:21:58

PROSPECTIVE JUROR: Currently I'm working with    11:21:59
St. Jude in security.    11:22:02

THE COURT: And how long have you done that?    11:22:05

PROSPECTIVE JUROR: A couple of years.    11:22:06

**UNREDACTED TRANSCRIPT**

THE COURT:  What do you do in security?  Are you armed security, unarmed?

PROSPECTIVE JUROR:  Unarmed security.

THE COURT:  And before that you were --

PROSPECTIVE JUROR:  Well, before that I worked with the state parks.  State park manager/ranger with T.O. Fuller State Park.  Prior to that I was with the Memphis Police Department.  I retired after 25 years.

THE COURT:  You were a ranger how long?

PROSPECTIVE JUROR:  Five years.

THE COURT:  And you were at the police department for?

PROSPECTIVE JUROR:  25 years.

THE COURT:  And what was your highest rank at the Police Department?

PROSPECTIVE JUROR:  Officer.

THE COURT:  And what did you do there?

PROSPECTIVE JUROR:  Just enforced the laws of the State of Tennessee as well as ordinances of the city.

THE COURT:  Were you on patrol?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Are you married?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Is your spouse employed?

PROSPECTIVE JUROR:  Yes, sir.

**UNREDACTED TRANSCRIPT**

**THE COURT:** What does she do?

**PROSPECTIVE JUROR:** She's a circuit court judge in Arkansas, the 6th district.

**THE COURT:** But you live in the Western District of Tennessee; is that fair?

**PROSPECTIVE JUROR:** No, sir, I don't. I live in Marion, Arkansas.

**THE COURT:** How did you get here? I'm not asking you whether you drove across the bridge.

**PROSPECTIVE JUROR:** No. The reason why I'm here is because my address of record I guess is in Memphis.

**THE COURT:** Your legal residence is in Memphis?

**PROSPECTIVE JUROR:** Yes, sir.

**THE COURT:** And your wife is a circuit judge in Arkansas?

**PROSPECTIVE JUROR:** Yes, sir.

**THE COURT:** She's a trial judge?

**PROSPECTIVE JUROR:** Yes, sir.

**THE COURT:** And does she have a civil docket or criminal docket or both?

**PROSPECTIVE JUROR:** I think she does primarily criminal. Probably a little bit of both.

**THE COURT:** Do you --

**PROSPECTIVE JUROR:** We don't discuss much of what's going on in her courtroom.

**UNREDACTED TRANSCRIPT**

**THE COURT:** You don't talk to her about her work; is that a fair statement?                                              11:23:58

**PROSPECTIVE JUROR:** Very seldom.                          11:24:01

**THE COURT:** Have you served on a jury before?            11:24:02

**PROSPECTIVE JUROR:** No, sir.                              11:24:04

**THE COURT:** Can you be fair?                              11:24:05

**PROSPECTIVE JUROR:** I can be fair.                        11:24:08

**THE COURT:** Let's go back to the back row.               11:24:20
Ms. Drake.  Are you employed?                                11:24:21

**PROSPECTIVE JUROR:** Yes, sir.                             11:24:23

**THE COURT:** What do you do?                               11:24:23

**PROSPECTIVE JUROR:** I'm an attorney.                      11:24:24

**THE COURT:** How long have you been a lawyer?             11:24:26

**PROSPECTIVE JUROR:** Twenty years.                         11:24:26

**THE COURT:** Twenty years.  And where do you work?        11:24:29

**PROSPECTIVE JUROR:** I work with the Department of         11:24:32
Homeland Security at U.S. Citizenship and Immigration        11:24:36
Services.                                                     11:24:36

**THE COURT:** And are you stationed in Memphis?            11:24:39

**PROSPECTIVE JUROR:** Yes, sir.                             11:24:43

**THE COURT:** And how long have you worked with            11:24:43
Homeland Security?                                            11:24:47

**PROSPECTIVE JUROR:** Seventeen years.                      11:24:50

**THE COURT:** What do you do there?  What is the           11:24:50
nature of your job?

**UNREDACTED TRANSCRIPT**

**PROSPECTIVE JUROR:**  I interview applicants and review their files when they are applying for benefits such as green cards and citizenship to determine if they're legally eligible for those benefits and write decisions citing the laws when they're not.

**THE COURT:**  So you're sort of a quasi-judge.

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  Do you try any cases?

**PROSPECTIVE JUROR:**  No, sir.

**THE COURT:**  Spend any time in the courtroom?

**PROSPECTIVE JUROR:**  No, sir.  Just for naturalization ceremonies.

**THE COURT:**  I perform those.  As a member of the bar, I assume you understand that you put aside your knowledge of the law for these purposes should you be a member of the jury.

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  And you'll follow the law as I give you the law even if you think you know the law better than I do?

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  Are you married?

**PROSPECTIVE JUROR:**  Yes.

**THE COURT:**  Is your spouse employed?

**PROSPECTIVE JUROR:**  Yes.

**UNREDACTED TRANSCRIPT**

THE COURT:  What does your spouse do?

PROSPECTIVE JUROR:  He's a dentist at the VA Hospital and a professor of dentistry at UT Dental School.

THE COURT:  How long has he done that?

PROSPECTIVE JUROR:  About 17 years.

THE COURT:  Have you served on a jury before?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Can you be fair?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Now, Ms. Brown.  Are you employed?

PROSPECTIVE JUROR:  Yes, I am.

THE COURT:  What do you do?

PROSPECTIVE JUROR:  I'm a head cook at Shelby County Schools.

THE COURT:  You're the what?

PROSPECTIVE JUROR:  Head cook at Shelby County Schools.

THE COURT:  The head cook.

PROSPECTIVE JUROR:  Yes.

THE COURT:  And that means you're in charge of all the meals for all the students in the Shelby County Schools.

PROSPECTIVE JUROR:  Just about.  I have a supervisor over me.

THE COURT:  But when I come into the cafeteria

**UNREDACTED TRANSCRIPT**

and I don't like the food, do I blame you?

**PROSPECTIVE JUROR:**  No, you blame the supervisor.

**THE COURT:**  Okay.  How long have you done that?

**PROSPECTIVE JUROR:**  Twenty-five years.

**THE COURT:**  Are you married?

**PROSPECTIVE JUROR:**  Well, I was married.  My husband passed in 2019.  He served in the United States Army.

**THE COURT:**  He served in the Army.  He was retired from the Army or serving when he died?

**PROSPECTIVE JUROR:**  He said he was retired, but I don't receive any benefits, so I don't know yet.

**THE COURT:**  But his history of work was in the Army?

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  What was his job in the Army?

**PROSPECTIVE JUROR:**  Some type of rifleman.

**THE COURT:**  Have you served on a jury before?

**PROSPECTIVE JUROR:**  No.

**THE COURT:**  Can you be fair?

**PROSPECTIVE JUROR:**  Yes, I can.

**THE COURT:**  Mr. Clark, are you employed?

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  What do you do?

**PROSPECTIVE JUROR:**  I'm a business manager for a palm oil company that's based in Cincinnati.  I work remotely

**UNREDACTED TRANSCRIPT**

from here in Memphis.

THE COURT:  How long have you done that?

PROSPECTIVE JUROR:  A little over a year.

THE COURT:  What did you do before?

PROSPECTIVE JUROR:  I worked for Sharp
Electronics, the manufacturing location in south Memphis.

THE COURT:  What did you do there?

PROSPECTIVE JUROR:  I was a senior buyer in
procurement.

THE COURT:  How long?

PROSPECTIVE JUROR:  I was at that position for
about two years.

THE COURT:  What did you do before that?

PROSPECTIVE JUROR:  I was in procurement for a
chemical company.  EMC Biogenics.  I was a contracts
purchaser for that chemical company.

THE COURT:  How long did you do that?

PROSPECTIVE JUROR:  My position changed, but I
was there for a total of 13 years.

THE COURT:  Are you married?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Is your spouse employed?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  What does your spouse do?

PROSPECTIVE JUROR:  She is a librarian at the

**UNREDACTED TRANSCRIPT**

Benjamin L. Hooks Public Library in the children's department.

THE COURT:  And how long has she done that?

PROSPECTIVE JUROR:  She has been there for I believe around eight years.

THE COURT:  Have you served on a jury before?

PROSPECTIVE JUROR:  No, sir.

THE COURT:  Can you be fair?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  Mr. Brown, you work for the IRS.

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  You still work for the IRS?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  What do you do there now?

PROSPECTIVE JUROR:  I'm a management program analyst for the IT risk management office.

THE COURT:  How long have you worked for the IRS total?

PROSPECTIVE JUROR:  I've been there 38 years now.

THE COURT:  Are you married?

PROSPECTIVE JUROR:  Yes.

THE COURT:  Is your spouse employed?

PROSPECTIVE JUROR:  Yes, sir.

THE COURT:  What does she do?

PROSPECTIVE JUROR:  She works at the IRS also.

**UNREDACTED TRANSCRIPT**

THE COURT: How long has she worked at the IRS? `11:29:28`

PROSPECTIVE JUROR: She's been there about 25 years. `11:29:31` `11:29:32`

THE COURT: What does she do at the IRS? `11:29:34`

PROSPECTIVE JUROR: Tax enforcement. On the tax enforcement side. Tax compliance. `11:29:35` `11:29:38`

THE COURT: Have you severed on a jury before? `11:29:44`

PROSPECTIVE JUROR: Yes, sir. `11:29:47`

THE COURT: How many times? `11:29:48`

PROSPECTIVE JUROR: Just once. It was the grand jury back in '92. `11:29:50` `11:29:51`

THE COURT: So you were on the grand jury? `11:29:54`

PROSPECTIVE JUROR: Yes, sir. `11:29:57`

THE COURT: You understand the difference between the grand jury and the petit jury? `11:29:57` `11:29:58`

PROSPECTIVE JUROR: Yes, sir. `11:30:01`

THE COURT: The grand jury decides whether to indict or not in a criminal case. And in civil cases and criminal cases juries like this one decides the case. You understand that? `11:30:01` `11:30:05` `11:30:11` `11:30:14`

PROSPECTIVE JUROR: Yes, sir. `11:30:14`

THE COURT: Other than your service on a grand jury, have you ever served on a jury? `11:30:14` `11:30:18`

PROSPECTIVE JUROR: No, sir. `11:30:23`

THE COURT: Can you be fair? `11:30:23`

**UNREDACTED TRANSCRIPT**

**PROSPECTIVE JUROR:**  Yes, sir.

**THE COURT:**  I have one other question that came up with Light, Gas and Water.  Anybody here ever work for Memphis Light, Gas, and Water?  Anybody ever have -- aside from I guess it was -- I've got a lot of Browns here.  Aside from Ms. Courtney Brown, didn't you say somebody in your family worked -- your fiance maybe?

**PROSPECTIVE JUROR:**  My fiance.

**THE COURT:**  Yeah.  Anybody else have a family member or close friend who's worked for the -- or have you yourself worked for Light, Gas, and Water?

All right.  Let me see counsel up here, please.

(At sidebar on the record.)

**THE COURT:**  Any additional questions for the panel, Mr. Ryan?

**MR. RYAN:**  I mean, you did a masterful job.

**THE COURT:**  Keep talking.

**MR. RYAN:**  We're good.  Thank you.

**THE COURT:**  Any questions?

**MR. HANCOCK:**  No.

**THE COURT:**  Anyone for cause?

**MR. RYAN:**  No.  I've got a few challenges though.

**THE COURT:**  Well, you've got three.  Anyone for cause?

**MR. RYAN:**  No, sir.

**UNREDACTED TRANSCRIPT**

MR. HANCOCK: No.

THE COURT: I think probably at this point we should take a break while you do your --

MR. RYAN: We've already -- it will take seconds.

MR. HANCOCK: I'm ready to keep going.

THE COURT: Okay. Wait a minute. The jury needs a break. So we're going to take a break and do your thing. I'll try to get them back here in ten minutes, if I can.

(End of sidebar.)

THE COURT: Ladies and gentlemen, I think it's time for us to take a little break. I know you've been sitting here a while, so usually after a certain point in life we like to have a little break. Some of us. Let's take ten minutes. It's not the end of the day if we take a minute more, but I'm trying to keep moving, and I'm hoping that we can finish up in ten minutes.

When we take this recess, if you are sitting behind the railing out there in what I call the public space in the courtroom, when you come back to the courtroom you'll stay where you are in that area, but you can sit anywhere. For those of you who are in the jury box, when you come back, take your position in the jury box right where you are now. Keep the same seat.

While we're in recess, do not talk to anyone about this case. I mean anyone about this case. If you

**UNREDACTED TRANSCRIPT**

happen to see the lawyers or the parties outside, don't speak    11:33:59

to them at all.  They won't be speaking to you.  Don't say    11:34:08

hello to them.  What we will do is I will ask you to remain    11:34:12

outside the courtroom until we ask you to come back.  So    11:34:19

you'll be outside the courtroom and stay outside the    11:34:28

courtroom until we tell you to return.    11:34:31

Does anybody have any questions about that    11:34:35

procedure?  If not, we'll stand in recess for the next ten    11:34:38

minutes.  Thank you very much.    11:34:43

(Jurors exited the courtroom.)    11:35:03

(Recess taken at 11:35 a.m. until 12:00 p.m.)    11:35:41

THE COURT:  Are we ready to go forward, Mr. Ryan?    11:59:56

MR. RYAN:  Yes, Your Honor.    12:00:17

THE COURT:  Anything we need to take up outside    12:00:18

the presence of the jury?    12:00:20

MR. RYAN:  Just real quick.  If we don't strike    12:00:22

them now, can we strike them next round?    12:00:26

THE COURT:  You're reading my mind.  One is there    12:00:31

are no back strikes unless there's new objections.  Two is if    12:00:34

you both strike the same potential juror, it counts against    12:00:41

both of you.  If you don't like Juror 3, you both strike    12:00:46

Juror 3, you both lose a strike.    12:00:52

What else, Mr. Ryan?    12:00:56

MR. RYAN:  That's it.    12:00:57

THE COURT:  Anything else we need to take up    12:00:58

**UNREDACTED TRANSCRIPT**

outside the presence of the jury pool I guess at this point, Mr. Hancock?

**MR. HANCOCK:** There's not, Your Honor.

**THE COURT:** Let's bring them in.

(Jurors entered courtroom.)

**THE COURT:** Those of you in the jury box, please be seated. Counsel, pass your peremptory challenges.

Mr. Wilson, you're excused. Thank you for your service. You may return to the jury room. Ms. Franks, you're excused. Thank you for your service. You may return to the jury room. And Ms. Drake, you're excused. Thank you for your service, and you may return to the jury room.

Mr. Mendez, I need four additional potential jurors.

**THE CASE MANAGER:** Yes, Your Honor. Teresa Clayton. Teresa Ervin. Steven Thornton. Earnesha Lane.

**THE COURT:** Welcome, ladies and gentleman. Is there anything any of you need to volunteer in answer to any question I've asked. I'll go through all my questions again more or less.

What about you, Mr. Thornton? You look expectant.

**PROSPECTIVE JUROR:** You asked the question did anybody know anybody that knew Mr. Reaves. And I do.

**THE COURT:** Do you know him personally?

**UNREDACTED TRANSCRIPT**

**PROSPECTIVE JUROR:** I don't know him personally, but my associates know him.

**THE COURT:** What do you do for a living?

**PROSPECTIVE JUROR:** I work IT at FedEx.

**THE COURT:** And you have people who -- your colleagues who know Mr. --

**PROSPECTIVE JUROR:** Who did IT work for them.

**THE COURT:** Oh, they are employees --

**PROSPECTIVE JUROR:** They're not employees. They just do IT work.

**THE COURT:** They provide services to Mr. Reaves' law firm.

**PROSPECTIVE JUROR:** They did, yes, sir.

**THE COURT:** They no longer do?

**PROSPECTIVE JUROR:** They no longer do.

**THE COURT:** Your associates are at Federal Express or are the independent --

**PROSPECTIVE JUROR:** Independent, sir.

**THE COURT:** Independent contractors. Would any experiences they had and conveyed to you affect your ability to be fair in hearing this case?

**PROSPECTIVE JUROR:** No, sir.

**THE COURT:** Anybody else want to volunteer anything before we proceed? Yes, Ms. Ervin?

**PROSPECTIVE JUROR:** I have been on a jury before

**UNREDACTED TRANSCRIPT**

in Tipton County.  And my husband works for Memphis Light, Gas, and Water.

            **THE COURT:**  What does he do at Memphis Light, Gas, and Water?

            **PROSPECTIVE JUROR:**  He's a systems operator.

            **THE COURT:**  Do you know the plaintiff, Ms. Mosby?

            **PROSPECTIVE JUROR:**  No.

            **THE COURT:**  Has your husband ever worked with her to your knowledge?

            **PROSPECTIVE JUROR:**  No.

            **THE COURT:**  Can you be fair?

            **PROSPECTIVE JUROR:**  Yes.

            **THE COURT:**  All right.  Having been over that, do you know any of the lawyers in this case?  Anybody know any of the lawyers?  Now, as I ask these questions, the four of you, Ms. Brown, Ms. Brown, Mr. Clark, Mr. Brown -- we can call this the Brown jury -- you don't have to answer these questions again.  However, sometimes I ask a question or you hear a response and it triggers a memory.  If that's true, speak up and tell me what you remember that you didn't remember before.  Otherwise, you can just sit there and be happy.

            For those of you who are new to the jury, anybody know the lawyers in this case, any of the four lawyers?  Anybody know the plaintiff, Ms. Mosby?  Anybody know the

**UNREDACTED TRANSCRIPT**

Reaves Law Firm?  Yes, on the back row on far left.  That would be Ms. Lane.    `12:09:38` `12:09:43`

**PROSPECTIVE JUROR:**  I don't know them, but my mom and stepdad went through him for a car wreck.    `12:09:48` `12:09:50`

**THE COURT:**  They did what?    `12:09:54`

**PROSPECTIVE JUROR:**  They had a car wreck, and they went through him through his company.

**THE COURT:**  You need to be a little -- somebody was in a car -- go ahead.

**PROSPECTIVE JUROR:**  My mom and stepdad went through him for their car wreck.    `12:10:04` `12:10:07`

**THE COURT:**  He represented your mother and your stepfather?    `12:10:11` `12:10:13`

**PROSPECTIVE JUROR:**  Yes.    `12:10:14`

**THE COURT:**  Did you have any representation there yourself?    `12:10:19` `12:10:20`

**PROSPECTIVE JUROR:**  No.    `12:10:21`

**THE COURT:**  Did you ever work with Mr. Reaves?    `12:10:25`

**PROSPECTIVE JUROR:**  No.    `12:10:27`

**THE COURT:**  Did your parents, your mother and stepfather, discuss with you their case?    `12:10:28` `12:10:30`

**PROSPECTIVE JUROR:**  No.    `12:10:33`

**THE COURT:**  How long ago was this?    `12:10:37`

**PROSPECTIVE JUROR:**  Like six, seven years ago.    `12:10:39`

**THE COURT:**  When did the case conclude?    `12:10:42`

**UNREDACTED TRANSCRIPT**

**PROSPECTIVE JUROR:** It was that long ago. Six or seven years.

**THE COURT:** So the case was over six or seven years ago; is that right?

**PROSPECTIVE JUROR:** Yes.

**THE COURT:** As far as you know, has there been any further conversation or representation by the Reaves Law Firm?

**PROSPECTIVE JUROR:** No.

**THE COURT:** Would your family's representation affect your ability to be fair?

**PROSPECTIVE JUROR:** No.

**THE COURT:** Let me ask you this. Here's Mr. Reaves in the courtroom today. Do you recognize him?

**PROSPECTIVE JUROR:** Yes, I do.

**THE COURT:** How do you recognize him?

**PROSPECTIVE JUROR:** From TV.

**THE COURT:** You don't recognize him from your family's case. You recognize him from TV?

**PROSPECTIVE JUROR:** Yes.

**THE COURT:** Would that affect your ability to be fair?

**PROSPECTIVE JUROR:** No.

**THE COURT:** All right. Now, we've talked about Ms. Mosby. Is there anybody else who's had any experience

**UNREDACTED TRANSCRIPT**

whatsoever with the Reaves Law Firm?  Is there anybody who's had a family member who's had an experience with the Reaves Law Firm?  Representation, represented somebody you know, sued somebody you know?  No one?  Okay.

Anybody have any sense of -- I'm going to let Ms. Lane off the hook on this one for a minute.  Does anybody have a sense of the reputation on the Reaves Law Firm?  Are you familiar with the name of the law firm, whether it has a good or whether it has a bad reputation?  Anybody have an opinion about that?  All right.

I read a list of the prospective witnesses who may or may not be called.  Did anybody know any of those potential witnesses?  Do any of you sitting in the jury box now know another?  Any of you know anything about this particular case?  Do you know and agree that even though the party in this instance, the Reaves Law Firm, is an entity, it's not a person, it's entitled to the same consideration you give to a natural person like that plaintiff?  Does anybody have any problem with that concept?

Did anybody ever do any business with the Reaves Law Firm?  Anybody ever been employed there?

Have you ever sued anybody?  Anybody ever sue someone or have you ever been sued yourself in any sort of case from personal injury to rent?

**PROSPECTIVE JURORS:**  (No response.)

**UNREDACTED TRANSCRIPT**

THE COURT:  Anybody ever work in a human resource department?  Any family members or close friends who work in human resources?

Any of you supervise people?  Have you ever been in a job where you supervised other people?  Have you ever believed that you were yourself the subject of invidious discrimination, that you were treated unfairly in the job?  Any of you ever feel that you were retaliated against for a legal activity in a job?  Have any of you ever been accused of invidiously discriminating against someone?

I've asked about Memphis Light, Gas, and Water.  Anybody work for Memphis Light, Gas, and Water other than what you've already disclosed?  Anybody have a family member or friend who worked for Memphis Light, Gas, and Water?

Anybody have strong opinions about lawyers?  You like lawyers, you don't like lawyers, in general or in specific?  Anybody ever have an unpleasant experience with a lawyer?

Ms. Clayton, are you employed?

PROSPECTIVE JUROR:  I am.

THE COURT:  What do you do?

PROSPECTIVE JUROR:  I am a teacher.

THE COURT:  What do you teach?

PROSPECTIVE JUROR:  I teach middle school, sixth grade and then one section of eighth grade.

**UNREDACTED TRANSCRIPT**

THE COURT:  You skipped the 7th grade.    12:16:41

PROSPECTIVE JUROR:  Yes, yes.    12:16:43

THE COURT:  Do you teach a particular subject?    12:16:44

PROSPECTIVE JUROR:  I teach sixth grade math, and    12:16:47
then I teach one section of eighth grade American history.    12:16:50

THE COURT:  That's a diverse --    12:16:55

PROSPECTIVE JUROR:  Yeah.  First year, and it's    12:16:57
really been a lot of work.    12:16:58

THE COURT:  This is the first year you've taught    12:17:00
both?    12:17:03

PROSPECTIVE JUROR:  Taught both, yes.    12:17:04

THE COURT:  Traditionally you'd be a math    12:17:06
teacher; is that a fair statement?    12:17:09

PROSPECTIVE JUROR:  Right.  And social studies.    12:17:11
Sixth grade social studies.    12:17:15

THE COURT:  How long have you done that?    12:17:17

PROSPECTIVE JUROR:  At this school 23 years.  And    12:17:18
then I have about three weeks left, and then my husband and I    12:17:24
are moving to middle Tennessee.    12:17:27

THE COURT:  I'm taught not to say you retire.    12:17:31
But you won't be teaching anymore.    12:17:34

PROSPECTIVE JUROR:  I won't be teaching anymore.    12:17:38

THE COURT:  New opportunities will arise.    12:17:42

PROSPECTIVE JUROR:  Right.    12:17:44

THE COURT:  And you're married.  Is your spouse    12:17:45

**UNREDACTED TRANSCRIPT**

employed?

**PROSPECTIVE JUROR:**  Yes.

**THE COURT:**  What does he do?

**PROSPECTIVE JUROR:**  He just took a job at BELL Construction just south of Nashville, Brentwood.

**THE COURT:**  They used to do highway construction.

**PROSPECTIVE JUROR:**  Yeah.  They do civil and bridge and highway.  He's heavy, bridge and highway.

**THE COURT:**  They've been in business a long time.

**PROSPECTIVE JUROR:**  Uh-huh.

**THE COURT:**  What is he doing today?

**PROSPECTIVE JUROR:**  He is a senior project manager at BELL.

**THE COURT:**  At BELL today?

**PROSPECTIVE JUROR:**  Today.

**THE COURT:**  In Memphis?

**PROSPECTIVE JUROR:**  No, no, no.  He's in Nashville, but he's actually working in Knoxville.  It's very complicated.

**THE COURT:**  When did he start working at BELL Construction?

**PROSPECTIVE JUROR:**  October.

**THE COURT:**  And what did he do before?

**PROSPECTIVE JUROR:**  He worked at RC Construction, and he was down at the airport for years.

**UNREDACTED TRANSCRIPT**

THE COURT:  He was a project manager.                12:18:36

PROSPECTIVE JUROR:  Yeah, all that concrete on        12:18:43
the tarmac.                                            12:18:45

THE COURT:  Oh, so that's who did it.  How many       12:18:47
years was he there?                                    12:18:48

PROSPECTIVE JUROR:  I think about seven years         12:18:49
then.  And then he worked at APAC, and they were down at the    12:18:51
airport also for years and years.                      12:18:55

THE COURT:  Have you served on a jury before?         12:18:57

PROSPECTIVE JUROR:  Never.                             12:19:00

THE COURT:  Can you be fair?                           12:19:00

PROSPECTIVE JUROR:  Yes.                               12:19:01

THE COURT:  Ms. Ervin, are you employed?              12:19:02

PROSPECTIVE JUROR:  I am.                              12:19:05

THE COURT:  What do you do?                            12:19:06

PROSPECTIVE JUROR:  I'm a realtor.                    12:19:07

THE COURT:  And how long have you done that?         12:19:08

PROSPECTIVE JUROR:  Sixteen years.

THE COURT:  Do you do commercial, residential, or    12:19:11
both?                                                  12:19:14

PROSPECTIVE JUROR:  Residential.                       12:19:14

THE COURT:  And you told me you're married.          12:19:16

PROSPECTIVE JUROR:  I am married.                      12:19:18

THE COURT:  And what does he do?                      12:19:19

PROSPECTIVE JUROR:  Memphis Light, Gas, and           12:19:21

**UNREDACTED TRANSCRIPT**

Water.

**THE COURT:** And tell me what his job is at Memphis Light, Gas, and Water.

**PROSPECTIVE JUROR:** He's systems operator. He's over the electric department.

**THE COURT:** How long has he done that?

**PROSPECTIVE JUROR:** Thirty-four years.

**THE COURT:** Have you served on a jury before?

**PROSPECTIVE JUROR:** I have. Tipton County.

**THE COURT:** How many times, once, twice?

**PROSPECTIVE JUROR:** Once, but they kept me a long time.

**THE COURT:** So what sort of case was it, civil or criminal?

**PROSPECTIVE JUROR:** It was a long time ago. I'm thinking it was criminal.

**THE COURT:** What was the defendant charged with?

**PROSPECTIVE JUROR:** Murder.

**THE COURT:** Was he convicted?

**PROSPECTIVE JUROR:** Yes. But that was a different -- they did the conviction in a different one, right? I know they do it in two different sections? Sentencing I guess is the other -- the --

**THE COURT:** I'm not going to comment on Tennessee state procedure because I don't fully understand it. The

**UNREDACTED TRANSCRIPT**

only cases I have known where the conviction and the sentence    12:20:25

were bifurcated were capital cases.    12:20:37

**PROSPECTIVE JUROR:** Like I said, it was a long    12:20:44

time ago.    12:20:46

**THE COURT:** Like a death penalty case. You don't    12:20:47

remember enough about the case?    12:20:51

**PROSPECTIVE JUROR:** Huh-hu.    12:20:54

**THE COURT:** You remember only that the defendant    12:20:54

was convicted of murder; is that right?    12:20:56

**PROSPECTIVE JUROR:** Yes.    12:20:59

**THE COURT:** Have you otherwise served on a jury    12:21:00

before?    12:21:01

**PROSPECTIVE JUROR:** No.    12:21:01

**THE COURT:** Can you be fair?    12:21:02

**PROSPECTIVE JUROR:** I can.    12:21:03

**THE COURT:** Mr. Thornton.    12:21:04

**PROSPECTIVE JUROR:** Yes, sir.    12:21:07

**THE COURT:** Are you employed?    12:21:07

**PROSPECTIVE JUROR:** Yes, sir.    12:21:09

**THE COURT:** What do you do?    12:21:10

**PROSPECTIVE JUROR:** I'm a senior IT specialist    12:21:11

for Federal Express.    12:21:14

**THE COURT:** How long have you done that?    12:21:17

**PROSPECTIVE JUROR:** Thirty-seven years.

**THE COURT:** Are you married?    12:21:20

**UNREDACTED TRANSCRIPT**

**PROSPECTIVE JUROR:**  Yes.    12:21:22

**THE COURT:**  Is your spouse employed?    12:21:24

**PROSPECTIVE JUROR:**  Yes, she is.    12:21:27

**THE COURT:**  What does she do?    12:21:28

**PROSPECTIVE JUROR:**  She's director of analytics and reporting at Baptist Hospital.    12:21:30

**THE COURT:**  How long has she done that?    12:21:30

**PROSPECTIVE JUROR:**  Twenty-five years.    

**THE COURT:**  Have you served on a jury before?    12:21:33

**PROSPECTIVE JUROR:**  No, sir, I haven't.    12:21:38

**THE COURT:**  Can you be fair?    12:21:39

**PROSPECTIVE JUROR:**  Yes, sir.    12:21:41

**THE COURT:**  Ms. Lane, are you employed?    12:21:42

**PROSPECTIVE JUROR:**  No, I'm not.    12:21:46

**THE COURT:**  Have you ever been employed?    12:21:47

**PROSPECTIVE JUROR:**  Yes.    12:21:49

**THE COURT:**  I mean employed outside the home. How long has it been since you were employed?    12:21:50    12:21:53

**PROSPECTIVE JUROR:**  A year.    12:21:56

**THE COURT:**  And what do you do in the meantime? What are you doing right now?    12:21:56    12:22:00

**PROSPECTIVE JUROR:**  A hairdresser.    12:22:01

**THE COURT:**  And do you do that independently?    12:22:02

**PROSPECTIVE JUROR:**  Yes.    12:22:05

**THE COURT:**  A year ago when you were working,    12:22:05

**UNREDACTED TRANSCRIPT**

what were you doing?

**PROSPECTIVE JUROR:**  At the United States Postal Service.

**THE COURT:**  How long did you work in the Postal Service?

**PROSPECTIVE JUROR:**  Three years.

**THE COURT:**  What did you do there?

**PROSPECTIVE JUROR:**  Material handler.

**THE COURT:**  Why did you leave?

**PROSPECTIVE JUROR:**  My son was sick.

**THE COURT:**  What did you do before you worked for the Postal Service?

**PROSPECTIVE JUROR:**  I was a medical assistant.

**THE COURT:**  How long did you do that?

**PROSPECTIVE JUROR:**  Like over five years.

**THE COURT:**  What did you do as a medical assistant?

**PROSPECTIVE JUROR:**  I worked in pediatrics.

**THE COURT:**  Are you married?

**PROSPECTIVE JUROR:**  No.

**THE COURT:**  Have you ever been married?

**PROSPECTIVE JUROR:**  No.

**THE COURT:**  Do you have -- have you served on a jury before?

**PROSPECTIVE JUROR:**  No.

**UNREDACTED TRANSCRIPT**

**THE COURT:** Can you be fair?

**PROSPECTIVE JUROR:** Yes.

**THE COURT:** Counsel.

(At sidebar on the record.)

**THE COURT:** Additional questions?

**MR. RYAN:** No additional questions.

**THE COURT:** How about you?

**MR. HANCOCK:** No additional questions.

**THE COURT:** For cause?

**MR. RYAN:** Yeah. Earnesia Lane's mom, stepdad represented. She could go home and start talking to mom. No telling what mom says.

**THE COURT:** I'm not so much worried about going home to talk to mom. I'll give them instructions about that. And I think she can follow them. I'm more worried about -- and I didn't want to get into it before the jury. We can do it at sidebar, but I don't think that's especially productive, but how did the case come out. I mean, did they win, did they lose, did they get a settlement? Are they happy? Are they unhappy? So we've got that problem which was a substantive problem as to what on earth the result of the case was, what sort of case was it. That's just way too much for the jury to hear.

The other problem I have with it is I don't think it looks good. I don't think it looks good to have someone

**UNREDACTED TRANSCRIPT**

on the jury whose family has had a prior association and     12:24:40

representation by the law firm that's being sued.  I think it 12:24:44

creates the appearance that is unfortunate.  Let's put it     12:24:49

that way.  You can always talk me out of that.               12:25:00

          MR. RYAN:  That was my whole point because if she   12:25:00

does talk to mom and mom says he's the greatest thing since   12:25:03

sliced bread --                                              12:25:10

          THE COURT:  I'm not worried about that.  I'm not    12:25:11

worried about her going home and talking to her family.  She  12:25:14

already knows what happened.  It's her mother and her         12:25:15

stepfather who were in an accident and were represented by    12:25:18

this law firm.  They were either pleased or displeased.  She  12:25:20

doesn't have to talk to her mom.  She already knows the       12:25:25

answer.  It could cut either way.  I don't know which way it  12:25:28

cuts, but either way it's unfortunate.  And then you've got   12:25:32

the appearance of --                                         12:25:37

          MR. RYAN:  We move to strike for cause.  I just     12:25:38

know that if Jaye Mosby represented one of the family members 12:25:41

on there, they'd be getting rid of --                        12:25:46

          THE COURT:  Do you have any objection for cause?    12:25:47

          MR. HANCOCK:  We do.  She said she could be fair.   12:25:49

          THE COURT:  She did.  And you think she could be    12:25:51

fair, but I'm not convinced she could be fair.  And even if   12:25:54

she could be fair, it looks terrible to put somebody on a     12:25:55

jury where a law firm is being sued whose family was          12:25:59

**UNREDACTED TRANSCRIPT**

represented by the law firm.  There's appearance of injustice built into that, and I think it's unavoidable.  But as to whether they were happy or unhappy, Mr. Reaves can tell you whether he thinks they were happy or unhappy, but I don't know if they were happy or unhappy.  I think it cuts either way.

And as far as Mr. Reaves has superior knowledge about whether they were happy or unhappy, that is superior to Mr. Ryan's knowledge or Ms. Mosby's knowledge, that's not fair either.

**MR. HANCOCK:**  For what it's worth, we've not even heard the names of the party, her mother, so we don't know that.  I don't think he's had the opportunity to develop --

**THE COURT:**  It could cut either way.  I didn't want to ask her about that because I thought that was prying under the circumstance, and I didn't want to get into the case or the substance of the case because, of the appearance, she has to go anyway for cause.

Now, then you can pass your peremptories at this juncture unless you have something else you want me to ask them.

**MR. RYAN:**  No, sir.

**MR. HANCOCK:**  I don't think we do.

**THE COURT:**  Nobody has to object to her.  I'm going to excuse her for cause.  She won't know that but --

**UNREDACTED TRANSCRIPT**

**MR. RYAN:**  Thank you.

(End of sidebar.)

**MR. HANCOCK:**  Your Honor, may we approach?

**THE COURT:**  Sure.

(At sidebar on the record.)

**MR. HANCOCK:**  I'd like to make one request.  We asked about the Reaves Law Firm.  Should we ask about Baker, Donelson and Donati too.  Whether any of the jurors have had any experience with either our firms, for the same reason?

**THE COURT:**  Well, I've already asked them about their views of lawyers and their experiences with lawyers.

**MR. RYAN:**  They don't know us.  I'm not going to mention Donati.

**THE COURT:**  I don't see any reason to ask -- as far as I know, they don't know what law firms anybody works for.  I introduced all the lawyers individually.  I doubt I've ever gone into law firms where people work.  Donati Law Firm or Baker Donelson law firm or any such as that.  You can explain to me what's gained by it.

**MR. HANCOCK:**  It's just if we were asking that about the Reaves, it just triggered --

**THE COURT:**  They're defendants.  Unless you want to be a defendant.

**MR. HANCOCK:**  I don't want to be a defendant.

**THE COURT:**  If you want to get sued, I'll ask

**UNREDACTED TRANSCRIPT**

them about the Baker Donelson law firm.                          12:30:01

          **MR. HANCOCK:**  I assure you I do not.              12:30:03

          **THE COURT:**  It's the fact that it's a party that  12:30:04
I asked about it.  And then I've asked a number of questions    12:30:06
about lawyers and their experience with lawyers, negative,      12:30:10
positive.  I think I've basically exhausted that topic unless   12:30:15
you have another question.                                      12:30:20

          **MR. HANCOCK:**  We're comfortable.                 12:30:22

          **THE COURT:**  All right.                           12:30:26

          **MR. HANCOCK:**  Thank you, Your Honor.

          **THE COURT:**  Pass your peremptories.             12:30:27

                    (End of sidebar.)                          12:30:41

          **THE COURT:**  Ms. Ervin, you're excused.  Thank you 12:31:48
for your service.  You may return to the jury room.            12:32:39

          And Ms. Lane, you're excused.  Thank you for your    12:32:42
service.  You may return to the jury room.                     12:32:47

          Mr. Mendez, I need two additional potential           12:32:50
jurors.                                                         12:32:54

          **THE CASE MANAGER:**  David Payne.  Briana Isom.    12:32:54

          **THE COURT:**  Welcome Mr. Payne and Ms. Isom.  Is  12:33:31
there anything you need to volunteer before we proceed with     12:33:46
the voir dire process?                                          12:33:50

          **PROSPECTIVE JURORS:**  No, sir.                    12:33:53

          **THE COURT:**  Anything you want to volunteer,      12:33:54
Ms. Isom?                                                       12:33:56

**UNREDACTED TRANSCRIPT**

PROSPECTIVE JUROR:  No.

THE COURT:  Does either of you know the attorneys in this case, any of the four attorneys that I have mentioned?

PROSPECTIVE JURORS:  No, sir.

THE COURT:  Anybody know the plaintiff, Ms. Mosby?  Anybody know Mr. Henry Reaves who's sitting here?

PROSPECTIVE JURORS:  No.

THE COURT:  Anybody know or have any dealings with the Reaves Law Firm?

PROSPECTIVE JURORS:  No.

THE COURT:  Have you ever done business with the law firm, been represented by the law firm, has the law firm ever sued you?

PROSPECTIVE JURORS:  No, sir.

THE COURT:  Any of you -- does either of you have any difficulty with the fact that an entity like the Reaves Law Firm is entitled to the same consideration, the same fairness as a natural person?  In other words, it's the same for our purposes here today as a natural person or human being.  Any problem with that?

PROSPECTIVE JURORS:  No, sir.

THE COURT:  Do you know any of the other potential jurors?

PROSPECTIVE JURORS:  No, sir.

**UNREDACTED TRANSCRIPT**

THE COURT:  Do you know anything about this case? 12:35:08

PROSPECTIVE JURORS:  No, sir. 12:35:10

THE COURT:  Do you know any of the individuals 12:35:11 whose names I called for potential witnesses in this case? 12:35:12

PROSPECTIVE JURORS:  No, sir. 12:35:17

THE COURT:  Has either of you ever been a 12:35:17 plaintiff or a defendant in a lawsuit?  Have you ever sued 12:35:20 anybody?  Has anybody ever sued you? 12:35:25

PROSPECTIVE JURORS:  No, sir. 12:35:34

THE COURT:  Can you follow the law as I give you 12:35:37 the law whether you agree with the law or not? 12:35:39

PROSPECTIVE JURORS:  Yes, sir. 12:35:42

THE COURT:  Has either of you ever worked in a 12:35:57 human resources or HR department? 12:36:02

PROSPECTIVE JURORS:  No, sir. 12:36:05

THE COURT:  Do you have family members or close 12:36:06 friends who work in such a department? 12:36:08

PROSPECTIVE JURORS:  No, sir. 12:36:10

THE COURT:  Does either of you now or have you in 12:36:11 the past supervised individuals? 12:36:17

PROSPECTIVE JURORS:  No, sir. 12:36:20

THE COURT:  Have you ever believed that you were 12:36:22 invidiously discriminated against or that you were retaliated 12:36:27 against for any protected activity? 12:36:32

PROSPECTIVE JURORS:  No, sir. 12:36:35

**UNREDACTED TRANSCRIPT**

**THE COURT:** Have you had any positive or negative experiences with lawyers or law firms?

**PROSPECTIVE JURORS:** No, sir.

**THE COURT:** Do you have any negative feelings about lawyers or law firms?

**PROSPECTIVE JURORS:** No, sir.

**THE COURT:** Are you aware of the Reaves Law Firm in any way by its reputation?

**PROSPECTIVE JURORS:** No, sir.

**THE COURT:** Has either of you ever worked at Memphis Light, Gas, and Water?

**PROSPECTIVE JURORS:** No, sir.

**THE COURT:** Do you have family members or close friends who work at Memphis Light, Gas, and Water?

**PROSPECTIVE JURORS:** No, sir.

**THE COURT:** Mr. Payne, are you employed?

**PROSPECTIVE JUROR:** Yes, I am.

**THE COURT:** What do you do?

**PROSPECTIVE JUROR:** I work for a pharmaceutical company?

**THE COURT:** A what?

**PROSPECTIVE JUROR:** Pharmaceutical company.

**THE COURT:** Okay. What do you do there?

**PROSPECTIVE JUROR:** I deal with frozen tissue. We ship out frozen tissue to the doctors and hospitals.

**UNREDACTED TRANSCRIPT**

THE COURT:  So how you do deal with it?  You keep it in a refrigerator? 12:37:32 12:37:33

PROSPECTIVE JUROR:  Yes, sir.  And we pack it in dry ice and we ship it out. 12:37:35 12:37:37

THE COURT:  So you're responsible for care of this tissue and being certain it's maintained at a certain temperature and pack it up and send it? 12:37:39 12:37:42 12:37:49

PROSPECTIVE JUROR:  Yes, sir. 12:37:52

THE COURT:  How long have you done that? 12:37:53

PROSPECTIVE JUROR:  Nine years. 12:37:55

THE COURT:  Are you married? 12:37:55

PROSPECTIVE JUROR:  No, sir. 12:37:56

THE COURT:  Have you ever been married?

PROSPECTIVE JUROR:  Yes.

THE COURT:  When you were married, was your spouse employed? 12:37:57 12:37:59

PROSPECTIVE JUROR:  Yes. 12:37:59

THE COURT:  What did she do? 12:38:00

PROSPECTIVE JUROR:  She worked at Saint Francis Hospital.  She was a secretary for the food nutrition. 12:38:02 12:38:07

THE COURT:  Have you served on a jury before? 12:38:10

PROSPECTIVE JUROR:  No, sir. 12:38:12

THE COURT:  Can you be fair? 12:38:13

PROSPECTIVE JUROR:  Yes, sir. 12:38:13

THE COURT:  Ms. Isom, are you employed? 12:38:14

**UNREDACTED TRANSCRIPT**

**PROSPECTIVE JUROR:**  Yes, sir.                            12:38:17

**THE COURT:**  What do you do?                              12:38:18

**PROSPECTIVE JUROR:**  I work at UTHSC downtown at          12:38:19
Chick-fil-A.

**THE COURT:**  There's a restaurant within the             12:38:27
Health Sciences Center.                                      12:38:29

**PROSPECTIVE JUROR:**  Yes, sir.                            12:38:31

**THE COURT:**  And what do you do in the restaurant?        12:38:31

**PROSPECTIVE JUROR:**  I'm a cashier.                       12:38:34

**THE COURT:**  How long have you done that?                 12:38:36

**PROSPECTIVE JUROR:**  Since January, the 21st.             12:38:38

**THE COURT:**  What did you do before that?                 12:38:41

**PROSPECTIVE JUROR:**  Before that I was at -- Lord,        12:38:43
hold on.  Sam's Club.                                        12:38:46

**THE COURT:**  Sam's Club?                                  12:38:49

**PROSPECTIVE JUROR:**  Yes, sir.                            12:38:50

**THE COURT:**  How long were you at Sam's Club?             12:38:51

**PROSPECTIVE JUROR:**  For a year.                          12:38:55

**THE COURT:**  What did you do there?                       12:38:55

**PROSPECTIVE JUROR:**  In the bakery.                       12:38:57

**THE COURT:**  Do you cook?                                 12:38:58

**PROSPECTIVE JUROR:**  Yes, sir.                            12:38:59

**THE COURT:**  What did you bake?  Did you bake             12:38:59
sweets or --                                                 12:39:02

**PROSPECTIVE JUROR:**  Yes, sir.                            12:39:03

**UNREDACTED TRANSCRIPT**

THE COURT: And before you were with Sam's Club, what did you do?

PROSPECTIVE JUROR: Starbucks.

THE COURT: And what did you do at Starbucks?

PROSPECTIVE JUROR: I was a barista.

THE COURT: How long did you do that?

PROSPECTIVE JUROR: For close to a year. Like ten months.

THE COURT: What did you do before Starbucks?

PROSPECTIVE JUROR: I can't remember off the top of my head.

THE COURT: What have you done previous to Starbucks in general?

PROSPECTIVE JUROR: I was at Top Golf a year.

THE COURT: What did you do there?

PROSPECTIVE JUROR: I was a prep cook.

THE COURT: And what other jobs have you held that you can recall?

PROSPECTIVE JUROR: FedEx and Nike.

THE COURT: What did you do at FedEx?

PROSPECTIVE JUROR: I was in the hub.

THE COURT: Dealing with packages, handling packages?

PROSPECTIVE JUROR: Yes, sir.

THE COURT: And what did you do at Nike?

**UNREDACTED TRANSCRIPT**

**PROSPECTIVE JUROR:**  I was a material handler.    12:40:09

**THE COURT:**  Have we covered most of the prior    12:40:11
employment that you can recall?    12:40:14

**PROSPECTIVE JUROR:**  Yes, sir.    12:40:16

**THE COURT:**  Are you married?    12:40:17

**PROSPECTIVE JUROR:**  No, sir.    12:40:18

**THE COURT:**  Have you ever been married?    12:40:19

**PROSPECTIVE JUROR:**  No, sir.    12:40:22

**THE COURT:**  Have you served on a jury before?    12:40:23

**PROSPECTIVE JUROR:**  No, sir.    12:40:30

**THE COURT:**  Can you be fair?    12:40:31

**PROSPECTIVE JUROR:**  Yes, sir.    12:40:33

**THE COURT:**  Counsel.    12:40:34

(At sidebar on the record.)

**THE COURT:**  Questions for the jury?  The panel,    12:40:42
or the individual jurors?    12:40:46

**MR. RYAN:**  All good.    12:40:50

**MR. HANCOCK:**  We don't have any.    12:40:51

**THE COURT:**  Anybody for cause?    12:40:52

**MR. RYAN:**  Nobody for cause.    12:40:55

**THE COURT:**  Anybody for cause?    12:40:57

**MR. HANCOCK:**  No.

**THE COURT:**  Any peremptories you want to pass up?  12:41:00

**MR. RYAN:**  We've got one left.  I think they're    12:41:00
done.  So let me go talk to them.    12:41:03

**UNREDACTED TRANSCRIPT**

THE COURT: See what you've got. Pass your peremptories even if you don't have any.

MR. RYAN: We will.

(End of sidebar.)

THE COURT: Ladies and gentlemen, this case must be decided solely on the evidence introduced during the trial and not on any outside influence. Do any of you know any reason whatsoever why you could not serve as a member of this jury and render a fair and impartial verdict?

PROSPECTIVE JURORS: (No response.)

THE COURT: Mr. Ryan, is this jury acceptable as constituted?

MR. RYAN: It is, Your Honor.

THE COURT: Mr. Hancock, is this jury acceptable as constituted?

MR. HANCOCK: It is, Your Honor.

THE COURT: Ladies and gentlemen, those of you who have waited patiently through this process, thank you for your service. As John Milton used to say: They also serve who only stand and wait. In this case I suppose it's a case of sitting and waiting. But in any event, your availability during this process has been absolutely essential, and I thank you for it. You should now return to the jury room and meet with the jury commissioner. If there's nothing further for you today, he will excuse you. Thank you again.

**UNREDACTED TRANSCRIPT**

**PROSPECTIVE JUROR:** Thank you for your service, Your Honor.

**THE COURT:** Thank you.

**PROSPECTIVE JUROR:** Forty-something years, that's great.

**THE COURT:** Thank you. Actually as a judge, it's only 23 years. I don't like to think of the other part.

(Released jurors exited the courtroom.)

**THE COURT:** Mr. Mendez, you may administer the oath.

**THE CASE MANAGER:** Would the jurors please stand and raise your right hand.

(The Jury was sworn.)

**THE COURT:** Ladies and gentlemen, we're going to take an hour for lunch. And that means you're going to have the opportunity to explore the many locations available in downtown Memphis, which there aren't many, at least in this part. They're all over downtown Memphis, but when you get up here it's like Siberia. So you won't find many spots to dine, but we'll take an hour so you can and also so you can just get a little rest if you want to.

Tomorrow I assume we'll still be going, and you will have the opportunity to order lunch. So lunch will come to you tomorrow. Are we still doing breakfast? No breakfast?

**UNREDACTED TRANSCRIPT**

**THE CASE MANAGER:**  No, Your Honor.

**THE COURT:**  You better get your breakfast at home.  You only get a free lunch out of this one.  So we'll have lunch available, but it's not available today.

Now, while you're out, do not -- well, first, don't talk about the case to anyone, and don't talk about the case among yourselves.  I will tell you later why that is so.  But don't even speak about this case among yourselves, and don't speak to anyone else about this case.  And certainly don't speak at all to the lawyers or the parties who are here before you in the courtroom.  Don't even say good morning.

When you come back -- you're going to go out through the jury room, and the court security officer is going to show you where the jury room is.  That's your home away from home.  When you leave the courtroom, you will always go out through the jury room.  You will not be using the door at the far end of the courtroom anymore.  When you come back from lunch or from overnight or from a break, come back to the jury room and remain there.  Don't come back to the courtroom.  Come back to the jury room, remain in the jury room, and we'll send for you when we're ready for you.

Sometimes we have things we need to take up outside your presence, so naturally there are things you don't need to hear.  They're usually legal matters, and they're simply matters that don't concern you.

**UNREDACTED TRANSCRIPT**

When you come back I will give you some preliminary instructions about how the case proceeds and how you conduct yourselves as members of the jury. Then you'll hear opening statements from the parties and then you'll hear the proof in the case. And after all the proof is in you'll hear closing arguments, and I'll instruct you on the law.

We're going to move as efficiently as we can, but we're not going to hurry justice. So bring your patience. My dad used to say World War II was all about hurry up and wait. And that's kind of how jury service is too.

Any questions about the procedures so far? All right. Enjoy your lunch, and I will see you back here in one hour.

(Jurors exited the courtroom.)

**THE COURT:** Mr. Ryan, anything we need to take up outside the presence of the jury?

**MR. RYAN:** No, sir.

**THE COURT:** Mr. Hancock?

**MR. HANCOCK:** There's not.

**THE COURT:** See you back here in an hour. I'll assume you're ready to roll. We stand in recess.

(Recess taken at 12:49 p.m. until 1:59 p.m.)

**THE COURT:** I think we've got our last couple of jurors on the way, so I hear. A couple of things while we're waiting. One is, just glancing over the material the parties

**UNREDACTED TRANSCRIPT**

have submitted for purposes of jury instructions and verdict form and so forth, the parties seem to disagree about the standard.  In other words, in looking it over, I guess the question is does the protected activity have to be the main reason or a substantial factor in a termination decision. Those things seem to differ.

I might be wrong in my reading of it.  But if you do have differing views of the standard, I would probably like to see whatever case law you've got that supports your reading.  I don't know what's out there.

MR. HANCOCK:  I think, Your Honor, we're coming from U.S. Supreme Court case law.  I believe the difference is the standard -- the plaintiffs are suggesting -- correct me -- is the common law standard.  So we suggest the federal 507 standard from our instruction that came from the Supreme Court.

THE COURT:  All I want, send me your cases.

MR. RYAN:  We will, Your Honor.

THE COURT:  Send me your cases.  The other thing I looked in there -- and you can educate me -- but it appeared to be that the burden shifting framework was bleeding over into the trial.  I've always treated McDonnell Douglas as a summary judgment standard.  I don't think I've ever submitted a burden shift to the jury.

MR. RYAN:  We're fine either way.  My preference

**UNREDACTED TRANSCRIPT**

is that it not be that way, but we are okay with --    14:02:05

**THE COURT:**  The way I've always handled it -- I    14:02:05
shouldn't always because I'm sure there's something else.  My    14:02:09
sense of it has always been that the plaintiff had the burden    14:02:14
of establishing the case.  And then the defendant can submit    14:02:19
whatever defenses it has.  In other words, the plaintiff has    14:02:25
to establish particularly, for example in this case, whether    14:02:29
there was protected activity.  Defendant says there wasn't.    14:02:32
And the FMLA issue was it outside -- I'll put it another way.    14:02:37
It wasn't adverse to the defendant at all.    14:02:45

It was in fact -- based on the plaintiff's    14:02:50
testimony, whatever you want to pull up, it was in fact she    14:02:53
was doing her job, and so there was no protected activity.    14:02:58
She was trying to protect the defendant.  She wasn't engaged    14:03:03
in assisting others.  And the jury will make of that whatever    14:03:07
it makes of it.  But it would be part of the plaintiff's    14:03:11
burden to establish the protected activity, and then the    14:03:15
defendant could attack that.    14:03:20

But as far as a burden shift, if you think it    14:03:21
goes to the jury, then I would need something that tells me    14:03:25
that.  Mr. Ryan says he doesn't care.    14:03:29

**MR. RYAN:**  I think at the end of the day we all    14:03:33
know that it's our burden at the end of the day.  And I do    14:03:37
agree with you --    14:03:53

**THE COURT:**  It's your burden even on the burden    14:03:53

**UNREDACTED TRANSCRIPT**

shift.  But anyway, go ahead.

**MR. RYAN:**  That's true.  Very comfortable either way.  Our preference would be your way.  Glad to hear you say that because I know Sixth Circuit has -- and I don't have the case right off the top of my head -- but has spoken to what you've just talked about, the problems with instructing the jury on McDonnell Douglas burden shifting.

**THE COURT:**  I've always thought it was disfavored.  But again, no matter how old I get I learn new things.  So if I need to learn something new about this, you can teach me.

**MR. HANCOCK:**  Your Honor, you're right.  We do still have the ability to take the position that we will that the plaintiff has engaged in protected activity, that there's no causal connection between that and the adverse action, and the adverse action isn't an adverse action.  Those are defenses.  But in the plaintiff is able to establish those for the purpose of argument, we can't still establish a legitimate nondiscriminatory reason for her termination.  And that is under the burden shifting where the defense opportunity comes to us.

**THE COURT:**  You have the opportunity to attack the plaintiff's case.  In other words, you have the opportunity to show that one or more elements were not satisfied.  And it may be that in the course of that you

**UNREDACTED TRANSCRIPT**

present certain nondiscriminatory reasons for termination. But it's still not technically a burden shift in the sense of I establish a prima facie case and you give your legitimate nondiscriminatory reasons, the burden shifts back to me, and I show that your reasons are pretextual.  That's not, I think, the function of the jury.

MR. HANCOCK:  Under the burden, Your Honor, we agree.  The ultimate burden stays with the plaintiff the whole time.

THE COURT:  Well, the ultimate burden -- the ultimate burden is with the plaintiff under McDonnell Douglas.  It never changes.  It's just you have a procedural burden, but that's not something for the jury.  And the question is, do you think that's wrong?  Do you have authority that says the jury ought to be doing a burden shift under McDonnell Douglas?

MR. HANCOCK:  No, Your Honor.  I think we're okay if we can't -- we would suggest that the business judgment rule needs to stay in.

THE COURT:  The business judgment rule, I'll charge the business judgment rule.

MR. HANCOCK:  I think that takes its place.

THE COURT:  Anytime the defendant wants the business judgment rule in there, as long as there's some basis for it.  And in this case there are various arguments

**UNREDACTED TRANSCRIPT**

in favor of it, including she was supposedly insubordinate and on and on and on. And it's not the jury's decision to concern itself with independent legitimate business judgment. It's the jury's decision to determine whether there's been illegal activity.

So if you've got that in, that will go in. But not the burden shift. Okay, everybody's in agreement on that. Let's go back to the main reason or substantial factor. Give me your cases on that.

**MR. RYAN:** We will. Not to get too much into the weeds right now, but the Supreme Court's case in *Gross versus*, I think, *CBL*, under the ADEA, basically said that it has to be the but-for cause, in contrast to that standard with the Title VII standard that we're suing under right here.

So I've heard it phrased a substantial factor. I've heard it phrased a motivating factor. It's less than what I would be comfortable calling the main reason.

**THE COURT:** Just send me the cases.

**MR. RYAN:** We will.

**THE COURT:** That's all.

**MR. HANCOCK:** I have them right now. Do you want me to --

**THE COURT:** No. I want you to send them to me so I can take a look at them when I'm trying to figure out how

**UNREDACTED TRANSCRIPT**

to instruct the jury. And I want to be sure I've got the standard right, which is fairly basic I should think. It should be straightforward. In any event, send those in.

What else do we need to take up outside the presence of the jury, Mr. Ryan?

**MR. RYAN:** Nothing, Your Honor.

**THE COURT:** Mr. Hancock?

**MR. HANCOCK:** I don't think we have anything either, Your Honor.

**THE COURT:** You're both ready to go forward with your opening statements when I finish talking, which will be never?

**MR. RYAN:** Yes, Your Honor.

**MR. HANCOCK:** We are.

**THE COURT:** Are all of them here?

**THE COURT SECURITY OFFICER:** Yes.

**THE COURT:** Bring them in. On the off chance you agree on the standard, please feel free to inform me of that.

**MR. RYAN:** We'll look.

(Jurors entered courtroom.)

**THE COURT:** Welcome back, ladies and gentlemen. I won't ask you if you enjoyed lunch. I just hope you found something to eat. There's a standard that I hope we can meet.

Before we begin the trial of this case, I'm

**UNREDACTED TRANSCRIPT**

going to review with you some of the procedure in the case so you know what to expect.  And then I'm going to go over with you some of the rules that will govern your conduct while you sit as members of the jury in this case.

This is a civil case.  And the settlement of disputes among people by litigation is a strong and necessary foundation of our civilization.  It's basic to the administration of justice that the determination of the law and the facts be made fairly and honestly.  So you as jurors and I as a judge have a heavy burden.  We have the responsibility to assure that a just result is reached in deciding the differences between these parties.

In the old days they had all sorts of bizarre methods of determining facts of who was telling the truth and who wasn't.  They had pockets with rocks, and if you sank into the lake, you were clearly not telling the truth.  There were many tests of fire.  I won't go through all the medieval methods.  Now we're a little more civilized, we think.  So this is the way we do it.

The first step in this trial is going to be the opening statements.  In the opening statements the parties will tell you about what they expect the proof to show.  In other words, the opening statements are a kind of roadmap to help you as you kind of navigate the case.  The opening statements aren't proof.  The proof will all come from the

**UNREDACTED TRANSCRIPT**

witness stand or through documents.  The opening statements will be the lawyers' view of the case.  Now, the plaintiff who is seeking damages in the case makes the statement first, and then the counsel for the defendant makes a follow-up statement or the second statement.

After the opening statements you're going to hear proof, and it will be through the introduction of evidence.  Ordinarily, the plaintiff will present her case in full before you hear the case of the defendant.  Never in any civil or criminal case is the defendant actually obligated to present proof, but usually the defendant does.  And then there's a chance for the plaintiff to rebut.  If the defendant has presented proof, the plaintiff can put on rebuttal proof.

What you'll see is in this case, I think, a number of witnesses.  Each party will call witnesses most likely.  A witness will come into open court.  In this case Mr. Ross Herrin, who has for the afternoon replaced Mr. Mendez, will swear the witness.  The witness will take an oath to tell the truth.  The witness will take the witness stand there to your right, and you will have the opportunity to hear the witness.

You'll have the opportunity to hear the words the witness says.  You'll have the opportunity to hear the witness's tone of voice.  You'll have the opportunity to observe the witness's demeanor.  What we call demeanor; some

**UNREDACTED TRANSCRIPT**

people would call it body language.  And you'll have all those tools at your disposal.

What will happen is the party who calls the witness will examine the witness.  In other words, the party will ask questions of the witness.  And then after that party has finished, the other party will have the opportunity to cross-examine the witness.  In other words, the other party will ask questions of the witness.  Usually there's an opportunity for initial examination again by the party calling the witness and an opportunity for a recross.

So if you, for example, take the plaintiff's case, you'll have plaintiff questions, defendant questions, plaintiff questions, defendant questions.  And that will be it, and that will be the proof of that witness.

I will ask you, as the case proceeds and as counsel for the parties ask questions, to remember the question themselves are not evidence.  In other words, sometimes a question is highly suggestive or something of that point.  The evidence comes from the witness stand.  You consider the question only insofar as it supplies meaning to the answer.

If I asked you do you live on Edgewood Cove and you say yes, you've adopted my question into your answer, and so the question becomes part of your answer.  And that makes sense if you think about it because the person on the witness stand is the one who supposedly has the knowledge, as to

**UNREDACTED TRANSCRIPT**

testimonial knowledge.  The lawyer, you presume, doesn't have that.  Now, that's one part of the evidence.  There are other parts of evidence that you can consider.

You will probably receive some documents that the Court will receive through Mr. Herrin or Mr. Mendez, whoever happens to be here that day.  We'll receive documents.  They'll be moved into evidence.  The Court will admit them or not.  If the Court admits the documents, then you can consider them.  And you'll know they're admitted because they'll be numbered.  If the documents are excluded, don't consider them.

The same with testimony.  Sometimes there will be objections to testimony.  If the objection is sustained, don't consider that testimony even if you've heard it.  If it's overruled you can consider the testimony as it comes in.

There's also opportunities for -- there are opportunities for judicial knowledge.  I hope in this case, Ms. Clayton, you weren't teaching English.  My subject and verbs don't seem to be agreeing today.

There are opportunities for the Court to take judicial notice of things that are considered to be obvious that can be considered by you as evidence.  And then there are stipulations or agreements.  Sometimes the parties agree that there are certain facts that you can consider, and you can consider those.  Those are the categories in general of

**UNREDACTED TRANSCRIPT**

evidence that you'll be called to consider.

Then after we've worked through all the proof in the case, the plaintiff, defendant, and any rebuttal proof, the attorneys will have the opportunity to come before you again and address you in what's called closing arguments. And like the opening statements, what's said in closing arguments is not evidence in the case. Those arguments are designed to present to you the contentions of the parties. In other words, the parties are going to tell you in closing argument what the evidence has shown, what they believe the evidence has shown, and what conclusions you as individual members of the jury can draw from the evidence.

The plaintiff will have the burden of proof by a preponderance of the evidence. So the closing arguments will go plaintiff, defendant, plaintiff. Plaintiff speaks last because the plaintiff has the burden of proof. After the closing arguments I'll instruct you on the law, and you'll retire to consider your verdict. That's the procedural in the trial.

Now, you and I have different jobs. My job is to decide the rules of law. Your job is to determine what the facts are. You're the sole determiners of the facts. I'll try during the course of this trial not to express any opinion about any of the facts in the case. I don't have a dog in this hunt or I wouldn't be here doing my job. This is

**UNREDACTED TRANSCRIPT**

not something that I have an interest in. I mean financial or anything of that sort. But you should also remember that any opinions I have about the facts of the case are irrelevant. It doesn't matter what I think about the facts. That's why you're here.

You decide the facts of the case. You're the sole judges of the facts of this case, and you have to decide the case based only on the evidence in the case. And that's the basis for your factual findings. On the other hand, you have to follow the law as I give you the law whether you agree with the law or not. Even if you think the law is foolish, it's your job to follow it.

Now, as this case goes on the parties may make some objections. Sometimes they object to testimony. Sometimes they object to facts. And I'll rule on those objections. Sometimes I'll do it where you can hear me and you'll hear what I say. But remember my rulings are based solely on the law as I understand it. You shouldn't draw any conclusion from any ruling I make about the facts of the case.

Sometimes we'll go over here, as we were earlier, to what I call the sidebar, and we'll discuss matters on the record, but outside your presence. And we're not trying to waste your time. We're just trying to make the case move on and deal with the various factual and legal issues that may

**UNREDACTED TRANSCRIPT**

come before us.  It should be short while we're at the    14:20:29

sidebar, but if it's going to take a long time, I'll excuse    14:20:33

you and let you go to the jury room while we talk about what    14:20:40

probably will be legal issues rather than just have you sit    14:20:44

there while we go on and on.  I don't always understand when    14:20:46

we start how long we may take.  So we may be going on and    14:20:52

then I'll excuse you.    14:20:57

Just remember, if testimony is excluded, don't    14:20:58

consider it.  If documents are excluded, don't consider those    14:21:03

even if you may have seen them by error for some reason.    14:21:08

Just remember that evidence will have no value to you in your    14:21:12

deliberations.  You shouldn't consider it at all.    14:21:17

Now, what about your conduct as members of the    14:21:20

jury.  I've said before and I will say repeatedly:  Don't    14:21:22

talk about this case among yourselves or with anyone else    14:21:27

during the course of the trial.  If someone tries to talk to    14:21:31

you about the case, tell that person not to.  If that person    14:21:35

persists in trying to talk to you about the case, don't    14:21:39

discuss that with the other jurors.  Come and see me.  In    14:21:42

other words, let me know immediately that that has happened    14:21:47

because it could be an attempt to influence your verdict and    14:21:50

I want the verdict to be your verdict and not someone else's    14:21:54

verdict.    14:21:59

As far as discussing it among yourselves, it's    14:22:00

very important that you keep open minds throughout the trial    14:22:04

**UNREDACTED TRANSCRIPT**

of the case, throughout the testimony in the case, throughout closing arguments, throughout my instructions. And you make up your mind when all eight of you are deliberating in the jury room. And even then, listen to your fellow jurors. You're all equal. Nobody's opinion is of any more value than anybody else's opinion. But I don't want you to -- you may think now I have an answer to this. Well, you don't. You don't have an answer. Keep your mind open until the case is fully tried.

Now, while you're sitting as a juror in this case, don't talk to any of these parties about anything. When I grew up they told me to be nice. I don't think it took. But in any event, you always want to be nice and polite and speak to people. Don't speak to any of the parties. Don't speak to the lawyers. Don't speak to witnesses in the case even to say good morning, the weather is nice. Do not speak to them.

And the reason is if one lawyer sees you talking to the other lawyer, the lawyer who sees you does not know you're saying isn't it a beautiful sunny day; I wish I were outside instead of here. The lawyer may think you're saying good job. When this is over we not only want justice to be done, we want justice to be seen to be done. That is our goal as well as doing justice. And justice will not be seen to be done if you appear to be talking with another lawyer.

**UNREDACTED TRANSCRIPT**

Don't talk about anything in this case.  That's to ensure both parties that they have a fair and impartial jury.

Everything that you decide in this case must be decided based on what you hear in the four corners of this courtroom.  If you have any prior knowledge of the case -- I don't think you do, but something might trigger a memory, if you read something about the case, put it out of your mind. If there's something in a newspaper or on television or somewhere else, ignore it.  You will know more about this case than anybody else when this trial is over.  So don't be influenced by that.  Don't be influenced by any prior opinion you may have.

What the Sixth Amendment to our Constitution guarantees is a trial by an impartial jury.  That means you decide solely based on the evidence in the case.  So don't do any independent research.  When I was in school you got extra points.  Here you get demerits.  Don't go look up something, try to find a definition of something, try to find out what the legal issues are.  Don't look up anything about the individuals or entities out here.  Don't try to get independent information about the plaintiff or the defendant.

Don't get out a dictionary or a reference book. Don't get on an Internet search.  I suppose you could look up the judge, but I don't recommend that.  Anyway, the bottom line is your verdict is going to be based only on what's here

**UNREDACTED TRANSCRIPT**

before you.

Now, don't communicate about this case with anyone.  And that doesn't only include face-to-face communications.  When you go home tonight and your spouse or significant other, your parents, or child wants to know what you're doing, you can tell them I'm working on a case, but you can't talk to them about the case.  Even in that situation.  Don't tell your best friend about the case.

When I was growing up -- now everybody is -- you see people walking around and they've got -- educate me -- ear buds; is that what they're called?

**JUROR:**  Airpods.

**THE COURT:**  Air what?

**JUROR:**  Airpods.  Thank you, Ms. Brown.  Airpods.  They're listening to music or somebody's communicating with them.  It used to be you'd see people leaving the office or leaving the parking garage with their phones.  Everybody communicates with these phones either in messages or talking.  Don't use any of that to communicate.  Smartphones, tablets, computers, they're out for communication purposes.  So no e-mails, no text messaging, no blogs, no social media, websites, no Twitter or Facebook, Instagram, LinkedIn, YouTube, WhatsApp, and Snapchat.  And anything else they've invented since I've learned about all that.

Don't use those methods to communicate.  And you

**UNREDACTED TRANSCRIPT**

say to me, Judge, I would never do that. I wouldn't do that. People do it all the time. And when it happens and it comes out, as these things often do, this case is over.

These parties have waited a long time for justice. They've spent money preparing. They've spent time preparing. And for the case to be lost because somebody was communicating improperly would be a sad thing because we'd have to start all over again. I think that horse is dead. I think you-all understand me and understand how important it is not to communicate about the case even though we live in a world of instantaneous communication.

I want you to be comfortable while you sit as members of the jury. I have absolutely no control over the air in this courtroom, but if you're too hot or cold, feel free to speak up about it, and we'll do our best to fix it. I want you to be comfortable. More important to me, if you're having trouble hearing or seeing, speak up immediately. If I'm muttering or you can't hear the witness, speak up. Or if there's a document on the screen, say it's blurry, I can't read it. I said earlier, your verdict will be no better than what you see and what you hear and what you remember. So if you're not hearing, please say so.

You can take notes during the trial if you wish. For some people, taking notes is very helpful. I like to take notes because it keeps me focused. For some people,

**UNREDACTED TRANSCRIPT**

taking notes is a disaster because you're always worried about your notes and you're running behind. Whatever you want. Do it your way. But remember if you take notes, they're for your use only. They're not to be shown to anyone else, and you can't get into the jury room and say my notes are better than your notes. Also, your notes refresh your own memory. If your memory is different from what you wrote down, your memory is what controls, not your notes.

What about our schedule? We usually start about 9:30 in the morning, and we'll usually take a break somewhere in the morning. And then we'll go to 5 or 5:30 in the afternoon. We usually take an hour, hour and a half for lunch. You'll get lunch here and when your lunch is delivered -- during this case we may take less time for lunch, maybe more like an hour, to keep the case moving. And then we take an afternoon break.

If you're uncomfortable, say so. Sometimes you need a break when we don't have a break scheduled. Say so and we'll have a break. If you want to pause a minute and just stand up and stretch, if you've got a back like mine and want to stand up and ease your back or whatever, say so, and we'll all take a group stretch in the course of the trial.

My goal is not to make you uncomfortable; although, you may not believe it. My goal is for you to be comfortable for a very selfish reason. If you're

**UNREDACTED TRANSCRIPT**

uncomfortable you may not be paying attention, and you may not be getting the information I want you to get so you can make a good decision.

We'll vary the schedule somewhat based on things I have back in chambers to work on.  If you need a variance because of your own situation, let me know.  We'll try to accommodate you, but we may not be able to.  Like several of those ladies, I couldn't have them on the jury because I simply can't accommodate them sufficiently with their childcare issues to keep a trial going.  But again, if you have a personal situation that needs attention, let me know, and I'll do what I can.  I make no promises.

Wear you badges.  That's how people know not to speak to you.  You don't have to wear your badge outside the courtroom -- well, outside the federal building.  You need to wear it in the federal building.  If you're really proud of serving on the jury, you can wear it home tonight.  But you don't need to wear your badge outside the federal building.

You'll always enter and leave the courtroom through that door over there.  That's how you'll get to and from the courtroom.  In the jury room when we break for lunch and so forth, you'll go out through that door.  When you come back do not come back to the courtroom.  Stay in the jury room until all of you are there, and then we'll send for you when we're ready.  Keep the same seat.  That's how I keep up

**UNREDACTED TRANSCRIPT**

with you.

Questions about the process or your role in the process?  Do you have any questions, something I have said that's unclear or something that I haven't said that you want to know?  You'll get lunch tomorrow.  I think they bring you the menu in the morning, and you choose your lunch for tomorrow.  Always a critical issue.

What have I left out, Mr. Ryan?

MR. RYAN:  Your Honor, may we approach just for one second?

THE COURT:  Sure.  Come on up.

(At sidebar on the record.)

MR. RYAN:  A lot of times it will pop up they'll want to ask a question or they'll want to know whether they can ask questions during the course of the case.  I don't know if you feel like you --

THE COURT:  I've never had that happen.  Well, no, I've had it happen a couple of times.

MR. RYAN:  So in Tennessee state court, jurors are instructed that they can ask questions.  It's an actual rule of civil procedure under Tennessee rules.  But not in federal court.

THE COURT:  We can permit it.  I have actually done it once or twice.  It just doesn't work.  What I do is I say write down your question and submit it to me.  And then I

**UNREDACTED TRANSCRIPT**

can either ask the question -- I usually -- it's been years since I did that. It's extremely dangerous because the parties aren't asking the question, and it's coming from a juror. And the other side of it is -- it's just like the Court in a jury trial asking questions. There's more potential for disaster. Now, in a bench trial I don't have any trouble with --

**MR. RYAN:** I don't disagree.

**THE COURT:** I've never had them -- we've got one -- well, we've got nobody on the jury who's ever served on a jury before, so I don't think they're worried about questions. But if you think I ought to -- what do you say?

**MR. HANCOCK:** How about we take it up if that happens, let's address it then. I don't expect it, but if it does --

**THE COURT:** Maybe I ought to address it now. I don't want it to happen. I've never -- I don't ever remember saying -- but I know it must have because I remember a case or two where I asked two more questions.

**MR. HANCOCK:** We had a pilot program for a while. We had a pilot program in the western district where the jurors were allowed to for just a minute.

**MR. RYAN:** The only reason why I raise it is because I've seen it happen more than once.

**THE COURT:** In federal court?

**UNREDACTED TRANSCRIPT**

**MR. RYAN:** I haven't seen it happen in federal 14:36:11
court. In state court I have. 14:36:13

**THE COURT:** How fortunate they are. What else do 14:36:15
I need to say about anything I've said? I'm not going to say 14:36:20
anything about that because I don't see the need for it. 14:36:26
What else? 14:36:31

**MR. RYAN:** Nothing else, sir. 14:36:32

**THE COURT:** What else do I need to -- 14:36:34

**MR. HANCOCK:** I'm ready for proof. They're 14:36:34
charged. 14:36:43

(End of sidebar.) 14:36:43

**THE COURT:** Ladies and gentlemen, we are ready to 14:36:43
proceed with the trial of this case. The first business will 14:36:46
be the opening statements of the parties. We will first hear 14:36:49
the opening statement on behalf of the plaintiff, Ms. Andrea 14:36:52
Jaye Mosby, by Mr. Billy Ryan. 14:36:58

Mr. Ryan. 14:37:01

**MR. RYAN:** Thank you, Judge. Ladies and 14:37:02
gentlemen, I go by Billy. And this is Janelle Osowski. 14:37:06
She's been my partner for the last 13 years. I'll be 14:37:12
handling the witnesses, but she is my right hand, and she 14:37:16
reads my mind. I read hers. You'll see us work together 14:37:21
through the course of the trial. And she's an invaluable 14:37:26
part of Jaye's team. 14:37:30

Jaye is our client. She's our client because she 14:37:33

**UNREDACTED TRANSCRIPT**

got fired by Mr. Reaves and Mr. Reaves' wife on June 2nd of 2022.  So take yourself back about three years.  In April of 2022, Jaye was working for MLG&W.  That's the reason why the judge has been asking you if you knew anything about it.  Jaye had been working for MLG&W for about 18, 19 years.  Before that, she had been working for the City of Memphis for a number of years.

Jaye's an attorney herself.  She's been licensed to practice since 1998.  Her two jobs effectively -- she had one job right out of law school briefly.  But basically her two jobs since around 2000 with the City and MLG&W have been in human resources and labor relations and doing inhouse attorney work.  You'll hear her testify inhouse attorney just refers to you're working for your client.  You are employed by your client whether it's a private sector company or if it's a governmental entity.

She's been an inhouse attorney and an HR professional for the last 25 years.  And that's what she was doing in April of 2022 when she was recruited by Mr. Reaves to come work for him as basically his -- this is the first time in his growing personal injury law firm, first time that he was going to have a dedicated -- like really dedicated senior HR professional.  He was going to call this person the chief people officer.  You'll hear that term nowadays.  But basically, director of human resources.

**UNREDACTED TRANSCRIPT**

And Jaye will tell you about their conversations, how she even heard about the job.  Turns out it was through another attorney that she had worked with that she had assigned work to for years who was good friends with Mr. Reaves, Henry.  And she sent Mr. Reaves her resume.  They had meetings.  They had back-and-forth negotiations over money.  And low and behold, he makes an offer to her and hires her in at 185 a year.

Now, she's making about 175ish with MLG&W, so it's a little bit of a raise.  Really she wants out at MLG&W because she's just tired of working there.  She's got a very secure job.  With a government job comes a lot of security.  And with a government job comes benefits and retirement.  But she made the leap to leave the government sector for a reason she'll explain.  Principally, that she was not fulfilled and wanted to move on.  And she takes this job at Reaves Law Firm, and then she starts in May of 2022.

Again, we're here because of what happened on June 2nd of 2022.  So we've got a very condensed time frame you're going to hear.  We don't have a lot of witnesses.  It will probably be just Jaye, Mr. Reaves and his wife, Neva.  Maybe a few others, but it may just be those three.  But we're talking about her being employed by Reaves Law Firm less than 30 days.

So she leaves a very secure position, a job that

**UNREDACTED TRANSCRIPT**

she can do on autopilot at LG&W, for Reaves.  But then she's put on the street.  She'll testify she's fired unceremoniously on June 2nd -- Thursday, June 2nd of 2022.

Now, we filed this lawsuit saying she was fired because she engaged in protected activity.  You'll hear Tennessee is an employment-at-will state, which typically means a company can let you go for good reason, bad reason, or no reason at all.  But there are federal and state laws that say you can't fire somebody for certain reasons.  And one of which is you can't fire a person -- and Mr. Reaves will acknowledge this because he's an attorney himself.  He's an officer of the court.  He'll acknowledge it's illegal to fire somebody because they engaged in protective activity.

What was Jaye's protected activity?  Two things. She spoke up about equal pay for equal work.  They were hiring in.  There was a lot of transition, and they were hiring a lot of people.  They were hiring in a male attorney, she learned, at 20K more -- 20 grand more than a young lady who was already an attorney who had been working there for three years.

She'll explain that under federal law there's something called the Equal Pay Act, equal pay for equal work. If you're doing the same or similar job, same experience, same duties, equal pay for equal work.  Now, she spoke up about this to Mr. Reaves.  This is a potential issue if

**UNREDACTED TRANSCRIPT**

you're going to be hiring in this gentleman at 20K more.  His reaction was very negative.  His reaction was you're being disloyal.

I'm not making this up.  You'll get to hear him acknowledge that he accused Jaye of being disloyal.  What was she disloyal about?  She was disloyal because he thought she was advocating for the employee instead of defending the company.

Now, Jaye will explain to you from her experience there's two types of HR professionals.  There's one HR professional that will stick up for the company and fall on the company's sword.  And they are the company in their own minds, and they will protect the company at all costs.

And then there's other HR professionals that are more well rounded that take into account the exposure or the liability or the compliance that the company has to be concerned with but who also cares about making sure that the rights of the employee are protected so that the employee is not getting screwed and getting violated.  Because a lot of times the employees don't even know, but HR knows.

And so Jaye spoke up.  She was accused of being disloyal.  That's what you'll hear.  She'll testify to that.  Mr. Reaves will testify to that.

She also spoke up about the fact that Mr. Reaves' personal assistant, a lady named PaQuita Raymond, was not

**UNREDACTED TRANSCRIPT**

getting paid overtime when she went over 40 hours of work in a workweek.  Why is that important?  Because that's Reaves -- in Jaye's mind, that's Reaves getting one over on an employee.  Literally taking money out of an employee's pocket when they are entitled to it.  He was paying her on a salary basis.  Not paying her overtime when she worked over 40 hours -- more than 40 hours in a workweek.

Again, his response was:  Whose side are you on?  Whose team are you on?  That's what Jaye will say.  I'm paraphrasing, but that's the gist of it.

Now, Jaye, at the end of May, loses her grandmother on May 20, 2022.  This is the beginning of very important dates for everybody to remember.  On May 20th of 2022, Jaye loses her grandmother.  And her grandmother is super, super close to her.  Didn't raise her, but in many respects was her second mom.  More so than just a grandmother.

On Friday, May 27th, Jaye is off work that day literally for her grandmother's services.  Her grandmother was buried that day, and they had the funeral services.  On Saturday, May 28th, you'll see an e-mail that Mr. Reaves sent to Jaye basically saying, Jaye, you are no longer chief people officer.  This is on the heels of him calling her disloyal for speaking out about the overtime issue and equal pay for equal work.

**UNREDACTED TRANSCRIPT**

You're no longer chief people officer, Jaye, and you're going to have to spend the next few weeks going through each department in our company, in our law firm, familiarizing yourself with what we do, and then you can go back to being chief people officer.  Jaye effectively took that as his effort to humiliate her and basically strip her of her title.  He didn't affect her pay.  He didn't touch her 185 in pay, but he did put her -- take all those duties away from her.

This is Saturday, May 28th, when she's not at work.  He sends out this e-mail.  And then effective that very next week she is supposed to start in the intake department where the calls come in.  If you get hurt in a car wreck and you call in to Reaves, the intake department handles your call.  And she's supposed to shadow and be a part of that.

Well, on Sunday, May 29th, again everybody is off work.  On Monday, the 30th of May, we have a national holiday, Memorial Day.  The office is closed.  The next three days are this whole case.  You will hear these next three days are the whole case.  Why is that?  Because Neva Reaves, Mr. Reaves' wife, sends out an e-mail on Thursday in the evening, June 2nd, terminating Jaye Mosby, terminating her employment.

Now, at the time in the e-mail she says that Jaye

**UNREDACTED TRANSCRIPT**

was terminated because Jaye failed to produce a transition document.  Again, she got her duties stripped as chief people officer, and Mr. Reaves had asked her to produce for him and create a transition document so that he could know what she had been doing the last few weeks, other than speaking out on behalf of the two ladies that were potentially having their rights violated under federal law.  Well, Jaye was terminated on Thursday, June 2nd, via e-mail at about 6:30 p.m.

Now, in a case like this you get to participate in discovery, and you get to take depositions.  And that's testimony that you take out of court.  But it's under oath.  So in this case they got to take Jaye's deposition at their office, and I got to take Mr. Reaves' deposition and Neva Reaves' deposition.  And I got to get a sneak preview of what they're going to say here at trial unless they change their stories.

What you will hear Neva Reaves testify to -- unless she changes her testimony -- is that wasn't the failure of Jaye to produce a transition document that got her fired.  The only reason that she got fired is that she didn't report to intake on Tuesday, May 31st; Wednesday, June 1st; and Thursday, June 2nd.  Neva Reaves will testify to that.  And if she doesn't testify to that, guess what?  I've got her prior testimony, and you're going to get to see what she said previously under oath.

**UNREDACTED TRANSCRIPT**

But either which way, those three days are everything. Because if you find that Jaye actually reported to work those days and that they are lying about the real reason that motivated them to let go -- to terminate a $185,000 a year employee literally less than a month into her employment, if you find that they are being deceitful and being dishonest and not true and that really it's a cover-up for illegal retaliation -- because he knows he can't retaliate. He's an attorney. He's an officer of the court. So he's not going to say I'm retaliating. He's going to have to come up with something. But if the something that he comes up with, if you find that it's false and wasn't true, then you're permitted, as Your Honor will instruct on the back end of the case, to find illegal retaliation.

After Jaye gets terminated, it takes her until September of 2023 to find a job. Now, some people go home and sulk. Jaye will tell you exactly what she did as far as looking for work, and you will see a stack of applications and documentation. Not my word for it. Don't take me. You remember the judge said don't listen to what the attorneys say; listen to the evidence.

You'll see the evidence in the form of documented job search efforts. Maybe as much as a hundred. I haven't personally counted them all. And I'm talking IP, FedEx. You name it. Everybody around here in addition to where she

**UNREDACTED TRANSCRIPT**

finally got a job in Atlanta with Scripps Howard and their immediate company. And she got hired in at 175 as an inhouse attorney still doing human resource functions for this company.

Now, you will hear testimony as to what her economic damages are, her losses. We're going to put on proof that she suffered $258,000 and change in backpay alone. Not talking about noneconomic damages about humiliation and embarrassment from getting fired. First time she'd ever been fired. Getting fired for speaking up about two people whose rights were being potentially violated. I'm just talking about on the economic damage side.

She will testify that I started looking for work almost immediately after my termination. I couldn't find anything in Memphis -- where she wanted to stay, where her family is from. By the way, for her to even move to Atlanta, she had to get into a custody dispute with her husband to even be able to take the child to Atlanta to get the new job over in Atlanta. And she'll tell you about that, which was all a result of her being fired illegal by Mr. Reaves.

So she'll testify $258,000 today, as of today, and change in lost wages. And she'll show you the stack of places, companies you've never even heard of and plenty of companies that you have heard of, in an effort to get employed and reemployed. Because her duty is you can't sit

**UNREDACTED TRANSCRIPT**

on the sidelines and say pay me a big stack of money. You have a duty to mitigate. And she will testify about the efforts she took to mitigate her losses, to reduce and minimize her losses.

You'll also hear proof about like what I just suggested that there's a nonmonetary side to these kind of getting terminated illegally. And she'll testify how it made her feel, what it was like having to address that when people go, well, where are you working, and what are you doing. People's job is -- their dignity oftentimes is wrapped up in their job. It's just the way we are. But that got stripped away from her for 15 months. Fortunately, she's back on her feet. But she'll testify what it's been like having to deal with this, being fired in the manner she was, for the reasons that she was.

And finally, if Your Honor so instructs, we'll ask you, in addition to an award of money for backpay, in addition to an award of money for the emotional harm that the termination caused her, we'll ask you for punitive damages to punish Mr. Reaves for his illegal termination of Jaye Mosby as well as to deter others from violating the law.

Again, we're dealing with an officer of the court here. This isn't just Frank Smith Plumbing Company. This is Henry Reaves, Esquire, Counselor, Attorney At Law, officer of the court, and his wife, Ms. Neva Reaves. And those are the

**UNREDACTED TRANSCRIPT**

three main witnesses and the three dates that you have to focus in on.

Where was Jaye Mosby and what was she doing on Tuesday, Wednesday, and Thursday? Tuesday, Wednesday, and Thursday. Because if you find that she was actually working those days and didn't just go MIA on her intake responsibilities, then they're not being truthful about the reason for termination. And that means, what is the truth?

Thank you.

**THE COURT:** Ladies and gentlemen, next we will hear the opening statement on behalf of the defendant, Reaves Law Firm, PLLC by Mr. Jonathan Hancock. Mr. Hancock.

**MR. HANCOCK:** Thank you, Your Honor. Good afternoon. My name is Jonathan Hancock, and I'm here with my cocounsel, Dean Shauger, and we are here representing the Reaves Law Firm. Mr. Henry Reaves is our client representative. I'm going to come back and talk a little bit more about Mr. Reaves in a minute.

But real quick before I get started -- sorry, I'm a little froggy this time of year. My allergies are bad, and I also got sinus cocktail, so I'm probably going to sweat like I'm outside at some point inadvertently. Apologies for that, but it's going to be better than sneezing on you.

Before I get started, I want to do one other thing other than tell you about my sinus cocktail. I want to

**UNREDACTED TRANSCRIPT**

make sure you remember Mr. Ryan doesn't give you evidence. Hold him to what he just told you. Hold me to what I'm going to say. That's the important part here is that you listen to the proof. I'm going to end on that note in just a second.

Before we do, I want to talk just a little bit about this case and about who the parties in this case are. I'm going to start with a big statement. Ms. Mosby lost her job because when she realized what it was going to take for her to learn that business, she decided it was beneath her, and she checked out, and she quit.

What you're going to hear is that Ms. Mosby is a very talented, experienced labor employment lawyer. In 2022, when she became the Reaves Law Firm's chief people officer, she'd been practicing labor employment for 25 years. Since 2011, Mr. Reaves had been practicing what we call personal injury law. That's when you represent somebody who's hurt through no fault of their own.

Mr. Reaves, as you're going to hear from the proof in this case, opened his personal injury firm in 2011 when he came back to Memphis. And that's important because this firm was growing exponentially. In 2011, he opens the firm. A year later, Mr. Reaves is practicing with ten and a paralegal. Five years later, Mr. Reaves has grown that firm to have 40 employees. And in 2022, when Ms. Mosby came on as the chief people officer, that firm had grown to be almost

**UNREDACTED TRANSCRIPT**

100 employees.  And that's why you're going to hear Neva and Henry Reaves tell you what they needed was somebody to help them take it to this next level, help them manage their most important resource, that's their people, and help them be a strategic and visionary thinker.  That's what they were looking for out of this chief people officer job.

You're going to hear a lot also about who Henry and Neva Reaves are.  Mr. Reaves grew up in this area, but he was also the child in a military family, so he went all around the country.  He did come back here and graduate high school in this area, and then he joined the Air Force.

While Mr. Reaves was in the Air Force he was able to get a top secret security clearance because he worked in intelligence.  And after he left the Air Force -- and he was honorably discharge -- he came back to this area, and he worked for a little while in Holly Springs as a police officer, and he worked for a little while at a Chevrolet dealership.

Then he went back out to Twentynine Palms, California.  That's where his mother was where he spent some time.  And he worked with marines who were about to be deployed to other places.  And he also met his wife at a Baptist church out there, and they got married, and then he went to the law school.  He went to the University of Indiana.

**UNREDACTED TRANSCRIPT**

While he was at Indiana, Mr. Reaves received some awards. He received an award for the Order of the Barristers, which is for trial advocacy. And he also clerked for a Court of Appeals judge after his second year. Then they came back to Memphis. And at that point Mrs. Reaves is a kindergarten school teacher in 2011 when he opens the job -- opens the firm, excuse me.

In 2017, Mrs. Reaves joins the firm and holds all the jobs they have ultimately becoming the chief experience officer. And that's an important point because what you're going to hear is this firm experienced phenomenal growth between 2011 and 2022 when Ms. Mosby got there. And it did it because of a lot of the things Mr. and Mrs. Reaves put together.

It's a unique law firm. One of the things that's unique about it is that it's divided into departments. You've got an intake department, a client satisfaction department, a negotiation department. That's not the same at every law firm, and it's not necessarily something Ms. Mosby had ever seen.

That's what you're going to hear about today is that Mr. Reaves was focusing his efforts to build this personal injury law firm. And although Ms. Mosby had 25 years practicing law, she did not have any real experience practicing in personal injury. And so when she got there she

**UNREDACTED TRANSCRIPT**

didn't really know the law and she didn't really understand the way they were working their cases. And that's important because the fact is she didn't understand -- and you're going to hear this from all the witnesses -- how the Reaves Law Firm was processing the work it was doing.

Very importantly though, you're also going to hear -- and I hope this didn't get lost in Mr. Ryan's opening statement. Ms. Mosby worked there for one month. We're talking about somebody who actually worked there for a little less than one month. You're going to hear during this trial about how when she started she was asked or told or put into training -- asked to work in all of the various departments. But she called Mrs. Reaves, and she asked if she could cut that short so that she could do something she thought was more important.

You're also going to hear a lot about how Ms. Mosby was tasked by the Reaves Law Firm with helping it manage how it paid its employees. That's one of the things she was specifically tasked with doing as chief people officer. In fact, you're going to hear from Ms. Mosby and a few other witnesses that she was tasked with putting together what's called a standardized pay scale. You may have been on a standardized pay scale before. It's when an employer goes together and puts together a range of payment so that people are paid the same for the same work. And that's one of the

**UNREDACTED TRANSCRIPT**

things she was working on.

And you're going to hear how she chose to do that part of her job. You're going to hear Ms. Mosby take the position that she was somehow complaining for other employees, representing them. But it's going to be very obvious from the proof -- in fact, it's going to be very obvious from the documents that she's drafted, and her own testimony, looking at these compensation issues and bringing them to Mr. Reaves' attention and to the Reaves Law Firm's attention. That was her job.

And you're going to hear about the fact that in the first month she was there it became really clear to Mr. Reaves that Ms. Mosby doesn't have the underlying understanding she needs of how this place works to really come in and start making these high-level, strategic valuated suggestions that he wanted his chief people officer to be able to make.

So about a month in, you're going to hear Mr. Reaves tell you that he started seeing some red flags, he started thinking about how to address those. Importantly, you just heard about Ms. Mosby's bereavement leave. I'm very sorry that all of that happened, but it's very important, Mr. Reaves didn't know about that. That's come out in discovery, but she didn't tell him.

And that's important because on May 28th,

**UNREDACTED TRANSCRIPT**

Mr. Reaves had realized -- didn't know she was on bereavement leave, but he did realize this isn't working the way I wanted it to work, and it's not working that way because she doesn't understand our business.  She's only been here two or three weeks.  What we need to do is give her the tools necessary to learn this business.

What I want you to be ready for and really read and pay attention to is an e-mail Mr. Reaves sent -- the one Mr. Ryan alluded to a minute ago.  It comes on May 28th.  And in this May 28th e-mail, you're going to see Mr. Reaves explain that he wants Ms. Mosby to go back and get that experience she doesn't have.  Don't spend a day or two and go get a superficial knowledge of what's happening in those departments.  Go and be an employee in those areas.  Learn everything they do.  Learn how they do it.

And he even tells her in an e-mail you're going to see from May 28th the logic behind that.  How are you going to offer us the sort of leadership things we want you to offer about the employees that are working in these departments if you haven't worked there?  And so he asked her to go -- he didn't ask her to go.  He told her as her boss this is where I want you to go.

She was going to start in intake.  You heard Mr. Ryan say if she showed up for intake for those three days that somehow she wins the case.  No.  She was going to be in

**UNREDACTED TRANSCRIPT**

intake for four weeks.  A long time.

And what you're going to hear from another witness is Tina Adams.  Tina is going to come.  Ms. Adams is going to be here today or tomorrow when we get to her.  She was the person who was going to train Ms. Mosby in the intake department.  What she's going to tell you is that she came for two days and didn't come back.

Then what you're going to hear is from Henry and Neva Reaves.  Now you're at June 2nd.  When Mr. Reaves asked Ms. Mosby to begin the process of what he called immersion training -- and it's important when you read that May 28th e-mail, there's not a negative word in it.  He doesn't demote her.  He tells her this is how I'm going to give you the tools you need to succeed.  And he calls it immersion training.

And you'll see in there that Mr. Reaves intended for Ms. Mosby to be over there for a period of about four weeks.  Very interestingly, Mr. Ryan made a big deal about depositions and I'll show what they said.  When I was taking Ms. Mosby's deposition, she told me she was in intake for two weeks.  It's impossible.  But truly listen to that.  What she told me in her deposition is not true.  She was there for two or three days.  Actually, she was there for two days before she decided to not come back.

You're going to hear that Mr. and Mrs. Reaves were

**UNREDACTED TRANSCRIPT**

obviously disappointed.  They had agreed to pay Ms. Mosby $185,000, and they wanted to have these big, high-level C-Suite decisions made.  And instead, they realized that she was overrepresenting even the fundamental understanding of how the firm worked.

So yes, there was some upset about it, but nonetheless, what they offered her was a chance to improve and become the valuable member of the leadership team that they needed her to be.

Maybe the most important fact in this whole case -- I don't disagree it's around the same time frame Mr. Ryan pegs it -- is how Ms. Mosby reacts.  On May 28th, Mr. Reaves sends her that e-mail, and he asked for a transition document.  And in the e-mail it's abundantly clear what he's asking for.  I need to know what you're working on so that I can let the rest of our membership team -- excuse me -- leadership team know so that nothing falls through the cracks.  Something fell through the cracks.  She didn't provide that leadership document ever.  It never came.

You get to Thursday of that week, June 2nd.  Mr. and Mrs. Reaves have no leadership transition document.  He sends an e-mail to his leadership team telling them we're going to meet today, I'm going to show you this transition document.  Why?  So that when we as a leadership team meet again Monday, we're going to be able to talk about these

**UNREDACTED TRANSCRIPT**

things that are going on and who's going to handle them.  He sends that.  He sent that.

He's asked for a transition document.  He's asked her to go to intake.  So when he finds out that she didn't go, Mr. and Mrs. Reaves decided it was time to reach the conclusion this wasn't a good fit.  And that's what you'll see in the e-mail.

On June 2nd, Ms. Reaves sends Ms. Mosby an e-mail.  She lets her know her employment has been terminated.  And the reason she gives her is because it's not a good fit.  There were a lot of reasons, and you'll hear them.  In fact, I talked about some of them, but you're going to hear even more from Mr. Reaves and from Mrs. Reaves about why they were unhappy with the value they received from Ms. Mosby as an employee.  They were paying her a huge salary.  They wanted a huge product to come back, and they were get nothing.

You're also going to hear about Ms. Mosby's response.  She's going to call it a demotion.  I want you to look in that May 28th e-mail.  See if you find the word demotion.  In fact, see if she was demoted.  Did she make less money?  Did somebody tell her anything disciplinary?  No.  What Mr. Reaves tells her throughout the e-mail is that I want you to do this so that you can get the tools you need to really be able to do this job.  That's not a demotion.

It's going to be undisputed that Mr. Reaves asked

**UNREDACTED TRANSCRIPT**

Ms. Mosby to produce the transition document. It's going to be undisputed that she didn't do it.

You're also going to see some e-mails that were exchanged around that time. And it's important because there's another thing I want you to pay particular attention about. Because really what this case is all about is whether or not Ms. Mosby really believed that she lost her job because she did a bad job or because she really was complaining about how other employees were being paid. Something that was her job.

Why did she lose her job? Was she a bad employee, or was she doing something that was protected activity? It's important because you're going to need to decide in her role as chief people officer was it her job to let Mr. Reaves know if employees weren't paid right so that the company could correct it. And how important is it if she points it out and then they correct it? It makes it look like her job. That's because it was her job. And that's really what this case is about.

You're also going to see an e-mail, and in this e-mail, that comes right after Ms. Mosby was terminated, she spends 30 paragraphs or so in this e-mail exchange talking about her opinions and what about happened to her when she was at the Reaves Law Firm. There's one word she never uses: Retaliation. The three claims in this lawsuit are for

**UNREDACTED TRANSCRIPT**

retaliation.  She's a labor and employment lawyer who's practiced for 25 years at the point she sends this e-mail. And it's 30-something paragraphs, and she never says you fired me because I was complaining about the way these people were paid.  She never uses the word retaliation.  None of that comes out until you get a lawsuit.

Ms. Mosby lost her job because after 30 days of working at the Reaves Law Firm she didn't do anything.  She was put back into a remedial place where she would gather the training she wanted, and she refused to put -- to use that step that could have been a valuable tool -- she refused to do it.  She refused to take that the right way.  She changed her mind and decided it was a demotion.  Didn't do the document and checked out of intake.

As the jury, you're going to have to decide if that's why she lost her job.  I know every single one of you has something you'd rather be doing today.  I get that.  You have something in your life that's important, and I get that you need to be doing that.  But you're not.  You're here. And what Judge Mays told you is exactly right.  This judicial system doesn't work without people doing exactly what you're doing.  I don't want to sit down before I say thank you. It's very important, and we appreciate it.

I also want to ask you for one promise.  It's what you've heard from Judge Mays today.  I want to ask you to

**UNREDACTED TRANSCRIPT**

promise me you're not going to get to the end of this case and base your verdict and your decision on what I told you. You're not going to base it on what Mr. Ryan or any of the lawyers told you. You're not even going to base it on what Judge Mays told you. You're only going to base your decision on what comes out of that witness stand, the testimony that the witnesses give, and the documents that are submitted into evidence. If you'll promise me to do that, then I'll sit down.

But before I do, I'm going to ask you to return a verdict in favor of the Reaves Law Firm and to pay attention during today's trial. And thank you for your service.

**THE COURT:** Does anyone need a break before we proceed with the proof? I don't hear anyone. We may have to take a break during your case-in-chief, Mr. Ryan.

**MR. RYAN:** Anytime anybody wants to take a break, I'm not stopping them.

**THE COURT:** All right.

**MR. RYAN:** I'm ready to call my first witness.

**THE COURT:** We're going to hear the proof in this case at this point. We're going to begin with the plaintiff's case-in-chief. Call your first witness, Mr. Ryan.

**MR. RYAN:** We call Neva Reaves, Your Honor.

**THE COURT:** Mr. Ryan, have we satisfied ourselves

**UNREDACTED TRANSCRIPT**

for the location of the podium?                                15:13:12

          **MR. RYAN:**  For the moment.                                15:13:14

          **THE COURT:**  Mr. Herrin, you may swear in the                                15:13:19

witness.                                15:13:22

               (Witness was sworn.)                                15:13:28

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

\*    \*    \*

**NEVA REAVES,**

called as a witness on behalf of the Plaintiff, having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. RYAN:**

Q.    I want you to please tell me to slow down if I start going too fast because I'm going to -- what I call the preliminary questions, I'm going to sort of just rapid fire. I think you'll be able to follow along.  There are no trick questions.  And if you need me to slow down, I'll be happy to do so, okay?

A.    Okay.

Q.    Tell us your name, please.

A.    Neva Marie Reaves.

Q.    Who are you married to?

A.    I'm married to Henry Reaves, III.

Q.    And Henry is the owner of the Reaves Law Firm, correct?

A.    That's correct.

Q.    But you and him, y'all make all the big decisions together, correct?

A.    Usually he makes the decision and I -- you know, I carry it out.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   But in personnel decisions like in who decided to terminate Jaye, both of y'all were involved in that decision, correct?

A.   Yes.

Q.   Now, you're not an attorney, right?

A.   That's correct.

Q.   But you understand that attorneys are officers of the court, correct?

A.   Yes.

MR. SHAUGER:  Objection, Your Honor.  He's leading the witness.

MR. RYAN:  Exactly, I am.  It's cross-examination.  She's a hostile witness.

THE COURT:  Why can't he lead her?

MR. SHAUGER:  She's not a party.

THE COURT:  Come on up, Mr. Hancock, and tell me all about it.

(At sidebar on the record.)

MR. HANCOCK:  Not a hostile witness.

THE COURT:  She's an adversarial witness.

MR. HANCOCK:  She's not a party.

MR. RYAN:  You don't have to be a party under 611.

THE COURT:  She's not a party.  Of course she's not a party.  She's an employee of the defendant.  And the

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

wife of the chief executive officer of the defendant and she is herself the chief experience officer of the defendant or something like that.  Of course he can lead her.

MR. HANCOCK:  Okay.

MR. RYAN:  Let me have a win every now and then.

(End of sidebar.)

MR. RYAN:  I forgot what question I asked.

THE COURT:  Oh, I'm sure you'll think of it.

MR. RYAN:  May I have the court reporter read it?

(The Court Reporter read back
The last question as follows:)

THE COURT REPORTER:  But you understand that attorneys are officers of the court, correct?

BY MR. RYAN:

Q.   You know that, correct?

A.   Yes.

Q.   And that means that above all else, attorneys shouldn't come in here and lie, right?

A.   True.

Q.   And you shouldn't come in here and give false testimony, should you?

A.   Right.

Q.   Okay.  Now, you remember when I took your deposition a few months back?

A.   Yes.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   At Mr. Hancock's office?

A.   Yes, I do.

Q.   And you remember our discussion when I was asking you about --

THE COURT:   One moment.  Could you turn off your microphone.  Thank you.  Go ahead, Mr. Ryan.

**BY MR. RYAN:**

Q.   Do you remember when I was asking you about why Jaye was fired?

A.   I do.

Q.   And do you remember telling me, quote:  If she had just reported to intake, she'd still be employed?

A.   I do.

Q.   These eight people right here -- you're not going to change your testimony from your deposition, are you?

A.   No.

Q.   Okay.  All these eight jurors -- y'all have just heard -- have they not, that if Jaye had just reported to intake on Tuesday, Wednesday, and Thursday of the week of May 30th, she'd still be employed by Reaves, correct?

A.   Sure.

Q.   Okay, good.  If she had just reported to intake as Mr. Reaves wanted, she'd still be employed?

A.   I can't predict the future, but we were trying to salvage her position.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   And so if she actually provides proof that she did report on Tuesday, Wednesday, and Thursday, if she actually from that witness stand -- like Mr. Hancock said, not me, not him, not the judge, not anybody else -- if she actually provides proof that she physically was inside the walls of Reaves on Tuesday, Wednesday, and Thursday of that week in the intake department with Tina Adams, then you're going to have to admit that she'd still be employed at Reaves, correct?

A.   She may have been.

Q.   I'm not talking about predicting the future.  I'm just talking about that couldn't have been the reason for which she was terminated if she was actually inside the walls of Reaves on those three days.

A.   That wasn't the only reason she was terminated.  We had lots of concerns.

Q.   Okay, there we go.  When a witness just tells you one thing and now they'll telling you another.

**MR. SHAUGER:**  Objection, Your Honor.  He's testifying.

**THE COURT:**  Whose witness is this?

**MR. SHAUGER:**  It's mine, Your Honor.  I'm objecting to Mr. Ryan --

**THE COURT:**  Anyway, don't make a speech.  Just ask a question.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

**BY MR. RYAN:**

Q.   Do you personally know whether Jaye reported to work on the 31st, the 1st, and the 2nd of that week?

A.   I don't personally know.  No, I don't.

Q.   You were in California that week, correct?

A.   That's correct.

Q.   So you can't sit up there and say she wasn't in intake, can you?

A.   Well, I can only say what my staff --

Q.   I'm talking about --

A.   -- told me.

Q.   -- you from your personal experience, your personal knowledge.

A.   Personally, no.

Q.   Now, you knew Jaye had been recruited to leave her job at MLG&W to come to work for Reaves, correct?

A.   No, I did not know that.

Q.   You weren't involved in her being hired?

A.   I was not.

Q.   Okay.  So Mr. Reaves, he was the sole decisionmaker to hire Ms. Mosby?

A.   That is correct.

Q.   And you knew she was hired in at 185,000 a year, correct?

A.   175.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   You're saying 175?

A.   That's correct.

Q.   Now, you were not her direct supervisor, were you?

A.   I was not.  I cannot supervise attorneys.  Only my husband does that.

Q.   Mr. Reaves was Jaye's direct supervisor, was he not?

A.   That's correct.

Q.   Now, by the way, before we forget, you hired Mr. Hancock's law firm to defend the company at the EEOC proceedings, correct?

A.   Yes.

Q.   And the EEOC is the government agency that Jaye had to file with in order to be able to come to court.  You understand that, right?

A.   Something like that.

Q.   And so you authorized the attorneys at Mr. Hancock's office to respond to Jaye's allegations and her charge of retaliation, correct?

A.   They were being my attorney and representing the Reaves Law Firm.

Q.   Did you personally review the position statement that that law firm submitted to the EEOC before it did so?

A.   We did review lots of papers with our attorneys.

Q.   But I'm talking about the actual position statement that they submitted to the EEOC in September of 2023, where

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

it outlined all sorts of reasons for her termination.    15:21:30

A.    We reviewed lots of paperwork.  If you show me what it 15:21:34

is, then maybe I can confirm that for you.    15:21:38

MR. RYAN:  I can use the ELMO.    15:21:46

THE COURT:  What are you doing?  Don't publish 15:21:49

anything until it's been admitted.    15:21:54

MR. RYAN:  Well, let me first approach, Your 15:21:57

Honor, and get the witness to identify EEOC's position 15:21:59

statement.    15:22:03

**BY MR. RYAN:**    15:22:10

Q.    It's October 24, 2022.  Do you recognize that position 15:22:12

statement?    15:22:15

A.    I do not.    15:22:15

Q.    It says:  Dear Investigator Alexander.  This firm 15:22:20

represents the named respondent Reaves Law Firm with respect 15:22:27

to the allegations set forth --    15:22:31

MR. SHAUGER:  Objection, Your Honor.    15:22:34

THE COURT:  She can't --    15:22:34

MR. SHAUGER:  The witness said she could not --    15:22:34

THE COURT:  She's testified she can't recognize 15:22:34

the document.    15:22:36

MR. RYAN:  Well, let me see if that refreshes her 15:22:38

recollection.    15:22:41

THE COURT:  Let her read it.  Your reading it 15:22:42

aloud to her will be no more effective in refreshing her 15:22:46

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

recollection than her reading it silently.

        **THE WITNESS:**  I don't recognize this document.
This is not what we filled out.

**BY MR. RYAN:**

Q.   I'm not asking you what you filled out.  I'm asking
are you aware of what they submitted to the EEOC on behalf of
your law firm?

A.   No.

Q.   Okay.  May I have that back?  Just out of curiosity,
don't you think the law firm that you retained and what they
submitted to the EEOC, don't you think they would mention the
fact that she failed to report to intake as the reason for
her termination?

A.   Okay, repeat that again.

Q.   Don't you think that the law firm that you hired to
respond to the EEOC charge that she filed, when they
submitted their position statement on behalf of the company,
don't you think that they would have mentioned the fact that
it was Jaye's failure to report to intake that was the reason
for which she was terminated?

A.   I mean, I trusted them.  We hired them.  So I trusted
what they were going to send was --

Q.   Okay.  And are you aware -- you've never seen this
document?

A.   No, I have not.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   And you don't know whether it mentions the fact that she failed the report to intake as a reason for termination or not?

A.   I do not.

Q.   But you do agree that you would think it would be very curious for your law firm to not mention to the EEOC that the reason for which Jaye was terminated was her failure to report to intake?

**MR. SHAUGER:**  Objection.  Speculation.

**THE COURT:**  Overruled.

A.   I'm a teacher by trade, so the law questions I usually ask my husband.

**BY MR. RYAN:**

Q.   I just want to get to the truth, ma'am.  You testified just now when we first started off that Jaye would still be working there had she only reported to intake.  Are you still sticking with that?

A.   She was to report to intake and also provide us with a transition document.  The catalyst for her termination was we missed a community event because she did not provide that document.  We were supposed to attend the SLIP program for high school students who wanted to be attorneys, and she did not let us know that she had already signed up for that, that it was already coming.  And when we received an e-mail that we were supposed to send an attorney, that's when we became

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

alarmed that there were several things that we were signed up for that was not going to be complete.

Q.   Okay.  So I knew you were going to say that, and that's the reason why I printed off your deposition so that the jury would actually know what you said when I asked you that question when I took your deposition.  Okay?

MR. RYAN:  If you could hit the ELMO.

BY MR. RYAN:

Q.   I asked you:  Was your answer that she would still be employed had she just done those two things, report to intake and complete the transition document?  Answer:  If she had just reported to intake, she would still be employed.

Not even talking about the transition document, she would still be employed if she were -- had she just reported to intake?  Uh-huh.  Is that a yes?  Answer --

What did you say?

A.   I can't see that at the top.

Q.   What did you say when I asked you -- when I asked you not even talking about the transition document she would still be employed if she had just reported to intake, and what did you say?

A.   Yes.  This was after.  But there were a lot of things. But my husband was being so gracious he still wanted to salvage her.  We had put her in front of the whole company --

MR. RYAN:  Your Honor, move to strike.  That

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

wasn't even part of the question.  Now she's just running on --                                                                                15:26:59 / 15:27:01

        **MR. SHAUGER:**  Your Honor, it was in response to the question.                                                                      15:27:01 / 15:27:03

        **THE COURT:**  Why don't you rephrase your question and ask your question again.                                                      15:27:04 / 15:27:05

**BY MR. RYAN:**                                                                                                                               15:27:07

Q.   So my question was simply -- so the jury could see what you testified to when they weren't around, and it was just me and you and a court reporter and the other attorneys in the conference room, what you said.  I asked you, take out the transition document, would she still be employed if she had just reported to intake?  And you said yes.  Right?                  15:27:07 / 15:27:10 / 15:27:15 / 15:27:17 / 15:27:21 / 15:27:25

A.   That's correct.  We were only talking about those two things at the time.  You're only showing them part of the document.  It's out of context.  There's lots of reasons that she was terminated.                                                                         15:27:25 / 15:27:28 / 15:27:31 / 15:27:35

Q.   You didn't give her a separation notice, correct?  You sent her an e-mail, right?                                                         15:27:37 / 15:27:42

A.   That was the notice.                                                                                                                      15:27:43

Q.   You didn't submit a separation notice as required by Tennessee law, correct?                                                              15:27:45 / 15:27:49

A.   My HR does that.  I'm sure Bill did it.                                                                                                   15:27:50

Q.   It hasn't been produced in the course of this case. I've not seen it.  Do you know where -- does it exist?                                15:27:53 / 15:27:57

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

**MR. SHAUGER:** Objection, Your Honor. He's -- 15:28:00

**THE COURT:** Wait a minute. 15:28:02

**MR. SHAUGER:** Can we approach, Your Honor? 15:28:04

**THE COURT:** Sure. 15:28:07

(At sidebar on the record.) 15:28:12

**MR. SHAUGER:** Billy, you didn't serve any 15:28:14
discovery in this case. 15:28:16

**THE COURT:** Excuse me, I'm here. 15:28:17

**MR. SHAUGER:** Sorry. Mr. Ryan didn't serve any 15:28:20
discovery in this case, so I don't think he can then say that 15:28:24
he hasn't been produced documents when he didn't ask for
anything. 15:28:25

**MR. RYAN:** Well, they didn't produce it in 15:28:25
disclosures. You would think that --

**MR. HANCOCK:** As --

(Indiscernible crosstalk.)

**THE COURT REPORTER:** One at a time. 15:28:31

**THE COURT:** I'll hear from one at a time. 15:28:31

**MR. SHAUGER:** Thank you, Your Honor. 15:28:35

**THE COURT:** It's your witness --

**MR. SHAUGER:** It's my witness. 15:28:37

**THE COURT:** -- I'll hear from you. All right. 15:28:38
What do you claim you asked for that you didn't get? 15:28:43

**MR. RYAN:** Well, we didn't ask for the separation 15:28:47
notice specifically, but it hadn't been produced in the 15:28:50

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

initial disclosures.  She's saying that she thinks that it   15:28:53

might have been submitted.  Ms. Mosby is going to testify   15:28:57

that she's never seen it.   15:28:59

**THE COURT:**  Ask her if she has personal knowledge 15:29:01

of the sending of any such document.  That's all you can ask. 15:29:05

**MR. RYAN:**  Okay.   15:29:11

(End of sidebar.)   15:29:12

**BY MR. RYAN:**   15:29:16

Q.   Do you know one way or another whether Ms. Mosby was   15:29:18

provided with a separation notice, the one-page form that's   15:29:21

titled Separation Notice where you're supposed to specify the 15:29:26

reasons where a person was terminated, and you're supposed to 15:29:30

give it to them within 24 hours of their termination so that   15:29:34

they can apply for unemployment benefits?  Do you know one   15:29:36

way or the other?   15:29:37

A.   I don't know for sure, but Bill is really good.  He   15:29:38

usually does everything in order.   15:29:41

Q.   But you don't know.  That's the real --   15:29:43

A.   I personally don't know.  We have an HR team, and I'm   15:29:45

not an HR professional.  That's why we hired Jaye because we   15:29:48

needed the expertise in human resources.   15:29:54

**MR. RYAN:**  Your Honor, I hate to -- if the   15:29:56

witness could just answer the question.   15:29:59

**BY MR. RYAN:**

Q.   I'm talking about the separation notice.  Not why you   15:30:01

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

hired Jaye.  Do you know whether you -- and I'm talking about Reaves Law Firm -- gave her a separation notice as required by Tennessee law within 24 hours of her termination that specified the precise reasons for which she was being terminated?

A.   I don't know that personally for sure, but I'm very confident in Bill, and he usually does everything in order.

Q.   So the answer is you do not know.

A.   I don't know that personally.

Q.   Then that's all you had to say.

Now, you sent out an e-mail on the 2nd of June, did you not?  You sent out this e-mail, correct, June 2nd e-mail?

THE COURT:  Are you publishing something that's been admitted?

MR. SHAUGER:  Nothing's been admitted, Your Honor.

THE COURT:  What's up on the scene, Mr. Ryan?

MR. RYAN:  It's her e-mail.

THE COURT:  It hasn't been admitted.

MR. RYAN:  I'll ask her --

THE COURT:  Take it down from the screen, please.

MR. RYAN:  I'm taking it down.

THE COURT:  Thank you.

BY MR. RYAN:

Q.   Let me pass this to you.  Is this your e-mail that you

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

sent to Ms. Mosby?

A.    This second page is not an e-mail.

MR. RYAN:   Your Honor, we'd like to show the jury Mrs. Reaves' e-mail.  June 2nd, 2022 e-mail.

THE COURT:  Are you asking that it be admitted?

MR. RYAN:  Yes.  I'll move to get it admitted now.

THE COURT:  Mr. Shauger, any objection?

MR. SHAUGER:  No objection, Your Honor.

THE COURT:  Without objection, it will be admitted and marked as Exhibit 1.

(Exhibit No. 1 was marked and admitted.)

**BY MR. RYAN:**

Q.    June 2nd, 4:35 Pacific Standard Time.  You're out in California at this time, right?

A.    That's correct.

Q.    So Memphis time is 6:36, correct?

A.    That's correct.

Q.    And you sent it to Jaye, and a lot of people were included, including your husband, right?

A.    That's correct.  Sent it to Jaye and our leadership team.

Q.    Now, the very first sentence is inaccurate, isn't it?

A.    No, it's not.

Q.    On May 28th, the CEO requested a transition document

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

that listed everything you've done and are doing as well as all future actions in order for RLF, Reaves Law Firm, to keep commitments and to maintain momentum.

So you're saying that that was -- he e-mailed that to her?

A.   That's correct, he did.

Q.   The CEO stated that this action was to take place immediately and listed as number one on the list of immediate actions.  And then you say on May 28th:  She acknowledged and stated the transition document was forthcoming.

Do you see that?

A.   Yes, I do.

Q.   You say on May 31st, the CEO sent a subsequent e-mail and stated that the transition document was to be submitted no later than COB today.  But Ms. Mosby was not a recipient of that e-mail, was she?

A.   That's correct.

Q.   So there's no e-mail traffic where Mr. Reaves ever says that she's got to produce the transition document by a date certain, is there?

A.   That's correct.  Her training in intake was going to start on the 31st.  So we definitely wanted the document before she started intake.  Before she started training at every department in the firm, we needed to be relieved of her HR duties so she could focus on her training.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   That's not my question, again.  Just will you please, out of respect for the jury, please listen to me.  Did -- is there any document that says, Jaye, you will be terminated if you don't produce the transition document by close of business on June 2nd?

A.   No.

Q.   There isn't, is there?

A.   No.

Q.   In fact, you go on to say -- even though there was no deadline ever communicated to her, you say that this is an active insubordination in addition to other missteps and unprofessional behavior, and it is an indication that it's best for RLF and Jaye Meachem to part ways, right?

A.   That's correct.

Q.   Now, guess what's missing from this e-mail, Mrs. Reaves.

A.   I don't know.

Q.   The fact that she's being terminated for not reporting to intake.  Would you at least agree that there's nothing in this e-mail that says she's being terminated because she failed to report to intake?

A.   It's not specifically.  I lined it out in other missteps.

Q.   You don't state in this e-mail anywhere that it's because you did not report to work on May 31st, June 1st, and

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

June 2nd that you're being terminated.

A.   Because there were so many things it would have been a four-page letter.  And I -- personally, I don't write four-page letter e-mails.  There were so many things.  She didn't know the name of our paralegals.

Q.   Ma'am, did you say she's being terminated for failing to report to intake anywhere in that e-mail?  Yes or no?

A.   No, not specifically.  But her other missteps include a lot of things.

Q.   Respectfully, stop dodging my questions and --

MR. SHAUGER:  Objection, Your Honor.  He's badgering the witness.  She's answering his questions.

THE COURT:  First, I don't think he's badgering the witness.

But I don't need for you to make a statement as we go, Mr. Ryan.

**BY MR. RYAN:**

Q.   Please just listen, okay, so that -- where in this e-mail do you say, Jaye, we're terminating you because you failed to report to intake like you said in your deposition when I took it under oath, ma'am?

A.   The other missteps.  There was a lot of things.  She didn't know the name of our client care paralegals --

Q.   I'm talking about --

A.   She tried to hire her friend to train our whole

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

department.

Q.   I'm talking about --

THE COURT:  Wait a minute.

Q.   -- reporting to intake.

THE COURT:  Wait a minute.  This is a simple issue.  Mr. Ryan asks the questions.  You answer the questions.

THE WITNESS:  Yes, sir.

THE COURT:  Answer his question as succinctly as possible.  If you have an explanation, make it and move on.

BY MR. RYAN:

Q.   I just want to know did you terminate her, yes or no, because she failed to report to intake?  Did you?

A.   That was one of the things.

Q.   But when I took your deposition you said she wouldn't have been terminated for any other reason other than failing to report to intake, correct?

MR. SHAUGER:  Objection, Your Honor.  Asked and answered.

THE COURT:  That's overruled.

BY MR. RYAN:

Q.   You can answer.

A.   Can you repeat the question?

Q.   Yes.  I took your deposition.  In fact, I just showed your deposition testimony, which was under oath, and you

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

testified that the only reason for which she was terminated was because she failed to report to intake. You said it wasn't because she didn't produce a transition document, right?

A.    I didn't say that was the only reason. In fact, right underneath it said: Is that the camel that broke the straw's back? And I said yes. That wasn't the only reason.

Q.    But in this e-mail that just got marked as the first exhibit, there is nothing in there that says she was being terminated because she failed to report to intake, is there?

A.    You're right.

Q.    Now, that May 31st e-mail that was referred to in your June 2nd e-mail that we just saw -- let me see if you can identify the May 31st e-mail that was from your husband to you and your executive team.

A.    Yes.

        **MR. RYAN:** Your Honor, we move to make the May 31st, 2022 e-mail as the next exhibit.

        **THE COURT:** Mr. Shauger?

        **MR. SHAUGER:** Billy, could I see the copy? Thank you. No objection, Your Honor.

        **THE COURT:** Without objection, it will be admitted and marked as Exhibit 2.

        (Exhibit No. 2 was marked and admitted.)

**BY MR. RYAN:**

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   Now, Jaye is not -- this is from Henry Reaves, correct?

A.   Correct.

Q.   And it's to Bill Walker, Emily James, yourself, PaQuita Raymond -- I mean Redmond.  Do you see that?

A.   Yes.

Q.   And she's Mr. Reaves' assistant, correct?

A.   That's correct.

Q.   And also Dwaun Hammond is copied, Hattie Benfield is copied, Jamie Benfield is copied, Mark Schirmer is copied, Ted Cummins is copied, and Tina Adams is copied, correct?

A.   Yes.

Q.   And Jaye is a part of what we call the C-Suite executive team at this point, right?  She's the chief people officer, right?

A.   Not at this time.

Q.   She had been -- her duties -- her title had been stripped by May 31st, right?

A.   Not her title.  Just her duties.

Q.   But she's left off of this May 31st e-mail, correct?

A.   That's correct.

Q.   And it says:  Team, Jaye is currently going through an immersion process and mastering all of our pre-lit departments, positions, and processes.

          Do you see that?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

A.    I do.

Q.    And it talks about what Jaye is going to be doing over the next seven months.  He said:  This immersion process will take up to seven months.  Once she successfully completes it, she will return to her position as CPO.  Right?

A.    Yes.

Q.    So on May 31st, when she's doing all these other missteps and all these crazy bad things that you're dissatisfied with, he's telling his team that he's going to return her back to her position after she does this seven months of training, right?

A.    Yes.

Q.    So if she was so bad that she was just a worthless employee and causing all sorts of drama in the workplace and doing all these missteps, there --

A.    We never said she was --

        **MR. SHAUGER:**  Objection, Your Honor.

A.    -- worthless or causing drama in the workplace.

**BY MR. RYAN:**

Q.    Listen.  You cut me off.

        **THE COURT:**  Wait a minute.  Shorten your questions.

        **MR. RYAN:**  Okay.

        **THE COURT:**  Wait for the question to be completed before you answer it.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

**THE WITNESS:** Yes, sir.

**BY MR. RYAN:**

Q.  There was nothing in this e-mail that says that the company is dissatisfied with her performance right here, is there?

A.  No, there's not.

Q.  There's nothing in this e-mail that says that she's on the verge of being terminated, is there?

A.  We didn't know at the time that she wasn't going to show up and comply with the CEO's instruction.  We didn't know that at the time.

Q.  So again, it's about whether she showed up or not; is that what you're saying?

A.  It's about whether she just followed instructions of the CEO.  Like, he's my husband, and I still follow his instruction.  Like, it's his business.  He's the visionary. We're vision builders.

Q.  Now, this says -- this is very important.  It says: Jaye is finishing up a transition sheet that she will give us marching orders in her absence.  This will be completed by close of business Thursday.

Do you see that?

A.  Yes, I do.

Q.  We will review in preparation to discuss this on Monday.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Do you see that?

A.   I do.

Q.   That was not communicated to Jaye in writing, was it?

A.   This part of it, no.  But her giving the document was communicated to her in writing.

Q.   You're talking about the May 28th e-mail.  I'm talking about the deadline.  No deadline was communicated to Jaye in writing, was it?

A.   It wasn't, but she knew.  She was the only one that knew we had a SLIP program on June 2nd.

    **MR. RYAN:**  Your Honor, she just answered the question and now she wants to -- I have no idea what she's trying to get into now.  Move to strike.  If she would just listen to the question, please.

    **MR. SHAUGER:**  Objection, Your Honor.  She's answering his questions.  He doesn't like the answers.

    **THE COURT:**  I'm not going to characterize the answers, but it is fair to say that the answers are not always responsive.

    **MR. SHAUGER:**  Your Honor, I think that she's been answering all of his questions in a responsive --

    **THE COURT:**  You and I would not entirely agree with that.

    **MR. SHAUGER:**  Okay.

    **THE COURT:**  I just ask you, Mrs. Reaves, listen

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

to the question and respond to it.  If you want to explain something that's related to your answer, you may do so.

                    **THE WITNESS:**  Okay.

                    **THE COURT:**  All right.  Go ahead, Mr. Ryan.

**BY MR. RYAN:**

Q.    Just give me -- if you can, listen and please respond just to the question that I'm asking you.  Okay?

A.    Sure.

Q.    This statement:  The transition document will be completed by close of business Thursday.  No such deadline was ever given to Jaye in writing, was it?

A.    That's correct.

Q.    Thank you.  Now, up until May 31st when that e-mail was sent out, Jaye had never been disciplined in writing in any way, had she?

A.    No.

Q.    And Reaves has a progressive discipline policy that speaks about various forms of discipline prior to termination, right?

A.    That's correct.

Q.    And most companies have some form of progressive discipline because they have an investment in the person that they've hired, and they're not just going to go off and fire them for any reason, right?

A.    You said most companies?

                    **UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q. Yes.

A. I don't know.

Q. Okay. But Reaves has a progressive discipline policy, correct?

A. That's correct.

Q. And you're familiar with the Reaves handbook, correct?

A. Yes.

Q. And I'm not going to ask you about every page in this handbook, but would you at least recognize -- take a look at that and tell me if that was the handbook that was in place at the time Jaye worked for y'all.

A. Yes.

MR. RYAN: Your Honor, we'd move to mark the handbook as the next exhibit.

THE COURT: Mr. Shauger?

MR. SHAUGER: No objection, Your Honor.

THE COURT: Without objection, it will be admitted and marked as Exhibit 3.

(Exhibit No. 3 was marked and admitted.)

BY MR. RYAN:

Q. Now, step one, coaching and counseling. Do you see that?

A. I do.

Q. Step two is a verbal reprimand. It gets documented that I verbally reprimanded you, but it goes in your file as

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

a verbal reprimand, correct?

A. Yes.

Q. And then there's written warning, correct?

A. Yes.

Q. And then there's a final written warning and performance improvement plan, correct?

A. That's correct.

Q. And then suspension potentially, right?

A. Yes.

Q. And then the last and most serious step in the progressive discipline is a recommendation to terminate, right? Do you see that?

A. Yes.

Q. And Reaves gives itself the right to skip all those earlier steps and go right to termination if it feels it's justified, right?

A. That is correct.

Q. But in this case there weren't any reprimand or written warnings or any of that with Jaye, were there?

A. That's incorrect. My husband sent her a very long e-mail detailing out what he wanted her to do. We wanted to salvage her position. We wanted to keep her. He was very gracious sending her that long e-mail saying, hey, I think you just need more training. I think this is going to work. We just need you to do all the departments.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   And timeline wise, just so the jury is very clear, you're talking about the May 28th e-mail that he sent to her, right?

A.   That's correct.

Q.   And then -- that was on a Saturday.  Sunday everybody is off work, correct?

A.   Yes.

Q.   Monday is a national holiday for Memorial Day, correct?

A.   Yes.

Q.   Office is closed that day, right?

A.   Yes.

Q.   And then on Tuesday, May 31st, that's the day that she's supposed to report to intake, correct?

A.   That's correct.

Q.   And then she's also supposed to report to intake on Wednesday, June 1st, right?

A.   For four more weeks.  Four weeks of intake --

Q.   Four more weeks --

A.   -- at $175,000.

Q.   But you don't give her that four-week period because on June 2nd, just three days after May 31st when that e-mail goes out to your team but she's not included on that e-mail, but just three days later on June 2nd, you send out the termination e-mail, correct?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

A.   She didn't give herself the time because she didn't complete the time.

Q.   Okay.  So back to what I started with.  It really wasn't the termination document according to your testimony. What really broke the -- the straw that broke the camel's back was that she didn't report to intake, correct?

A.   She was terminated for a lot of things.

Q.   A lot of things?

A.   Yes.  It was just apparent that the relationship was sour.  No need to continue.

Q.   And the reason why the relationship was sour is because you had been told by your husband that Jaye had confronted him about a male attorney being offered employment at $20,000 more than a female attorney, correct?

A.   That's not what he said.  What he said was she was hollering, shouting, and screaming in his face about Attorney Davis, a female attorney, making $65,000.  And she was incorrect.  And it was her idea to move the starting pay attorneys to 90,000, and my husband said, yes, I agree with that.

Q.   Now, you understand your husband called Jaye disloyal, don't you?

A.   Yes.

Q.   And you also viewed her as being disloyal to your law firm, didn't you?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

A.    I thought her going around telling everyone that we had a bad reputation in the community and that we needed to change this and this or that, I didn't think that was becoming of an HR professional.  I thought her job was to go around and present us well.

Q.    So you're going to call in a bunch of people from the community who are actually going to testify that Jaye was going around badmouthing the law firm that just hired her in at $185,000?

A.    She was telling those to the employees.

Q.    What employees are you going to call to testify that Jaye was badmouthing Reaves?

MR. SHAUGER:  Objection, Your Honor.  Mrs. Reaves isn't a party to a lawsuit.  I'm not sure exactly how she would be able to call witnesses.

THE COURT:  Well, that's a statement.  You can rephrase your question in some way, but I believe it's correct she's not in a position to call any witnesses.

BY MR. RYAN:

Q.    Let me ask you this question.  You understand that -- you're not an attorney, but you do understand that federal laws prohibit retaliation for speaking out about equal pay for equal work, don't you?

A.    I do understand that.

Q.    And you also understand that federal laws prohibit

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

retaliation for speaking out about potential overtime violations?

A.   Yes.

Q.   So Jakira Davis was a -- at the time that Jaye was employed by, she had been with the law firm for three years, correct?

A.   I would have to look at the employment records.

Q.   Approximately.

A.   I would have to look at the employment records.  I know she was employed at the same time that Jaye was there.

Q.   And you understand that Jaye believes in good faith that Ms. Davis was only getting paid $65,000?

A.   I don't think it was in good faith because she was an HR professional.  She was privy to the salary information, and that's accurate information that she should have given the CEO.

Q.   You know, she's going to testify -- you sat in on her deposition, right?

A.   No, I did not.

Q.   You listened in, didn't you?

A.   No, I did not.

Q.   So you don't know what she's going to testify to as to whether she had access to actual payroll information?

A.   I don't know.

Q.   And who is Sheena Payne?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

A.   Sheena was our attorney at the time.

Q.   And Sheena was over Ms. Davis, correct?

A.   She was over the pre-lit attorneys.

Q.   And so hypothetically, if Ms. Payne told Jaye that Ms. Davis was make $65,000 a year, that's something that Sheena would actually know, right, because she's a supervisor?

A.   The supervisors didn't have salary information.

Q.   And so you understood that Jaye confronted your husband about Ms. Davis getting paid 20 grand less than what he had offered to this incoming male attorney.

A.   She did confront him.  It was very unprofessional hollering and yelling and screaming at the CEO in his office.

Q.   Were you in the office?

A.   No, I wasn't there.

Q.   Exactly.  Now PaQuita Raymond is his assistant, correct?

A.   Redmond.  Yes.

Q.   Thank you for correcting me.  She was paid a salary, right?

A.   That's correct.

Q.   As an assistant, she wasn't paid on an hourly basis, right?

A.   No.

Q.   So that means if she went over 40 hours in a workweek,

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

she was not paid any overtime, was she?

A.   She never went over 40 hours in a workweek.

Q.   Do you know what she told Ms. Mosby about the fact that she was being called at all hours of the night to do things and that that time wouldn't be kept and recorded?

A.   No, I don't know that.  I know we let her work remote. We let her go out of town -- when she was at work, we let her go out of town, and she would do things from Nashville.  I know that she had a very lenient, lax job.  I paid her more salary than she was making at her previous job.  She had benefits.

Q.   You understand that none of that has anything to do with whether she was classified properly under the Fair Labor Standards Act and should be entitled to overtime if she goes over 40 hours in a workweek?

A.   Well, she didn't go over 40 hours in a workweek.

Q.   But you didn't actually keep her time, so you can't sit up here and say one way or the other, can you?

A.   I think she was clocking in and out.  Everybody was supposed to clock in and out.

Q.   Even if she was salary?

A.   Yes.

Q.   So you have time records from Ms. Redmond that shows that she never worked over 40 in a workweek?

A.   I'll have to check with Bill.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   But Bill would have those time records, right, if she actually clocked in and clocked out?

A.   That's correct.

Q.   You testified at your deposition that her behavior and actions showed she didn't believe in us, didn't you?

A.   That's correct.

Q.   You felt that she was more of an advocate for employees than sticking up and defending Reaves, didn't you?

A.   No, I never said that.

Q.   That's what you meant.

A.   No, I didn't.  I never said that.

Q.   Do you agree that some HR people are for the company no matter what?  Have you ever experienced that?

A.   No.

Q.   Have you ever heard that?

A.   No.

Q.   In all your years of doing business, you've never seen or heard HR people being viewed as doing whatever they have to do to protect the company?

A.   Well, we were novices, and that's why we hired Jaye.  We thought she had expertise in human resources.  We wanted someone to come in and level our pay to make sure that we were up to standard.  We needed someone for that because we were growing rapidly.  We didn't have the expertise.

            **MR. RYAN:**  Your Honor, if I can have one minute?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

**THE COURT:** You may.

**BY MR. RYAN:**

Q. By the way, in real time while she was still working there, did you or your husband go, Jaye, you're mistaken about Ms. Davis making 20 grand less than the male that was being offered an attorney job? Did you say, in fact, here's Ms. Davis' payroll records so you can see for yourself?

A. I've never logged in to payroll. My HR staff does. I have a login, but I've never logged in to payroll. My staff e-mailed me the second week Jaye was there and they asked me could they give permission for her, and I said yes. So at that time she should have been able to log in herself and give us accurate information. That's what we expected from someone on the C-Suite making $175,000.

Q. She's going to testify that she was never given -- in the month that she worked there, she was never given access to the payroll information, and the only way that she knew what Ms. Davis was making was from Sheena Payne who supervised Ms. Davis and knew what Ms. Davis was hired in at, at $65,000. Do you have anything to dispute that?

A. Well, I think as an HR professional she should have gone to Jakira and made sure that she was making the amount of money that she said she was making before she gives information to the CEO.

Q. But the CEO -- all Mr. Reaves had to do was say, Jaye,

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

you're mistaken.  Here's the printout and here's what Ms. Davis is actually making.  Please apologize for bringing this erroneous information to my attention.

A.    Well, he was a CEO.  He was also conducting trials and supervising the litigation team.  So we hired her for that, to give us that HR information, the human resource information.

Q.    But you just said Bill -- whoever Bill is.  What's Bill's last name?

A.    Walker.

Q.    Bill Walker had access to payroll in --

A.    She should have gone to him.  She went to him for permission to get the payroll.

Q.    Do you have any proof that Bill Walker printed out Ms. Davis' payroll information to show Jaye that she was mistaken about Ms. Davis' pay?

A.    We use a portal, a login, and they give us permission and they give us a login, and that's how she's supposed to go in and view the information.

Q.    And if she didn't have that login, why wouldn't Bill, who had that information, just say you're mistaken, Jaye? See, look on the computer screen.  You're mistaken.

A.    He probably would have if she had gone to Bill, the source.  Bill or Jamie.

Q.    But after she went to your husband, all your husband

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

had to do was say, Jaye, go into Bill's office and look on the computer screen, and you'll see that Ms. Davis was actually getting paid $20,000 more than what you believe she was.

A.   Well, she was a CPO at $175,000.  I didn't think the CEO had to tell her to do menial tasks for $175,000.  She was an attorney.  We expected some critical thinking.  We expected some expertise.

Q.   Well, you're the one that's saying that she didn't have a good faith belief that Ms. Davis was making 20 grand less.  And she's going to say, you know what, if they really thought I was mistaken, how come they just didn't show me.  Don't you think that makes good sense?

A.   It doesn't.  At $175,000 she should have gone and sought out the information that she brought to us.  She shouldn't have brought any information that she heard at $175,000 on the C-Suite.  When I was a teacher I made $33,000.  I had to go and seek information --

**MR. RYAN:**  Move to strike.  This is -- what she made as a teacher doesn't have anything to do with anything.

**BY MR. RYAN:**

Q.   You were copied on the May 28th e-mail, correct?

A.   Is this it?

Q.   Yeah.

A.   Okay.  I believe so, but I can't see the top.  Okay,

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

yes, I was copied.

        **MR. RYAN:**  Your Honor, we move to mark the May 28th e-mail as the next exhibit.

        **MR. SHAUGER:**  Can I take a look at it?

        **THE COURT:**  Has she identified it?

        **MR. RYAN:**  She just did.

        **MR. SHAUGER:**  No objection, Your Honor.

        **THE COURT:**  Without objection, it will be admitted and marked as Exhibit 4.

        **MR. RYAN:**  Thank you, Your Honor.

    (Exhibit No. 4 was marked and admitted.)

**BY MR. RYAN:**

Q.   Now, Mr. Reaves, he's working early on Saturday, May 28th, right?  4:15 a.m.  Do you see that?

A.   Yes, I do.

Q.   I don't know if -- he's on Pacific Time?  Is he out in California with you?

A.   No.  We were at home I think.  Maybe we were in California.  I don't know.

Q.   One way or another, it's early morning on Saturday, the 28th, that he sends that message to Jaye, correct?

A.   Yes.

Q.   Okay.  Now, he says:  Effective immediately I will be interim CPO.  Correct?

A.   That's correct.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.  And so he took away job duties and the title, right?    16:04:51

A.  Yes.    16:04:58

Q.  Okay.  I just want to make sure that's clear.  He    16:04:59
didn't touch her pay, but he stripped her from her title and    16:05:03
her job duties, right?    16:05:07

A.  Well, she had the title.  She just wasn't doing the    16:05:09
duties.    16:05:12

Q.  That's not my question.  He gave her different duties    16:05:13
going forward in this e-mail, correct?    16:05:17

A.  Yes.    16:05:19

Q.  All right.  He says:  Starting Tuesday, you will    16:05:20
report to Tina as an intake member.  Do you see that?    16:05:24

A.  Yes.    16:05:28

Q.  Okay.  So if she reported to -- again, Tuesday is    16:05:28
May 31st.  And Tina is Tina Adams, right?    16:05:33

A.  Yes.    16:05:36

Q.  She still works for you guys, right?    16:05:36

A.  Yes.    16:05:39

Q.  So you can control whether she comes to testify or    16:05:40
not, right?    16:05:43

A.  No.  I can't control anyone.    16:05:43

Q.  Well, Mr. Reaves certainly can.    16:05:47

A.  No, he can't.    16:05:50

Q.  Okay.  Well, she was identified as a witness.  So why
did y'all identify her as a witness?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

A.   You identified her as a witness.

**MR. SHAUGER:**  Objection, Your Honor.  Again, she's not a party to the lawsuit.  She's not identified any witnesses.  And also --

**THE COURT:**  Well, I think he's asking a different question.  So to the extent he's asking a different question, your objection is overruled.  As I understand the question, it's not a legal question.  It's a question of authority to control a witness.  And he can ask that question.

**BY MR. RYAN:**

Q.   She still works for Reaves and gets paid by Reaves, correct?

A.   That's correct.

Q.   Okay.  Now, Tina would certainly be able to say whether Jaye reported to work on Tuesday, Wednesday, or Thursday of that week, wouldn't she?

A.   Yes.

Q.   She would be the best human being in the world to say whether she reported to work on those three days, right?

A.   That's correct.

Q.   And again, if she only reports to work on those three days, she's still working for Reaves according to your testimony, right?

A.   I'm sorry?

Q.   Yeah.  Again, if she actually reported to work on

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

those three days, then the basis for termination that you
testified to under oath in your deposition is false, right?

A.   No.   If she reported for the seven-month training, she
would still be employed.   Three days would not have been
enough to learn intake.   And eight weeks would have been
enough to learn the other departments.

Q.   But you didn't give her that chance because you
terminated her at 6:36 on Thursday the 2nd.

A.   She didn't show up.   She didn't give herself a chance.

Q.   Okay.   If I can show you for a fact through her
testimony and Tina Adams' testimony that she actually showed
up to work on June 2nd, the day that you were in California,
would you change your testimony and admit that the reason for
termination was false?

A.   I wouldn't change my testimony.

Q.   Okay.

A.   Because that was the reason in '22 why I sent that
e-mail.   I can't change it now three years later.

Q.   And he goes on to say you'll spend four weeks in
intake, eight weeks in client care, and 16 weeks as a
negotiation team member, right?

A.   Yes.

Q.   Now, nowhere in this e-mail does he say that I need
this transition document by a date certain, does he?

A.   I can't see the whole e-mail.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   Let me give it to you so you can look at it very closely, line by line.  And you tell me where it says that it's to be produced by a date certain.

A.   It's number one, for her to turn that in --

Q.   I'm talking about a date certain.

A.   You didn't let me finish.  You cut me off.

Q.   Exactly.  I'd love for you to point it out.  I have all day.

A.   So if it's not there, don't answer it?  Is that what you're saying?  Because I was saying it's in here but there's not a date, but you cut me off.

Q.   That's what I'm saying, a date certain, ma'am.  In other words, hypothetically, does it say, Jaye, I need this by the close of business on Thursday?  Yes or no?

A.   No.

Q.   Thank you.  The truth of the matter, there never was a deadline that was communicated to Jaye, was there?

        **THE COURT:**  Let's -- do you want to answer the question?

A.   The deadline was implied because she was the only one who knew we had a SLIP program on June 2nd.  She was the only one who knew.  So why wouldn't you turn that in before the event as a professional?

**BY MR. RYAN:**

Q.   Why didn't you just tell her in writing to be crystal

UNREDACTED TRANSCRIPT

**TESTIMONY OF NEVA REAVES**

clear, you will be fired if you didn't turn it in by the close of business on Thursday?

A.   Because that wasn't our intention to fire her.  Our intention was to keep her.  We thought that she was going to complete the training and actually be our CPO.

Q.   But the fact of the matter is she was never told in writing that she was going to be terminated if she didn't turn in that transition document by a date certain, was she?

A.   No.

Q.   Thank you.

**MR. RYAN:**  I'm sorry.  No more questions.

**THE COURT:**  We're still here, Mr. Ryan.

**MR. RYAN:**  Sorry.

**THE COURT:**  Mr. Shauger, do you have questions for this witness at this time?

**MR. SHAUGER:**  I do, Your Honor.  Just a brief cross and then we'll --

**THE COURT:**  What we're going to do then is take a recess.  It's late to take our recess, and we'll be out of here by 5 or 5:30.  But we do need to go ahead and take a recess because of the length of time we spent.  So don't talk about the case while you're out.  Relax for a few minutes. When we're ready, we'll send for you.

(Jurors exited the courtroom.)

**THE COURT:**  Mrs. Reaves, you may also take a

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

recess.  We're all still here.

Whose idea was it that this case would take a day to try?

MR. HANCOCK:  I didn't say we agreed on that.

MR. RYAN:  I'm not going to say why that took longer than it did.  I think we know.

MR. HANCOCK:  I disagree with you.

THE COURT:  You know, there's a wonderful old saying that no one who's not my age probably remembers, but it's it takes two to tango.

MR. RYAN:  Agreed.

THE COURT:  Now, Mr. Shauger, how much time are you planning to spend with this witness?  Based on the direct examination, I believe the time available to you is infinite.  But I prefer you not take that much time.

MR. SHAUGER:  Your Honor, I have two questions.

THE COURT:  Two questions?

MR. SHAUGER:  Yes, Your Honor.

THE COURT:  You didn't tell me that.  I would have let you ask your two questions.

MR. SHAUGER:  We attempted to.  We didn't want to disappoint the jury after you told them to take a break.

THE COURT:  All right.  Well, we'll come back.  You ask your two questions, and with luck we won't have any redirect, and we can move on to your next witness, Mr. Ryan.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

**MR. HANCOCK:** Do we need to talk about that? Is your next witness going to be long? I'm only trying to look at the clock.

**THE COURT:** We're going to be here till 5 or 5:30, I don't know which, but we're going to be here until 5 or 5:30. And if we have to interrupt a witness's testimony in mid testimony, we will. I have foolishly told the story -- I thought I was going to tell the jury it would be two to three days, but for some reason I fell into two days.

**MR. RYAN:** I think it's -- we're going to be two.

**THE COURT:** Are you thinking?

**MR. HANCOCK:** I am thinking.

**THE COURT:** I appreciate all thought. Go ahead.

**MR. HANCOCK:** If we take all the deposition testimony as the barometer --

**THE COURT:** What?

**MR. HANCOCK:** If the deposition testimony is our best way to gauge how long it took us to take the depositions for how long it's going to take the witnesses to testify, we should not have more than three, maybe four hours of proof. That's my best guess as what we're looking at.

**THE COURT:** I would simply ask for restraint and as much noncumulative testimony as possible. All right. Let's take our recess so we can get going again.

And you don't have to sit there in the witness

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

stand unless you're just comfortable there, Ms. Reaves.  You can move around, go back to the witness room, do what you like.

           **THE WITNESS:**  Okay.

       (Recess taken at 4:15 p.m. until 4:40 p.m.)

       **THE COURT:**  I believe the jury is about ready.  A couple of things.  With my peripheral vision I seem to sense hand gestures and expressions of dismay, which may be unconscious, but it needs to stop.  And it's coming from over here.

       Second point, be sure to turn off your microphone when you are not speaking because it's disruptive.  Or at least it's disconcerting for me to hear a bunch of papers shuffling around when I'm supposed to be paying attention to the proof.  So turn off your microphone.  If I hear it and it disturbs me, I will point it out.

       Now, 5:30 is our goal.  Let's bring in the jury.

       (Jurors entered courtroom.)

       **THE COURT:**  Welcome back, ladies and gentlemen of the jury.  5:30.  That's our departure time.  We'll start again at 9:30 in the morning.  We're leaving this evening at 5:30.  We are ready for the cross-examination of the witness in this case, Mrs. Neva Reaves.  Mrs. Reaves, you're still under oath.  Thank you.  And the cross-examination will be with Mr. Shauger.  Mr. Shauger?

                        **UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

**MR. SHAUGER:**  Thank you, Your Honor.  Your Honor, may I publish Exhibit 4 to the jury?    16:42:07  16:42:16

**THE COURT:**  Absolutely.    16:42:20

### CROSS-EXAMINATION

**BY MR. SHAUGER:**

Q.    Mrs. Reaves, I'm going to show you the e-mail that Mr. Ryan previously showed you.  This is the e-mail that your husband had sent to Ms. Mosby on May 28th.  Mr. Ryan had made up a pretty big deal about there not being a deadline to complete the transition memo.  If you look about halfway down this document here, can you please read that line for me, please?    16:42:26  16:42:32  16:42:36  16:42:41  16:42:47  16:42:54  16:42:57

A.    Immediately.    16:42:57

Q.    And then what's underneath that?    16:42:59

A.    Prepare a transition document that shows everything you've done and are doing, as well as necessary future actions on the HR front so I can keep the momentum of your progress.    16:43:01  16:43:04  16:43:08  16:43:14

Q.    And would you consider "immediately" to be a deadline?

A.    Yes.

Q.    Also, Mr. Ryan didn't really give you an opportunity to explain the other missteps that you testified about that you allege led to Ms. Mosby's termination.  Can you please tell the jury what those were?

A.    One of them was the hiring.  We needed a trainer for    16:43:25

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

our entire firm because we were interviewing novices.  It's very hard to find experienced paralegals, so we moved on to finding people straight out of community college or college.  So we needed to train them.  So we needed to train each department at our firm.  And the first resume that she brought was a resume -- when I looked at the resume there was no -- there was no degree from a school.  And when I asked her about that, she said she didn't know.  And I was quite taken aback because I expected lots of expertise.  And even I know how to read a resume and write a resume.

So I expected to see the school, the beginning of the school, the end date, and the degree, and all of that was missing from the resume.  But she did already present that to the CEO.

Q.   Anything else?

A.   Also, she was mislabeling departments and employees and not hiring the right employees because she was mislabeling departments and employees.

Q.   Could you give an example of that for the jury?

A.   So because the business is Henry's brain child, he did create all of this from his mind, so he decided to rename paralegals client care because he wanted them to know when they came in their primary job was client care.  And she came to the meeting and she said that we didn't need client care.  So that would mean that the attorneys would be doing all of

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

their work, which is virtually impossible.

Q.    Thank you, Mrs. Reaves.

MR. SHAUGER:  No further questions, Your Honor.

THE COURT:  Do you have any other questions for this witness, Mr. Ryan?

### REDIRECT EXAMINATION

**BY MR. RYAN:**

Q.    Who made the statement under oath:  If she had reported to intake and not submitted the document -- talking about the transition document -- she would still be employed. Who made that statement under oath?

A.    That sounds like my deposition.

Q.    I'll read it one more time.  You're not going to try to run from this, are you?  If she had reported to intake and not submitted the document, she would still be employed. That was your testimony under oath, wasn't it?

A.    That's correct.

Q.    Thank you.  No further questions.

THE COURT:  Do you have anymore questions, Mr. Shauger?

MR. SHAUGER:  No, Your Honor.

THE COURT:  Thank you, Mrs. Reaves, you may step down.

(Witness was excused from the stand.)

MR. RYAN:  Your Honor, we'll call Henry Reaves.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

*    *    *

**HENRY REAVES,**

called as a witness on behalf of the Plaintiff, having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. RYAN:**

Q.   Again, tell me to slow down because we're getting close to 5:30.  I'm going to try to get through all the preliminary matters as quickly as possible, but you let me know if I'm going to too fast.  Okay?

A.   All right.

Q.   Born in Mississippi; is that correct?

A.   I was born in Memphis.

Q.   Born in Memphis, but raised in maybe Ashland, Mississippi; is that right?

A.   Hometown, Ashland, Mississippi, but actually we moved around a lot because my father was in the Navy.

Q.   And then did you go to high school in Holly Springs for a bit?

A.   Ashland, Mississippi.  Right outside of Holly Springs.  My actual address was Holly Springs, but I went to Ashland High.

Q.   Where did you actually graduate from high school?

A.   Ashland High School.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

Q.   Okay.  And what year?    16:47:20

A.   1998.    16:47:21

Q.   And then four years in the Air Force?    16:47:22

A.   Four years in the Air Force.  Actually, it was four    16:47:24
and a half because after 9/11 there was a stop-loss, and so I    16:47:26
ended up having to stay in for about an extra six months.    16:47:31

Q.   And I think your attorney mentioned it, and I think    16:47:34
you told me in your deposition, honorable discharge.  Had an    16:47:37
intelligence clearance, a security clearance, and all that    16:47:41
good stuff, right?    16:47:43

A.   Among other awards, yes.    16:47:44

Q.   And would you agree that we're not here about your    16:47:47
awards?    16:47:50

A.   I wouldn't agree with that.  I think that my    16:47:51
credibility is really at stake.  Because if they believe me,    16:47:54
then you and your client are lying.    16:47:59

Q.   And if they believe that your wife said that had she    16:48:02
just shown up to intake she'd still be employed, then you    16:48:05
would agree that whatever you have to say about the    16:48:08
transition document doesn't matter?    16:48:11

A.   I'm the CEO.  My wife works with me.  My wife works    16:48:14
for me.  But I am the CEO, so I would be the one who would    16:48:19
make ultimate decisions on who stays and who does not stay    16:48:24
with the Reaves Law Firm.  So as far as -- even though I    16:48:28
spoke with my wife and I talk with my wife, as far as the    16:48:31

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

decision for Jaye, I take full credit for that decision.

Q.   And you're trying to distance yourself from your wife's testimony under oath right now, aren't you?

A.   What I'm trying to do is articulate exactly how a marriage and how our business in particular runs.  So if Jaye would have, you know, came those few days and stuff like that, there's much more than that.

Q.   Okay.  So back to the awards.  If Jaye has received a bunch of awards, do you want -- can we talk to the jury about all of her awards?

A.   We can talk about her awards as long as we can talk about the lawsuits that you and Jaye have against --

     **MR. RYAN:**  Your Honor.

A.   -- MLG&W.

     **MR. RYAN:**  Your Honor.

     **THE COURT:**  Wait a minute.

     **MR. RYAN:**  Move to strike.  That's almost mistrial stuff right there.  Can we approach?

     **THE COURT:**  We may.

          (At sidebar on the record.)

     **MR. RYAN:**  You've got to be kidding me.

     **MR. HANCOCK:**  He walked right into that.  He's sitting here asking about all of these questions that's exactly what --

     **THE COURT:**  That was just -- that came out of

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

nowhere.  He was talking about awards, her awards, his awards, and suddenly he announces wanting to talk about a lawsuit she's filed.

**MR. HANCOCK:**  I think his point was that if we're going to talk about good things, we can talk about bad things too.

**THE COURT:**  But that's not what he said.

**MR. HANCOCK:**  Well, he said I can talk about that if we can talk about those.  I believe that was his point.

**THE COURT:**  He mentions litigation apparently against him or somebody.

**MR. RYAN:**  MLG&W.

**THE COURT:**  Whatever he wants to talk about has nothing to do with this case.  And I don't think we're far enough along --

**MR. RYAN:**  So that I preserve myself, I'm moving for a mistrial.  I'm moving for a mistrial.  I'm moving for a mistrial.

**THE COURT:**  Well, I'm going to deny that at this time.

**MR. HANCOCK:**  Respectfully, Your Honor --

**THE COURT:**  Wait a minute.  Let me say where I think we are.  He had started to volunteer about other litigation.  It has nothing to do with this case.

**MR. RYAN:**  Right.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**THE COURT:** But he hadn't gotten into any details that -- 16:50:49

**MR. HANCOCK:** He -- 16:50:58

**THE COURT:** Why are you interrupting me? 16:50:58

**MR. HANCOCK:** Sorry. 16:50:59

**THE COURT:** He hasn't gotten into any details about that litigation. It raises an issue for the jury, but at this point I don't think it justifies a mistrial. But maybe I need to pause and tell the jury that they need to focus on this case, and they're not called upon to decide any other case if there should be any other case. And that solves that problem as far as I'm concerned. I don't think we need to one off of it. I hope he's not planning to start volunteering about MLG&W. 16:51:00

Now, you wanted to say something? 16:51:42

**MR. HANCOCK:** Only that he opened the door about credibility and started talking about things that were in that realm. And this -- 16:51:42

**THE COURT:** He opened the door about credibility. The witness is the one who is suddenly declaring his credibility is at issue. And the witness is the one saying, well, if you believe me, not only the plaintiff but her lawyer is a liar just representing her. We're fishing far from the shore in inappropriate ways. 16:51:49

And I understand for the parties it's an 16:52:17

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

emotional matter, and they insult one another apparently freely.  I've tried to keep that away from the jury.  But I'm worried now that he's going to start going down these ways -- these rabbit trails, is really what they are.  He didn't open the door with credibility issues that involve other litigation.  And this man is a lawyer.  I think.

MR. HANCOCK:  He is a lawyer.

THE COURT:  Yes.  A member of the bar.  So he should know better than that.  Anyway, my proposal at this point is simply to point out to the jury that they need to decide this case.  If there's any other litigation out there somewhere, they can't consider it.

MR. HANCOCK:  We're fine with that.

THE COURT:  Does anybody object to that?

MR. RYAN:  No.  I mean, that's the next best thing.

THE COURT:  Do you object to that, Mr. Hancock?

MR. HANCOCK:  I do not object to that.

MR. RYAN:  I think he needs to be admonished in the future to --

MR. HANCOCK:  I object to that.

THE COURT:  What?

MR. HANCOCK:  I object to that.

THE COURT:  I'm not going to sit here and admonish him in front of the jury.  If I'm going to talk to

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

him, I going to do it outside the presence of the jury.

MR. HANCOCK:  Thank you.

THE COURT:  Otherwise, it appears that I'm    16:53:26
favoring one party over the other.    16:53:27

MR. RYAN:  I don't trust him to not mention it    16:53:30
again.  Because he wants to mention it, obviously, if he    16:53:33
wants to backdoor it that way.    16:53:36

THE COURT:  There are two things I can do if    16:53:41
that's a problem.  I think what I want to do is wait and see    16:53:44
if something like that happens again.  I don't mean that    16:53:47
specific thing.  There are two alternatives.  I can put the    16:53:52
jury out, and I can talk to him outside the presence of the    16:53:57
jury, or he steps off and briefly talks to Mr. Hancock, and    16:54:01
Mr. Hancock tells him don't do that again.    16:54:07

MR. HANCOCK:  I'm going to do that now if that's    16:54:08
what the Court would prefer.    16:54:16

THE COURT:  Well, it's one way of getting at it,    16:54:16
but I can't --

MR. HANCOCK:  It's a quick way to fix it.

THE COURT:  I don't want to -- what?    16:54:17

MR. HANCOCK:  I think it's a quick way to fix it
if that's the concern.

MR. RYAN:  What are you going to say to him?

THE COURT:  Wait a minute.  You're asking him
what he's going to say to his client?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**MR. HANCOCK:** I'm not going to tell him.

**THE COURT:** How long are you going to take with this witness anyway?

**MR. RYAN:** It's going to be pretty quick. But see, this is the kind of thing I wasn't anticipating, and it's clearly improper under 404. It's improper and it should be excluded under 403.

**THE COURT:** The question is what do you do with it and are we going down that repeatedly. So how do I get him off the stand to talk to his lawyer?

**MR. RYAN:** I don't think it looks bad. It could be done in 20 seconds and in addition to your instructions.

**MR. HANCOCK:** How about we see if we have a problem again and that's how we fix it, if we do, outside the presence of the jury so that this doesn't look like we've conferred and he's now in trouble.

**THE COURT:** I'm going to send the jury out.

(End of sidebar.)

**THE COURT:** Ladies and gentlemen, we are going to take another brief recess. I told you at the outset that we might be having some conversations at the sidebar, and sometimes they might take longer than I would hope. But if they're going to take a little longer, I don't want you just sitting there while we talk. So why don't we take a recess.

Don't talk about the case while you're out.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

We're still going home at 5:30, and we'll do our best to move it along.  Thank you.

(Jurors exited the courtroom.)

**MR. HANCOCK:**  May I approach?

**THE COURT:**  You may.

(Off-the-record discussion.)

**THE COURT:**  Okay.  Let's bring the jury back. And I'm going to give the brief instruction we talked about.

**MR. RYAN:**  I'm not going to being mentioning anything else about awards or whatever.  It got mentioned in openings, so I thought I would try to address it.  But I don't think it's proper to --

**THE COURT:**  You can leave it out.  Let's see if the jury is ready.

(Jurors entered courtroom.)

**THE COURT:**  Welcome back, ladies and gentlemen. I want to remind you of one thing that I said at the outset. This case needs to be decided only on the facts and the law related to this case.  If there are other cases or something out there, which I don't know, they're not something for you to consider.  Focus on this case, the facts and the law in this case.  Ignore anything else that may be happening out there in the world.  Does everybody understand that?

**JURORS:**  Yes.

**THE COURT:**  Good.  Thank you.  Mr. Ryan.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**BY MR. RYAN:**

Q.   Let's try to get back on track and move this through as quickly as possible.  You get your undergraduate degree and go to law school in Indiana, correct?

A.   Correct.

Q.   And then you come back to the Memphis area in 2008, 2009?

A.   2009.

Q.   And you first start working for a law firm, correct?

A.   Yes.  Leitner, Williams, Dooley and Napolitan, an insurance law firm downtown.

Q.   And then you decide you want to open up your own firm, and you get it off the ground what year?

A.   I really just decided I didn't want to do defense work anymore.  I didn't initially say I wanted to start my own law firm.  Every other door just closed, and I had to start my own law firm.  So 2011.

Q.   Okay.  And you guys are based in what part of town?

A.   Starting out we were in Whitehaven.  We also have an office downtown, and we also have an office in Jackson, Mississippi.

Q.   And what office were you at when Jaye was physically reporting to you?

A.   Whitehaven.

Q.   And what was the address there?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

A.    1991 Corporate.

Q.    And your law firm had grown over the years, correct?

A.    Correct.

Q.    And you wanted -- in the spring of 2022, you wanted to bring somebody like Jaye onto your team to sort of head up HR and be the chief people officer, correct?

A.    Correct.

Q.    Now, in the spring of 2022, you mentioned to a friend of yours, Rod Holmes, an attorney here in town, that you were looking for a person to fill that role, correct?

A.    Yes.  I was looking for the C-Suite head of my human resources.

Q.    What does C-Suite mean for the jury?

A.    C-Suite, the way that we're structured in our organization, we have the head of all departments, top executive, that would be the C-Suite.  So marketing, finance, operations, HR.

Q.    And your wife is working with you at this time, correct?

A.    Correct.

Q.    Her official title is?

A.    CXO.  So she's a chief client experience officer.  So her major thing was how do the people feel that they are being treated when they come to the Reaves Law Firm.

Q.    Did you consult with her when you hired Jaye?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

A.   No.

Q.   You are the singular person to decide to hire Jaye; is that correct?

A.   Yeah.  There's a long history between me and Rod, why I would rely on him.  So I completely relied on her, I don't know, friend or whatever Rod Holmes.  And I didn't even look at her resume.  I mean, it was one interview.  We sat, we talked.  She said what she wanted.  I kind of gave it to her. It was a very, in hindsight, just really an overreliance on Rod Holmes.  But he had been my HR attorney for the last -- for ten years, and he was at that first law firm with me, so I really relied on him.

You know, she passed the muster in the initial interview.  I have a large blind spot when it came to HR, so she knew more than me, sounded good.  I trusted her.

Q.   And you trusted Rod, correct?

A.   Correct.

Q.   And Rod told you how he knew Jaye, right?

A.   Correct.

Q.   They had actually worked together for many years, correct?

A.   I'm assuming so.  I'm not sure.

Q.   And she actually e-mailed her resume to you on multiple occasions.  You do understand that, don't you?

A.   No.  She may have.  I don't remember -- recall seeing

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

it.  But we forwarded you all our e-mails, so, you know, if you have it, it's in the evidence and you can present it.

Q.   Right.  And you and Dwaun Hammond were copied on the e-mail that she sent attaching her resume.

A.   She may have sent the resume.  But like I said, she was hired at the interview, you know, right at the time off of the conversation.

Q.   So you're going to hire somebody without even opening up the resume --

A.   Yes.

Q.   -- and looking at the resume?

A.   Yes.  Not now though, but I did.  And that's only because I'd known Rod Holmes for the amount of years, and she had been in labor and law for 25 years.  I think the biggest mistake that we made is, like, a labor employment lawyer is not an HR specialist.  It's two different things.

Q.   Let me ask you this question then.  And listen to my question, please.

A.   Yes, sir.

Q.   When you first offered her the position, you offered her a salary of $150,000, correct?

A.   I don't recall.  I gave her whatever it is she asked for.

Q.   And she told you she wanted to be making at least what -- the compensation she would be giving up if she left MLG&W

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

to come work for you, correct?

A.   I don't recall.  I just know that I gave her what she asked for.

Q.   You don't remember her sending an e-mail to you where she said my comp package at MLG&W is 175, so if I'm going to leave MLG&W, I want to be making at least this?  You don't remember that?

A.   She may have.

Q.   Okay.

A.   I mean, if she -- whatever she asked -- that was over three years ago.  She asked for the 175.  We gave her the 175.  I cannot say the specifics of, you know, how that went down.

Q.   You actually gave her 185, sir.  She's going to testify, and we have the payroll documents.

A.   I have a hundred employees, so if it was 185 -- I mean, I don't -- you'd have to look at the documents.  I don't know.

Q.   Now, you have a state-of-the-town-hall meeting, state-of-the-firm meeting on or about Monday, May 15th, correct?

A.   Yes.  We have it on a quarterly basis, so we have one in the quarter.

Q.   Would you agree that you were effusive in your praise about bringing Jaye Mosby on?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

A.   Absolutely.  I was extremely -- you know, I was praising her in front of -- I brought her in front of the whole team.  And I let them know, hey, we finally got this person who is going to be dedicated to hearing your concerns as the person you would go to if you have any problems.  I introduced her.  I was very happy.

Right after, we had the Memphis in May.  We had a tent.  She had her girlfriend -- or her wife was out there with her.  I profusely was accepting, you know, her and her girl --

MR. RYAN:  Your Honor, whether she has a female partner has no relevance.  I didn't ask him anything about that.  I said effusive praise at the town hall meeting.

THE WITNESS:  This was at the town hall meeting.

MR. RYAN:  I'm not talking about a Memphis in May tent.

THE COURT:  I'll just say this.  The plaintiff's personal relationships are absolutely irrelevant to this case.  Put them aside.  They don't matter.  Now, as to what might have been going on, what contribution defendant may have made to the plaintiff, that's something you can consider, but --

MR. RYAN:  Can you leave out her --

THE WITNESS:  I'm not saying it in a derogatory manner.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

THE COURT: Wait, wait, wait --

MR. RYAN: By mentioning --

THE COURT: Wait a minute, Mr. Ryan. I'm not finished. Everybody understand that? She's going to be treated by you just however she is. We're not going to compound any invidious discrimination in this case.

MR. RYAN: I don't know why he's mentioning it.

THE COURT: Mr. Ryan, don't make a speech. I've said what I have to say to the jury. You don't need to say anything else. Ask your question.

BY MR. RYAN:

Q. You were effusive in your praise of Ms. Mosby at the town hall meeting when --

A. Yes, because I had to get my team also to believe in her, and I wanted them to also be comfortable to come to her if they had any type of problems or if they have any type of issues. That was part of my job.

Q. Including things that might be illegal such as pay?

A. Definitely.

Q. And she did come to you pretty quickly on about Jakira Davis' pay, didn't she?

A. She came -- she came and she told me that Jakira Davis was making $20,000 less than an individual. And the offer that we gave, it came through her recommendations as well. She is the one who we sat and we talked about what the

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

starting pay for new attorneys was going to be.  So the    17:09:33

initial offer, it came through her.  And then I offered what    17:09:37

came through her recommendation.

    She tells me Jakira Davis is making less than 60 -- is    17:09:42

making 65,000.  I immediately e-mailed our payroll -- and you    17:09:45

can see the e-mail -- to tell them move Jakira up to 85,000.    17:09:49

And you know what they told me?  She's already making 85,000.    17:09:55

So she was wrong about that in the first place.  But my    17:09:59

response was an immediate e-mail that you can pull up, and I    17:10:02

called my HR and I said move her to 85,000.  This is the job    17:10:06

that I paid her to do.  I wanted her to come in and find any    17:10:11

irregularities.    17:10:16

Q.   Guess what e-mail is not on the pretrial order that    17:10:17

you identified as something that you would offer to show the    17:10:21

jury in this case.    17:10:22

        **MR. HANCOCK:**  Object, Your Honor.  It is.  It's    17:10:22

on the pretrial order.    17:10:25

        **THE COURT:**  Is this your witness?    17:10:27

        **MR. HANCOCK:**  Yes.    17:10:28

        **THE COURT:**  And what's your statement?    17:10:29

        **MR. HANCOCK:**  He just said what e-mail was not on    17:10:30

the pretrial order.  And the e-mail he's talking about is on    17:10:33

the pretrial order.    17:10:36

        **MR. RYAN:**  We'll get to that.    17:10:36

        **THE COURT:**  Well --    17:10:42

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**MR. RYAN:** Let me reask the question. Let me ask you this --

**THE COURT:** Why don't you reask the question. You sit down.

**BY MR. RYAN:**

Q. You believe that she was disloyal, in your own words, for bringing that issue to your attention?

A. Absolutely not. That's what I paid her to do. When you get someone who's going to be over your HR, like the responsibility they have is to bring things to your attention that can get you sued. So that's exactly what I wanted her to do.

So the reason that she was called disloyal was because the actions that she did with the hiring. She hired -- the first thing she did was she hired her mother for $75,000 a year, which is more than starting attorneys were making, 65,000. And she hired her mom to make -- this is the first month. That ain't the first hire though.

**MR. RYAN:** Guess what? I'm defy you -- I'm going to challenge you to prove me wrong and show me that she paid her mom -- that her mom was paid $75,000. Please bring some evidence to court tomorrow when you have the chance, okay?

A. So you're giving my attorneys permission to bring someone tomorrow?

**MR. HANCOCK:** Objection, Your Honor.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**THE WITNESS:**  Is that what you're saying?

**MR. RYAN:**  Bring the proof.

**THE COURT:**  I've got three of you, and I only need one at a time.

**THE WITNESS:**  So we have --

**THE COURT:**  Mr. Reaves.

**THE WITNESS:**  Sorry.

**THE COURT:**  Do you have an objection?

**MR. HANCOCK:**  I do.  A challenge to a witness isn't a question.  It's inappropriate.  And we'd like to put this on the record to not to keep happening.  That is not a question.

**THE COURT:**  Mr. Ryan, you don't need to be arguing with the witness in that way and telling the witness what the witness ought to be doing.  Ask some straightforward --

**BY MR. RYAN:**

Q.  Do you have any --

**THE COURT:** -- short questions.

**MR. RYAN:**  I'm sorry, Your Honor.

Q.  Do you have any documentary proof --

**MR. HANCOCK:**  Your Honor --

Q.  -- that Ms. Mosby's mother --

**MR. HANCOCK:**  I'm sorry, Your Honor.  You weren't even finished talking.  I'd just like to hear the rest of

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

where you were going.

THE COURT:  What are you saying?  Speak up.

MR. HANCOCK:  I did not -- I couldn't hear the
rest of what you said because Mr. Ryan starting asking
questions before you stopped talking.

THE COURT:  I was just cautioning Mr. Ryan as he
asked questions not to be argumentative and not to challenge
the witness to do things.  Just to ask a simple,
straightforward narrative question.

Go ahead, Mr. Ryan.

BY MR. RYAN:

Q.   Let me back up.  I'm going to ask you a very precise
question.  Quote.  Did you ever say these words to Jaye?  I
did tell her I questioned her loyalty with some of the
decisions she was making.  Yes or no?

A.   I'm pretty sure I did because I did question her
loyalty because of some of the decisions that she was making.
And one thing that my wife didn't mention, that person that
who she tried to hire --

MR. RYAN:  Your Honor --

A.   -- over training --

MR. RYAN:  -- move to strike.  I asked for a yes
or no.  Now he's just running on and filibustering.

THE COURT:  Could you be as concise as possible,
Mr. Reaves?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**THE WITNESS:**  Yes, Your Honor.    17:13:58

**THE COURT:**  Thank you.    17:13:58

**BY MR. RYAN:**    17:13:59

Q.  You told her that you questioned her loyalty regarding some of the decisions that she was making, correct?

A.  Yes.  Can I explain why?  Or no, you don't want me to explain?

Q.  Well, I've got a follow-up question to that.  You also told her that you articulated to her that you had trust issues with her, correct?

A.  Yes, I definitely had trust issues with her.  I do not -- did not trust her.  I don't.  That's true.  And I can articulate why if you'd like.

Q.  So we have a May 28th e-mail that you sent to her, correct?

A.  Yes.

Q.  And you weren't talking about terminating her for any trust issues at that point, were you?

A.  No, I was not.

Q.  And on May 31st, when you sent an e-mail to your team talking about how she was going to go off for seven months and train, you didn't tell anybody on your leadership team that you had trust issues with her and you were going to consider terminating her because of trust issues, did you?

A.  I don't talk negatively about my employees to other

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

employees.  I go directly to the employee and tell them.  I don't think it is proper for me to go around telling people that I don't trust her and that she's not loyal.  What does that -- like, what does destroying her character do for me?

Q.   The reason why you told her to her face and the reason why you've admitted under oath that you called her disloyal and that you had trust issues with her is because she brought the fact -- you didn't like the fact that she was on the side of the employee, Ms. Davis, who was getting paid $20,000 less than what you wanted to offer this male attorney.

A.   May I give my -- may I answer that?

Q.   Yes or no.  Is that true or not?

A.   I cannot answer that question yes or no.  You are consistently saying that Jakira Davis made $20,000 less when it's been established that she always made 85,000.

Q.   Did you provide proof to Jaye at that time right then and there that Ms. Davis was making $85,000 a year?

A.   I'm the CEO.  How would I know?  I didn't know.  How do I know what everyone is making to the T?  What I did immediately is what I would assume someone who is supposed to be the head of my human resources would do, go to payroll and tell payroll to fix the anomaly.  And had she gone to the same person I went to before she came in, she would have known.  But her thing -- it was never about Jakira.  It was always about her trying to set something up.  And that's why

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

we're here today.

Q.   Do you realize what you just said?  To fix the anomaly.  In other words, you instructed payroll to raise Ms. Davis' pay --

A.   Yes.  If she was making 65,000 and another -- and a man was making $85,000, I'd say raise it to 85,000.

Q.   Exactly.  Thank -- we now get --

A.   But she wasn't making 65.  She was making 85.  And I can tell you how anomalies could happen over time if you'd like to hear that.  But you like yes-or-no answers.  I'm not able to articulate it in a yes-or-no answer.

Q.   In addition to the fact that it was only because of her that she identified that Ms. Davis wasn't getting equal pay for equal work, she also raised Ms. Redmond's failure to get overtime issue with --

A.   And that was -- her assessment of PaQuita Redmond was just as inaccurate as hers for Jakira Davis.  And also, just, if you want to let the jury know, when she said that, the thing about it, it was just very theatrical everything she did.  PaQuita sits right outside my door.  She's yelling and loud being like uncouth.

It was a very -- it was a difficult time.  I just looked at it as like maybe she's passionate about it.  Shoot, I like that.  You're passionate about the people.  I need you as a CPO.  That's good.  But you still have to learn what it

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

is we do.  And the biggest issue is she did not know what we did.  And when I laid it out for the steps so she could learn what she did, she sees it -- and she just testified and she's going to testify today she sees it as a demotion, and she sees it as me doing something evil.

And so, like, when you do that, like, there's going to be a certain way that you're going to move around.  She saw it as a demotion.

Q.   Sir, you could have started that from day one.  You didn't have to spring that on her a month into the job.  You could have said before you start doing chief people --

A.   I didn't know -- I didn't know how much she didn't know.  I did not know how much she didn't know.  And we had it set up where she was supposed to do immediate, but she asked to get pulled out early so she could do stuff.  And the stuff that she was doing was painting her office, selecting furniture, things of that.  Like, in her short time in one month, she offered her mom 75,000, and she offered someone to head our education 90,000 who has like a GED or high school diploma.  Doesn't have a college degree and never did training.

Q.   Sir --

A.   Like, it was her friend.

Q.   Again, I assume -- I would love to see it.  If you can prove -- provide any documentation that shows her mom got

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

anything more than an hourly rate of pay for part-time work, I'd love to see it, okay? Okay? So bring it if you've got it.

Now, let me ask you this. You send the e-mail asking -- on May 28th, asking for the transition document, right?

A. Immediately.

Q. You didn't say in there by a date certain, did you?

A. Let's paint the scenario. I paid her $185,000. I have taken everything from her. The only thing that she needs to do is this transition document. And now what I started to feel was that she viewed what I was doing as some type of punishment, and she's going to just -- you know, she's just not going to do it. She's not going to comply, not going to follow.

And now when she testifies it's clear that, yes, that's what she did. She took it as some type of demotion, and she was mad and she chose not to do it.

Q. You told -- in your e-mail to her on May 28th -- I spent a lot of time with your wife on this. But will you at least agree it does not have a deadline by which --

A. I do not agree because if you read the preface, it says do these actions immediately. And in my definition, immediately does not mean don't do it for four days. I'm sorry if I -- I wasn't thinking -- I wasn't like preparing

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

that I'm going to be in court and it's a lawsuit.  I didn't

say have it done at 8/22 at 2:01 p.m. so I could set you up       17:20:47

and fire you.  I don't have to play all those games to fire       17:20:52

you.  I could have just fired her if I wanted to fire her.        17:20:57

Q.   And you didn't tell her that I'm going to fire you if        17:20:59

you don't turn it in by a date certain, did you?                  17:21:02

A.   I didn't tell her that I was going to fire her if she        17:21:06

came into my office and shot it up, but if she does something     17:21:10

like being completely insubordinate and not doing what we say

-- and she also went around the office and started                17:21:16

badmouthing saying that the reason that she was going through     17:21:18

this immersion was because she got demoted.                       17:21:22

Q.   Which is further reason that you retaliated against          17:21:25

her because you didn't like the fact that she believed she        17:21:29

was being demoted for speaking up for these women.                17:21:33

A.   I think that any -- an attorney who would illegally          17:21:37

fire a labor law employment attorney who has 25 years of          17:21:43

litigating for an illegal reason, I think that would be the       17:21:43

dumbest lawyer in America.  I think that would be the dumbest     17:21:46

lawyer in America.                                                17:21:51

Q.   Well --                                                      17:21:53

A.   Hey, hey, say it.  I'm dumb, ain't I?                        17:21:54

Q.   No --

A.   Say it.                                                      17:21:59

Q.   Let me ask you this.  Did you see -- were you at work,       17:21:59

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

physically at work, on Tuesday, May 31st?

A.    I'm not sure.

Q.    Were you physically at work on Wednesday, June 1st?

A.    I don't recall.

Q.    Were you physically at work on Thursday, June 2nd?

A.    I do not recall.

Q.    Ms. Mosby is going to testify under oath upon penalty of perjury that she reported to intake on all three days. Okay?

A.    Uh-huh.

Q.    Do you have any proof or evidence to contradict what her testimony will be?

A.    My proof is once that she felt that the path that I took her down was a demotion and that she wasn't participating with it and she was going to badmouth it, like once I got that information and I knew that that's the way that she took it, she was going to be gone, gone, gone.

So you can say whatever you want to say about one day, two day, three day. I articulated several reasons why Ms. Mosby did not -- she was not at my office for a month. And I fired her, and I stand on it, and I would fire her again today if I could fire her again today. I did that because that was in the best interest of Reaves Law Firm. That was in the best interest of my clients. That was in the best interest of my employees. And I would not be in

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

business if I kept her there.

Q.   And the decision to terminate Jaye was made on what date?

A.   The decision to terminate, the final decision, was probably about June 2nd.  Like right around June 2nd.

Q.   Thursday, June 2nd?

A.   Yeah.  Probably after she goes three, four days and not turning in the transition document.  Like clearly doing a little like revolt.  And the thing about it -- I don't know if you've ever been in a large corporation, but when you have people at the top like C-Suite members and stuff like that, like you have to have a very -- like those are very powerful people to have in your organization.  And when you have one that's dead set on destroying your organization from the inside, it's very irresponsible to leave somebody like that in that position.

Q.   So what do you make about your wife's testimony, if she had reported to intake and not submitted the document she would still be employed?

A.   Maybe that's what she says or maybe that's what she thinks.  I'm telling you right now had she -- I will tell you this.  Had she reported and had she done what she was supposed to do and she was able to be humble -- and at the end of the day she just wasn't humble because she had been at the City of Memphis.  You come in and working for this little

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

hood dude in Whitehaven.  She felt like she was above learning the stuff.

But when I started my law firm, like, I had to sweep the floors, I had to mop, I had to do intake, I had to know how to order medical records.  Like, there's nothing wrong with learning the job, but she felt like she was above it.

Q.   So if she just stays quiet and doesn't speak out about things that she believes are potentially illegal on behalf of employees at Reaves, she'd still be there, right?

A.   Billy, do you notice that she is a female that I hired over the head of my -- over the head of HR?  My chief operations officer is a female.  The head of my intake is a female.  Plenty of my lawyers are females.  My wife is a female.  My building is -- my whole business is built on females.  I literally had a Super Bowl commercial that said: Reaves Law Firm, built by strong women just like America.

So I believe in hiring women.  I believe in paying them -- like every woman who I have ever hired I have paid her more than what she worked at before.

Q.   Well, why do people retaliate then?  Maybe it's because they don't want to be challenged, they don't want to be questioned.  They want others --

A.   I want to get questioned.

Q.   They want others below them to be humble and quiet.

A.   I want to get questioned.  I want to get questioned.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

But at the same time when you're leading the organization, like at the end of the day if we agree or we disagree, you know, we have to go out on that field and we run whatever play the coach calls. And I accept that responsibility as the CEO.

Q. Now, on Tuesday May 31st, you had sent an e-mail to your team, but Jaye was not on that e-mail, correct?

A. Correct.

Q. And in that e-mail, you make the comment that Jaye is finishing up a transition sheet that will give us marching orders in her absence. This will be completed by close of business on Thursday. Do you remember saying that?

A. Yes.

Q. Okay. But there's nothing in writing that says that Jaye was included on this e-mail, does it?

A. Jaye was not included on that e-mail because that e-mail was not -- I had already transitioned Jaye to where she was going. That was my active C-Suite. I was letting everyone know exactly what she's going through. And I would love if you could read the email to the jury and let them hear it, and you'll understand and see there's no venom there. I was not talking down about her. I wasn't talking bad about her. There was no plan for me to terminate or fire her or anything like that. It's the way that she handled it that made me say that she could not be in the law firm.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

Like, I love to hire people and give people chances, but some people, like, you cannot have them work in your organization. Like, they will kill it.

Q. So when you sent this at 5:08 p.m. on May 31st, which was at the end of Tuesday -- and we know she only worked two more days -- you had no intent on terminating her at 5:08 p.m. on Tuesday, May 31st, right?

A. No.

Q. So on Wednesday, June 1st, she reports to intake and works with Tina Adams that entire day. And she reports on June 2nd and works with Tina Adams that entire day.

A. Well, if she did that, if she was working, that even shows more of her insubordination for not turning in that sheet, that transition sheet.

Q. So you --

A. How would she do all those things and fail to turn in a transition sheet and make us miss opportunities to help underprivileged high schoolers through the SLIP program because she chose not to do exactly what it is that we ordered. And not only are we letting down the kids, that also permeates bad for our reputation. The Reaves Law Firm, we admitted -- we have a commitment. We say we're going to do stuff. I have someone in place. I ask for the transition document. And it's one thing you playing with me and my money, but now you're playing with kids. And you're playing

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

with our reputation.

Q.    You could have easily on Wednesday, the 1st, said how's the transition document coming?  Can I --

A.    Why should I have to do that?

Q.    You could have.  Couldn't you have?

A.    Why should I have to do that?

Q.    Will you agree that you could have?

A.    There's a lot -- I agree that there's lots of things I could have done.  I could have prepared the transition document for her.  There's lots of things I could have done.

Q.    And you could have e-mailed her on June 2nd -- on Thursday, June 2nd, and said if I don't have it by the end of the business day --

A.    Why do I have to threaten people like that?  If I have to go to that point for a C-Suite member, that is someone who is clearly not for the organization.  If I have to -- if you have to -- my experience has been, like, it is not productive to stand over someone and threaten to fire them and hold their job over them.  Like, if you have to do that, I feel like that is the wrong person, especially when they're at the highest echelon of leadership.  Maybe if she was an intake person, maybe I could have done that.  But if you're the highest echelon of leadership, everyone reports up to you, there's a little bit higher standard.  And I don't expect to have to tell her three or four times when she is clearly just

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

doing it because she's mad and feels it's a demotion.

Q.   Now, the June 2nd termination e-mail that your wife sends at 6:36 p.m., it says:  On May 31st, the CEO sent a subsequent email and stated that the transition document was to be submitted no later than close of business.

Do you see that?

A.   Yes.

Q.   But she was not on the receiving end of that e-mail, was she?

A.   No.  She was on the receiving e-mail of the document on May 28th that said that she needs to do it immediately.

Q.   Now, this June 2nd e-mail -- and you can take your time because this is going to go back to the jury room.

THE COURT:  In fact, you could probably take overnight because it's 5:30.

MR. RYAN:  Can I ask one more question and then I'll be done for today?  And I really mean it.

THE COURT:  Ask one more question.

BY MR. RYAN:

Q.   Would you agree that nothing in this e-mail indicates that she's being terminated for failing to report to intake on the 31st of May, the 1st of June, and June 2nd?

A.   Absolutely not.  I do not agree with that.  If you look at the third sentence up from that, it says:  This act of insubordination in addition to other missteps and

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

unprofessional behavior.

So I would say that clearly, clearly it is a misstep or it is an unprofessional behavior to not go where you're reported to go.  Especially when I'm not messing with your money at all.  I'm still paying you, you say, 185,000.  And the people who you're sitting next to for seven months are making 14 and $15 an hour, but I'm still going to pay you 185,000.  I feel like that shows an investment in Jaye Mosby.

I don't feel like you would pay someone $185,000 for seven months to learn and do a job that you're paying people 14 and $15 an hour.  That just doesn't even make sense as to why someone would move like that.  That doesn't make sense.

Q.   The word "missteps" were used, not absences from work, correct?

A.   Well, if we look at a misstep, an absence from work can be a misstep.  You can pull up misstep and you look at the definition, and I believe it would be a step that is not consistent with what someone who is reasonable would do.  So I would believe that that clearly falls under -- that would fall under a misstep.  And also the unprofessional behavior should also -- it should also catch that as well.

MR. RYAN:  Your Honor, I'm going to hold myself to my word and I'll finish up with Mr. Reaves tomorrow.

THE COURT:  I think you asked two questions.

MR. RYAN:  Yeah, sorry.

**UNREDACTED TRANSCRIPT**

THE COURT:  It's 5:30.

MR. HANCOCK:  Can I have one question of cross-examination?

THE COURT:  No, no.  He's not finished with his direct.  We're just going home.

MR. HANCOCK:  Oh, okay.  I didn't know if he was finished.

THE COURT:  But I'll hold you to that too, one question.  No.

I think we're going to adjourn at 5:30 for the day although we're in the midst of direct examination of Mr. Reaves by Mr. Ryan.  So have a good evening.  Do not talk about this case this evening.  Do not discuss it with anyone at home.  Do not use any devices that I do not understand or any devices I do understand to communicate with anyone about this case.  And don't do any research or any of those things that are negative.

And whoever is rattling the papers, please turn off your microphone.

Anyway, have a good evening.  I'll see you here at 9:30 a.m., and we'll continue with the trial of this case.  I'm not going to predict how long the case might take, but it seems to me to be taking longer than I had anticipated.  We shall see.  Thank you very much.

(Jurors exited the courtroom.)

**UNREDACTED TRANSCRIPT**

THE COURT:  What else do we need to address this evening, Mr. Ryan?

MR. RYAN:  Nothing, Your Honor.  We're going to take a look at the causation language, and we may have an agreement --

THE COURT:  I'll get to that in a minute.  What about you, Mr. Hancock?

MR. HANCOCK:  Nothing, Your Honor.

THE COURT:  Yes, what I ask is that you promptly submit -- I would say immediately, but I don't think I'll say that.  Promptly submit your authority for your seemingly varying interpretations of whether the protected activity has to be the main reason or a substantial reason for the firm's termination decision.  And I urge you to do that because tonight is when the instructions and verdict form I hope will be underway.  So the sooner the better.  And I'm asking for whatever you've got that you think supports your position.  I don't want to hear it now.

MR. HANCOCK:  I just want to make sure we send it to the right place.  We e-mail that to chambers?  Is that where you want it?

THE COURT:  Here's the expert in e-mails.  You're talking to someone who knows nothing about e-mails, e-mail addresses.  Text messages, I can respond to them but I can't initiate them.  Where do these things that I'm supposed to

**UNREDACTED TRANSCRIPT**

work on go?

**THE LAW CLERK:**  We got the submission from Mr. Shauger.

**MR. SHAUGER:**  Thank you.

**THE COURT:**  Well, speak now or forever hold your peace.  How much longer are you taking with your case-in-chief, Mr. Ryan?

**MR. RYAN:**  We'll finish up with Mr. Reaves pretty quickly and then put Jaye on.  And we should be through by 11:00 if we start at 9:30.

**THE COURT:**  That doesn't necessarily include Mr. Hancock's cross.

**MR. RYAN:**  No, it does not.

**MR. HANCOCK:**  I don't think that it would be -- I certainly don't think it would be an hour.  I expect it to be somewhere closer to 30 minutes.

**THE COURT:**  So we're talking noon at that point.

**MR. HANCOCK:**  That's very fair, yes.

**THE COURT:**  And Mr. Ryan, will that conclude your proof?

**MR. RYAN:**  Yes.

**THE COURT:**  I'm not asking you to make a firm commitment.  I'm just asking you for a prediction.

**MR. RYAN:**  Yes, it will.

**THE COURT:**  Somewhere around lunchtime tomorrow,

**UNREDACTED TRANSCRIPT**

if we can rely on your representations about timing --

17:37:10

MR. RYAN:  Yes, Your Honor.

17:37:14

THE COURT:  -- your case-in-chief will be over.

17:37:15

And then where are you going, Mr. Hancock?

17:37:17

MR. HANCOCK:  We will have three witnesses.  Two

17:37:20

of them will be shorter because they were called on in the

17:37:22

plaintiff's case-in-chief.  I expect our witnesses to be less

17:37:26

than an hour and a half -- less than two hours total.  And

17:37:30

that's the direct, not the cross.

17:37:34

THE COURT:  Now, the only witnesses we're hearing

17:37:36

from at this juncture, as I understand it going forward,

17:37:39

Mr. Ryan's next witness will be the plaintiff.  And then you

17:37:44

have no other witnesses, Mr. Ryan; is that right?

17:37:47

MR. RYAN:  That's right.  No other witness.

17:37:48

THE COURT:  And you're planning to put on?

17:37:51

MR. HANCOCK:  Mr. Reaves, Mrs. Reaves and Tina

17:37:53

Adams.

17:37:58

THE COURT:  Okay.  There we are.  Well, I think

17:37:58

I've covered everything I can cover.  You might want to clean

17:38:03

up over there because I cannot assure you of the security for

17:38:10

anything you leave in the courtroom.  We're adjourned.

17:38:16

(Proceedings concluded at 5:38 p.m.)

17:38:20

## C E R T I F I C A T E

**UNREDACTED TRANSCRIPT**

I, POLLY W. WARDLAW, do hereby certify that the foregoing 235 pages are, to the best of my knowledge, skill and abilities, a true and accurate transcript from my stenotype notes of the TRIAL, DAY 1, on the 5th day of May 2025, in the matter of:

Andrea Jaye Mosby

vs.

Reaves Law Firm, PLLC

Dated this 27th day May 2025.

*S/* Polly W Wardlaw

_____
POLLY W. WARDLAW, CCR
Official Court Reporter
United States District Court
Western District of Tennessee

**UNREDACTED TRANSCRIPT**