1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____
                              |
UNITED STATES OF AMERICA,     |
                              |
            Plaintiff,        |
                              |
vs.                           |   NO. 2:23-CV-2099
                              |
REAVES LAW FIRM, PLLC,        |
                              |
            Defendant.        |
                              |
_____


TRIAL, DAY 2

BEFORE THE

HONORABLE SAMUEL H. MAYS, JUDGE



TUESDAY

MAY 6, 2025



POLLY WARDLAW, CCR, LCR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103


**UNREDACTED TRANSCRIPT**

2

A P P E A R A N C E S


Appearing on behalf of the Plaintiff:

          WILLIAM RYAN, ESQ.
          JANELLE OSOWSKI, ESQ.
          Donati Law Firm, LLP
          1545 Union Avenue
          Memphis, Tennessee  38104
          (901) 278-1004
          Billy@donatilaw.com
          Janelle@donatilaw.com



Appearing on behalf of the Defendant:

          JONATHAN C. HANCOCK, ESQ.
          DEAN J. SHAUGER, ESQ.
          Baker Donelson, Bearman, Caldwell & Berkowitz, PC
          165 Madison Avenue
          Suite 2000
          Memphis, Tennessee 38103
          (901) 526-2000
          Jhancock@bakerdonelson.com
          Dshauger@bakerdonelson.com

**UNREDACTED TRANSCRIPT**

3

# WITNESS INDEX

**WITNESSES:**

<u>FOR THE PLAINTIFF</u>

HENRY REAVES
Continued Direct Examination By Mr. Ryan..... 7
Cross-Examination By Mr. Hancock............. 24
Redirect Examination By Mr. Ryan............. 27
JAYE MOSBY
Direct Examination By Mr. Ryan............... 38
Cross-Examination By Mr. Hancock.............102
Redirect Examination By Mr. Ryan............177
Recross-Examination By Mr. Ryan.............180

<u>FOR THE DEFENDANT</u>

NEVA REAVES
Direct Examination By Mr. Shauger............190
Cross-Examination By Mr. Ryan................199
HENRY REAVES
Direct Examination By Mr. Hancock............207
Cross-Examination By Mr. Ryan................225

**UNREDACTED TRANSCRIPT**

4

# **E X H I B I T S**

Exhibit                                                    Marked


  Exhibit 5.......................................    8
  Exhibit 6.......................................   25
  Exhibit 7.......................................   40
  Exhibit 8.......................................   86
  Exhibit 9.......................................  104
  Exhibit 10......................................  120
  Exhibit 11......................................  123
  Exhibit 12......................................  125
  Exhibit 13......................................  126
  Exhibit 14......................................  150
  Exhibit 15......................................  158

**UNREDACTED TRANSCRIPT**

**TUESDAY**

**MAY 6, 2025**

----------------------

THE COURT:  Good morning to all.  Are you ready to go forward this morning, Mr. Ryan?

MR. RYAN:  Yes, Your Honor.

THE COURT:  How about you, Mr. Hancock?

MR. HANCOCK:  We are, Your Honor.  Thank you.

THE COURT:  Are we ready for the jury?  Anything we need to take up outside the presence of the jury, Mr. Ryan?

MR. RYAN:  No, sir.

THE COURT:  What about you, Mr. Hancock?

MR. HANCOCK:  There is not, Your Honor.

THE COURT:  I think you've submitted everything you needed to submit for the jury instructions including the case law, which I appreciate, and I'm at work.  What can I say?  Others are at work as well.  I don't know where the others have gone.  There's more than one of us trying to think.  Let's bring in the jury.

(Jurors entered courtroom.)

THE COURT:  Welcome back, ladies and gentlemen. I hope everyone had a calm, restful night.  I hope no one has been talking about the case or even thinking about the case.

**UNREDACTED TRANSCRIPT**

We're ready to resume the trial in Andrea Jaye Mosby against Reaves Law Firm, PLLC.  As you may recall, when we adjourned yesterday evening we were in the midst of the plaintiff's case-in-chief.  Specifically, we were in the midst of the direct examination of Mr. Henry Reaves by Mr. Ryan on behalf of the plaintiff.  So we are ready to resume the direct examination of Mr. Reaves.

Mr. Reaves, if you will pause a minute, Mr. Mendez is going to swear you.

(Witness sworn.)

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

*    *    *

**HENRY REAVES,**

called as a witness on behalf of the Plaintiff, having been

first duly sworn, testified as follows:

**CONTINUED DIRECT EXAMINATION**

**BY MR. RYAN:**

Q.   I've got a question I want to ask you that I was
thinking about this morning.  Do you agree that if you're
telling the truth, your story shouldn't change because you're
telling the truth?

A.   I'm telling the truth.

Q.   No, I'm just asking whether you agree with that
statement.  If you're telling the truth, your story shouldn't
change because you're telling the truth.  Do you agree with
that?

A.   If you're telling the truth, yes, you should be
consistent with what you're saying.  Yes, I agree with that.

Q.   Okay.  Now, I asked your wife, Mrs. Reaves, about the
EEOC position statement that Mr. Hancock's law firm sent to
the EEOC addressing Jaye's charges and allegations when she
filed that administrative charge.  Do you remember that?

A.   Yes.

Q.   Your wife said that she couldn't identify the position
statement, but that was made an exhibit at your deposition,

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

and so I want to show it to you. 09:46:52

A.  Sure. 09:46:58

THE COURT:  You may approach. 09:46:59

MR. RYAN:  Thanks, Your Honor. 09:47:01

THE COURT:  You're welcome. 09:47:03

BY MR. RYAN: 09:47:05

Q.  That's the position statement that you authorized the law firm to send to the EEOC, correct? 09:47:06 09:47:09

A.  If that's what it's proposed to be, I would say yes. 09:47:12

Q.  Well, I asked you that in your deposition.  I said, did you review your position statement that you attorney submitted to the EEOC prior to it being submitted to the EEOC?  Answer:  I'm sure I did I. 09:47:16 09:47:20 09:47:23 09:47:25

A.  Yeah, I'm sure I did. 09:47:30

MR. RYAN:  Your Honor, we'd move to mark the position statement as the next exhibit. 09:47:33 09:47:35

THE COURT:  Your witness? 09:47:38

MR. HANCOCK:  No objection. 09:47:39

THE COURT:  Without objection, it will be admitted and marked as Exhibit 5. 09:47:40 09:47:41

(Exhibit No. 5 was marked and admitted.) 09:47:44

BY MR. RYAN: 09:47:44

Q.  How many pages is that position statement? 09:47:45

A.  It says seven pages. 09:47:47

Q.  And how many times in that seven-page position 09:47:49

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

statement is it mentioned that Jaye was being fired because she didn't show up at intake?

A.   I do not know.  I didn't write the position statement. We spoke with our attorneys.  And I really tried to remove myself from the situation and my wife away from the situation because you and Jaye Mosby have been trying to attack us, and so we really give as much as we can to the attorneys.

So, yes, if you want to ask me about why I fired your client, you can ask me any question.  If you want to go into these intricacies and seven-page documents and what I talked to these attorneys over three years --

**MR. RYAN:**  Move to strike, Your Honor.

**THE COURT:**  Mr. Reaves, just stick to the answers.

**BY THE WITNESS:**

A.   Yes.  I cannot remember everything in every document that was submitted on my behalf in defense of this frivolous lawsuit.

**BY MR. RYAN:**

Q.   I asked you at your deposition did you review it before it got sent to the federal agency --

A.   And I'm sure I did.

Q.   Okay.

A.   I said that I'm sure I did.  I cannot recall reviewing it.  I do not recall.  I'm sure I did because I deal with a

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

law firm that has integrity.  Baker and Donelson has integrity.  They're not submitting stuff to courts without having their clients review it, and they're not submitting things that are fraudulent.

Q.   All right.

A.   So because those attorneys have integrity, I'm sure that they let me see it.  I do not recall or I do not remember -- you know, I cannot remember seeing it.  I cannot remember sitting down and going over this seven-page document with them.  I trust them as my employment law attorneys.  That's why I retained them and hired them because I don't do employment law.

Q.   By the way, he's got more integrity than anybody I know, and I love him as a person.

A.   That's great.

Q.   And a friend.

A.   That's great.

        **THE COURT:**  Is this a moment for personal testimony?

**BY MR. RYAN:**

Q.   But listen to my question because I'm not talking about anybody's integrity right now.  I'm talking about just facts and evidence.  In that position statement, is there --

A.   I don't remember reading the position statement.  I'm sure I did.  I don't know what's in there.  But you're asking

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

about a piece of paper when you have me right here.                    09:50:08

Q.    Exactly.                                                         09:50:11

A.    Ask me anything that you want to about why I fired              09:50:12
your client.  I can tell you.  I do not recall reading this.         09:50:15

THE COURT:    Wait a minute, Mr. Reaves.  Here's          09:50:20
where we are, which I'm sure you already know.  But the               09:50:25
questions are asked by Mr. Ryan, and you answer them.  Don't         09:50:27
tell him what he needs to ask you.  Okay?                            09:50:30

THE WITNESS:    Yes, Your Honor.                           09:50:32

THE COURT:    Thank you.                                   09:50:33

BY MR. RYAN:                                                           09:50:33

Q.    I just want a simple yes or no.  Is it mentioned in            09:50:34
that seven-page position statement, which discusses the              09:50:38
reasons for Jaye's termination, is it mentioned anywhere that        09:50:42
the reason she's being fired was because she failed to show          09:50:45
up for intake?  Yes or no?                                           09:50:49

A.    I cannot answer that.  Would you like me to stop right         09:50:50
now and read the seven pages and then give the answer?               09:50:53

Q.    Yes.  Look at the seven pages.                                 09:50:56

A.    All right.  I will stop, I will read it, and I will            09:50:57
give you the answer.  Now, the question is about -- repeat           09:51:01
that.                                                                09:51:03

Q.    Whether the position statement mentions as a reason           09:51:03
for her termination her failure to show up for intake.  Yes          09:51:07
or no?                                                               09:51:13

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

A.   Now, I want to say that there's language on here in this statement that does specifically say that this is not exhaustive.  Would you agree with that?

THE COURT:  Mr. Reaves --

**BY THE WITNESS:**

A.   Is that an answer?  Like if there's --

THE COURT:  Mr. Reaves, Mr. Reaves, pause here, please.  The questions are coming from the attorney.  Your job is to answer the questions.

THE WITNESS:  Yes, Your Honor.

THE COURT:  Not to ask him questions, okay?

THE WITNESS:  Yes, Your Honor.  I just want to understand.  I'm really -- I'm literally -- I'm not trying to be disrespectful to you.  I'm not trying to be disrespectful to the Court.  I just really want to understand, you know, and I want to make sure that my yes means my yes.

So if I say that this statement says that this is not exhaustive, then I would say that that would mean that if it's in here or if it's not in here, the statement itself says that this is not exhaustive of all the reasons.  So what is that a yes or should I say --

**BY MR. RYAN:**

Q.   What date was that document submitted to the EEOC?

A.   The date that's circled on here on the top is October 24, 2002 --2022.  So I'm not sure exactly when --

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

Q.   That's what I asked you.  What date was the letter dated?

A.   October 24, 2022.

Q.   Thank you very much.

A.   And it does say that it's not exhaustive.

Q.   All right.  You agree that the jury -- now that this is an exhibit, the jury should carefully look at this document as they review the documents that have been marked into evidence?

A.   I think that the jury should review the testimony and exactly what the judge said.  I think they should review everything.

Q.   And the jury should actually carefully review this document as well, correct?

A.   And I think the jury should understand that if it says that it's not exhaustive, that means that every reason she was fired was not listed.  So I do believe that they should thoroughly examine that document.  And if it says that it's not exhaustive, then they should take it as not exhaustive.

Q.   Why wouldn't an attorney who's representing you not list the true reasons for termination in the document that they submitted to the EEOC?

A.   Very simple answer.  Because they did by saying it's not exhaustive.  There are several reasons that -- my thing is we have no desire to disparage Jaye to the legal

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

community.  Jaye Meachem.  We have no desire to say everything that Jaye did.  That's not the way that we move.

Q.   On October 24, 2022, did you know whether she reported to work on Tuesday, May 31st, Wednesday, June 1st?  Did you know?

A.   Yeah.

Q.   Okay.  So you did know whether she reported to work or not on those days at the time this was submitted to the EEOC.

A.   At the time it was submitted to the EEOC it said that it was not exhaustive.

Q.   No, that's not the question.  The question is -- listen.

A.   I said yes, sir.

Q.   Did you know whether she had reported to work on May 31st or June the 1st at the time you submitted this position statement?

A.   At the time that my attorneys prepared that and submitted it, yes.

Q.   Okay.

       MR. RYAN:  Janelle, can you pull up Mr. Reaves's affidavit, pretty please.

       MR. HANCOCK:  Your Honor, we object to that going up here.  It's not been admitted yet, and we haven't even talked about it.  Object to --

       MR. RYAN:  I can ask him about his affidavit.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**THE COURT:** You can show him his affidavit, but you can't publish it.

**BY MR. RYAN:**

Q.   Did you submit an affidavit in connection with this case at the summary judgment proceedings?

A.   If my attorneys gave me an affidavit, a statement, yes.  I reviewed, I submitted everything they did.

**MR. RYAN:**  May I approach?

**THE COURT:**  You may approach.

**BY MR. RYAN:**

Q.   Do you see it says "declaration", which is an affidavit of Henry Reaves?

A.   Yes.

Q.   And did you declare under penalty of perjury that the foregoing was true and correct?

A.   Yes.

Q.   And in this declaration, what did you say at Paragraph 7?

A.   Plaintiff never reported to intake May 30th, May 31st, June 1st, and June 2nd.

Q.   Now, May 30th was a national holiday, Memorial Day, so the office was closed that day, right?

A.   Uh, yeah.

**THE COURT:**  Don't stand over him.  I know it's tough when you're trying to deal with that device, but don't

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

stand over him while he's testifying.

**BY MR. RYAN:**

Q.   So where did you get your information that she did not report to intake on May 31st or June 1st or whatever?

A.   I got it from my wife who got it from her intake lead.

Q.   Tina Adams?

A.   Yes.

Q.   So you said under declaration upon penalty of perjury in a document that you submitted in this case to try to get Ms. Mosby's case dismissed before trial that she never reported to intake, correct?

A.   Yes.  To the best of my knowledge, she didn't.

Q.   Did you review Tina Adams's affidavit that was submitted in this case?

A.   No, I did not.

Q.   Would you be surprised to learn that the affidavit that she submitted is inconsistent with your affidavit?

A.   No.

Q.   You wouldn't be surprised?

A.   I mean, I don't know.  I don't know.  I do not know.  Either way I don't know.  But I'm telling you exactly why I fired Jaye.

Q.   I'm not asking about --

A.   I'm telling you exactly why.  I did not fire her for doing her job.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**MR. RYAN:** Your Honor, move to strike. He's just not responsive.

**THE COURT:** Answer the questions, Mr. Reaves.

**BY MR. RYAN:**

Q. I just want to know yes or no to this question, and I'll keep it as simple as possible. If Jaye wanted to hire somebody at Reaves, did she need to check with anybody, either you, your wife, or anybody else at Reaves on the executive --

A. Jaye never checked with me when she hired her mother for 75,000, and she never talked to me when she offered 90,000 to someone with a GED to be over our education and training department for our entire law firm.

**MR. RYAN:** Your Honor, again, move --

**BY THE WITNESS:**

A. So she didn't talk to me.

**MR. RYAN:** Move to strike.

**THE COURT:** That's granted. Here we are, Mr. Reaves. Just answer the questions. Save the closing argument for your lawyer.

**THE WITNESS:** I mean, she didn't talk to me.

**BY MR. RYAN:**

Q. That's not my question, sir.

A. Okay.

Q. Was she --

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

A.   Nobody here -- nobody here told her to hire her mother for $75,000.

THE COURT:  Mr. Reaves, there's no question on the table.  He hasn't asked a question.

MR. RYAN:  Again, move to strike.

THE COURT:  Granted.

BY MR. RYAN:

Q.   Was she expected -- if she was going to make a recommendation to hire somebody, would she have -- listen to my question before you cut me off, please.  I'll give you every courtesy.

A.   You've been very polite.  Thank you.

Q.   I don't have anything against you personally, okay?

A.   And you were polite to my wife too, but go ahead.

Q.   Well, thank you.

A.   Uh-huh.

Q.   Was she expected -- was Jaye expected to get approval for any hire?  I'm not talking about a specific hire.  I'm talking about any hire.  Was she expected to get approval before a person was hired?  Just yes or no?

A.   It depends on the hire.  I would say -- I mean, if we look at it, I'm putting her in a position as CPO, chief of human resources.  And so ultimately if she's hiring someone for our intake department or someone who is in our operations, you know, how much authority is she getting when

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

she does that.

Now, I feel like it's different if you want to hire your mother and you want to hire your buddy and pay them more than the lawyers get paid.

Q. And so --

A. I feel like that's different.

Q. -- would you agree that it would be best practice for her to include you, your wife, or others in the leadership team, loop them in and keep them in the loop before she hired somebody in?

A. I think if she's going to give her mother 75,000 and her friend 90,000, that, yes, you should loop in your direct -- you should loop me in on that one. If you want to pay your mom 75 and you want to pay someone with a GED $90,000 to be over our training at a law firm, then, yeah, I think you should probably loop me in on that one.

Q. And so just to be clear, it would be something that you would expect of Jaye to get approval from, say for example, your wife before she made a hire?

A. To be honest, I would expect someone who I trust with a fiduciary duty of being my CPO to not do it in the first place. That's to me -- if I'm honest, I expect them not to come in in your first two weeks and hire your mother for more than the lawyers make and try to hire one of your friends and pay them 90,000, and they have a GED and probably have never

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

made more than $14 in their life.

Q.    Just out of curiosity, if hypothetically -- I want you to assume that Jaye communicated with your wife in early May of 2022, and she said that she wanted to hire a family member on a part-time, temporary basis.  Is that something that you would expect Jaye to do?

A.    Jaye is a -- Jaye is a manipulator --

Q.    Okay --

A.    -- so I would expect her to try to manipulate a position and show the piece of information that she wants to see to get what she wants to get.  I doubt that Jaye ever sent any e-mail saying I want to pay my momma $75,000 to sit in front of my office, and I want to pay one of my friends $90,000 to be the head of my training.

Q.    I'm just asking hypothetically if Jaye communicated to your wife in early May of 2022 that she wanted to hire a family member on a part-time -- part time, not full time, part-time temporary basis, is there anything wrong with her getting your wife's approval to do so?

A.    If she was manipulative to do it.  So if I send an e-mail and I say is it okay if I hire a family member part time, I feel like that's different than saying I want to hire my mother and pay her $75,000, and I want to hire my buddy with a GED and pay them $90,000 to be over my training.  I think that those are two different things.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

Q.   Just out of curiosity, do you know how long Jaye's mother worked at Reaves Law Firm?

A.   Well, part of the stuff when we transitioned her --

Q.   Do you know how long, sir?  Yes or no?

A.   I don't know the exact amount of time.

Q.   Okay.  Thank you.

A.   It couldn't have been that long because Jaye was there for less than a month.  She wasn't even there for 30 days, so her mom had to be -- you know, she might have hired her mom her first week or something like that.

Q.   I asked you a question, and I think you answered it you don't know.

A.   I don't know the -- no, sir, I do not know the exact amount of days her momma worked.

Q.   By the way, the lady you are referring to as "her friend", she's a human being, she's got a name, it's Deneice Davis, right?  Do you agree with that?

A.   I agree she has a name.

Q.   Okay.  But do you -- are you putting the name of Deneice Davis with that person that you're talking about?

A.   If Deneice Davis is the person with no college degree who she tried to hire for $90,000 who never had any experience in training or running training departments or education, yeah, that's the one I'm talking about.

Q.   Just out of curiosity, are you familiar with Southern

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

University in Baton Rouge, Louisiana?

A.    No.

Q.    You're not?

A.    No.  And she's not either.  There's no references.  No one checked that out.  She didn't go to school anywhere.

Q.    I'm just asking -- I'm asking you whether or not on Ms. Davis' resume --

A.    I say bring Ms. Deneice Davis to trial, put her on the stand, and let's see her recommendations.  Let's see what her resume is.  You can bring people.  You asked me yesterday to bring someone.

Q.    I'm actually looking at --

A.    Bring Deneice Davis.  No.  You're looking at it.  Bring Deneice Davis in court, put her under oath, and put her in front of the jury.

Q.    Just out of curiosity, do you know one way or the other where Southern University is?

A.    Jaye is a liar and a manipulator is what I'm saying.  Bring her in and we can go put her under oath, and you can ask what you want.  If you just want to bring a document that Jaye gave you to bring in here to say all this stuff she did, bring her.  You know, this is what we've been saying the whole time.  Bring in Ms. Davis.

            **MR. RYAN:**  Your Honor, move to strike all of this.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**THE COURT:** Granted. Stick to answering the questions, Mr. Reaves.

**BY MR. RYAN:**

Q. Southern University is a historically black college in Baton Rouge, Louisiana, is it not?

A. Yes.

Q. Thank you.

A. Did she graduate from there? Did she graduate from there, sir? Is there a degree, sir?

**THE COURT:** Mr. Reaves, we've been over this about three times. You don't ask the questions. Mr. Ryan asks the questions. You answer the questions.

**THE WITNESS:** Yes, Your Honor.

**THE COURT:** Thank you.

**BY MR. RYAN:**

Q. You fired her because she was disloyal to you, didn't you?

A. I think that she was disloyal to me by hiring her mother for $75,000 and hiring Deneice Davis with a GED who never did any training or teaching, offered her $90,000 to be over the training at a black-owned law firm. I think that is absolutely ridiculous.

Q. You just admitted to this jury of eight people that you don't even know, that none of us know, that you fired her because she was disloyal, didn't you?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

A.   Is that what you heard?

Q.   That's what I heard.

A.   Well, that's what you heard, man.

**MR. RYAN:**  No further questions, Your Honor.

**THE COURT:**  Do you have questions for this witness, Mr. Hancock?

**MR. HANCOCK:**  Very few, Your Honor.  And very quiet and quick.

**CROSS-EXAMINATION**

**BY MR. HANCOCK:**

Q.   Mr. Reaves, let's do a few things that are going to be pretty easy.  Let me show you a few things.

**MR. HANCOCK:**  If I may approach, Your Honor?

**BY MR. HANCOCK:**

Q.   Mr. Reaves, can you tell the jury today is Patricia Anne Mosby the plaintiff's mother?

A.   Yes.

Q.   And was it your understanding when you learned that she'd been hired that she was hired as a full-time employee?

A.   Yes.

Q.   Can you identify the document that I've handed you?

A.   This is a printout from our payroll system, People Process.

**MR. HANCOCK:**  Your Honor, I would like to mark this as an exhibit.  I believe we are to 6.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**THE COURT:** Mr. Ryan?

**MR. RYAN:** Let me make sure that's --

**MR. HANCOCK:** It's the --

**MR. RYAN:** I'm good. Thanks.

**THE COURT:** What does this purport to be?

**MR. HANCOCK:** This is a base compensation history document.

**THE COURT:** It's a what?

**MR. HANCOCK:** Base compensation history.

**THE COURT:** Okay. Without objection, it will be admitted and marked as Exhibit 6.

**MR. HANCOCK:** Thank you, Your Honor.

(Exhibit No. 6 was marked and admitted.)

**MR. HANCOCK:** Let me try to make this a little easier to read. It's pretty small type. Can everybody see that a little bit? Can you see that okay?

**THE JURORS:** Yes.

**MR. HANCOCK:** I'll straighten it up a little bit. Do you see that okay?

**THE JURORS:** Yes.

**BY MR. HANCOCK:**

Q.   Mr. Reaves, will you agree with me that this document reflects that Ms. Mosby's mother was hired at $35 an hour?

A.   Yes.

Q.   Mr. Ryan, you'd also agree with me that if you're

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

trying to figure out what an hourly employee's annual salary is, you take this hourly rate and you multiply it times a 40-hour workweek?

A.    Yes.

Q.    And I'm going to represent to you -- I did the math on my phone, not in my head.  I'm not a math teacher.  If you multiply this $35-an-hour rate times 40 hours, would you agree with me it's $1,400 a week?

A.    Correct.

Q.    And if you multiply $1,400 a week times the 52 weeks that are in a year, do you agree with me that's $72,800?

A.    Correct.

Q.    And do you believe that was what you understood Ms. Mosby's mother to be making when you learned she'd been hired?

A.    Yes.

Q.    I'm going to show you one more thing and I'll sit down.  This is what we've marked as Exhibit 5.  It's the document Mr. Ryan referred to that my law firm prepared. We're going to call it the position statement so it has a name.

MR. HANCOCK:  Can everybody read that okay?

THE JURORS:  Yes.

BY MR. HANCOCK:

Q.    Mr. Reaves, will you read the footnote for the jury,

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

please?

A.    The statements set forth herein are based upon this firm's investigation and understanding of the facts and records at the time this correspondence was prepared.  By submitting these statements, respondent does not waive its right to present new or additional facts or arguments for substance or for clarification should it be necessary. Additionally, the statements set forth herein do not constitute testimonial evidence or an affidavit and are not intended to be used as evidence of any kind in any administrative or judicial forum.  Rather, they should be accepted only as statements made in an attempt to conciliate this matter.

Q.    Was that the reference you were making to this document?

A.    Yes.

        MR. HANCOCK:  I don't have any further questions, Your Honor.

        THE COURT:  Do you have any further questions, Mr. Ryan?

                    **REDIRECT EXAMINATION**

**BY MR. RYAN:**

Q.    Now, again with -- for the record, Jaye's mom's name is Pat.  With respect to Pat Mosby, if we provide proof to this jury that your wife authorized Jaye to hire Pat Mosby on

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

a temporary, part-time basis, you would believe your wife, right?

A.    If she also put that she was going to be making $75,000 a year.  So if my wife saw that Jaye said I want to hire my mother at 75,000, your client is extremely manipulative, and so she probably gave part of the information.

Q.    Well, the ladies and gentlemen of the jury will get to hear Jaye, and they'll get to hear your wife's testimony.

A.    And when they hear her they will understand exactly what I'm saying.

Q.    Now, the fact -- the lawyer who wrote that position statement put a footnote and said we may come up with additional new information and new facts that we could supplement, correct?

A.    It said additional.  It doesn't say -- you know, there is new and it's also additional.

Q.    But one thing that was not new in October of 2022 was the fact that you believe she had failed to report to intake, correct?

A.    That document explicitly states what it was to be used for.  It was to try to get this done.  It was not used to be evidence.  They specifically stated that.  If it was something that was used to be evidence in a judicial form, perhaps they would have been more exhaustive with listing.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

But that purpose of that document, how you're trying to use it with the jury is being dishonest.

Q.    You can --

A.    You're being dishonest with the jury.

Q.    You can have your opinion all day long.  The fact of the matter is the judge let this come into evidence because it's admissible as an admission under the Rules of Evidence. Do you understand that as an attorney?

        **MR. HANCOCK:**  Your Honor, may we approach?

        **THE COURT:**  Sure.

        (At sidebar on the record.)

        **MR. HANCOCK:**  Your Honor did not admit this as an admission.  You admitted it as an exhibit.  And to suggest that the Court has endorsed this as an admission goes way too far.  And it way exceeds the scope of my questions.  We're way off base --

        **THE COURT:**  Let me look at your question. Maybe --

        **MR. RYAN:**  He just said I was dishonest for using it.  I mean, it's just --

        **MR. HANCOCK:**  They've been fighting for the last hour.

        **MR. RYAN:**  No, I haven't been fighting.  This is ridiculous that I'm having to deal with this guy.  Everybody knows it.  And it's an admission that came in under

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

801(d)(2).

**THE COURT:**  In the first place, let's work our way through the issues.  The first issue is, is this within the scope of the direct -- the cross, rather.  That's the question.  And the cross dealt with -- the cross specifically took Exhibit 5, which is the position paper, and cited a footnote.  And then -- so it's within the scope of the direct that he can interrogate Mr. Reaves about the document.

Now, as far as representing the Court's position, that's not something that would be appropriate because you're giving the Court the imprimatur of the interpretation you're putting on the document.  And while I did admit it, I admitted it for reasons that I stated at length in a written order.  And I think the fact that I admitted it shouldn't be something that gives your version of it greater credibility.  That's my concern.

I wish that Mr. Reaves would stop talking when he's answered the question or stop talking if he's not going to answer the question.  I can't control that, as I have discovered.

**MR. RYAN:**  So he's making the argument from the stand that somehow it was improperly used or that somehow that language down at the bottom gets him out of having to accept --

**THE COURT:**  You can't -- it is what it is.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

There's the exhibit.  It's Exhibit 5.  It speaks for itself.  It says how it was intended to be used.  There's no reason it can't come into evidence in my view.  And the jury can review it and make out of it what it is.  He's got his own view of it.  You've got your view of it.  It's extremely unfortunate to question the credibility that way.  It's beyond unfortunate.  I'm not sure I've ever had a witness do that in such a situation.

                **MR. HANCOCK:**  I couldn't hear that.  I'm sorry?

                **THE COURT:**  I said it's extremely unfortunate that Mr. Reaves questioned Mr. Ryan's credibility.  I've never had a witness I can recall do it in that way.  I don't know how to deal with it, but it's extremely unfortunate.  And Mr. Reaves is a member of the bar.  He should know better.  But apparently he doesn't, or he doesn't care.

                **MR. RYAN:**  He doesn't care.

                **MR. HANCOCK:**  I think he disagrees and I think the temperature got too high.  But the jury could disregard this if we need even further instruction.

                **MR. RYAN:**  How about you say you know that I'm not dishonest?

                **THE COURT:**  You want me to say that?

                **MR. HANCOCK:**  Please say that the admission of a document, that does not in any way suggest the Court is treating it like an admission and --

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**THE COURT:** I'm not going to say all that.                    10:17:52

**MR. RYAN:** How about clear up my good name?                   10:18:02

**THE COURT:** I'm probably not going to clear up               10:18:02
your good name either. I don't know how to deal with that.      10:18:04
What I might say to the jury is the document is in evidence.     10:18:07
It speaks for itself. And they can review it and make           10:18:11
whatever any determination they want about it. That's my        10:18:14
view of it. That's the only thing I know to say about it.       10:18:18
What else can I say about it? That it's an admission? I          10:18:21
mean, I can't say --                                            10:18:26

**MR. RYAN:** He's implying that it's been                      10:18:26
improperly admitted somehow because I'm a dishonest attorney.   10:18:28

**THE COURT:** Well, it's properly admitted. It's              10:18:33
up to them to review it and decide what it says.                10:18:35

**MR. RYAN:** Can you at least say Mr. Ryan properly            10:18:39
admitted this document that is in evidence for your review?     10:18:41

**THE COURT:** I can say that. I'm not sure that's             10:18:47
exactly what I want to say. Let me think.                        10:18:50

**MR. HANCOCK:** There's a lot of endorsement in                10:18:54
that.                                                           10:18:56

**THE COURT:** No, it's --

**MR. RYAN:** Oh, yeah, I --                                     10:18:58

**THE COURT:** Don't talk to each other, please.               10:18:58

**MR. RYAN:** Well, I love him.                                  10:19:03

**THE COURT:** I don't care how much you love him.             10:19:04

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

You can love him or hate him, but I am sitting on the bench, and you address your remarks to me and not to each other.

Now, I guess I should have let the jury take a break.

**MR. RYAN:** No. I'm almost done with him.

**THE COURT:** I think what I want to say is the document has been properly admitted into evidence, it's available for the members of the jury to review, and they can decide what it means.

**MR. HANCOCK:** I'm good with that. Thank you, Your Honor.

(End of sidebar.)

**THE COURT:** Ladies and gentlemen, we've been talking about Exhibit 5, which purports to be a position statement submitted to the Equal Employment Opportunity Commission by the defendant in this case. That document has been properly admitted in this proceeding. It is available for you to review. And after you have collectively reviewed it in the jury room and deliberated about it, you can make of it what you will.

You'll be the decision-makers about the facts of the case, and you'll decide what that document means and how it applies to this case. Does everyone understand?

Mr. Ryan, you're between me and the jury.

**MR. RYAN:** I'm sorry.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**THE COURT:** Does everyone understand? | 10:20:41

**THE JURORS:** Yes. | 10:20:43

**THE COURT:** Thank you. | 10:20:45

**BY MR. RYAN:** | 10:20:46

Q. Now, you do understand, this document, I haven't | 10:20:46
pulled any lawyer tricks. It is now properly part of the | 10:20:50
evidence to be considered by the jury. You understand that, | 10:20:52
right? |

A. I understand that it is properly admitted into | 10:20:52
evidence. | 10:20:55

Q. Thank you. | 10:20:56

A. But what you're saying it stands for... | 10:20:57

Q. And by the way -- Pat Mosby. It shows she was | 10:21:21
terminated on Tuesday, May 31st of 2022, correct? | 10:21:26

A. That's what it says, yes. | 10:21:31

Q. And that's your document that you're relying on, | 10:21:32
right? | 10:21:35

A. Yes, that's what it says. That's when the date of | 10:21:36
termination was entered. This is the document -- when you | 10:21:41
asked yesterday to bring a document that showed that she made | 10:21:48
$75,000, that's what we brought this document for. When you | 10:21:48
told the jury she didn't make that. | 10:21:54

Q. If -- if -- if she worked on a full-time basis at 35 | 10:21:59
an hour -- listen to me, please. Your attorney just said I | 10:22:03
just did the math. He said I didn't do it in my head, I did | 10:22:08

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

it on the phone.  Do you remember that?                          10:22:12

 A.    Uh-huh.                                                   10:22:13

 Q.    And the math that he's talking about, to yield 72,000,   10:22:14
you have to multiply $35 times how many hours.  Do you          10:22:20
understand?  Do you know?                                       10:22:24

 A.    The person who determines the hours is the manager.      10:22:24
And if you look at the manager's name, it says Jaye             10:22:28
Mosby-Meachem.                                                  10:22:33

 Q.    Sir, listen to me, and I'll let you off the stand, and   10:22:33
I'll go back and sit in my chair.  Okay?  Listen to me.         10:22:37

       Do you understand how many hours she would have to       10:22:39
work to get to 75,000 a year?                                   10:22:41

 A.    Roughly 40 because all the employees get bonuses as      10:22:45
well.  So she would have cleared 75 at 35 an hour.  So 40       10:22:48
hours.  If she would have worked 40 hours, she would have       10:22:53
made 75 with bonus.  Over 75,000.                               10:22:56

 Q.    If she'd have worked on a full-time basis for a year     10:23:02
40 hours a week at $35 an hour, that's how you in your head     10:23:10
get to the $75,000 figure; is that correct?                     10:23:16

 A.    That's how we do everyone.  Everyone is hourly.  So      10:23:20
everyone is hourly.  We don't have anyone who's making --       10:23:25
outside of the attorneys, you know, we don't have anyone who    10:23:25
is making $35 an hour.                                          10:23:28

 Q.    Please listen to my question.  I'm sorry to be -- you    10:23:30
get to $75,000 a year assuming that she would have worked       10:23:33

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

40 hours a week on a full-time basis throughout the year; is that correct?

A.   Correct.

Q.   Thank you.

A.   With her daughter giving her the hours.

Q.   Thank you.  Thank you.  Thank you.

A.   And she might have worked overtime.  It might have been more.

Q.   And she was terminated before Ms. Jaye Mosby was terminated, correct?

A.   Correct.  Part of the transition --

Q.   Okay, that was the question.  I didn't ask for anything else.  She was terminated on May 31st of 2022, prior to Jaye being terminated on --

A.   To the best of my knowledge, yes, sir.

Q.   And May 31, 2022 -- I'm not trying to be cute -- that's three days before June 2, 2022, correct?

A.   To the best of my knowledge, yes, sir.

        **MR. RYAN:**  No more questions.

        **THE COURT:**  Do you have any questions for this witness, Mr. Hancock?

        **MR. HANCOCK:**  I do not, Your Honor.

        **THE COURT:**  Thank you, Mr. Reaves.  You may step down.

        (Witness was excused from the stand.)

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**THE COURT:** How are we holding up, ladies and gentlemen?  Would anyone like a midmorning break before we proceed to the next witness?  You will not be receiving demerits if you want a break.  Everyone is fine.  If you change your mind, raise your hand.  I will not be able to read your mind.

Call your next witness, Mr. Ryan.

**MR. RYAN:**  Jaye Mosby, Your Honor.

(Witness sworn.)

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

* * *

**JAYE MOSBY,**

called as a witness on behalf of the Plaintiff, having been

first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. RYAN:**

Q.   What's your full name?

A.   Andrea Jaye Mosby.

Q.   I'm going to try to keep this as condensed as

possible.

A.   Okay.

Q.   So answer my question and only my question.

A.   Yes.

Q.   Do you have an agreement?

A.   Yes, we have an agreement.

Q.   And I'm not going to get into awards or commendations

or anything like that.  I want to know a little bit about

you.  Tell the jury where you're from, where you went to law

school, and what you have done professionally prior to

Reaves.

A.   Okay.  I am originally from Memphis, Tennessee.  I

attended Whitehaven High School.  Then I went to Rhodes

College.  I left and did two years of law school at SMU in

Dallas, and then I did my final year at GW in Washington D.C.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

I stayed in D.C. for a while. I did private practice at a law firm, and that's where I was first introduced to labor and employment.

Then I took a little sabbatical for a minute and came back to Memphis and started working for the City of Memphis heading their employee labor relations department which was housed within HR. I did that for three years and then I was asked to move to MLG&W to do the same thing for them. I did it in the legal department. I was there for about almost 18 years.

Q. Okay. I'm going to pass this document to you. Do you recognize it as your resume?

A. Yes.

Q. And you remember Mr. Hancock asking you about your resume at your -- during your deposition?

A. Yes.

MR. RYAN: Your Honor, we'd move to have Jaye's resume marked as the next exhibit.

THE COURT: Is this your witness, Mr. Hancock?

MR. HANCOCK: It is. I just want to make sure it's the right version, but no objection. This is not the one that's Bates stamped. Is it the same?

MR. RYAN: It's from her deposition.

MR. HANCOCK: Oh, it's the same one you marked.

MR. RYAN: Yeah.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**MR. HANCOCK:** No objection, Your Honor.

**THE COURT:** Without objection, it will be admitted and marked as Exhibit 7.

(Exhibit No. 7 was marked and admitted.)

**BY MR. RYAN:**

Q.   This will go back to the jury room so that everybody who wants to look at it in detail can look at it in detail. I'm going to show it to you on the screen.  This is your resume; is that right?

A.   Yes.  My resume at that time, yes.

Q.   By the way, who are you working for now?

A.   I work for E.W. Scripps Media Company in Atlanta, Georgia.

Q.   And you started in September of 2023?

A.   Yes.  September 18th, I think.

Q.   All right.  So LG&W, 2005 all the way up until early May of 2022, correct?

A.   Correct.

Q.   And then that's when you joined Reaves?

A.   Correct.

Q.   And again, the jury can look this over, and I don't want to belabor it, but how would you, just in a nutshell, describe your view of your own breadth of HR experience?

A.   Aside from the short stent in private practice, I've been exclusively doing labor and employment and exclusively

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

in-house counsel.  So I am able to do everything related to HR.  I can build an HR infrastructure.  I can make sure of pay equity.  I can ensure that my employer is compliant.  I can make sure that the employees are receiving the benefits and the rights that they are entitled to receive.  I am very proficient in what I do.

Q.   Now, backing up to April of 2022, did you get connected with Henry Reaves about a position that he wanted to create at the Reaves Law Firm?

A.   Yes.  I was actually, during that time, still working for Memphis Light, Gas, and Water, and we knew a mutual person that had come to me and said --

Q.   Don't tell us what he said, but was that Rod Holmes?

A.   Yes.  I'm sorry.  Rod Holmes.

Q.   And Mr. Reaves said he had a good relationship with Mr. Holmes and trusted Mr. Holmes.

A.   Yes.

Q.   Did you have a good relationship with Mr. Holmes?

A.   Yes, I did at the time.

Q.   Had you worked with Mr. Holmes for years?

A.   For double digit years.

Q.   He's an --

MR. HANCOCK:  Your Honor, he's leading.  He's almost testifying.

MR. RYAN:  I'm trying to speed it through.  I can

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

slow down.

THE COURT: You can lead as long as he doesn't object. He objected. You can't lead.

BY MR. RYAN:

Q. I'm just trying to get through it, but I think you know where I'm going with this.

A. Yes.

Q. Will you tell the ladies and gentlemen of the jury how you knew Mr. Holmes? What was your association with him?

A. So in my capacity of both the City of Memphis and Memphis Light, Gas, and Water, I managed employment litigation. So I would hire various attorneys throughout the city to represent my client, which was either the City of Memphis or MLG&W, in court. Rod Holmes was one of the attorneys that I used to represent Memphis Light, Gas, and Water. So I knew him through -- that's how I was first introduced to him. And I continued our relationship.

I think during the course of that time he may have moved around to various firms, but I consistently used him in that capacity as outside counsel.

Q. So Mr. Holmes introduced you to Mr. Reaves?

A. I was introduced to Mr. Reaves through Mr. Holmes, yes.

Q. Okay. Now, did you send Mr. Reaves a copy of the resume that we just introduced as an exhibit?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.    Yes.   I sent him an e-mail copy of the resume before I met with him, and then I brought a copy of the resume when I interviewed with him, and then I sent him a subsequent e-mail of the resume because he wanted another copy and he wanted his CFO on the e-mail.  So I gave it to him three times.  We talked about the resume during the course of the interview.

Q.    Did he mention things on your resume that would have only been known from somebody who reviewed your resume?

A.    Yes.  We literally sat and talked about what I had done at the various companies that I worked for.

Q.    Now, who was the CFO of Reaves at that time?

A.    Dwaun Hammond.

Q.    Now, tell the ladies and gentlemen of the jury how the job offer was made to you to be the chief people officer at Reaves.

A.    I can't remember if Henry said something at that meeting or sent me a subsequent e-mail.  He gave me, I think, 150.  I told him I needed more because I, you know, was leaving a lot to come work for him.  And so he was able to come up to the 185, and that's how I started working for him. He offered me the position at 185.

Q.    What was your annual comp at LG&W?

A.    I think I was at a little bit under 185 or maybe between 178 and 185.  I can't remember the exact numbers.

Q.    Now, in addition to just the compensation, what other

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

benefits including retirement benefit plans did you participate in at MLG&W?

A.   I mean, it's the government, so it really is a good retirement plan.  They paid into my pension.  I had great insurance benefits.  Based on my trajectory, I could retire in six years, so I would probably be two years away from that now.

Q.   Were you fulfilled professionally doing what you were doing at LG&W?

A.   Not really.  You know, I had done it for so long.  I had cleaned up everything I needed to clean up.  I had developed the processes that I needed to develop.  I had a really good staff that could almost run automatically, you know.  So I think I just -- I had gotten to a point where there was no more growth for me there.

Q.   Why did you believe it was worth taking a chance on the Reaves Law Firm?

A.   Because I believed the story that he told me.  I believed him when he said he was, you know, a visionary and he was the champion for the downtrodden and he was there to help people and be a voice for people who didn't have one.  I believed the story that he tells everybody.  The commercials and the kind of person that he was, I wanted to work for that kind of organization.  I wanted to work somewhere where I could make a difference.  It was time.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   Did you have any interaction with his -- Mrs. Reaves, Neva Reaves, during the interview process?

A.   No.  I wasn't even aware that she was a part of the firm.  I wasn't aware of a lot of things.  But, no, I had no idea that she was there.

Q.   Let's just go ahead and jump in.  You started in early May of 2022; is that correct?

A.   Correct.

Q.   Okay.  There's been some discussion about your mother. Let's just address that and move on.

A.   Okay.

Q.   What's your mother's name?

A.   My mother's name is Patricia Mosby.

Q.   Okay.  Was she employed anywhere at the time you started at Reaves?

A.   No.  She was retired and had been retired for maybe 10, 12 years.

Q.   Now, did you have a conversation with Neva Reaves about bringing on a family member to Reaves?

A.   Yes.  I specifically sent a text message to Neva.  I asked, I know this is a family firm but I wanted to make sure is it okay if I bring on a family member to work part time on a temporary basis.

Q.   And what was her response?

A.   Yes.  If that person works, then yes, we're fine with

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

it.  I said what would the salary be or what would the hourly rate be.  She told me to get with Bill.  Bill was out on leave, so then I sent a message to Dwaun.  I asked Dwaun the same thing.  I said, Neva suggested I contact you.  What should the rate be?  He said $35 an hour.

Q.    And you specifically mentioned to Neva --

MR. HANCOCK:  Your Honor, I object.  Can we approach?

THE COURT:  You may.

(At sidebar on the record.)

MR. HANCOCK:  Ms. Mosby is being asked to testify and is testifying about text messages and communications that she said she had with other people.  She didn't produce those even though we asked for them in discovery.  And we asked for them to be excluded in the motion in limine, and the Court agreed.  This is testimony that was specifically excluded by the motion in limine.

MR. RYAN:  We gave their forensic IT her phone, and they had access to download every text.  Neva's got these very text messages.  We're not introducing a text.  She's testifying as to her communications over text.  There's a huge difference.  We're not trying to introduce a text.

If they want to impeach her, they can impeach her.  But we gave them her phone to be imaged, the entire thing, to download every text message.  They know it.  They

UNREDACTED TRANSCRIPT

**TESTIMONY OF JAYE MOSBY**

can't run from that.  What's the objection?

**MR. HANCOCK:**  I need to respond to that.

**THE COURT:**  That's what I'm trying to figure out, but I need to pause and see what's at issue.  What's at issue is hiring Patricia Mosby.  And the question is did she get permission to hire her.  And she said she did.  And the next question is what was she told about the rate.  And she had a fellow named Dwaun Hammond who apparently set the rate at $35 an hour.

As far as the texts are concerned at this juncture, apparently they're excluded, but there's no reason he can't ask her about what the company -- whether she got permission or not or whether she was told what the rate was.  Of course he can ask the questions.

**MR. HANCOCK:**  There's a huge disadvantage, Judge.  That's not what happened.  We asked in discovery for --

**THE COURT:**  Wait a minute.  He's not asking to introduce anything at this point.

**MR. HANCOCK:**  He is.  Because we're not able to impeach her.  She's saying she texted people --

**THE COURT:**  Let's be clear.  You could ask her did she get permission --

**MR. RYAN:**  Yeah.

**THE COURT:**  -- from Ms. Neva Reaves.  You could ask her if she sought a proper rate or the conditions of the

UNREDACTED TRANSCRIPT

**TESTIMONY OF JAYE MOSBY**

employment that Mrs. Reaves approved as the representative of the defendant.

          **MR. RYAN:** That's what I did.

          **THE COURT:** Well, not entirely. You can ask about the way she got the rate or not on how she got the rate and how it was fixed. But you can't back it up with texts.

          **MR. RYAN:** I'm not seeking to introduce --

          **THE COURT:** But you're asking her about the texts which is not --

          **MR. RYAN:** That's how she communicated with her.

          **THE COURT:** But that's the problem. The texts have been ruled out. You just stick to what happened and not the texts. In other words, the substance of what happened.

          **MR. RYAN:** Backing up, do you understand that Neva Reaves has these very text messages?

          **THE COURT:** That's not the point.

          **MR. RYAN:** They also have --

          **MR. HANCOCK:** She --

          (Indiscernible crosstalk.)

          **THE COURT:** Calm down. You're interrupting him and you're interrupting me. When I want to hear from you, I'll tell you.

          **MR. RYAN:** They wanted to extract every text message from her phone. She gave her phone --

          **THE COURT:** That has nothing to do with where we

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

are at the moment.  The fact that it was discoverable and the    10:40:48

fact that it was discovered doesn't speak to its    10:40:52

admissibility at this juncture in the proceedings.    10:40:55

        **MR. RYAN:**  Okay.    10:40:58

        **THE COURT:**  All right?  So --    10:40:58

        **MR. RYAN:**  But they're impugning her credibility.    10:40:58
Mr. Reaves sat up there repeatedly that you hired your mom,    10:40:58
you hired your mom.  She got permission from Neva over text.    10:41:04

        **THE COURT:**  Well, here's where it is.  If she    10:41:07
testifies without -- over text evidence and without    10:41:10
references particularly to the text about what happened    10:41:20
independently, if she's sought to be impeached in some way    10:41:22
with texts or in some other way, the texts can come in.    10:41:32

        **MR. RYAN:**  To impeach Neva, right?  Because it's    10:41:36
pure impeachment.    10:41:41

        **THE COURT:**  You can use texts to impeach.    10:41:43

        **MR. RYAN:**  Okay.    10:41:46

        **THE COURT:**  And you can use them -- well, we    10:41:46
won't get into all that because it hasn't come up yet.  But    10:41:47
you can use them to impeach.    10:41:51

        You wanted so say something?    10:41:53

        **MR. HANCOCK:**  I do.  There's been a gross    10:41:53
misrepresentation of this.  And that's not, with all due    10:41:56
respect, what happened.  She didn't answer the    10:41:59
interrogatories.  She didn't provide anything.  Then after    10:42:00

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

the discovery period, we offered at our expense to try to do it, and we were trying to do her job for her.  And the expert could not extract the texts.

So the inference that Mr. Ryan is --

**THE COURT:**  None of this has anything --

**MR. HANCOCK:**  -- giving you is --

**THE COURT:**  None of this has anything to do with the price of eggs as far as I'm concerned.  All I care about is this:  Can she testify that she got authority from Ms. Neva Reaves to hire her mother -- hire Ms. Mosby's mother.  Yes, she can.  And she can testify that she talked to Mr. --

**MR. HANCOCK:**  Dwaun Hammond.

**THE COURT:**  -- Hammond, who was an employee of the company with authority to speak for the company.  She can testify about that.  She just can't present the texts.  She can't bring in the texts.  That's the point.

Now, for impeachment purposes we'll see how it develops.  There's no reason that you can't use these things for impeachment if he's got them or who's got them.

**MR. RYAN:**  Neva's got them.

**THE COURT:**  Who?

**MR. RYAN:**  Neva.

**THE COURT:**  Well, but she's -- if they're not in evidence -- let's not go there.  Does everyone understand

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

where we are?  Do you understand where we are?

>        **MR. RYAN:**  Yes.

>        **THE COURT:**  Do you understand where we are?

>        **MR. HANCOCK:**  I do.

>        **THE COURT:**  All right.  So you will not be
inquiring about texts.  Now, if she starts talking about
texts, that's another issue.

>        **MR. RYAN:**  Okay.

>        **MR. HANCOCK:**  Thank you, Your Honor.

>                  (End of sidebar.)

**BY MR. RYAN:**

Q.   Just to close this loop, yes or no, did you get
permission from Neva Reaves to hire Pat Mosby on a temporary,
part-time basis?

A.   Yes.

Q.   Who did she, Neva Reaves, direct you to initially as
far as what Pat would be paid?

A.   Bill.

Q.   Was Bill available?

A.   No, he wasn't.

Q.   Who then did you talk to about what Pat would be paid?

A.   The CFO, Dwaun Hammond.  He gave me that rate.

Q.   Did you come up with that rate?

A.   No, I didn't come up with any rates.  I didn't have
access to that information.  So no.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   Did you ever suggest, yes or no, to anybody within Reaves that you wanted to hire Pat Mosby on a full-time basis, full-time hours for $75,000 a year?

A.   No.  My mother was 70-something.  She had been retired for a long time.  It was only part time, temporary.  Because she had 40 years of recruiting experience, I needed her to help me recruit.

Q.   Now, when she actually started, did you hide her in some private office so nobody could find her or see her?

A.   No.  She came to the staff meetings.  She was in an office across from me.  She didn't sit outside my office.  She participated.  Everything had to be processed through payroll.  I don't control payroll.  I don't know how to put her in the system.  So, no, she was not hidden.  Everyone knew who she was and what she was there for.

Q.   Did anybody ever suggest that she was not qualified for the role -- the temporary, part-time role that you were hiring her for?

A.   Only since this litigation.

Q.   Will you tell the ladies and gentlemen of the jury -- and I'll move on -- by the way, in the position statement -- did you review their position statement?

A.   Yes.

Q.   Is Pat Mosby's name even mentioned in the position statement that they submitted to the EEOC?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.    Not to my knowledge, no.

Q.    Do you know why they wouldn't mention Pat Mosby's name in their EEOC position statement if they were being truthful about the reasons for which you were being terminated?

A.    The EEOC position statement wasn't true.

Q.    Now, what was Pat -- in the brief part-time period that she was there, what was she tasked to do?

A.    She was tasked exclusively to help me recruit.  That was what I heard every day all day.  Needed to recruit because they could not retain employees.

Q.    Clerical support staff?

A.    My mother was helping me recruit everyone.  Attorneys, cleri- -- everybody that needed to be recruited, she was helping me do that.

Q.    Who had instructed you to staff up, so to speak, and hire these additional people?

A.    Henry and the other attorneys that were managing groups.  I have my notes.  Every meeting, we need five attorneys.  Now we need seven.  Everybody's was a priority. I was just one person.  I could not do it, so I brought my mother in to help me fill that need.

Q.    Mr. Reaves spent a considerable amount of time talking about Deneice Davis.

A.    Yes.

Q.    Who was Ms. Davis?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.   Deneice Davis was not my friend, as he portrayed.  She was someone whose resume was submitted to me because I needed an executive assistant.  That person was not only supposed to support me, she was going to support three people:  The chief people officer, me; the CFO, which was Dwaun; and Ted, the CAO, chief administrative officer.  I think that was his title, or COO.

She was supposed to support three people, do training and handle all of our scheduling and everything else that needed to be done.

Q.   Did you have the sole ability to hire Ms. Davis in and not get approval?

A.   No, I did not.  And I was not the only one who sat in an interview.  Ted sat in the interview with me.  It was the two of us that interviewed her.  He was a little reluctant. We talked about it some more.  We finally said let's get her because she can come on in because my mother was not going to stay long.  They were mistreating her, and I was not going to keep my mother there.

Q.   For Ms. Davis' position, do you remember what she was offered?  The compensation that she was offered?

A.   She requested 85.  We talked about it.  She did have training experience.  She had event planning experience.  I talked to Dwaun.  Dwaun said, okay, let's go ahead and do it. So I offered her that position.  After they gave me the

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

go-ahead, I offered her that position.  She quit her job to take that position, and then they told me a few days later that Neva changed her mind.  And so I had to let that woman know that she couldn't work for us after she had quit her job.

Q.    So she just was --

A.    Out of a job.

Q.    -- after working there less than a week?

A.    Yes.  She didn't work.  She did not work.  I gave her the offer, and she terminated her employment with the expectation of starting to work.  They never let her come in.  Neva looked at it or Neva did whatever she did, and they told me two days later she could not work there.  So I had to rescind that offer.

Q.    And by the way, did you review her resume and what it said as far as her education?

A.    Yes.  And although there's no slight on people that have received her GEDs, I don't know why they keep referring to her as that.  That was not the case.  She did attend college and was continuing to get her degree.

Q.    She had attended Southern University --

A.    Yes.

Q.    -- at Baton Rouge for three years but had not obtained a college degree, right?

A.    Right.  And she had studied business, yes.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.  Okay.  But again, could you have just unilaterally hired her and offered her any amount of money that she wanted?

A.  I didn't have the authority to do anything at that firm.

Q.  And tell the ladies and gentlemen of the jury, did you have any prior relationship with this lady?

A.  I knew of her from someone else.  I knew the church that she worked at, and I had attended some of the events that she had planned.

Q.  But she never actually worked for Reaves?

A.  No.  I had to rescind her offer.

Q.  Now let's talk about two concepts.  One, equal pay for equal work.  Without being overly technical, what is your understanding of that concept?

A.  I mean, it's self-explanatory that you're supposed to receive equal pay for equal work.  That you can't give someone else a higher salary than another person who is doing the same work, same/similar qualifications.

Q.  So if, for example, a female attorney was making 20 grand more than a male attorney and they were doing the same or similar work, same level of experience, same expectations, et cetera, do you believe that that would be legal?

A.  I believe that that would be illegal.

Q.  Now, early on, maybe second or third week at Reaves,

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

tell the ladies and gentlemen of the jury what you confronted as far as equal pay for equal work.

A.   So the interview -- there was an interview.  This was I think one of the few that I sat in, and they were -- Henry was really eager to interview this guy.  He wanted us to really make sure that we scheduled this.  And so I --

Q.   Who was this gentleman?

A.   I don't know his name -- I don't remember his name after all these years.

Q.   What position were you --

A.   This was for an attorney.  It hadn't been designated which department, which is why Sheena and Mark were part of the interview because he was either going to work for Sheena or work for Mark.

Q.   Give us last names.

A.   Mark -- Shure?  It's been a while.

Q.   Sheena Payne?

A.   Sheena Payne, yeah.  I don't remember Mark's.

Q.   And what departments were they over?

A.   I think Sheena was in pre-lit and Mark was in litigation.  I think.  Don't quote me on that.  I just know that the two of them were scheduled.

Q.   So this male attorney is getting interviewed.  Who's part of the interview team?

A.   Sheena, Mark, and myself.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   Now walk us through what you recall.

A.   Sheena and Mark basically -- the three of us spoke, and the plan was that after the interview Henry really wanted to meet this person -- wanted to meet this guy, so we were supposed to take him upstairs to Henry.  So we sat in the interview.  Sheena and Mark did most of the questions because a lot of the interview questions were surrounding what they were going to be doing in their particular areas.

I asked him a few maybe cursory questions.  After that we got a message that Henry was ready for us, so we walked upstairs, the four of us.  Went into Henry's office.  Sheena and Mark sat on the sofa.  Me and the candidate sat at the desk.  And Henry sat behind his desk, and he did what he does, which is this long, glowing speech about helping the people and being this beacon of light.

And so after he did his spiel talking about himself, then I tried to wrap it up because it had gone on longer than the interview should.  So I asked the candidate did he have any salary demands and that we would get back to him.  And so before he could tell me what his salary demands were, Henry was like no, no, no, we don't need to do all that.  Look, 85,000.  We want to hire you.

And that is not how you conduct an interview.  That is not how you provide an offer.  And so I couldn't say anything because, he's right, it's his firm.  So he said 85,000.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

That's what he wants.  So I looked at the gentleman and I said you can take some time, but let us know.  He said he had another offer that he was considering.

So we all went downstairs, and I walked him out.  Sheena and Mark went into Sheena's office.  As I came back up, Sheena asked me to come in there and talk to them.  So the first statement was:  What the F?  That was not the statement that I made, but it was, what the F.  Because the three of us had not expected the interview to go that way.

And so Sheena said:  And the messed up part about it is that I'm paying Jakira -- whatever her name is.

Q.  Jakira Davis.

A.  Jakira Davis.  And she didn't say her whole name.  I think she just said Jakira.  I'm paying 65,000, so why does he get 85?

Once again, I did not have access to payroll.  They said they gave it to me.  I did not have access.

Q.  Let's take a little bitty baby detour.

A.  Okay.

Q.  You've sworn to tell the truth upon penalty of perjury.

A.  Yes.

Q.  You're sitting on that stand.

A.  Yes.

Q.  Did you have access to payroll information where you

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

could check against what Sheena was telling you --

A.    No.

Q.    -- at the time she told you that?

A.    No, I did not.  And it was time sensitive for me because he had just interviewed this guy.  I did not want him to accept the offer and then we still have these pay equity issues.  So that is why I immediately went up to Henry and said can I talk to you for a second.  I went into his office, and I was like, Henry, you can't do that.  And I was very blunt.  And of course things took a detour.

Q.    When you said you can't --

A.    You cannot offer someone a salary at the table without assessing everything.  Like, Sheena just told me -- so that's when I went into that.

Q.    So you've got a male that would be making 20 more than a female.

A.    Yes.

Q.    And let's talk about Jakira Davis.

A.    All right.

Q.    Tell the ladies and gentlemen of the jury what you were doing with respect to Ms. Davis.

A.    So everything I knew came from Sheena.  If it's wrong, that's the information that came to me from her supervisor.  So I did my due diligence with respect to asking Sheena the information.  I couldn't go and check in the system.  I

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

didn't have access to it.  I couldn't go ask payroll; they weren't talking to me.  So I asked Sheena how long has she been here.  Sheena said she's been here three years.  I said, how much experience did she have?  She said she came to us new, but she has our three years.  Where does she come from?  She came from Atlanta.

So I took that information, and that's what I went to Henry to talk about.  The first thing Henry said was, well, he has more experience than her.  This guy had just taken the bar -- or had just gotten his bar results.  I don't know if he had just taken it, but he had just gotten his bar results.  So he did not have the three years of experience that she had, as Sheena informed me.

He said well, he's moving here from Mississippi.  This young lady moved from Atlanta.  So once again, I'm saying, Henry, it's not the same.  We've got to fix this.  And if that meant increasing her salary, then that's fine.  But instead of taking it like that, then it became you're disloyal.  Who have you been talking to?  Why are you always telling me what I can't do?  And then the conversation went downhill from there.

Q.   Now, when he made the disloyal comment, were y'all specifically talking about the pay equity issue between the male and female attorney?

A.   Yes.  At that point that's all we were talking about,

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

but then the conversation just expanded.

Q.   Now, with respect to Ms. Davis, had she learned that she was getting paid 20K less than somebody that she had more experience, what rights would she have?

A.   She would have had rights to file a claim against us.

Q.   And by filing a claim do you mean a lawsuit?

A.   Yes, a lawsuit.

Q.   Which could actually name Mr. Reaves individually?

A.   Yes.

Q.   Now, Mr. Reaves and Mrs. Reaves, their testimony --

THE COURT:   We're going to take a break.

MR. RYAN:   Okay.

THE COURT:   I have a break request.  So ladies and gentlemen of the jury, we'll take ten minutes.  Step out into the jury room.  Don't talk about the case.  As soon as we're able to resume, we will send for you.

(Jurors exited the courtroom.)

MR. RYAN:   Your Honor, can Jaye get off the stand?

THE COURT:   Wait a minute.  Wait till the jury goes out.

MR. RYAN:   Sorry.

THE COURT:   Now, what's your point?  What did you say?

MR. RYAN:   Can she step off the stand?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

THE COURT: Oh, sure. You can step down. We're going to be in recess.

THE WITNESS: Thank you.

(Recess taken at 11:00 a.m. until 11:20 a.m.)

THE COURT: Are you ready to proceed, Mr. Ryan?

MR. RYAN: Yes, sir.

THE COURT: Are you ready to proceed, Mr. Hancock?

MR. HANCOCK: We are.

THE COURT: Let's bring in the jury.

(Jurors entered courtroom.)

THE COURT: Welcome back, ladies and gentlemen. We're ready to proceed with the direct examination of Ms. Mosby by Mr. Ryan. Mr. Ryan, you may proceed. Ms. Mosby, you're still under oath.

THE WITNESS: Yes, Your Honor.

BY MR. RYAN:

Q. Back to the -- you talked to Mr. Reaves about Jakira Davis being paid $20,000 less. Did at any point in time anybody with the Reaves firm say here's true and accurate payroll data as to what Ms. Davis is making, and you're mistaken?

A. No. And I would have been okay with being mistaken. I'm not perfect. I based my information on what was told to me. If that was not the case, then that's fine. That's good

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

for us.

Q. But did at any point in time while you were employed or since you were terminated did they ever just say, don't you see, here's what she was actually making?

A. No.

Q. Sheena gave you bad information. She was actually making the same as what this male attorney was going to be?

A. No, they never did.

Q. Now, in your conversation where he accuses you of being disloyal, did the word trust also come up?

A. Yes. He said he couldn't trust me, and who was I talking to and why was I talking to the employees.

Q. Wasn't it your job to make sure that equal pay for equal work was enforced?

A. That was one of my jobs, and he told me to talk to the employees.

Q. In addition to that, what duty did you feel to the Ms. Davises of the world who would not be -- their rights would be violated?

A. I wanted to advocate for them.

Q. Now, what is your philosophy on HR? What have you seen over the course of -- the two types of HR that you've seen?

A. I mean, you know, being in this position, it's difficult. We're walking a thin line. Sometimes when you're

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

in-house you are beholden to your client, the business.  And so there is an inclination to make sure that their rights are protected, and sometimes there's a request to do it at any cost.  And then you have a responsibility to the employees, your coworkers that are coming to you with their concerns to advocate for them, and that puts you in the middle of your client and the employees.  It's a thin line.

Q.   And where do you see yourself as -- while you were at Reaves did you see yourself?  What hats, if any, were you wearing within your HR role?

A.   Well, a lot of hats.

Q.   Well, as far as --

A.   That was the problem.

Q.   As far as the question I just asked you about, the HR philosophies.

A.   You know, initially it was, okay, we need to correct these.  And then it became, okay, you're doing this wrong.  This is affecting this person.  Or in particular, for the equal pay, there was one person that at that time I was advocating for.  If my information was wrong, I was open to correction.

I've been doing this a long time.  I make mistakes.  If I'm wrong, then okay, but don't tell me I'm disloyal because I am advocating for her.  Don't tell me you don't trust me.  Don't tell me I shouldn't be talking to the

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

employees that you hired me and said you wanted me to talk to and listen to their complaints and resolve their issues. And then when I do it and it's contrary to keeping up your image or doing what you want to do, then I'm disloyal, and I'm demoted and I'm called manipulative and all this other stuff.

Q. Now, with respect to PaQuita Redmond, tell the ladies and gentlemen of the jury who she is.

A. PaQuita Redmond was Henry's executive assistant. And she started around the same time I did. So I met her in the orientation that they also mischaracterized as me leaving it. But, yes, I met her in the orientation, and she was his executive assistant.

Q. Okay. Now, was she paid on a salary basis?

A. It was my understanding that she was -- you know what, I did not know exactly the specifics because I did not have access to that information.

Q. Did she believe she was being worked off the clock?

A. So yes. PaQuita had come to me because there were some things that she was being asked to do that she didn't know how to do. At the same time among all of his other projects, he was shooting a movie. PaQuita was charged with handling some aspects of this movie for him. She did not know how to do that. She called me upset about that.

She told me that she was getting called to do his personal things with respect to his kids. His wife was

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

calling for her to do things.  She was working after hours.

Q.    Tell us what the Fair Labor Standards Act is, the overtime law.  If you work over more than 40 hours in a workweek and you're not exempt otherwise, what are you entitled to?

A.    You're entitled to overtime at time and a half.  So with PaQuita, I asked for the org chart.  I asked for the information because I needed to determine, first, if she was properly classified, if she was listed as a nonexempt employee or an exempt employee because that would then determine whether or not she was entitled to that overtime. I did not get that information.

And so when we started talking about the issue with Jakira, it got heated.  He started screaming at me.  I started raising my voice back.  I did not feel comfortable. I know his history.  He has a gun.  I did not feel comfortable being in that office with him.  So we took it to Ted's office.

PaQuita was also right outside his office.  I would not have said anything about PaQuita that PaQuita could have heard.  If she heard it, then it's because he told her.  So we went down to Ted's office as Ted was a witness to everything.  Things got really heated and I started saying, okay, and then there's an issue with PaQuita.  Once again, why are you talking to her?  You're disloyal.  It just -- it

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

just got really bad.

And so I remember saying to him if you call me disloyal again, I'm walking out.  In true Henry fashion, he did.  And so I walked out and went to my office.

Q.   Now, around May 15th, just a week or so before, there was a town hall.

A.   Yes.

Q.   A state of the firm meeting where you were introduced to the firm.

A.   Yes.

Q.   And what do you remember Henry saying about you at that time?

A.   Just singing my praises.  He did that each time.  And I told Henry I was getting pushback from the employees.  They weren't very open to talking to me.  They were scared.  They were not very receptive.  They weren't nice.  They weren't nice to my mom.  It was just a very toxic environment.

He did a good job initially of this is Jaye, she's going to handle HR.  He literally said in a meeting, I don't want to hear shit.  Excuse me, Your Honor.  I was just quoting.  Take it to Jaye.  If there's any issues related to that, I don't want to hear it.

So he kept telling everybody to talk to me, to bring those things to me.  So I started having meetings with individual groups.  I was not there for a long time.  I was

**TESTIMONY OF JAYE MOSBY**

there for less than 30 days.  There were a million things this man had me doing.  I was not painting my office.  I was charged with painting the entire office, finding a painter. So between all of that I was still holding meetings with individual groups to find out what their issues were because they didn't have anybody to voice those concerns to.

So that's how I started addressing him.  And at first it was overall.  Henry, we need to look at the pay issues overall.  We need to look at the classification issues overall.  Then it became specific.  That was the first time with Jakira and PaQuita that I specifically said these two people, we've got the fix this, we need to address this, and it just went downhill.

Q.   Do you recall getting an e-mail on Saturday, May 28th, from Mr. Reaves?

A.   Yes, I did.

Q.   Now, the day before, without -- don't try to contain your emotions.  I don't want to prompt anything.  But what had happened the day before?

A.   So my grandmother died on the 20th and my grandmother lived -- so I moved her in with me, and I was taking care of her.  And she died on the 20th.  I mourned but I went to work.  And I worked until her funeral.  I went to her wake on the 26th.  I went to her funeral on the 27th.  And then on the 28th --

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   That was a Saturday.                                              11:30:45

A.   -- I got a letter that I was being demoted.  And I was   11:30:48
told to terminate my mother.                                          11:31:04

Q.   Now, this had previously been marked as Exhibit 4.      11:31:09
I'm going to show it to you.  He says:                                11:31:14

Over the last few weeks it has been glaringly obvious        11:31:14
that you will be unable to fulfill the requirements of your  11:31:20
position without making a serious investment and learning    11:31:26
exactly what we do, how we do it, and why we do it.          11:31:?

Do you see that?                                             11:31:29

A.   Yes.                                                    11:31:29

Q.   He then says:  I now realize the duties and experience  11:31:30
you gained while at MLG&W did not in itself prepare you for  11:31:34
the complexities and responsibilities of being a C-Suite     11:31:38
level HR leader at RLF.                                      11:31:44

Do you see that?                                             11:31:47

A.   Yes.                                                    11:31:47

Q.   Was there anything more complex at Reaves Law Firm      11:31:47
than what you had ever dealt with at the City and MLG&W?     11:31:51

A.   Yes, to the extent that they did not have an HR         11:31:54
infrastructure.  There were a lot of issues there.  I have   11:31:59
never seen an organization that was so toxic in their view of 11:32:05
how they treat their employees.                             11:32:14

Q.   He then says:  This has been evidenced by several      11:32:18
interactions and conversations that I've had with you.  It is 11:32:21

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

glaringly obvious that absent filling of these gaps, putting you in a position with as much power and influence as a CPO is extremely dangerous and irresponsible on behalf of the CEO.

Do you see that?  Was that on the heels of you being disloyal and --

A.    Couldn't be trusted.

Q.    -- not trustworthy?

A.    Yes.

Q.    And then he basically says effective immediately he's going to be the interim CPO, right?

A.    Yes.

Q.    And then on starting Tuesday -- and again, Tuesday would have been May 31st because Monday was Memorial Day.

A.    Correct.

Q.    Starting Tuesday you will report to Tina as intake member.  Do you see that?

A.    Yes.

Q.    And then he goes down what you're going to be doing. Do you see that?

A.    Yes.

Q.    Okay.  And without going over it line by line, the jury will have it, basically he was going to take you out of the role for which he hired you and then put you through a seven -- and take away your title, take away your duties, and

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

for the next seven months go into this immersion training process?                                                    11:33:43 11:33:48

A.   Yes.                                                    11:33:48

Q.   He says:  You will not be taking a pay decrease.  He did not touch your pay?                                     11:33:48 11:33:53

A.   No, he didn't.                                          11:33:55

Q.   He says the following actions are to be taken immediately.  And that's prepare a transition document.  Do you see that?                                             11:34:00 11:34:06 11:34:10

A.   Yes.                                                    11:34:13

Q.   And to forward all sent and received communications and correspondence with all the BLSA reps at various schools he requested.  Do you see that?                 11:34:13 11:34:19 11:34:29

A.   Yes.

Q.   Three is blank.  Four, rescind all offers for team members.  That included Deneice Davis, right?            11:34:29 11:34:33

A.   Yes.

Q.   Five, end the temporary recruiting assignment with your mother, right?

A.   Yes.

Q.   And that was his words, "temporary".

A.   Yes.

Q.   Did he know whether she was hired permanently or temporarily?

A.   He knew that she was temporary and part time.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q. And then he's taking away the Monday leadership meeting attendance, right?

A. Yes.

Q. Now, this is very, very important. You've seen what Mrs. Neva Reaves -- you were at her deposition. She was asked why you were terminated. And whether you would be terminated even if you didn't turn in the transition document, would you still have been terminated. And she says if she had just reported to intake, she'd still be employed.

A. Yes.

Q. Did you report to intake?

A. I did.

Q. Tell the ladies and gentlemen who Tina Adams is.

A. The person that I reported to. Tina's office was right next to mine anyway. So Tuesday morning I reported to work in intake and spoke to Tina and started receiving the training materials for the intake position.

Q. And again, intake is when somebody calls to Reaves, they go through an intake process to screen them to see whether they can bring them on as a client.

A. Yes.

Q. Again, physically describe the office and where you were in relation to Tina and in relation to the rest of the leadership team.

A. I was right next to Tina's office. Outside of our

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

offices were, I think, the intake specialists. They worked outside there. And everyone else was around the office. I didn't walk around it -- I was embarrassed, so I didn't really go out and speak and communicate with people. I just stayed in my office. I talked to Tina. I left for lunch, came back, and did what Tina asked me to do. People came by -- a few people came by to talk to me.

Q. And the next day on Wednesday, June 1st, did you report to Tina?

A. I sure did.

Q. And did you go through the normal workday at that point?

A. Yes, we worked the same way we normally did. She gave me my assignments, and I worked all day.

Q. By the way, on that Tuesday you were not copied on an e-mail that Mr. Reaves sent to the team, the executive team.

A. I didn't see it until this litigation started.

Q. And in that e-mail he says -- this is Exhibit 2. He says: Jaye is finishing up a transition sheet that she will give us marching orders in her absence. This will be completed by close of business Thursday. Do you see that?

A. Yes.

Q. Did he ever set a firm deadline for you to give him the transition?

A. No, he did not. He did not tell me when to give it to

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

them.  I was working on it.  He requested it in the e-mail, I think, on Saturday.  Sunday and Monday, you know, were holidays.  But I started gathering the documents.  You see my notes.  It's just all over the place.  So, yes, I was working on it, but I didn't know I had a hard fast date.  I had put a hard fast date on myself of getting it to him that Friday.  So that would have been a little bit less than a week from when he asked for it, which was on that Saturday.  And I was fired.

Q.  Did he tell you he had a meeting set for the following Monday and that's why he needed it?

A.  Of course not.

Q.  By the way, your response to his e-mail on Saturday, May 28th, said:  Recruitment info forwarded, transition plan forthcoming.  Do you see that?

A.  Yes.

Q.  What recruitment info did you forward to him?

A.  I don't remember what it was, but I know my mother had contacted a few schools.  And I was letting her do that part, so she forwarded it over.  We didn't get much movement once she only worked for two weeks, 20 hours a week.  And we were still working on some other things, other priorities that he kept giving us.  So whenever I forwarded to them.

Q.  So he had said at Item 2:  Forward all sent and received communication and correspondence with all the BLSA

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

reps at various schools.

A.   Yes.

Q.   Is that black student associations --

A.   Yes.

Q.   -- at the law schools?

A.   Yes.

Q.   And so that's what you forwarded to him?

A.   I gave him the information that my mother had forwarded to me.

Q.   Okay.  Now, this is also important.  Tell the ladies and gentlemen of the jury whether you physically actually went into the office on Thursday, June 2nd.

A.   Thursday, June 2nd, no, I did not.

Q.   That's the date that you were terminated that evening?

A.   Yes.

Q.   Did you work that day?  Not go into the office, but did you work that day?

A.   Yes, I worked on the transition plan that day.  I was sick, which is what I notified Tina that I don't feel well today.

Q.   Tell the ladies and gentlemen of the jury exactly not how you communicated with her but what you said to her and what she said in response.

A.   I said Tina -- it was about 7:00 in the morning. Tina, I don't feel well today.  My allergies are kicking my

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

butt. I won't be in. Is this sufficient notice, or do I  11:41:01
need to do anything else? She said, this is enough for me.  11:41:07
I'm not sure if you need to log in to People Processes. And  11:41:10
I said, can we do tomorrow what we were scheduled to do  11:41:15
today? And she said, yes, indeed. And I think she said take  11:41:20
care. And that was that day's interaction.  11:41:24

Q.   So on Thursday you're working, but you don't  11:41:27
physically go in?  11:41:31

A.   Right.  11:41:31

Q.   Now, by the way, I think Neva Reaves was in California  11:41:34
that week.  11:41:37

A.   Uh-huh.  11:41:37

Q.   Make sure you say yes or no.  11:41:37

A.   Yes. I'm sorry. I mean, according to her testimony.  11:41:40

Q.   But you don't recall seeing her at work?  11:41:44

A.   I didn't recall seeing her at work.  11:41:47

Q.   Do you recall seeing Henry at work on Tuesday, May  11:41:50
31st or Wednesday, June 1st?  11:41:54

A.   I don't remember Tuesday. I did see him Wednesday,  11:41:57
and he came into my office and talked to me.  11:42:03

Q.   Was there anybody else present in your office when you  11:42:06
spoke to him on Wednesday, June 1st?  11:42:06

A.   No. It was just he and I, but Tina and I talked about  11:42:13
it afterwards. He had talked to her also.  11:42:16

Q.   Earlier when I was asking him questions I showed him  11:42:17

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

his declaration that he had submitted under penalty of    11:42:20
perjury that said you did not report to intake on May 31st or    11:42:24
June 1st.    11:42:33

   A.    That's not true.  I was there all day.  If I left, I    11:42:33
may have left for lunch, or I brought my lunch.  But I    11:42:40
reported to work on the 31st and the 1st.    11:42:43

   Q.    And you did not have to clock in and out because of    11:42:46
your position as an exempt employee, correct?    11:42:50

   A.    No.  There was no need -- we didn't have -- or that    11:42:54
wasn't required.  I didn't have a badge or a login.  I didn't    11:42:56
have to log in or anything.    11:42:57

   Q.    There's video at the office, right --    11:42:59

   A.    Yes.    11:43:00

   Q.    --that would show you coming in and leaving?    11:43:00

   A.    There's video showing me.  It's --    11:43:03

   Q.    People?    11:43:06

   A.    People that can attest.    11:43:06

   Q.    Tina?

   A.    Tina will attest that I was there.    11:43:06

   Q.    Now, what was your conversation with Mr. Reaves about    11:43:09
on Wednesday, May 31st?    11:43:13

   A.    He came into the office, and he said that instead of    11:43:16
me doing -- because the plan was four weeks in intake and    11:43:20
eight weeks and then 16 weeks.  So on the second day --    11:43:27
because I worked Tuesday, Wednesday.  On the second day he    11:43:30

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

said I would be taking an assessment from the intake within a few days, and then he was going to move me to the next department. So I wasn't going to do four weeks in intake. I was going to be moved to the next department. He told Tina the same thing.

Q. Did Tina offer her opinions to you as to whether you even needed four weeks in intake?

A. Tina didn't think I needed what I was going through anyway. No one agreed that that's what I needed to learn the business. So no, Tina was not in agreement with that.

Q. By the way, when you worked at MLG&W, did you go out and dig utility poles and work as an electrician and do every one of those jobs?

A. When I worked for MLG&W I never dug a ditch, I never climbed a pole, I never connected any kinds of electricity. When I worked for the City I never rode on a fire truck or rode with police. I don't have to do what the employees do to understand labor and employment principles and make sure that their rights are protected and my company's rights are protected. I don't have to.

Q. And to install HR processes?

A. I do not have to get in those departments and do that work to do my job.

Q. But did you do it anyway?

A. Yes, I didn't have a choice. I lost my job -- I was

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

going to lose my job.  I left a good thing.

Q.   Now, the termination e-mail, is there any mention of you not reporting to intake as a basis for your termination in this e-mail?

A.   No.  When I got the e-mail, it was my understanding that I was being terminated for insubordination because I did not provide a document immediately.

Q.   Now, Mrs. Reaves says on May 31st -- excuse me.  Yeah, Tuesday, May 31st, the CEO sent a subsequent e-mail and stated that the transition document was to be submitted no later than the close of business today.  Do you see that?

A.   Yes.

Q.   Were you included on that e-mail?

A.   No.

Q.   And did he ever say you have to have the transition document by a date certain or be terminated?

A.   This is when I was made aware that I didn't do something based on something I didn't receive.

Q.   Now, he says:  This act of insubordination, in addition to other missteps and unprofessional behavior, is an indication that it's best for RLF and Jaye Meachem-Mosby to part ways.

Do you see that?

A.   Yes.

Q.   Your termination is effective immediately.  Do you see

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

that?

A.   Yes.

Q.   Did you turn in your keys and turn in whatever else?

A.   I'm sure I gave whatever I was supposed to.  I didn't need to keep their stuff.  My parents helped me do my office that afternoon.  So I left everything in there.

Q.   Describe how you felt inside when you read that e-mail.

A.   You know, everything was just propounded.  I had been demoted and embarrassed.  I had been hollered at at work and disrespected.  And then the demotion came, and that was embarrassing.  And then I took it -- I took it -- I took what he said.  I took that demotion and being belittled.  I did it and I showed up to work, and then he fired me for something that I didn't even do.  Yeah, it was emotional.

I was in the middle of a lot of stuff.  And so to lose my job -- I'd never been fired.  And knowing I just should have stayed where I was.  But I trusted him.

Q.   Now, you respond at about 12:21 a.m. on Friday the 3rd, you respond to the e-mail, correct?

A.   Yes.  Regarding insubordination because that's what he told me --

Q.   The specific allegation that you're being terminated because you were insubordinate, you attempted to respond to him by saying this is what insubordination is.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.   Yes.

Q.   And read --

THE COURT:  What are the exhibit numbers we're talking about?

MR. RYAN:  That's Number 1, Your Honor.

THE COURT:  All right.  What about the last exhibit?

MR. RYAN:  I've been referring to Exhibit 1 the whole time.

THE COURT:  I thought there was a response that you were saying.

MR. RYAN:  Her response on June 3rd is a response to the June 2nd termination e-mail.  It's all part of Exhibit 1.

THE COURT:  All right.

BY MR. RYAN:

Q.   What did you tell Mr. and Mrs. Reaves regarding what insubordination really is?

A.   I just told them that they had to show that I was told to do something, that I understood, and I refused to comply.

Q.   Did you refuse to comply with the transition?

A.   I hadn't refused to do anything since I worked for Henry other than violate people's rights.

Q.   And if he had -- now, you then say:  I assure you you will not be able to establish all three prongs.  There was no

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

such request made with a designated deadline.  Henry

requested a transition plan with no designated deadline.

Do you see that?

A.   Yes.

Q.   Now, he's saying the deadline was immediately.  You're saying you didn't tell me by the close of business on any certain date.

A.   Yeah.  Is immediately Saturday when he sent it to me?  Is immediately Sunday?  There was no guidance.  Just immediately.  And then start intake, which is what I was doing at work.  Not a transition plan at work.  I was having to do it at home.

Q.   But as it turns out, based on what Mrs. Reaves' testimony is, you'd still be there had you reported to intake.

A.   I was at intake.  I was doing what I was told to do.

Q.   Now, there's also -- you say:  Please send a copy of the May 31st e-mail in which Henry allegedly told me to send the transition plan by close of business.  It may take some time since no such e-mail exists.  Did you mean no such e-mail to you?

A.   Yes.

Q.   Now, did y'all have a further exchange that continued on after that where he responded to you, you responded to him?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.   Yes.

Q.   How would you describe that exchange?

A.   Angry for me.  I can't explain how he felt.  But yeah, I've been angry.  I was angry and hurt and disappointed.

Q.   Now, you had just lost your grandmother.

A.   I had just lost my grandmother.  I was going through a never-ending custody case.

Q.   By the way, who is the gentleman sitting right back there?

A.   My ex-husband.  We are in a contentious custody case.  I have no idea why he's here.

Q.   Did you invite your ex-husband --

A.   I absolutely --

Q.   -- to come to court?

A.   -- did not invite him.  I'm afraid of my ex-husband.

Q.   Do you know why he's even here?

A.   I have no idea why he's sitting back there.

MR. HANCOCK:  Your Honor, I don't know how far we need to go with this.

THE COURT:  You may believe you speak loudly, but I don't hear you.  Who wants to talk?

MR. HANCOCK:  Are you moving on?

MR. RYAN:  Yeah.

MR. HANCOCK:  All right.

THE COURT:  What?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**MR. HANCOCK:** If he's moving on, I don't need a sidebar.   11:52:21 / 11:52:24

**THE COURT:** Okay.   11:52:26

**BY MR. RYAN:**   11:52:28

Q.   Now, did your pay stop immediately?   11:52:28

A.   Yes.   11:52:30

Q.   Did you start looking for work immediately?   11:52:32

A.   Yes, I've always worked.  I've worked since I was 14. I probably didn't start looking for work that next day.  I'm pretty sure I cried and went into a depression.  I know I did.  But then I came out because I had to pay lawyer fees. So yes, I started looking for work.   11:52:35 / 11:52:43 / 11:52:45 / 11:52:49 / 11:52:55

Q.   Now, let me pass a stack of documents.   11:52:56

**MR. RYAN:** Jonathan, it's job search efforts. Number 12.   11:53:04

**BY MR. RYAN:**   11:53:09

Q.   Identify this stack of documents, please.   11:53:09

A.   This just reflects the applications, some of them, that I sent out during the course of my unemployment.   11:53:13 / 11:53:19

**MR. RYAN:** Your Honor, we'd mark that as the next exhibit, please.   11:53:23 / 11:53:26

**THE COURT:** Mr. Hancock?   11:53:28

**MR. HANCOCK:** No objection, Your Honor.   11:53:31

**THE COURT:** Without objection, it will be marked as Collective Exhibit 8.   11:53:31 / 11:53:35

UNREDACTED TRANSCRIPT

**TESTIMONY OF JAYE MOSBY**

(Exhibit No. 8 was marked and admitted.)

**BY MR. RYAN:**

Q.   You applied at International Paper for HR business partner position?

A.   Yes.

Q.   Did you get that?

A.   No.

Q.   Applied at VACO Staffing Firm, HR operations manager. Did you get that?

A.   No.

Q.   You applied at Amazon?

A.   Yes.

Q.   As employee relations manager.  Employee relations?

A.   Yes.

Q.   Cargill?

A.   Yes.

Q.   Were you looking ideally initially to stay in Memphis?

A.   I needed to stay in Memphis because I couldn't afford -- I knew it was going to be hard to do a relocation to get my son with me, and I didn't want to leave Memphis.  My mom had just lost her mom.  My dad had just lost his mom.  So yes, this is home.  I wanted to stay here.

Q.   Okay.  Tell the ladies and gentlemen of the jury what that whole process was like trying to find, you know, a same or similar job over the next 15 months.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.   I mean, it was painful.  If anybody has looked for a job, you know it's difficult.  And it's difficult -- I'm in-house counsel.  That's my experience.  And so that means I need to find a company to work in-house for that company.  This is Memphis.  This is not the mecca of corporations.  So it was limited, my in-house experience.  If I tried to work for a firm, I don't litigate, which means after 27 years, 26 years I've got to learn how to litigate.  So I had to focus on what my experience level was, and it was in-house.

So during that time I was still having to pay fees for custody cases.  I was still having to maintain my household.  I did not work for six months before I was hired by Henry because I was taking a leave and taking care of my grandmother.  So I was already in the hole.

Q.   Let me ask you about this:  Did you also go through networking firms and headhunting firms to try to get re-employed?

A.   Yes.  I signed up with various agencies for them to act as a recruiter for me.  I was on LinkedIn, Indeed, Glass Door, everything.  I applied for over 100 jobs, and I got rejected for all of them.  Until Scripps.

Q.   Tell us about how you got hired on at Scripps and when and for what compensation?

A.   So a recruiter called and asked if I would be interested in applying for a position or being considered,

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

and so I told him yes. I don't know which agency he was with, but anytime I got a call for consideration, yes, submit my information. So they submitted my information, and then I got a call.

His name is Chris. Chris set up an interview. I did about three or four interviews back to back really quickly. And then I didn't hear anything for a few weeks. So I was like all right, here we go again. And then Chris called me one night on a Thursday night at 10:00. And I thought he was calling to tell me I didn't get it. And he was like it's been busy here, it's been crazy, but are you ready to move to Atlanta? That was mixed emotions because that was the first time I had gotten a job. And I didn't want to move, but I had to.

Q. And to be able to move to Atlanta and actually maintain primary custody of your child, what did that entail and require you to do in your custody?

A. So because I tried to maintain some level of semblance for my son. So we had our home here, and I had to be in Atlanta for two days a week. So at first I just tried to get like an Airbnb and then drive back. And it just became too expensive. And I'm crying because I'm tired. So for a year I had to be in Memphis one week and be in Atlanta one week. Every Sunday.

Q. And then eventually you filed a petition to be able to

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

move full time with your child to Atlanta?

A.   Yes.   I started the relocation because I just could not maintain a week on in Atlanta and a week on in Memphis. And my job was very patient and allowed me to miss weeks being in the office because I had my son that week.  The arrangement at that time was 50/50.  So the weeks that I had my son I was in Memphis, and when he was with his dad I was in Atlanta.

I rented my house here because I could not afford to keep my house here and pay rent in Atlanta.  So I rented my house here, and my son and I moved in with my parents who lived in Memphis.  And so I did that, and then we started the relocation, which was expensive.  And ultimately I was granted relocation rights for my son.  So my son moved to Atlanta August last year.  And so he lives with me.

Q.   So you had to go through a court proceeding to establish that it would be in his best interest for you to be able to move him to Atlanta?

A.   He lives in Atlanta with me.  He sees his dad.  Well, his dad misses his visits, but he is ordered to see him once a month, which, you know, that's good for me because that's a break for me.

Q.   And you want him to have a relationship with his dad?

A.   He loves his dad.  Yes.  He adores his dad.

Q.   All right.  Now, have you taken the time to calculate

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

your backpay damages?    12:00:06

A.    Yes.    12:00:06

Q.    Okay.  I'm going to pass up a demonstrative exhibit to    12:00:08
you and see if you can identify this.    12:00:15

A.    Yes.    12:00:21

Q.    This isn't going to be made an exhibit, but I want you    12:00:23
to refer to as we walk through your damages, okay?    12:00:34

A.    Okay.    12:00:37

Q.    What date were you terminated on?    12:00:37

A.    June 2nd, 2022.    12:00:38

Q.    And when were you reemployed at Scripps?    12:00:40

A.    September 18, 2023.    12:00:43

Q.    How many weeks were you off week?    12:00:47

A.    Sixty-eight weeks.    12:00:47

Q.    And at the time you were terminated, how much were you    12:00:49
making per week?    12:00:53

A.    3,557.69 a week.    12:00:53

Q.    So $3,557.69 per week times 68 weeks yields how much    12:01:00
money you lost by being off work those 15 months?    12:01:09

A.    $241,922.92.    12:01:11

Q.    Now are you making the exact same or a little bit less    12:01:24
in your new job as compared to what you were making at    12:01:28
Reaves?    12:01:32

A.    Yes.    12:01:32

Q.    How much less per week?    12:01:34

UNREDACTED TRANSCRIPT

**TESTIMONY OF JAYE MOSBY**

A.    About $192.31.

Q.    So you were making effectively 185 at Reaves and 175 at Scripps?

A.    Yes.

Q.    And how many weeks has it been since you started work at Scripps up until yesterday?

A.    Eighty-five weeks.

Q.    And 85 weeks times $192.31 a week yields how much?

A.    $16,346.35.

Q.    So what are you asking the jury to award you in total for your backpay damages?

A.    $258,269.27.

Q.    Now, you understand there's a principle law called a duty of mitigation?

A.    Yes.

Q.    And what do you understand that to be as far as -- I mean, can you just sit at home and then come to court and ask somebody for a big backpay award?

A.    No.  You have a duty, like it says, to mitigate your damages.  You have a duty to look for a job.  You have a duty to find employment.

Q.    And do you believe you did so dutifully in this case?

A.    I did -- yes, I did so desperately in this case.

Q.    Now, by the way, did you play any part, any role in drafting the Reaves handbook?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.   No, I did not.

Q.   Did they follow the progressive discipline system that they put into place in their employee handbook?

A.   No, they did not.

Q.   And you understand it also contains language which says we can skip the steps?

A.   Yes.  Correct.

Q.   But they never told you that you were being suspended without pay or here's a written warning or anything of that nature?

A.   No.  The only misstep that they mentioned was Deneice's hiring, and they weren't happy with that.  But not knowing paralegals' names and not knowing -- I wasn't told that I needed to memorize everybody's name.  No one said anything to me about that.  So no, I was not told of all the other things.

Q.   And then Deneice actually -- the offer was rescinded.

A.   Yes.

Q.   And she never even -- her offer was rescinded before you were even terminated?

A.   Exactly, yes.

Q.   And if he wanted to terminate you because you made the offer, he could have fired you at the time he found out that you made the offer.

A.   Exactly.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   But did he do so?

A.   No.  And even on that he talked about I wasn't humble.
I don't know how I was supposed to be humble.  But even with
the Deneice matter, I accepted my -- I accepted the apology.
Even though that wasn't a unilateral decision, both Ted and
Dwaun were part of that decision, everything fell on me.  So
I accepted responsibility for it, and I apologized.  I felt
so badly for her, but I needed to keep my job.

Q.   Let me ask you this.  He said that you should have
been humble.  Is part of being humble not speaking out on
behalf of others?

A.   At that firm part of being humble is just going along.
And I realized he didn't want an HR executive.  He just
wanted a figurehead.

THE COURT:  It's time to break.

MR. RYAN:  I think I'm -- let me confer -- can we
take the break and then --

THE COURT:  We're going to lunch.

MR. RYAN:  Yes, sir.  I hear you.

THE COURT:  Lunch is here.

MR. RYAN:  Okay.  Then I'll sit down.

THE COURT:  Ladies and gentlemen, lunch is here.
Don't talk about this case while you're out.  We'll spend
about an hour and 15 minutes at lunch.  We'll come back and
resume the direct examination of the plaintiff.  And have a

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

good lunch.

(Jurors exited the courtroom.)

**THE COURT:**  Mr. Ryan, anything else?

**MR. RYAN:**  I'm going to talk to Ms. Osowski.  I may be done with Ms. Mosby.  If I'm not done, I'm very close to being done.  And then that would mean Mr. Hancock -- you know, he's probably got a while with her.  So if we come back -- I'm just thinking the rest of the day if we're going to be able to get through.

**THE COURT:**  It's a one-day trial.  I think I was a little closer to estimating the time than counsel.

**MR. RYAN:**  Yes, sir.  Well --

**THE COURT:**  So we're going to finish with Ms. Mosby and -- you may be resting with Ms. Mosby.

**MR. RYAN:**  Exactly.

**THE COURT:**  And passing the witness to Mr. Hancock who is going to take some time on his cross-examination.

**MR. HANCOCK:**  It won't be an hour.  It will be less than that.

**THE COURT:**  That's encouraging.

**MR. HANCOCK:**  I'm hoping it won't.

**THE COURT:**  I'm not holding you to it.  I assume Mr. Ryan will rest his case-in-chief.

**MR. RYAN:**  Yes, sir.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

THE COURT: And at that juncture you'll have your proof. How much proof do you have?

MR. HANCOCK: Your Honor, I think we're going to only have two witnesses, and both of them have already been called. So they'll be shorter than they would have been. I don't think it will be two hours. It's something less than that. The cross will be hard to predict. The direct is less than two hours.

THE COURT: So we'll complete direct.

MR. RYAN: I mean, I'm not going to recover stuff just to recover. Hold me to it.

THE COURT: Oh, I'll hold you to it. But Mr. Hancock can feel free to object if there's cumulative testimony.

MR. HANCOCK: I think that we are -- I expect our case with cross to be less than four hours. I think it will be.

THE COURT: You're talking about the whole case?

MR. HANCOCK: I'm talking about the defense proof.

THE COURT: Less than?

MR. HANCOCK: I think it will be between two and three, if I'm guessing correctly, but in all event less than four.

THE COURT: Let me figure this out. We'll be

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

back here around 1:15 -- 1:30. Let's say we're back here by 1:30. Let's assume Mr. Ryan completes his direct examination. Let's assume that you have an hour on your cross.

    **MR. HANCOCK:** It won't be more than that. Yes.

    **THE COURT:** So we're now at 2:15, 2:30. Let's assume that you then begin your case-in-chief. And you're going to take how long?

    **MR. HANCOCK:** Being fair, Your Honor, I think I have two witnesses, and both of them are going to between 30 and 45 minutes on direct. Probably one of them is going to be closer to 30 and maybe a little shorter.

    **THE COURT:** These are the same two witnesses I've already heard from?

    **MR. HANCOCK:** They are. And it may be that they're 15 or 20 minutes. I just don't --

    **THE COURT:** And you're estimating three hours.

    **MR. HANCOCK:** No more, yes.

    **THE COURT:** At that point it will be 5:30 and the jury will go on.

    **MR. HANCOCK:** One wrench. We do probably plan to move the Court for a directed verdict. I'm not positive that we will.

    **THE COURT:** You may move under Rule 50 if you want. It probably won't take me long.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**MR. HANCOCK:**  I thought that would be -- `12:10:06`

**THE COURT:**  Probably won't take you long either.

**MR. HANCOCK:**  That's fair.  So I don't know that `12:10:08` that will extend it.  I think I can get this done faster than `12:10:08` that. `12:10:11`

**THE COURT:**  So at that point, at 5:30, the jury `12:10:11` will go home. `12:10:15`

**MR. HANCOCK:**  I think there's a chance we can get `12:10:15` this to the jury closer to 4:30 if we're moving okay.  I just `12:10:18` mention that if it makes a difference. `12:10:26`

**THE COURT:**  That will conclude the proof in the `12:10:26` case.  We still have to do instructions, closing arguments, `12:10:29` instructions delivered, deliberations.  But presumably we `12:10:37` could get started on Wednesday with closings, possibly.  It `12:10:44` depends on how much time we spend on instructions.  I don't `12:10:53` plan to spend a long time on that. `12:10:55`

**MR. HANCOCK:**  We've reached a lot of agreements. `12:10:55` I don't know that you even need to hear from us, but we've `12:10:58` tried to keep working on the but-for issue. `12:11:02`

**THE COURT:**  Well, to give you a hint, my reading `12:11:05` -- and this is preliminary because I haven't finished writing `12:11:06` it all out.  But my reading was the Supreme Court -- the `12:11:12` statute says "because of".  And the Supreme Court seems to `12:11:16` say that too, and I usually follow the Supreme Court.  So if `12:11:19` it says because of, that's probably where I'm going to be. `12:11:26`

UNREDACTED TRANSCRIPT

**TESTIMONY OF JAYE MOSBY**

And I don't know about the "but-for" parts and all that, but "because of" seems to be the operative language.

I used to say the most disturbing words you could hear came after lunch when the judge said I've been doing some research over the lunch hour.  It is not necessarily a good thing.  And I have been the beneficiary in my practice years ago of judicial research over the lunch hour.

My favorite was the case where the judge had discovered a dispositive case in workers' comp.  And Bob Green -- if you recall Bob, one of the greatest trial lawyers I ever knew -- was on the other side.  The judge hands the case to Bob, and Bob says, Your Honor, I believe this is dispositive; I believe Your Honor has done it again.

And I said, well, could I see the case?  And he passed me the case, and I looked at it.  And I said, Your Honor, Your Honor, this is a very interesting case, but it applies to workers' comp, and our case is not a worker's compensation case.

**MR. RYAN:**  Difficult position.

**THE COURT:**  So I won't mention the name of the judge, an old friend of my family, a fine gentleman, but we quickly established that even the judge was finally convinced, despite Bob, that his research over the lunch hour was probably not as productive as he might have hoped.

So I can only say I hope the lines on the statute

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

or the Supreme Court is more productive.  So you'll get to see the work product.  If you've agreed on something and want to give it to me, I'll take whatever agreement you've got.  But I'm still responsible when the case goes up, should it go up, for my own decision, and I don't get to blame the parties for misleading me, I have discovered.  All right.

MR. HANCOCK:  I will see what we can do to streamline our proof in hopes that I can come in well under my estimate.  That's how we'll spend our lunchtime.

THE COURT:  That would be a great thing.  And also, if Mr. Ryan could exercise restraint considering if the two witnesses are Mr. and Mrs. Reaves --

MR. HANCOCK:  They are.

THE COURT:  -- that Mr. Ryan has already thoroughly examined both of them, I would think.  Maybe he'll want to offer some impeachment.

MR. HANCOCK:  That may get us to the point we finish much faster, Your Honor, much quicker.

MR. RYAN:  I've always remembered this phrase Judge Bailey, D'Army Bailey, said to me one time:  Mr. Ryan, you don't need to beat an ant over the head with a sledge hammer.

THE COURT:  I used to say it was a mosquito.  But Judge Bailey and I were old friends and we went to the same law school.  And we disagreed about many things , but we

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

managed to be friends all those years.

**MR. HANCOCK:**  That's neat.

**THE COURT:**  And I'll defer to the -- ant?  Was that what it was?  We'll let the ant take preference over the mosquito.  Maybe it was a gnat that I used.

**MR. RYAN:**  Yeah.

**THE COURT:**  Anyway, we'll see you back here at 1:30.

(Recess taken at 12:15 p.m. until 1:36 p.m.)

**THE COURT:**  Good afternoon.  Are we ready to go forward this afternoon, Mr. Ryan?

**MR. RYAN:**  We're ready, Your Honor.

**THE COURT:**  How about you, Mr. Hancock?

**MR. HANCOCK:**  Ready to proceed, Your Honor.

**THE COURT:**  Let's bring in the jury.

(Jurors entered courtroom.)

**THE COURT:**  Welcome back ladies and gentlemen of the jury.  How was lunch?  It was a good lunch.

**JUROR:**  Yes.

**THE COURT:**  I'm glad to hear it.  Ladies and gentlemen, when we took our recess for lunch we were in the midst of the direct examination of the plaintiff, Ms. Mosby, by Mr. Ryan.

Mr. Ryan.

**MR. RYAN:**  I looked back over my notes and I've

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

got a couple of questions.  I'll be quick.

        **THE COURT:**  Okay.  Ms. Mosby, you may return to the witness stand.

**BY MR. RYAN:**

  Q.  Do you remember Mr. Reaves' testimony?

        **THE COURT:**  Let me remind you you're still under oath.

        **THE WITNESS:**  Yes, Your Honor.

**BY MR. RYAN:**

  Q.  Do you remember Mr. Reaves' testimony under oath -- and I don't know if he meant to say this or not, but he did. He said:  We fixed the situation with respect to Ms. Davis.

  A.  Yes.

  Q.  Jakira Davis, the female employee.

  A.  Yes.

  Q.  What did you understand that to mean?

  A.  Fixed means it was broken and they fixed it, which means she may have been underpaid.

  Q.  By the way, he said that he had sent an e-mail to payroll.  Were you copied on any e-mail that he sent to payroll regarding Ms. Davis?

  A.  Oh, no.

  Q.  Did he ever state at the time in real time right then and there when you brought the Davis and Redmond pay issues to his attention, did he say you don't know what you're

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

talking about, you're bringing these allegations in bad faith?

A.    No.  He just focused on the fact that I was being dishonest and he couldn't trust me anymore.

            **MR. RYAN:**  No further questions, Your Honor.

            **THE COURT:**  Mr. Hancock.

                        **CROSS-EXAMINATION**

**BY MR. HANCOCK:**

Q.    Ms. Mosby, I'm Jonathan Hancock.  We've met several times before.

A.    Hi, Jonathan.

Q.    As you know, I'm representing the Reaves Law Firm in this matter.

A.    Yes.

Q.    And forgive me.  I'm going to try to not cover ground that we've already covered.  So I'm going to walk through this outline but hopefully skip a few pieces.

A.    Okay.

Q.    Before we do that, I want to talk a little bit about some of your testimony this morning.  In particular, I want to start with some questions about Deneice Davis.  Do you remember who Deneice Davis was?

A.    The young lady that I was trying to bring in as a trainer and an executive assistant.

Q.    You mentioned that you brought her in this morning as

                        **UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

an executive assistant and that she was going to support three different people; is that right?

A.    Correct.

Q.    And you also testified that weren't sure why Mr. and Mrs. Reaves thought that she was just a trainer.  Do you remember saying that?

A.    I don't remember saying that.  They may have thought she was just a trainer, but Henry was aware that she was supposed to support the three of us.  We talked about that. Henry and I did.

MR. HANCOCK:  May I approach, Your Honor?

THE COURT:  You may.

**BY MR. HANCOCK:**

Q.    I'll ask if you can recognize or identify this document?

A.    Yes.

Q.    Would you agree with me this is the offer letter for Ms. Deneice Davis?

A.    Yes.

MR. HANCOCK:  Your Honor, I'd like to mark this as exhibit -- I believe we're to 7.

THE COURT:  It should be 9.

MR. HANCOCK:  Oh, that's right, 9.

THE COURT:  Mr. Ryan, is this your witness?

MR. RYAN:  Yes, Your Honor.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**THE COURT:** Still?

**MR. RYAN:** No objection.

**THE COURT:** Without objection, what purports to be the letter will be admitted and marked as Exhibit 9.

(Exhibit No. 9 was marked and admitted.)

**BY MR. HANCOCK:**

Q.   I'll put this up real quick.  I just have one question.  Will you read that first paragraph?

A.   We at Reaves Law Firm would like to offer you the position of human resources orientation and training analyst. This position is full time with an annual salary of 90,000. Your effective date of employment is Monday, June 6, 2022.

Q.   So Mr. or Mrs. Reaves testified that they thought Ms. Davis had been hired as a human resource orientation and training analyst and not as an executive assistant.  You'd agree with me this document says that?

A.   Yes, this document does say that.

Q.   I also want to talk a little bit about the PaQuita Redmond situation.

A.   Yes.

Q.   You testified that you, when talking with Mr. Reaves, said that we needed to look at the pay issues overall.  Do you remember that?

A.   Uh-huh.  Sure did.

Q.   And do you agree with me that's because looking at

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

those pay issues was your job?

A.   That's part of my job, yes.  Correct.

Q.   And then I want to look at this e-mail that we have marked as Exhibit 4 a little bit more.  This is the May 28th e-mail that came from Mr. Reaves, the one I believe we've called a few times the immersion training e-mail?

A.   Yes.

Q.   Do you recall this e-mail?

A.   Yes.

Q.   Today you testified that on June 2nd you were working remotely; is that right?

A.   I was working at home on the transition plan.  I wasn't in the office, correct.

Q.   Do you agree with me that in his 28th e-mail Mr. Reaves instructed you that the entirety of this journey will occur in the office and not remote?

A.   Yes.  I was not on the immersion journey on that day. I was sick, and I was working on the transition plan.  I wasn't doing training.  I wasn't working on the intake information.  I was on an official sick day, and that was my opportunity to continue working on the transition plan.

Q.   Mr. Reaves didn't know any of that, though, did he?

A.   Mr. Reaves didn't ask anything.

Q.   But really you didn't tell him, did you?

A.   I didn't have an opportunity.  At what point was I

**TESTIMONY OF JAYE MOSBY**

going to tell him that?

Q.   You had time to tell Ms. Adams, didn't you?

A.   Tell Ms. Adams that I was sick?

Q.   Uh-huh.

A.   Yes, because you're supposed to call your supervisor. Mr. Reaves was no longer my supervisor at that time.  So I did what the manual required.  If I had still been CPO, and I was not coming in, then I would have communicated that to Henry.  But once I got demoted to an intake clerk, I called the supervisor that I'm supposed to call.  That's what I did.

Q.   Well, in reality, you decided you were demoted, right? None of this says demotion.

A.   No, I did not decide I was demoted.  Mr. Reaves --

Q.   Where in this does it say demotion?

A.   He didn't use the word demotion.  Can you go up?

Q.   I can go anywhere you want.  Where would like it?

A.   "Effective immediately I will be interim CPO."

     I was CPO.  He removed me from CPO to intake clerk. Is that not a step down?

Q.   No.

A.   I was no longer responsible for any of the work I had done for 25 years.  I was no longer responsible for the work that he hired me to do.  Instead, I was to learn intake.

Q.   Real easy question.  I think you can get it.  Does this e-mail say demotion?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.   This e-mail says you will no longer -- that he was going to be the CPO.  You will no longer attend Monday leadership meetings.

Q.   Did you not understand my question?

A.   You want me to look for the word demotion.  It does not say the word demotion.

Q.   That's what I'm asking.  Thank you.

A.   He did take my responsibilities.

Q.   I also wonder if you can read the very last sentence.  Can you read that out loud?

A.   "It is my desire that you put in the work and develop into the CPO we need.  If I didn't believe you had the ability, this would be a much shorter e-mail."

Q.   So it's your testimony that after receiving this e-mail, understanding what Mr. Reaves communicated, you decided unilaterally to take a day out of training on June 2nd?

A.   We have a sick leave policy.  I decided to utilize our sick leave policy, yes.

Q.   And you decided that without saying anything to Mr. Reaves about it?

A.   I adhered to the policy.  I no longer reported to him.

Q.   Let me ask you this:  You could have told him, couldn't you?  You could have said, hey, I know you want me in intake, but I'm not going to be there today.  Is there

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

some reason you couldn't have done that?

A.   "Starting Tuesday you will report to Tina as an intake team member."  Tina was my supervisor.

Q.   I'm missing where -- does that say don't tell me?  My question is could you have told him, or is your testimony to these people --

A.   Of course I could have.

Q.   -- that you couldn't have told him?

A.   I could have told everybody at that firm.

Q.   That's right.  You could have told him.

A.   I could have called everyone.  That's not what the policy requires.

Q.   Let's talk a little more about that June 2nd day.  Actually, before we do that, so I don't have to come back to this e-mail, when Mr. Reaves is talking about intake -- let me get this right.  Starting Tuesday.  It says:  You will receive all the training intake receives, have all the responsibilities that an intake team member has, work the same schedule, attend the same meetings, and be graded on the same metric as intake professionals.

A.   Uh-huh.

Q.   Your testimony today was that in the two days you worked in intake training you did it in your office.  Is that what you said today?

A.   I was in the office on that Tuesday and Wednesday.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.    Did any of the other intake members stay in their office all day?

A.    None of the other intake team members had offices.  I was not instructed to move my office.  If he wanted me to sit in a cubicle like everyone else, then he could have spelled that out in this letter.  He didn't.  So I stayed where I had been staying.

Q.    And if you really wanted to do a good job and get all this stuff at a good level, you could have just moved on your own and sat with the rest of the team.  You could have done that, right?

A.    Tina, my supervisor, told me I could stay where I was.  And she was training me.  It was not --

Q.    That's not what I asked.  Could you have gone and sat with the rest of the team?

A.    No, because Tina didn't give me permission to do that.

Q.    Let's talk a little bit more about that June 2nd day.  Today you've testified that you were working remotely and you took a day off; is that right?

A.    No, that is not what I said.

Q.    Well, okay.  That you took a PTO.  You were taking advantage of the sick leave.

A.    I was sick, yes.

Q.    But you didn't go to work; is that right?

A.    I don't believe I went into the office that day.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   You don't think you showed up in person?

A.   I can't remember.  I don't think I did.  I know I had to go into the office to clean it out when he fired me that afternoon, but when --

Q.   Well, which is it?  You said that you didn't go to the office, you don't believe.  Is that your testimony or not?

A.   I cleaned my office out that afternoon.  I don't remember going in.  I don't remember.

Q.   Cleaning your office out after you were terminated?

A.   Yes.

Q.   Okay.  But before you were terminated you don't remember going in?

A.   I don't remember going in.  I don't.

Q.   Do you remember giving your deposition testimony with me on September 18th?

A.   Yes.

Q.   During your deposition I asked you what you remembered about that day.

          **MR. RYAN:**  Just go page and line.

          **MR. HANCOCK:**  I'm getting there.  When I get there I will.  I brought the condensed version.  This has four to a page.

**BY MR. HANCOCK:**

Q.   If you look at Page 144.  And starting at Line 4, you say when you were in intake:  I was supposed to be there for

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

three or four weeks.

And then you go on to say:  After two weeks Henry came into my office, sat down and said -- and then you go on and conclude with what Mr. Reaves said to you while you were at work on June 2nd.

A.    I misspoke.  That was that Wednesday.  That's all it was.  I couldn't remember if I got fired on a Wednesday or Thursday.  I got fired on a Thursday.  Wednesday is when he told both Tina and I that we were moving to the next level -- that my training was moving to the next level.  That was on a Wednesday.

Q.    So your testimony is you just had that wrong under oath the fist time?

A.    Absolutely.

Q.    You also signed an affidavit in this case on the 6th day of December 2024.  Do you remember that?

A.    Yes.

Q.    That affidavit, if you'll look down to Paragraph 19, it says that prior to -- on June 2nd, prior to my termination, Mr. Reaves told me and Tina that I would not need to stay in the intake department.

That's absolutely not true, is it?

A.    I'm sorry, what did you say?

Q.    Paragraph 19 is not true.

A.    Yes, it is absolutely true, but it was that Wednesday.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

It wasn't the Thursday that he terminated me.  So the part that's not true is the June 2nd, the date.

Q.   So your testimony is that the day before Mr. Reaves terminated your employment he came in and told you you were doing such a good job you could move on?

A.   He didn't say you're doing such a good job.  He said you're not going to have to be in intake for four weeks.  You are going to move to the next level.  You need to pass the assessment.  He told Tina that.  He told me that.  And then Tina came in my office and we discussed that.  He also made that same statement to the CFO, Dwaun.

Q.   And your testimony is you just had those dates wrong and that although nobody else remembers this conversation about Mr. Reaves, he had this conversation with you and then later decided to terminate your employment.

A.   No.  He had that conversation with me, and then his wife the next day decided to terminate me, which didn't make sense.  And I can't explain why they did it that way.  But on that Wednesday he told me in my office that I was moving to the next phase and I wouldn't need to train intake for four weeks.

Q.   Let's talk for just a second.  You made the comment today that your mother was mistreated while she was at the Reaves Law Firm.

A.   Yes.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   That was never mentioned in your EEOC statement, was it?

A.   I didn't file an EEOC statement on behalf of my mother.    13:51:58 / 13:52:01

Q.   Well, you talked about your experience in the law firm, didn't you?    13:52:01 / 13:52:04

A.   Yes.  I had a lot of things I experienced.  I didn't put them all in that EEOC claim.    13:52:05 / 13:52:09

Q.   By my question is, did you mention it in the EEOC statement or not?    13:52:10

A.   That was not a place, no.  I didn't.    13:52:11

Q.   Did you mention it anywhere in your lawsuit?    13:52:13

A.   That's not a basis of my lawsuit, so no.    13:52:15

Q.   But you talked about your employment.  You didn't mention it anywhere there either, did you?    13:52:18 / 13:52:18

A.   That my mother was mistreated in my EEOC claim or in my lawsuit?  No.    13:52:18 / 13:52:22

Q.   You were also deposed for quite a while.  You didn't mention it in your deposition either, did you?    13:52:24 / 13:52:28

A.   You didn't ask a question that would elicit that response.    13:52:30 / 13:52:34

Q.   You said today there's two types of HR.    13:52:34

A.   Uh-huh.

Q.   Can you identify an article or anybody else who's ever had that opinion other than you?    13:52:39 / 13:52:44

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.   You want me to do a Google search?  I can look up HR principles.  I've been doing this for a long time, so I think I have some pretty good experience.

Q.   I'm asking you whether you can identify a single place, anybody else in the country, that has any idea about HR has ever referred to this theory that there are two types of HR, or is that something you made up?

A.   It is absolutely not something I made up.

Q.   Who else has made a reference to that that you can point to us?

A.   I believe that is my lawyer's theory as well.  I believe that that is the theory of some HR people that I work with.  So do I need to depose them and see if they agree with me?  We can.

Q.   And under this theory that there are two types of HR representatives, it's your belief -- or am I correct in your story today that one type of HR person is making sure that a company is covered and complying with the laws and avoiding legal risk and exposure --

A.   Okay.

Q.   -- but another type of HR is representing the employee and pursuing a claim on their behalf?

A.   No.

Q.   What's the other type of HR?  What do they do?

A.   The ones that do whatever they need to do to protect

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

the company --

Q.   Right.

A.   -- and not really factor in the employees.

Q.   But if you were really going to look out for the employees, you'd go to the EEOC or the Department of Labor. You'd send them somewhere to someone who could advocate on their behalf; is that right?

A.   So in best practices you start with the employer. Since I represent the employer, that's where I started, with the employer because it was a simple issue to fix.  It was very simple.

Q.   In fact, Mr. Reaves fixed the compensation issue, didn't he?

A.   Which is great.  That was the end goal, for her to get the pay that she deserved.

Q.   Let's talk a little bit about what you were doing at the time you accepted the job.  You were at MLG&W at the time you accepted with Reaves; is that right?

A.   Correct.

Q.   Were you currently working?

A.   No, I was on leave.

Q.   When you first began your employment with the Reaves Law Firm, was there a policy manual in place?

A.   I'm sure.

Q.   Is it the one --

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.   No, I'm sorry.  I'm sorry.  When I first began my employment with MLG&W or Reeves?

Q.   I meant Reaves.  Did I say MLG&W?

A.   No.

Q.   No, I meant Reaves.

A.   Okay.

Q.   If I said MLG&W, that was my mistake.

A.   Yes.

Q.   This has been marked as Exhibit 3 to your deposition.  Do you agree with me that is the manual that was in place at the time you joined?

A.   Yes.  To the extent of my knowledge, yes, that is it.

Q.   Let's run through a few things about this.  In the policy manual -- first of all, you've been in HR.  This is the set of written work rules that governed your employment at the Reaves Law Firm; is that right?

A.   Correct.

Q.   And this manual was provided -- you were provided this manual during orientation?

A.   Correct.

Q.   Let's try to do this quickly.  First, do you agree with me that the employment you had at the Reaves Law Firm was on an at-will basis?

A.   Yes, correct.

Q.   And as opposed to me reading this, is that a correct

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

statement of the at-will law principles in Tennessee as you understand them?

A.   Yes.

MR. HANCOCK:   Let me know if anybody needs a minute to read that before I pull it down.   I can make it larger.

JUROR:   Yeah, can you make it larger?

MR. HANCOCK:   I sure can.   Well, I hope I can. Okay, great.

**BY MR. HANCOCK:**

Q.   And I'm going to flip over to the next page.   And we won't need to read all these policies.   I'll point you to the parts we need.

A.   Okay.

Q.   Do you agree with me that the firm at the time you were working there had an equal opportunity policy?

A.   Yes.

Q.   And a nonharassment, nondiscrimination policy?

A.   Yes, correct.

Q.   And were you familiar with these policies?

A.   Yes.

Q.   And am I correct that they were in place the whole time you were there?

A.   Correct.

Q.   If you look at part of this policy on Page 10, you

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

agree with me that this provision I'm pointing to that begins with "no employee" is the part of the handbook that says the company won't retaliate against you if you complain in good faith regarding the violation of policies?

A.    Yes.

Q.    Would you also agree with me -- we're not going to read it -- at the top it says reporting/complaint procedure. Do you agree with me that the Reaves Law Firm had a complaint procedure you could have utilized if you had a complaint?

A.    Yes.

Q.    Did you ever utilize that procedure?

A.    To file what complaint?  The complaint that I had when I spoke to him about the two women?

Q.    I'm asking whether you ever utilized that procedure.

A.    That was the complaint I had.  Yes, I did.

Q.    Did you report that to anyone other than Mr. Reaves as part of the discussion about their compensation?

A.    The only other person I could report it to was myself.

Q.    You could have reported it to Bill, couldn't you?

A.    Bill reported to me.  And Bill was sick.  Bill was in and out of the office.

Q.    During this case you produced some notes that were notes you kept during the course of your employment.  Do you remember those?

A.    Yes, the notes on my reMarkable.

UNREDACTED TRANSCRIPT

**TESTIMONY OF JAYE MOSBY**

Q.   Is a reMarkable an electronic tablet?    13:58:40

A.   Yes.    13:58:44

Q.   And that's one of the things like an iPad or something    13:58:44
where you can take notes?    13:58:47

A.   Yes.    13:58:48

Q.   And then you were able to take those notes and print    13:58:49
them?    13:58:52

A.   Yes.  Well, my attorney was.    13:58:52

Q.   Fair enough.  And in those notes I'm going to    13:58:54
represent to you, Ms. Mosby -- so we didn't have to shuffle    13:58:59
paper like I've been doing, this is just a few of them.    13:59:04
Actually, I need to represent nothing to you until you can    13:59:08
identify those.  I'm sorry.    13:59:11

A.   That looks like my writing.    13:59:13

Q.   Does that appear to be the notes from your reMarkable    13:59:15
tablet?    13:59:20

A.   Some of them, yes.    13:59:21

Q.   It is an excerpt from there?    13:59:22

A.   Yes.    13:59:31

         MR. HANCOCK:   I'm going to mark these as exhibit    13:59:32
-- or I'd like to mark these as Exhibit 10.    13:59:32

         MR. RYAN:   No objection.    13:59:35

         THE COURT:   That was a motion?    13:59:37

         MR. HANCOCK:   It was a moving to mark them as    13:59:40
Exhibit 10, yes.    13:59:42

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**THE COURT:**  Without objection, what purports to be the notes will be admitted and marked as Collective Exhibit 10.

(Exhibit No. 10 was marked and admitted.)

**BY MR. HANCOCK:**

Q.   Real quick so that we don't talk about something the jury doesn't quite understand.  If we refer to Bates numbers, Ms. Mosby, do you agree with me these little numbers that are at the bottom of all the pages are what we mean when we refer to Bates numbers?

A.   Yes.

Q.   Right here?

A.   Yes.

Q.   Okay.  If you go down to the bottom of this page, that is 65.  Actually, if you go right there.

A.   Yes.

Q.   It says:  Will get CTO job description.  What is this talking about?  Can you tell me what this -- I'll scoot it back up so you can see the whole page.

A.   Can you let me see the whole page so I can get some context?

Q.   Yes.

A.   Okay.  So that's one of the many responsibilities I was given on that particular day was to recruit a chief technical officer.  He wanted it in 90 days.  I didn't have a

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

job description.  There was no job description.  I was        14:00:45
supposed to draft the job description once I got confirmation 14:00:49
of what he needed in that job description.                    14:00:54

Q.   Did you hire a CTO?                                      14:00:57

A.   I never got a job description.  I never got the          14:01:01
specifics on what needed to be done, so no.                   14:01:05

Q.   No?                                                      14:01:08

A.   No.                                                      14:01:11

Q.   The next, 77.  It looks like you're keeping notes from   14:01:12
May 9th; is that right?  Is that the date up at the top?      14:01:18

A.   Yes.                                                     14:01:20

Q.   And there's a question that says:  Are we keeping new    14:01:20
employees in intake for 90 days?  And then it says yes.  Do   14:01:23
you see that?                                                 14:01:29

A.   Yes.                                                     14:01:30

Q.   Is that because new employees were in intake so they     14:01:30
could train for 90 days?                                      14:01:34

A.   That is what I was told, that I was going to keep them   14:01:35
for 90 days.  That's why I responded yes.  That was the       14:01:37
question that I had.                                          14:01:38

Q.   If you flip over to this page, it says:  HR issue,       14:01:39
brought to me by Tina.  Do you see that?                      14:01:44

A.   Yes.                                                     14:01:50

Q.   And then it says that there is -- there's some           14:01:50
questions in there about how to deal with the people that are 14:01:51

<b>UNREDACTED TRANSCRIPT</b>

**TESTIMONY OF JAYE MOSBY**

late and the attendance policy; is that right?

A.    Yes.

Q.    And this is an issue that Tina brought to you so that you could resolve questions about an HR issue.

A.    So that I could address it, yes.

Q.    Do you agree with me that compensation issues are just like this, they're HR issues?

A.    They could fall under HR, yes.

Q.    And people brought them to you, and your job was to resolve them.

A.    People really didn't bring compensation issues to me, but yes.  Other than the two ladies I talked about, I didn't know any of the other compensation stuff.  I didn't know who made what.

Q.    As you were put on notice of compensation issues because people told you about them or because you observed them, that was an HR issue.

A.    What was an HR issue?

Q.    The compensation issue.

A.    Oh, it definitely falls under HR, yes.  In conjunction with finance.

Q.    And then you've got on the next page a conversation that looks like you're talking about attorney salaries.  Do you remember this?

A.    Yes.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   And was this an effort to come up with a standardized employee compensation plan for attorneys?

A.   That is what Henry told me he wanted to do.  He set those salaries.  I did not have authority to set anyone's salary.  He wanted 65,000 to start, and he did 90 for out of state.

Q.   But you were tasked with figuring out compensation and looking at it and making suggestions, right?

A.   Yes.

Q.   That was a big part of your job.

A.   Uh-huh.

Q.   In fact, it was a real big part of your job.  I'm going to hand you this and ask you if you can identify the document.

A.   Yes.

Q.   Is this the EEOC charge that you filed in this case?

A.   Yes.

        **MR. HANCOCK:**  I'd like to mark this as exhibit --
I think we're to 11.

        **MR. RYAN:**  No objection.

        **THE COURT:**  Without objection, it will be admitted and marked as Exhibit 11.

        (Exhibit No. 11 was marked and admitted.)

**BY MR. HANCOCK:**

Q.   Real quick, Ms. Mosby, I just want you to confirm that

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

second -- really it's the first two sentences that -- let me    14:03:59

get it where you can read it.    14:04:06

A.    Yes.    14:04:06

Q.    One of the first matters among many that I was tasked    14:04:07

with performing dealt with employee compensation.  Is that    14:04:13

true?    14:04:17

A.    Yes.    14:04:17

Q.    And you quickly identified pay disparity issues among    14:04:17

the attorneys employed by the firm; is that true?    14:04:24

A.    Yes.    14:04:25

Q.    So doing that, identifying those pay disparity issues    14:04:25

was your job.    14:04:30

A.    That was one of my responsibilities, yes.    14:04:31

Q.    When the issue came up with Ms. Davis, just to clarify    14:04:40

how this -- actually, I need to show you this.  We talked a    14:04:46

lot about her salary.  Can you identify that e-mail?    14:04:52

A.    From Jamie to Henry regarding Jakira pay.    14:04:55

Q.    And was that the e-mail where Mr. Reaves is told that    14:05:04

actually Ms. Davis already makes 85,000?    14:05:09

A.    That is what they presented, and that is what this    14:05:12

document says, yes.    14:05:14

Q.    And when you told Mr. Reaves she was making 65,000, it    14:05:14

was when he went to check on it to change her comp that he    14:05:20

found out it was actually 85; is that right?    14:05:24

A.    I mean, that's the date on there, which means I was    14:05:27

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

still working there, so that could have been conveyed to me.          14:05:28

Q.   That's not what I asked you.          14:05:30

A.   Yeah, that's right.          14:05:32

Q.   That's what I thought.          14:05:33

          **MR. HANCOCK:**  I'd like to mark this as          14:05:34
Exhibit 13.  Sorry, it's actually Exhibit 12.  Move to mark          14:05:37
as Exhibit 12.          14:05:54

          **THE COURT:**  Moving the introduction of what          14:05:54
purports to be an e-mail.  Without objection, it will be          14:05:56
admitted and marked as Exhibit 12.          14:06:01

          (Exhibit No. 12 was marked and admitted.)          14:06:04

**BY MR. HANCOCK:**          14:06:05

Q.   I think we can skip the next e-mail.  You agree with          14:06:05
me that after Mr. Reaves figured out that Ms. Davis was          14:06:06
making 85, he raised her salary to 90 because that's what you          14:06:10
suggested new attorneys needed to be making.          14:06:15

A.   Incorrect.          14:06:17

Q.   Okay.  Tell me did he not raise her salary to 90?          14:06:18

A.   I don't know what he did.  I wasn't a part of it.  And          14:06:22
also I did not suggest 90,000.  That was him.          14:06:25

Q.   I'll hand you a document, and tell me if you've ever          14:06:27
seen this e-mail?          14:06:31

A.   Only as a result of this litigation.  I didn't see it          14:06:32
on the 31st or the 1st or the 2nd.          14:06:36

Q.   But in this e-mail --          14:06:44

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**THE COURT:**  Wait a minute.  Is this in evidence?    14:06:45

**MR. HANCOCK:**  No.  I'll move to mark this as    14:06:48
Exhibit 13.    14:06:51

**MR. RYAN:**  No objection.    14:06:53

**THE COURT:**  Without objection, the document will    14:06:58
be admitted and marked as Exhibit 13.    14:07:00

(Exhibit No. 13 was marked and admitted.)    14:07:03

**BY MR. HANCOCK:**    14:07:09

Q.   Without going back into the page on your notes where    14:07:10
you had $90,000 identified, you were working on a pay scale    14:07:13
with Mr. Reaves for the lawyers.    14:07:17

A.   I was writing down what he wanted the lawyers to make.    14:07:18
So, yes, we were developing the pay scale.  I still had not    14:07:22
had access to the pay information.    14:07:27

Q.   But you were working on a pay scale with Mr. Reaves    14:07:28
for the lawyers?    14:07:31

A.   Yes.  That was part of my job.  That was part of the    14:07:32
process.    14:07:35

Q.   And as part of that process, you and he had    14:07:35
standardized or worked towards standardizing 90,000 as    14:07:39
attorneys' salary?    14:07:44

A.   At that point, yes.  The 90,000 for out of state.    14:07:45
Whatever my note says is what he wanted.  So if it was out of    14:07:49
state.    14:07:52

Q.   So his decision in the e-mails we just looked at was    14:07:52

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

consistent with the discussion you had with him.

A.   What he determined he wanted the salary to be, yes.

Q.   When you were talking earlier about the interview for the lawyer that came from Atlanta, Mr. Reaves told you in advance that that was a highly sought-after candidate; is that right?

A.   No, he did not come from Atlanta.  He came from Mississippi.

Q.   Mississippi.

A.   The young lady came from Atlanta.

Q.   Excuse me about that.  The attorney from Mississippi, you did know that that was an individual Mr. Reaves had identified as a highly sought-after candidate?

A.   According to Sheena and Mark, yes.

Q.   And you knew Mr. Reaves was impressed with his resume?

A.   I didn't know the basis of why he was so sought after. They just said Henry really wants him.

Q.   Did they tell you that he really wanted him based on his resume?

A.   No.

Q.   Did you ever look at his resume?

A.   I think during the interview process, yes.  I'm sure I looked at it during the interview process.

Q.   The main reason I'm asking you that is do you recall in your deposition when you said he really wanted that

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

person?  He was impressed by that resume, so he really wanted  14:09:24
to roll out the red carpet?  14:09:30

A.  He had to have been impressed by him for us to want to  14:09:33
take him upstairs so that he could impress him.  So yeah.

Q.  So you said that during your deposition?  14:09:50

A.  And you could see he was a really good guy.  He
interviewed really well.  So it wasn't misplaced.  That
wasn't my fight that he shouldn't have gotten that money.  I  14:09:50
just wanted to make sure she was compensated fairly.  14:09:52

Q.  And you agree that Mr. Reaves, after you brought that  14:09:55
issue to his attention, changed his compensation?  14:09:58

A.  I don't know when he did it.  I got fussed at and  14:10:00
demoted after that.  I wasn't a part of any of that other  14:10:04
stuff.  14:10:08

Q.  Let's talk a little bit about this e-mail where you're  14:10:08
calling it a demotion.  14:10:11

A.  Uh-huh.  14:10:16

Q.  Do you remember receiving this e-mail?  14:10:38

A.  Yes.  14:10:40

Q.  And in the first sentence --  14:10:40

**THE COURT:**  What's the exhibit?  14:10:43

**MR. HANCOCK:**  I'm sorry.  This is Exhibit 4, Your  14:10:45
Honor.  14:10:49

**BY MR. HANCOCK:**  14:10:50

Q.  In the first sentence, Mr. Reaves says it's become  14:10:51

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

glaringly obvious that you'll be unable to fulfill the requirements of your position and that a serious investment in learning is what he needs to do.

Do you agree with me that's what he's telling you right there?

A.   That's what he says, yes.

Q.   He now realizes that the duties and experiences you gained at MLG&W did not prepare you for this.  Is that what he's also telling you?

A.   That's what he's saying, yes.

Q.   Mr. Reaves in the next paragraph is explaining that he is basing this decision that you need to go through the immersion training on the last several interactions and conversations he's had with you.  Is that what he's telling you right there too?

A.   That is what he says, yes.

Q.   And does he also say that it would be glaringly -- where's the phrase?  It would be extremely dangerous and irresponsible to have somebody making the decisions he was asking you to make without understanding the business.  Is that what he's telling you in the next paragraph?

A.   That's exactly what that says.

Q.   Mr. Reaves could have terminated your employment on May 28th; is that right?

A.   He could have terminated my employment at any point.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   So he could have done it on May 28th?    14:12:01

A.   At any point, yes.    14:12:03

Q.   He chose not to do that, didn't he?    14:12:04

A.   No, he chose not to.    14:12:07

Q.   And in this next few numbered paragraphs, one through    14:12:09
four, is Mr. Reaves laying out for you what the immersion    14:12:13
training is going to include?    14:12:19

A.   Yes, he did.    14:12:20

Q.   And in each of those bullets -- it will be two, three,    14:12:21
and four -- you agree with me that Mr. Reaves is going into    14:12:24
pretty great detail telling you what he wants you to do, and    14:12:26
it's clear he wants you to understand not in a superficial    14:12:31
level but in a very detailed level what happens in those    14:12:36
department?    14:12:42

A.   I'm not going to make this leap.  I can just tell you    14:12:42
what this says.  I can't interpret what he meant.    14:12:47

Q.   But that's what this says.  Do you agree with me about    14:12:48
that?    14:12:52

A.   It says what?    14:12:52

Q.   That's that what he says.  That he wants you to go and    14:12:54
get that training so that you will gain that knowledge and    14:12:55
understanding.    14:12:57

A.   He wanted me to go four weeks, eight weeks, 16 weeks    14:12:58
and immerse myself in those departments.    14:13:03

Q.   And then it says in Paragraph 5 that he wants to    14:13:05

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

further invest in you by providing you even more additional

trainings so that you could become an RLF-caliber team member

and leader.  So he was even willing to do more; is that true?

A.   Yes, he was willing.

Q.   And under six, it says when you're finished with this

you'll return to your position as CPO.

A.   That's what that says.

Q.   We said it a minute ago.  Did anybody give you another

e-mail that said this is a demotion?

A.   Did anybody?

Q.   This e-mail doesn't say it's a demotion.  Did somebody

else give you an e-mail that said it was?

A.   We've already gone over that.  No one else has given

me another e-mail.

Q.   Did Mr. Reaves ever tell you that he intended to

demote you?

A.   Mr. Reaves took my responsibilities from me.

Q.   Did he ever tell you that he intended to demote you?

A.   He did not use the word demotion.  He did not.

Q.   So Mr. Reaves' expression to you about why he wanted

you to go to the immersion training is this e-mail.

A.   Mr. Reaves' what?  I'm sorry.

Q.   Expression to you --

A.   This is --

Q.   -- about why he wanted you to do the training -- the

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

jury sees the same thing you saw about why he wanted you to do it.

A.   Yes.

Q.   And nothing in that says demotion or says that you won't be returned to your regular position, does it?

A.   That was the idea was for me to be returned after seven months.

Q.   There has also been a lot of talk about this next little bit:  The following actions are to be taken immediately.

A.   Yes.

Q.   You received this on May 28th; is that right?

A.   Yes.

Q.   If you weren't sure when it was due, you could have gone to Mr. Reaves and said, this says immediately.  Do you want this by Wednesday?  Is that right?

A.   I could have done it upon my arrival back on Tuesday, yes.

Q.   You could have e-mailed it back in response to this e-mail, couldn't you have?

A.   I was kind of dealing with my grandmother being dead, so --

Q.   My question is whether --

A.   I responded.  I did more than I should have in light of what I was going through at that time.  So I very well

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

could have asked for clarification.  I could have.  I did not care on that date.

Q.   You never told Mr. Reaves about your grandmother, did you?

A.   Yes, I did.  He knew that.  Everyone in that firm knew that.  I got all the messages of condolences.  Yes, he knew that.

Q.   Mr. Reaves takes the position he didn't tell you.

A.   Mr. Reaves --

Q.   Did you get a message from him about condolences?

A.   -- has taken a lot of positions that were not true over these past two days.  A lot of positions.

Q.   Something you can prove.  We'll back up on that.

Immediately.  My question that you haven't answered yet.  If you wanted to know what immediately meant, you know this is an e-mail from your boss where he's telling you that you don't really know everything he wants you to, and he's giving you a 17-week or so plan.  So if you wanted to make sure you were in good standing with this person who is your boss and he tells you "immediately", you could have clarified, right?

A.   I could have very well on that date said please explain when you want these things, yes.

Q.   You could have done it on any other day.  You chose not to; is that right?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.    I chose not to; that is not true.  I did not choose not to.  I was working on it to turn it in.

Q.    But you didn't ask when it was due.  That's what I was asking you about.  You never clarified that?

A.    I didn't ask when I needed to fire my mother either. I didn't ask when that needed to be done.

Q.    Did you know that the SLIP program was going to require the Reaves Law Firm to do something before the June 2nd?

A.    I was not familiar with the components of the SLIP program because I did not start the SLIP program.  The SLIP program was managed by Neva and Emily.  I was told --

Q.    It was something -- go ahead.

A.    Can I continue?  I was told to hire on every given date, show all of my notes.  On Monday we need six attorneys. On Tuesday we need 20 paralegals.  On Wednesday we need this. I was there for less than 30 days.

Q.    That's not my question at all.

A.    So I was not familiar with the SLIP program.

Q.    Okay.

A.    So the answer is no.

Q.    So if Mrs. Reaves believes that you were in charge of the SLIP program, she's wrong about that?

A.    Mrs. Reaves also believed I wasn't at work when I was, so.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.    If you go down to the next few paragraphs, get down here:  That you will not be taking a pay decrease.  I hope that you appreciate the level of investment RLF is making in your personal development to give you this opportunity.

Not only did Mr. Reaves tell you you're not taking a pay decrease, he actually told you that your pay was going to stay the same and called it an opportunity; isn't that right?

A.    That's what he called it.

Q.    And then he points out he has spent an immense amount of time and energy in formulating your path of success.  You agree that's what this says at the end.  That's how he ends it.

A.    That's what that says, yes.

Q.    And then he actually right at the end says:  It is my desire that you put in the work and develop into the CPO we need.  If I didn't believe you had the ability, this would be a much shorter e-mail.

A.    That's what he says.

Q.    And by that he means if I didn't want to invest in you this way, I could have just terminated your employment.

A.    I can only testify to what he says, not what he means.

Q.    Do you think that's the common takeaway from that sentence?

A.    What is the common takeaway?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   That when Mr. Reaves says at the bottom:  If I didn't believe you had the ability, this would be a much shorter e-mail.  Do you think that can be construed several different ways?

A.   I know that he had the opportunity to terminate me at any point.  He had it within his purview, and he chose not to on the 28th.

Q.   And then you -- let's go back so we can see that date. That same day on May 28th, you did respond to Mr. Reaves' e-mail, right?

A.   Yes.

Q.   And you did tell him that the transition plan was, quote, forthcoming?

A.   Yes.

Q.   Bear with me.  We've covered a lot of this ground. I'm going to hand you another exhibit that I believe we talked about briefly.  I'll ask you a few things about what we've marked as Exhibit 2.  Are you now familiar with this e-mail?

A.   Just in the course of this litigation.

Q.   Before -- and I can put it back up if you need me too. In the May 28th e-mail that Mr. Reaves sent to you, does he say anything negative about you as an employee or a person?

A.   Oh, no.

Q.   And in fact, as we just went through, he's encouraging

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

you to complete the training and telling you that you'll be    14:20:31

restored to your position of CPO at the end of it; is that    14:20:35

right?    14:20:39

A.    Yes.    14:20:39

Q.    And then in this e-mail do you agree with me that    14:20:39

Mr. Reaves is explaining the immersion training that you're    14:20:44

about to do to the executive team at the Reaves Law Firm?    14:20:47

A.    Yes.    14:20:50

Q.    And in this e-mail do you agree that it not only    14:20:50

doesn't disparage you, it says this in positive terms?    14:20:59

A.    Positive?  Yes.  If that's your interpretation, yes.    14:21:02

Q.    I'm asking you yours.  At the bottom it says:  Jaye is    14:21:04

finishing up a transition sheet that will give us the

marching orders in her absence, to be completed by close of    14:21:08

business, COB, Thursday.  We'll review in preparation to    14:21:12

discuss this on Monday.

       Do you agree with me that all of the leadership team    14:21:22

at the Reaves Law Firm meets on Mondays?    14:21:25

A.    Yes.    14:21:26

Q.    And in this e-mail Mr. Reaves is telling the    14:21:27

leadership team, hey, I've got this transition document    14:21:31

coming, so you can look at it and we can figure out what's

going on, and then we'll talk about it at our Monday meeting?    14:21:34

A.    That's what he's telling them, yes.    14:21:36

Q.    So he's explaining to his executive team why he needs    14:21:39

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

it.

A.   He just says that they will be reviewing it and they will get their marching orders.  It doesn't say why we need it, but yes.

Q.   It actually says that in the other e-mail, doesn't it?

A.   Well, you asked me about this.

Q.   That's true.  But it does say that in the other e-mail, or do I need to get it?

A.   If you want to, you can get it.

Q.   Do you agree with me that in the other e-mail Mr. Reaves explains to you why he needs the transition memo?

A.   There was never a question about why he needed it.  I don't dispute that he put an explanation in there.  I never said he never explained to me why he needed it.  He just didn't tell me when to get it to him by.

Q.   Let's look at the June 2nd e-mail.  We've looked at this e-mail a few times.  I'll try to cut my questions down so we can be pretty succinct.  Are you familiar with this e-mail?

A.   Yes.

Q.   Can you explain why --

THE COURT:  Did you say which exhibit it is?

MR. HANCOCK:  I apologize, Your Honor.  This is Exhibit 1.  Page 2 of Exhibit 1.

BY MR. HANCOCK:

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.    In the first sentence Mrs. Reaves says that on May 28th the CEO -- who's Mr. Reaves -- requested a transition document that listed what you were doing.  Do you see that?  That's true, isn't it?

A.    Yes.

Q.    And then in the second sentence it says that the CEO indicated that that was to take place immediately; is that true?

A.    Yes.

Q.    And on May 28th, you did an e-mail back and say that it was forthcoming.  That's true too, isn't it?

A.    Correct.

Q.    And then you didn't know about the May 31st e-mail that he sent to the rest of the group.  That's your testimony too; that's right?

A.    I wasn't on that e-mail; that's correct.

Q.    So you did not know about it?

A.    I did not know about it.

Q.    And then the next sentence says:  With you having full knowledge of our commitment to the students being served as SLIP, you chose not to prepare a transition document with this commitment.

Is it your opinion that you did not know what this SLIP program included?

A.    I didn't know the components of the SLIP program, no.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

I knew that they wanted to do a summer internship program with law school students, and we were supposed to recruit those among the other people that we had to recruit.

Q.   So you weren't tasked with recruiting the law students?

A.   I knew they wanted law school students.  I didn't know what the particular -- if they needed them for clerks, if they needed paralegals or whatever.  For whatever purpose interns I wasn't sure.  I just got my marching orders on all of the different people that needed to be recruited.

Q.   Do you know what the SLIP program is?

A.   I knew that it was a program that Emily had been working on and that they had had problems the previous year. I can look at my notes.  That was in 2022.  I don't remember everything in 2022, but I have my notes.

Q.   I'll represent to you that that stands for Students Learning In Practice?

A.   Okay.

Q.   And that it is a bar association program that puts students in law firms for educational purposes.

A.   Okay.

Q.   So it's not really hiring and recruitment, is it? It's not like a law student.

A.   I don't know exactly -- you can explain it to me, but I'm not familiar with all the components of it.  But if you

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

say that's what it is, I'm not going to argue with you about that.

Q.   The next paragraph says:  Your failure to provide the requested transition document is disappointing, especially after RLF took away all your other HR duties and gave you an opportunity.

Do you agree that's what that says?

A.   Yes, that's what that says.

Q.   And the next paragraph, the one we've talked about a lot, the act of insubordination in addition to other missteps and unprofessional behavior, that is the reason that Neva Reaves put in this letter for, quote, parting ways, which means terminating employment.

A.   That's what she stated, yes.

Q.   And nothing in this letter references anything about your comments about other employees' compensation?

A.   She has a wide explanation for what "missteps" mean, so that could have fallen under all those missteps that she was talking about.

Q.   But it's not specifically referenced?

A.   Neither are the other missteps that she was talking about.

Q.   And then after you received this e-mail, did you have any questions?  Did you e-mail back?

A.   I'm pretty sure I did.  I didn't have any questions,

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

or I don't know if I -- I mean, yeah, knowing me, I did.  I just got terminated after what I had gone through, yes, I'm pretty sure I e-mailed back.

Q.   And this was your response, right?

A.   Yes.

Q.   Exhibit 1?

A.   Uh-huh.

Q.   And in this exhibit you never mention anything about a belief that you were terminated for engaging in discussions about the way other employees were paid, do you?

A.   I was addressing her previous letter.

Q.   Okay.

A.   Her letter stated insubordination was my reason for termination.  So that is what I was responding to --

Q.   Okay.

A.   -- her letter.

Q.   Then after this e-mail do you remember whether you received a response from Mr. Reaves?

A.   I believe I did.

Q.   I'm going to -- I'm going to ask you to --

**MR. RYAN:**  Your Honor, may we approach?

**THE COURT:**  You may.

(At sidebar on the record.)

**MR. RYAN:**  Again, move to exclude.  Her subjective belief as to why she was fired is not relevant.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Case law makes very clear and -- case law makes very clear, and you've probably cited it in a thousand SJ opinions that a plaintiff's subjective belief as to why she was terminated is not relevant.  And so we would renew the objection for any questions related to why she thought she was terminated, with specific reference to the e-mail that he's getting ready to present to her.

**THE COURT:**  Her subjective belief is she -- according to what the lawsuit is in the amended complaint is that she was terminated for protected activity.  That's a subjective belief.  Any belief is by definition a subjective belief.

**MR. RYAN:**  But, for example, she could have believed because she was a mad woman that she was terminated because she was a fairy, but that would not be relevant.  The only thing that is relevant is the motivation of the employer at the time they terminated.  What was on their mind and why they terminated her.

**THE COURT:**  But there's no reason not to figure out what she thought, that I can see.

**MR. RYAN:**  Why it does it matter?  It doesn't go to anything the jury is to decide.  The jury is not going to be instructed you have to consider what the plaintiff was thinking at the time she wrote an e-mail after --

**THE COURT:**  Wait a minute.  I am -- her belief is

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

related to the case, a specific case, in that she has the    14:30:18

burden of proof that she has to prove by a preponderance of    14:30:25

the evidence that she had a belief and that it was a fair    14:30:29

belief.  In other words, it was a well-taken belief.  That's    14:30:31

part of the burden.    14:30:39

        **MR. RYAN:**  Yeah, as to her protected activity.    14:30:40

But this e-mail isn't speaking to her protected activity.    14:30:43

This was an e-mail, again, written on June 3rd after she was    14:30:47

terminated.    14:30:51

        **THE COURT:**  But it all goes back to the same    14:30:52

issue, it seems to me, that she has to have had some good    14:30:57

faith belief about her protected activity.  And there's a    14:31:02

reasonable person standard.  There's an objective standard as    14:31:09

well.  There's a subjective standard, and there's an    14:31:11

objective standard.  And as we work our way through, I think    14:31:14

you're trying to parse it too carefully in excluding the    14:31:20

subjective standard that bleeds over into her protected    14:31:23

activity.    14:31:27

        **MR. RYAN:**  Well, at the time she complained I    14:31:27

agree.  At the time she complained before she was terminated,    14:31:29

that requires a look at what she was believing and whether it    14:31:33

was objectively reasonable for her to believe that the law    14:31:36

was being broken.  But that was at the time that she engaged    14:31:40

in the protected activity, not after she's terminated.    14:31:45

        **THE COURT:**  That's true.    14:31:48

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**MR. RYAN:**  That's my whole point.    14:31:49

**THE COURT:**  That's true.  It does speak to a time  14:31:52
that she is reporting and complaining.  But it -- I limit it  14:31:54
in that way for purposes -- evidentiary purposes for every  14:32:00
bit of the subjectivity factor.  I think it's too close to  14:32:07
the draw.  That's my sense of it.    14:32:11

Do you want to say anything, Mr. Hancock?    14:32:14

**MR. HANCOCK:**  No.  I agree, Your Honor.  Clearly  14:32:16
she's got to show she has a good faith belief to this and  14:32:17
she's got credibility issues.  And this goes directly to  14:32:21
that.  It goes to the fact that she did not have a good faith  14:32:23
belief that she engaged in protected activity, and she didn't  14:32:24
have a good faith belief that she had a retaliation claim.  14:32:27
This shows that.  It makes that fact that is certainly an  14:32:31
issue here much less likely.    14:32:35

**THE COURT:**  What you've got -- and the problem in  14:32:37
trying to dice it is that it all happened in a very narrow  14:32:40
time frame.  And so you're looking at a moment when she  14:32:47
complains and then a period after -- a short period after,  14:32:53
relatively, which is something in your point.  Proximity,  14:33:00
your point, Mr. Ryan.  And then suddenly she's terminated.  14:33:03
So I think you're trying to draw your parameters to narrowly.  14:33:07

**MR. RYAN:**  I respect your decision because I  14:33:27
think you're an excellent judge and --    14:33:28

**THE COURT:**  Let's be clear.  I'm not always  14:33:29

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

right.  And if you all believe I'm not always right you can write to the Court of Appeals and they'll tell you so.

MR. RYAN:  In all seriousness, there's -- the cases are legion.  The plaintiff's subjective belief as to why they were terminated, it's just not relevant.

THE COURT:  This is something more than that I think.  And the something more than that is what do you say about protected activity when you complain about it.  And we all agree, I think, that there has to be essentially a good faith belief --

MR. RYAN:  At the time she made it.

THE COURT:  -- at the time she made it.

MR. RYAN:  Not on June 3rd.

THE COURT:  But these issues -- and I'll hear them as they come in.  But these questions I think relate directly to the good faith belief at the time.

MR. RYAN:  Yes.

THE COURT:  I don't see how you can exclude them when they speak to that issue.

MR. RYAN:  The e-mail is from June 3rd.  The e-mail exchange is June 3rd, and the questions --

THE COURT:  I've redacted most of that.

MR. RYAN:  Right.  And that's the e-mail that he's getting ready to --

THE COURT:  He's not going to go into the

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

redacted matter.

**MR. RYAN:**  No, I know --

**MR. HANCOCK:**  No.

**MR. RYAN:**  I'm not suggesting he would go into the redacted matter.  I am suggesting that he will try to elicit testimony that she didn't mention in the e-mail that she felt she was retaliated against, but that doesn't have anything to do with the questions the jury is going to decide.

**THE COURT:**  I've already ruled on that.

**MR. RYAN:**  I know.

**THE COURT:**  I did it in a motion in limine.  Now, you can raise it again.

**MR. RYAN:**  That's why I'm raising it again.

**THE COURT:**  I will admit that it was a relatively close question for me.  I had some difficulty resolving it.  But at the end of the day I resolved it in a way that was satisfactory to me and to my understanding, and that is it's relevant and the defendant could explore it.

My -- relevance under the Federal Rules of Evidence is a very broad proposition.  You're not going to exclude much based on absence of relevance.  You're going to exclude mostly on unfair prejudice, you know, 403 issues.  You're going to exclude on hearsay grounds.  It's not hearsay; it's exception to hearsay.  But relevance is very

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

broad.  And it's very difficult to me to tell the defendant that the defendant can't explore what I believe to be relevant information that can reflect directly on what she thought at the time.

**MR. RYAN:**  All I know is if I were to get up and argue in closing argument that she didn't mention retaliation in this post-termination e-mail and that somehow gives you a glimpse of what she was thinking and what was on her mind back when she did engage in the protected activity, that would be improper.

**MR. HANCOCK:**  No.

**THE COURT:**  I'm not sure I follow.

**MR. HANCOCK:**  I don't agree with that.

**THE COURT:**  Just a minute.  I didn't really follow that argument.

**MR. RYAN:**  Well, I think --

**THE COURT:**  You're both arguing from the negative.  You're both arguing that in certain circumstances the opposing party didn't mention something; therefore, it wasn't accurate that it happened.  And I think it's pretty far from the shore in both instances.  But I'm letting it happen because I think it's an argument you can make and evidence that you can explore with the jury.

**MR. RYAN:**  Okay.  I'll accept it.  I'm a big boy. I'll go back to my seat and I'll sit down.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**MR. HANCOCK:**  After you.    14:37:17

**THE COURT:**  You know, I think I'm right.  Did you   14:37:17
want to say something else, Mr. Hancock?    14:37:19

**MR. HANCOCK:**  I think I'm doing pretty well being   14:37:20
quiet.    14:37:24

**THE COURT:**  Never mind.    14:37:25

(End of sidebar.)    14:37:27

**BY MR. HANCOCK:**    14:37:37

Q.  I'll ask you if you can identify that?    14:37:37

A.  Yes.  Excerpts from an e-mail, yes.    14:37:39

Q.  Are you familiar with this e-mail?  Do you remember   14:37:47
it?    14:37:49

A.  Yes.    14:37:49

Q.  Did you send this e-mail -- I can find the date if we   14:37:50
need to.    14:37:53

A.  Yes.    14:37:54

Q.  Did you send this e-mail --    14:37:54

**THE COURT:**  Is this e-mail in evidence?    14:37:56

**MR. HANCOCK:**  Nope, Your Honor.  I apologize.  I   14:37:59
would like to mark this e-mail as Exhibit Number -- we are to   14:38:02
14.    14:38:08

**MR. RYAN:**  No objection in light of Your Honor --   14:38:09

**THE COURT:**  All right.  We'll admit it without   14:38:12
objection except any objection that might already have been   14:38:15
noted.  It's 14.    14:38:19

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

(Exhibit No. 14 was marked and admitted.)

THE COURT: I'm going to make one remark to the jury before you --

MR. HANCOCK: Would you like me to put --

THE COURT: You can put it on the screen there, and I want to say something to the jury.

Ladies and gentlemen, there's a lot in that e-mail that you won't read. And you won't read it because it's been redacted. And it's been redacted because it's not relevant to your consideration. So even though it looks like it's there, I'm not trying to hide -- I did it. I'm not trying to hide anything from you in the sense that I'm trying to keep relevant evidence from you. I'm merely observing that the portion you see can come in and you can consider it, but don't speculate about what's not there. Okay? Thank you.

BY MR. HANCOCK:

Q.   I believe we have taken the first page off. Did you need to see it again with the first page?

A.   I'm fine.

MR. HANCOCK: Your Honor, unless there's an objection, I'd like to add a page because I'm offering an incomplete exhibit.

THE COURT: Tell me again what you want to do.

MR. HANCOCK: When I picked it up I didn't grab

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

the first page, and Mr. Shauger has corrected me.  I'd just like to correct the exhibit and add the first page.

THE COURT:  Okay.  Be sure Mr. Ryan is seeing the exhibit that you are now proffering.

MR. RYAN:  We're on the same page.  No problem. Thank you.

MR. HANCOCK:  This helps a little.  Thank you, Mr. Shauger.

**BY MR. HANCOCK:**

Q.   So we can put this in context, the e-mails that we have looked at -- the e-mail from Mrs. Reaves came to you on June 2nd; is that right?

A.   Uh-huh.

Q.   And then Mr. Reaves responded -- you responded, Mr. Reaves responded, and this is your response to his e-mail; is that right?

A.   Yes.

Q.   And you sent this to Mr. Reaves on June 3rd, 2022?

A.   Yes.

Q.   I'll represent to you because I counted them -- feel free, you're welcome to do it.  There's a few more than 35 paragraphs in this e-mail.  Do you agree with that?

A.   Yes.

Q.   And do you agree with me that at this point when you sent this on June 3, 2022 you were a labor and employment

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

lawyer with 25 years' experience?

A.   A recently-terminated women, yes, with that experience.

Q.   Is there anywhere in this e-mail where you mention retaliation?

A.   This wasn't an attempt to lay out my case.

Q.   You're talking about your employment at the Reaves Law Firm, aren't you?

A.   I'm responding to what was previously stated in the e-mails.  That's what I was --

Q.   But you're talking -- you're covering things in this e-mail that are not covered in the previous emails too, aren't you?  You're exploring your concerns and complaints about the Reaves Law Firm.

A.   They called me unqualified.  I responded to that.

Q.   And in your 36 paragraphs or 37 where you're talking about your experience at the Reaves Law Firm, you don't mention retaliation anywhere; isn't that true?

A.   So for clarification, there was an edit.  And so the same paragraphs were printed over and over again.  This is not a 37-paragraph thing.  It was an edit issue, so it's the same paragraphs.

Q.   The number of paragraphs in the e-mail is 37, right?

A.   Yes, and that's redundant.  It's cut and paste from things that's on those previous pages.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   But in those however many paragraphs you'd like to say it was, you don't mention retaliation anywhere, right?

A.   I wasn't laying out my case, no.

Q.   Well, the question -- do you mention retaliation?

A.   I said no.  I wasn't laying out my case.

Q.   And you don't mention anywhere the fact that you believe you were engaging in protected activity.

A.   I did not lay out my case, no.

Q.   That's not at all what I'm asking you.  You did complain about your lawsuit, didn't you?

A.   No.

Q.   I mean, you did complain about your employment.  You were talking about the Reaves Law Firm in all the paragraphs in this whole e-mail.

A.   In response to the previous termination e-mail, yes, I was.

Q.   And even though you picked all these other topics and you talk about yourself, your testimony to the jury is that you sent this e-mail, but you didn't mean it to be laying out what your case is now.  Is that your testimony today?

A.   That was my response to insubordination, yes.

Q.   So that's your testimony?

A.   Yes.  Because that was the reason that --

Q.   Your EEOC charge included claims of retaliation, didn't it?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.   Because they later came back with other things.  When I wrote this I had not talked to my attorney.  This wasn't a legal strategy.  This was a woman who had just been unfairly terminated.

Q.   So you didn't have any belief you were retaliated against until you talked to your lawyer?

A.   No.  At that time I wasn't looking at a legal case.  I was looking at the accusations that they put in that letter.

Q.   But you're just not going to agree with me.  This could have included -- along with your list of complaints about the Reaves Law Firm, it could have included your complaint about retaliation that you're now describing to the jury, right?

A.   Yes.  Can I give a further explanation?  Just as the termination letter could have explained everything that they're now saying.

Q.   You see down here where it says "ronic"?

A.   I'm sure there was an "I" in there.

Q.   I was just going to ask you if you'll agree with me that that is probably the word, "ironic".

A.   I think the judge redacted out my "I".

Q.   That's okay.  So that word would be "ironic"; is that right?

A.   Yes.

Q.   So that sentence would say:  Ironic how you accused me

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

of plotting to set up a lawsuit against you when my only    14:44:35

interest was helping you to navigate avoiding employment    14:44:39

liability.    14:44:44

A.    Yes.    14:44:44

Q.    So your job was to help him navigate to avoid    14:44:45

employment liability.

A.    That was part of my job, yes.

Q.    And you're talking about that in this e-mail.    14:44:45

A.    In response to that e-mail, yes.  The previous e-mail.    14:44:47

Yes.    14:44:51

Q.    Did you get accused of plotting to set up a lawsuit in    14:44:51

any of the previous e-mails?    14:44:52

A.    I was accused of being disloyal to --    14:44:52

Q.    In a previous e-mail?    14:44:55

A.    No, not -- of course not in an e-mail.

Q.    But I thought you just said -- sorry.  I thought you    14:45:00

just said that this was only a response to the previous    14:45:01

e-mails.    14:45:03

A.    This was in response to my entire experience at the    14:45:04

firm and the result of me being recently terminated.    14:45:08

Q.    That's my point too.  This was your response to your    14:45:11

experience at the Reaves Law Firm.  And even though you went    14:45:16

37 paragraphs in, it doesn't mention retaliation anywhere.    14:45:20

A.    I did not lay out a legal strategy.    14:45:23

Q.    And it does not lay out the fact that you believe you    14:45:26

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

engaged in protected activity.  But you are a lawyer of 25 years' experience at the time you wrote it.

A.    Uh-huh.  Yes.

Q.    For clarity, in this lawsuit you're asserting three different claims for retaliation; is that right?

A.    Yes.

Q.    So this e-mail was sent on June 3rd?

A.    Uh-huh.

Q.    That's the same day, isn't it?

A.    Yes.

Q.    And in this e-mail you are talking about things that would come out in a lawsuit, right?  What an employer must show to prove insubordination?

A.    Because that's what I was just accused of, yes.

Q.    You were accused of that in e-mails?

A.    Insubordination, yes.  The termination e-mail, yes.

Q.    So you were talking about legal claims here, just not retaliation.

A.    Because she didn't accuse me of anything at that point.  Just insubordination.

Q.    But she accused you of retaliation?

A.    She accused me of missteps.

Q.    But you just said to this jury that this e-mail was supposed to cover all your experiences at the Reaves Law Firm.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.   That's --

Q.   So she didn't have to mention it in her e-mail, did she?

A.   This is a different e-mail.

Q.   No, these are all the same e-mails.  It's all the same exhibit.

THE COURT:  Is there an e-mail stream that you're introducing under one exhibit?

MR. HANCOCK:  I am, Your Honor.

THE COURT:  Remind me of the exhibit number.

MR. HANCOCK:  Exhibit 14.

THE COURT:  Exhibit 14.

MR. HANCOCK:  Exhibit 14.  And it is a connected e-mail string, yes.

**BY MR. HANCOCK:**

Q.   Can you identify this?

A.   My complaint.

Q.   A copy of this lawsuit, the plaintiff's lawsuit?

A.   Yes.

Q.   Just for clarification because I keep mentioning it --

MR. HANCOCK:  Your Honor, I would like to mark the Amended Complaint as Exhibit 15.

THE COURT:  You're moving to admit it?

MR. HANCOCK:  I am.

THE COURT:  Mr. Ryan?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**MR. RYAN:**  No objection.

**THE COURT:**  Without objection, it will be admitted and marked as Exhibit 15.

(Exhibit No. 15 was marked and admitted.)

**BY MR. HANCOCK:**

Q.    For the jury will you one more time identify what this is?

A.    My Amended Complaint in this lawsuit.

Q.    Paragraph 12, and I've got a little bit of a line running down this, so forgive me.  I'm going to make it big enough to read, and then I'm going to have to flip the page.

Paragraph 12, you agree, it says:  Plaintiff quickly identified a number of pay disparity issues among others --

A.    Among attorneys.

Q.    -- employed by -- oh, is it attorneys not others? Sorry.  Among attorneys employed by defendant.  In particular, plaintiff learned that an incoming male candidate with less experience was to be paid significantly more than a current existing female attorney with more experience.  Do you see that?

A.    Yes.

Q.    That's the situation we've been talking about with Ms. Davis; is that right?

A.    Correct.

Q.    In the next paragraph it says that you voiced your

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

concerns about the pay issue to Mr. Reaves.  Do you agree with that?

A.    Yes.

Q.    And we've seen the e-mail this morning where Mr. Reaves raises Ms. Davis' salary to the level he offered the male attorney.  That's correct, isn't it?

A.    Correct.

Q.    And then in Paragraph 16 it says that during the same conversation plaintiff also voiced her concerns with Mr. Reaves regarding the Fair Labor Standards Act and potential wage-an-hour overtime issues that exposed defendant and Reaves individually to liability damages.

      Is that what that says?

A.    Yes.

Q.    It's talking about PaQuita Redmond?

A.    Yes.

Q.    And going back to the statement you confirmed in your EEOC charge a minute ago, it was your job to deal with those things.

A.    It was my job to protect the company and to advocate for the employees, yes.

Q.    It was your job to handle concerns about compensation for employees at the Reaves Law Firm.  That was your job.

A.    And to advocate for the employees, yes.

Q.    And those are -- so in doing this, all you were doing

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

is reporting concerns about Ms. Davis and Ms. Redmond to Mr. Reaves so he could fix them.

A.   No, it went beyond expressing concerns.  It was expressly advocating for these particular employees regarding this particular issue.  It wasn't addressing overall pay issues at the firm.  At that time my focus was on advocating for these employees.

Q.   You've said that a few times.  With Ms. Davis, you've also said that you were glad she got raised up.

A.   Yes.

Q.   If you were really advocating for her, wouldn't you have advocated that she was due backpay for the period where she wasn't paid that amount?

A.   I didn't get any information.  I was demoted at that point.

Q.   You weren't demoted on that day.

A.   No, not at that day, but --

Q.   So that's not exactly true --

A.   -- at 5:00 --

(Indiscernible crosstalk.)

**THE COURT:**  One at a time.

A.   That happened at 5:00 that afternoon.  I was demoted shortly thereafter.  I had no CPO responsibilities at that time.

Q.   If you look in this lawsuit, you've got three claims.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Count 1, retaliation under Title VII.  Count 2, retaliation 14:51:28
under the Fair Labor Standards Act, Equal Pay Act.  And 14:51:33
Count 3 is retaliation under the FLSA.  Are those your three 14:51:38
legal claims? 14:51:43

A.    Yes. 14:51:44

Q.    And even though you took the time to discuss the legal 14:51:45
elements of an insubordination claim and you took 37 14:51:48
paragraphs, your claim is now that you were retaliated 14:51:54
against.  But you just didn't know it when you sent that 14:51:58
e-mail? 14:51:59

A.    First of all, there were not 37, so I can't answer a 14:51:59
question with incorrect facts. 14:52:03

Q.    Would you like to count them? 14:52:05

A.    It -- 14:52:06

Q.    Let's count them. 14:52:06

A.    As I've expressed, that is an edit issue.  So the 14:52:06
other part of your response is there's a difference between 14:52:11
the complaint that's filed by my attorney months, months 14:52:14
after I'm terminated and the letter that I respond that 14:52:18
contained inaccurate information about insubordination. 14:52:22

Q.    Did anything else happen to you from the Reaves Law 14:52:31
Firm after June 2nd? 14:52:33

A.    What do you mean? 14:52:33

Q.    I mean, that last -- your last interaction with the 14:52:35
Reaves Law Firm.  The last time you communicated with them 14:52:35

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

was your e-mail.

A.    Right.

Q.    So nothing happened after this e-mail that changed your view of whether you had a legal claim.

A.    Yeah, the reality that -- the excuses that they were giving were inaccurate --

Q.    Well, you knew all those when you sent --

(Indiscernible crosstalk.)

A.    -- they --

Q.    You knew all those when you sent the e-mail, didn't you?

A.    That's what I kept trying to tell them.  Like, you do not have insubordination.  There is no insubordination. That's what I am saying to them.  I didn't have to address retaliation because they weren't asking or addressing those issues.  It was clearly insubordination, and I was telling them I had not done anything that was insubordinate because I had not been given a deadline.

Q.    Are you really going to -- are you going to take the position that this e-mail didn't include the rest of your complaints that weren't raised in their e-mails?

A.    I will take this position all day every day, yes.

Q.    Well, you just showed us a second ago how you were talking about something that wasn't in her e-mail.  Do I need to pull that back up?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.    Yes, you can pull up whatever you want to pull up. When we talked and when I responded, it was regarding the insubordination and the fact that he said I was not qualified.

Q.    Here you say:  You accused me of plotting to set up a lawsuit.

A.    Yes.

Q.    None of that is in any of the emails, is it?

A.    That --

Q.    This is about your employment, but it's not --

MR. RYAN:  Your Honor --

THE COURT:  One at a time.

MR. RYAN:  Your Honor, she can handle herself. She's a big girl.  But this has been gone over about three or four times.

MR. HANCOCK:  But she keeps changing her testimony.

THE COURT:  Wait --

MR. RYAN:  No, she's actually a hundred percent accurate, and your client's -- we don't even know what he's saying.  I would move to --

THE COURT:  You can move on.

MR. RYAN:  Thank you.

BY MR. HANCOCK:

Q.    When you were terminated you accepted a job at

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Scripps.  Am I right about that?    14:54:25

THE COURT:  You can also take that down.    14:54:25

BY MR. HANCOCK:

Q.    Is that right?    14:54:25

A.    Yes, in September of 2023.    14:54:25

Q.    And when you took that job, you were actually making    14:54:27
-- you're actually making a little more money, aren't you?    14:54:33

A.    At this time?    14:54:34

Q.    Yes.    14:54:36

A.    Now, yes.  I've been there for over a year.    14:54:37

Q.    And you were offered a bonus opportunity too?    14:54:40

A.    Yes.    14:54:42

Q.    And when you were looking for jobs, you said that you    14:54:43
went for something like a year without any ability to find    14:54:49
one?    14:54:53

A.    Yes, over a year.    14:54:53

Q.    Did you apply at private firms?    14:54:54

A.    I don't know how to litigate.    14:54:57

Q.    Well, do you agree with me that law firms do a whole    14:54:59
lot of stuff that's not litigation?    14:55:03

A.    No, not for 25-year attorneys.  Yes for attorneys    14:55:05
coming in fresh but not for 25-year attorneys.    14:55:08

Q.    I'll represent to you that law firms employ people    14:55:08
with the knowledge of labor and employment for the purpose of    14:55:11
letting them --    14:55:14

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**MR. RYAN:**  Your Honor --                                          14:55:15

Q.    -- advise clients.  Do you disagree with that?

**MR. RYAN:**  Your Honor --                                          14:55:18

**THE COURT:**  Wait a minute.

**MR. RYAN:**  That's just him testifying.  That's                    14:55:18
improper.                                                             14:55:21

**MR. HANCOCK:**  I'm asking if she agrees.                           14:55:22

**THE COURT:**  It's sustained.  Go ahead.                            14:55:27

**BY MR. HANCOCK:**                                                   14:55:35

Q.    Is it your testimony that law firms just don't employ
people who can offer labor and employment advice?                     14:55:35

A.    So I started out in this field in private practice.             14:55:35
That was the absolutely worst experience I ever had.                  14:55:39
Sixteen, 18-hour days.  That was my experience in private            14:55:42
practice.  So no, I could not go back to that.                        14:55:46

Q.    So you chose not to apply.  Actually, that's                    14:55:49
interesting.  Which reason is it?  Is it because you didn't           14:55:53
litigate or because you didn't want to?  Those are different.        14:55:55

A.    Both.  They're not mutually exclusive.  I don't know            14:55:57
how to litigate.  I don't want to litigate.  I don't want to          14:56:00
work for a private practice.  I don't want to do any of that.        14:56:04

Q.    So you --

A.    I focused on what my experience was.  I am a labor              14:56:07
employment attorney.  That's it.                                      14:56:11

Q.    And you chose not to apply to law firms despite the             14:56:13

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

fact that you could have gotten a job there possibly that made money, right?

**MR. RYAN:** Your Honor, there's been no proof offered of any available private practice jobs for which she's qualified. It's their burden. He can't just say that there were without offering proof.

**THE COURT:** Your objection is overruled to this extent. Well, let me rephrase it. Counsel can explore what efforts she made. But your objection is sustained to this extent: Comments about hiring practices at private law firms and who might hire with whom would be inappropriate. So you can talk about what she did and what she didn't do but not about how successful those matters might have been --

**MR. HANCOCK:** I'll move on.

**THE COURT:** -- given your understanding.

**BY MR. HANCOCK:**

Q. But you chose not to apply to law firms.

A. I did not apply to any law firms.

Q. You've mentioned that you had all these years in HR. Did you apply as an HR consultant anywhere?

A. I actually tried to start an HR consulting business, my own.

Q. Did you make any money doing that?

A. Not at all.

Q. And so your testimony is that you in a year and a half

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

were unable to get a single job offer?    14:57:53

A.    Yes.  I did not get a single job offer.    14:57:55

Q.    Did you go and look at other industries like    14:57:57
management and places of retail and restaurants?    14:58:01

A.    Yes.  And those jobs would just not -- that's not    14:58:03
everything that I applied for.  That is just some of them.  I    14:58:09
applied consistently at a lot of places.  No, I didn't go to    14:58:14
a fast food restaurant.  No, I didn't clean up buildings.  I    14:58:18
did not do those things.  I looked where my level of    14:58:23
experience was, and I tried to -- and I lived off savings.    14:58:24

Q.    In your discovery responses you describe your    14:58:29
emotional damages as those being garden variety.  Is that the    14:58:32
right way to describe them?    14:58:39

A.    Yes.    14:58:41

Q.    There were also a lot of things going on in your life,    14:58:41
you've testified about, at the day or at the time your    14:58:46
employment was terminated from the Reaves Law Firm.  And that    14:58:48
includes a divorce, a custody case, and things your described    14:58:51
in your deposition as being from hell.  And we've also heard    14:58:55
about your grandmother.  All that was going on at the same    14:59:00
time, wasn't it?    14:59:03

A.    Yes.    14:59:03

Q.    And all of those things caused you emotional damages;    14:59:04
is that right?    14:59:09

A.    All of those things caused me stress.  The fact that I    14:59:09

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

could no longer pay was what caused me great emotional 14:59:13
damage. 14:59:17

Q. Do you think those events impacted your ability to do 14:59:17
your job at the Reaves Law Firm the way they wanted you to do 14:59:20
it? 14:59:21

A. I filed for divorce in 2018. I've been very 14:59:21
successful in what I was doing. I know how to walk and chew 14:59:25
gum. So no, that did not impact my ability. Yes, my 14:59:29
grandmother was sick and dying and living with me. That 14:59:34
impacted me mentally. But I had to pay for a custody case. 14:59:38
I had to keep my job. 14:59:42

Q. You made $185,000 when you were at the Reaves Law 15:00:01
Firm; is that right? 15:00:05

A. Well, I worked for a month, so. 15:00:05

Q. Your salary was 185? 15:00:07

A. Yes. 15:00:10

Q. That's your testimony, right? 15:00:10

A. Yes. 15:00:10

Q. And if you divide -- same thing. I did the math on my 15:00:10
phone. If you want, I can do it up here. But if you divide 15:00:13
185,000 by 12, you'd agree with me that means you earned 15:00:16
$15,416.67 a month. Does that sound right? 15:00:23

A. I'm not going to say it is. I don't have a 15:00:23
calculator, so. 15:00:27

Q. Let me do it real quick. 15:00:27

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**MR. HANCOCK:**  Your Honor, if I may, I'd like to put my phone up there and use my calculator for the jury.

**THE COURT:**  Any objection to that?

**MR. RYAN:**  I mean, she testified that -- she broke it down by week, her weekly pay.  He's doing it by monthly.  I'm not sure where he's going, but he can -- I mean, I don't have any objection.  It's just math.

**MR. HANCOCK:**  It's just math.

**THE COURT:**  Go right ahead.

**BY MR. HANCOCK:**

Q.   So if you take 185,000 and divide it by 12, do you agree with me that that would give you a monthly salary of 15,416.6667?

A.   Yes.

Q.   And do you also agree with me that you're asking for $258,269.27?  Is that also the amount you're asking for in backpay?

A.   I don't have it in front of me.  I don't remember the numbers.  We've kind of talked about a lot of things.

Q.   You were shown this -- although it was a whole piece of paper then -- by your attorney.  Does that refresh your recollection?

A.   Yes.

Q.   So am I correct that the backpay amount you've sought is this amount, 258,269.27?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.    Yes, it reflects what my attorney has previously submitted.

Q.    And do you also agree with me that if you do the math you're asking the jury to give you 16.75 times what you earned while you worked at the Reaves Law Firm; is that right?

**MR. RYAN:**  Your Honor, that's not -- that's just false.  That's not --

**MR. HANCOCK:**  The math is right.

**MR. RYAN:**  No, it's not.

**THE COURT:**  Wait a minute.

**MR. RYAN:**  Your Honor -- well, we don't need to approach.  This is incorrect.  She testified as to --

**THE COURT:**  Wait a minute.  I don't want you sitting here discussing her testimony.

**MR. RYAN:**  Okay.

(At sidebar on the record.)

**MR. RYAN:**  She was off work for 68 weeks, so she lost that much per week for 241 and change, almost 242.  And then the difference between 185 and 175 a week -- or 185 per year, that's reduced down to its week.  And then that's what 175 is.  So she's got a difference of 192 per week that she's losing since she went back to work.  So 85 weeks.

What he was asking is just not true on math.

**THE COURT:**  In the first place, I'm not going to

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

be deciding who's right and who's wrong about calculations. 15:04:31

You can present your calculations.  Figure it out.  The 15:04:34

problem is, for my purposes at the moment, your ship is 15:04:38

passing in the night.  One of you is doing weekly 15:04:43

calculations, one of you is doing monthly calculations. 15:04:50

**MR. RYAN:**  You don't do them by the month. 15:04:50

**THE COURT:**  Well, that's fine with me.  I don't 15:04:51

under -- well, what do you want to say? 15:04:54

**MR. HANCOCK:**  I'm making a point to the jury in a 15:04:57

perfectly relevant way that she's asking for an award that is 15:05:00

17 times what she made.  That's not the point. 15:05:07

**MR. RYAN:**  That's not the point.  You need to do 15:05:08

it on a weekly basis.  You can't say it's 17 times.  That has 15:05:09

no connection -- 15:05:14

(Indiscernible crosstalk.) 15:05:20

**THE COURT:**  Wait a minute.  Wait.  The point is a 15:05:20

point you can make, but I'm not sure you can make it the way 15:05:25

you're making it. 15:05:25

**MR. HANCOCK:**  Would it fix it if I made it by 15:05:29

months?  I can do the same thing by months -- I mean by 

weeks. 15:05:32

**THE COURT:**  If you do it by week, then the issue 15:05:32

goes away.  The point is that she worked this period of time 15:05:35

and she got paid this amount of money for the period of time 15:05:40

she worked, and now she's asking for damages -- 15:05:42

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

        **MR. RYAN:**  Exactly.

        **THE COURT:**  -- for a higher percentage.  What relevance that has I'm not certain because that's not the testimony of her reimbursement.

        **MR. RYAN:**  She's not asking for a multiple.  She asking for --

        **THE COURT:**  Wait a minute.  I have a case manager who is on his feet.  I don't know why he's on his feet.

                (End of sidebar.)

        **THE COURT:**  Ladies and gentlemen, we're going to take a brief recess while we resolve these matters.  This will be your midafternoon break.  So don't talk about the case while you're out.  When we're finished we'll send for you.  Don't go wandering off.  Not that you would go wandering off anyway.  I know how engaged all of you are, so I'm sure you'll be right here.  Please don't talk about the case.  Thank you.

                (Jurors exited the courtroom.)

                (At sidebar on the record.)

        **THE COURT:**  While we're here --

        **MR. HANCOCK:**  Months versus weeks.

        **THE COURT:**  I think you can put it in for purposes of argument.  It's just --

        **MR. HANCOCK:**  That was my last question about it.  I don't have anything else.

                        **UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**MR. RYAN:** Am I missing the point for what you're trying to -- 15:07:08

(Indiscernible crosstalk.) 15:07:13

**THE COURT:** Talk to me. I never thought I'd have to stand on my head to get attention from two lawyers that are trying a case in my court. The point is -- we're going to have to take a break. 15:07:13 15:07:17 15:07:20

**THE COURT REPORTER:** I couldn't hear what you said.

**THE COURT:** Where did you lose us?

**THE COURT REPORTER:** -- to have to get attention from two lawyers in my court. And then you said, the point is --

**THE COURT:** Strike "the point is". You go to the ladies room, and we'll figure this out while you're gone. We can handle this off the record at this point. 15:08:05

(Recess taken at 3:08 p.m. until 3:29 p.m.) 15:08:05

**THE COURT:** Are you ready for the jury? 15:28:58

**MR. RYAN:** Yes. 15:29:30

**MR. HANCOCK:** Your Honor, I have one question before the jury comes back. 15:29:30 15:29:32

**THE COURT:** When the jury comes back? Before the jury comes back? 15:29:34 15:29:37

**MR. HANCOCK:** Before the jury comes back. 15:29:37

**THE COURT:** All right.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

**MR. HANCOCK:** I would like to ask her during the week that she was coming to the Reaves Law Firm she resolved a claim against MLG&W. She has said repeatedly that she left MLG&W to go to the Reaves Law Firm. I would like to confirm that she was resolving a claim during the first week -- that she had asserted a claim of retaliation against MLG&W the week she was employed at the Reaves Law Firm.

**THE COURT:** Let me say a couple of things about that. My memory of the testimony is she was employed at Light, Gas, and Water for 18 years. She testified that for six months she had been on leave. And I believe the leave was to care for her ill grandmother. I don't believe there's been any testimony about why she left Light, Gas, and Water except that she left to take a new job. That's all I remember about it.

**MR. HANCOCK:** There was testimony this morning of I left a good job, I had a good deal there, and I left it for the Reaves Law Firm.

**THE COURT:** Well, let me say a couple of things about that. One is I'm not sure that the statement that I had a good job and I left it is inaccurate unless she was leaving her job anyway.

**MR. HANCOCK:** I think she's trying to paint the picture that she left a job she was going to stay at when in reality she voluntarily resigned and she negotiated a

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

severance package.

THE COURT: Okay. She left the job, but she did leave it to go to the new job. I mean, I think. I don't know that --

MR. HANCOCK: I'm sure that's kind of --

THE COURT: They haven't established in my mind the exact timing of it. But let me tell you what the crux of it is for me. I don't want them trying a prior case of discrimination or charge of discrimination, or resolution of discrimination. And it's a straight 403 issue for me. And then the jury starts thinking, well, what happened at Light, Gas, and Water, what was going on there and what was that case about.

But I've tried many of these cases unfortunately from my perspective where the employee sued, remained on the job, which is possible, and when the case came up was still on the job. I just did one of these within the last three or four months. It was a Light, Gas, and Water case. So who was suing, she was working at Light, Gas, and Water.

MR. HANCOCK: Very difficult cases.

THE COURT: To me -- well, I'm not going to get into all that.

MR. HANCOCK: I wanted to preclear that, and now I understand.

THE COURT: I don't think that's a way I want to

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

go.  I was concerned about it when it was raised originally     15:32:24
about old suits or possibilities of suits and so forth.  I
want them focused on this case.     15:32:30

        **MR. HANCOCK:**  Very good.  Thank you, Your Honor.     15:32:31

        **THE COURT:**  Now, Mr. Ryan?     15:32:32

        **MR. RYAN:**  I have nothing further to say.     15:32:34

        **THE COURT:**  All right.     15:32:36

        (End of sidebar.)

        **THE COURT:**  Wait a minute.  What are you doing     15:32:51
back up here?     15:32:53

        **MR. RYAN:**  I think he's done.  I've just a --

        **THE COURT:**  Well, he's -- in the first place,     15:32:59
Mr. Hancock, have you finished with this witness?     15:32:59

        **MR. HANCOCK:**  I have.     15:33:02

        **THE COURT:**  All right.  He's going to say that in     15:33:02
front of the jury, at which point, Mr. Ryan, you can engage     15:33:04
in redirect.     15:33:07

        **MR. RYAN:**  I'm a little eager.  Sorry.     15:33:08

        **THE COURT:**  I noticed.  Now, are we ready for the     15:33:23
jury, Mr. Ryan?     15:33:25

        **MR. RYAN:**  Yes, Your Honor.     15:33:27

        **THE COURT:**  Are we ready for the jury,     15:33:28
Mr. Hancock?     15:33:30

        **MR. HANCOCK:**  We are, Your Honor.     15:33:30

        **THE COURT:**  Now let's bring in the jury.     15:33:32

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

(Jurors entered courtroom.) `15:34:07`

THE COURT:  Is it true that the IRS always comes `15:34:11` in last?  I didn't say that.  And my social security number `15:34:13` is very different from what they've got.  There are snacks `15:34:23` back there in the jury room? `15:34:28`

JUROR:  There are. `15:34:30`

THE COURT:  Okay.  I want to be sure you're being `15:34:31` taken care of.  Plus, if you leave early I get some snacks `15:34:34` maybe. `15:34:39`

Mr. Hancock, where are we? `15:34:39`

MR. HANCOCK:  Working toward that leaving early `15:34:43` snack date. `15:34:47`

THE COURT:  Okay. `15:34:47`

MR. HANCOCK:  I am going to pass the witness. `15:34:48`

THE COURT:  All right.  Mr. Ryan. `15:34:49`

MR. RYAN:  I'm really not going to be long.  I `15:34:52` promise. `15:34:54`

**REDIRECT EXAMINATION**

BY MR. RYAN:

Q.   The handbook, remember that employment-at-will `15:34:57` provision on the handbook? `15:35:00`

A.   Yes, I do. `15:35:01`

Q.   Does the fact that you are an employee at will, does `15:35:02` that mean that anybody such as Mr. Reaves can fire you for `15:35:06` any reason? `15:35:10`

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

A.   No.   That's exactly what it doesn't mean.   I cannot be fired for illegal reasons.

Q.   And so if there's a federal law that prohibits retaliation because you speak up about equal pay for equal work or for unpaid overtime, that trumps, if you will, the employment-at-will doctrine, does it not?

A.   Exactly.   Yes, it does.

Q.   Have you ever seen instances while you've worked all those years at the City and MLG&W where they have all these great policies in the handbook that say we don't discriminate and we don't retaliate but nevertheless --

A.   They discriminate and they retaliate.

Q.   So no matter what's on paper, Mr. Reaves and his wife can always decide to violate their own policies and retaliate, can they not?

A.   Do exactly as they did, yes.

Q.   By the way, have you even tried to count how many different reasons they've come up with over the course of the life of the case for why you've been terminated?

A.   I think yesterday was number eight and nine.   I learned new reasons yesterday.

Q.   Do you believe the principle I asked Mr. Reaves about that if you tell the truth you don't have to change your testimony?

A.   Exactly.   The truth doesn't change.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   Now, with respect to -- you're only asking to be made whole by your losses; is that right?

A.   Exactly.

Q.   Are you asking for any extra money from the jury regarding your backpay number to date?

A.   No, I'm not.

Q.   Okay.  And the way you did the calculation is you took what you were making at Reaves, you didn't make any money for 68 weeks while you were looking for comparable work.

A.   Correct.

Q.   That was 241,922.92, correct?

A.   Correct.

Q.   And then 85 weeks since you got employed by Scripps, you're losing 192.31 per week.  That's 16,346.35.

A.   Yes.

Q.   And the two together add up to 258,269.27.

A.   Yes.

Q.   That's just math, right?

A.   Yes.

Q.   Now, Mr. Hancock made the point that, well, you didn't apply for private practice jobs.

A.   Uh-huh.

Q.   Did you apply for a job at his law firm, for example?

A.   No, I didn't.

Q.   Did you apply for a job at other law firms around the

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

country that could actually pay close to what you were making?

A.    Yes, I did apply for a few law firms that had an of-counsel position, yes.

Q.    But those were not litigation positions, were they?

A.    No, they were not.

Q.    And the jobs that you did apply for were attorney positions.  I think we also discussed earlier they were human resource positions.

A.    I applied for some paralegal positions.  I applied for a variety within my field.  I -- yes.

Q.    Now, it took you 15 months.  Did it surprise you that you would have to stay off that long?

A.    It didn't surprise me.  It scared me.  But, you know, I was applying for positions where they would have a thousand candidates.  Like on LinkedIn, it literally tells you how many applicants they have.  So I know that for every $10,000 of your salary it takes you a month.  And so it took me 15 months.  That was not surprising.  It was just hard.

            **MR. RYAN:**  No further questions, Your Honor.

            **THE COURT:**  Any further questions for this witness, Mr. Hancock?

            **MR. HANCOCK:**  Just one real quick.

                        **RECROSS-EXAMINATION**

**BY MR. RYAN:**

                        **UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

Q.   You mentioned a second ago that you're counting the Reaves Law Firm has offered nine reasons for your termination.  What are those nine?

A.   I was being facetious.  But I can go through --

Q.   So that wasn't true.

A.   No, the number wasn't true, but I can go through all the reasons that I've gotten.

Q.   Just before I do, I think you need to count that.  This is Exhibit 1 that I am publishing real quick.  There's been a lot made out of the fact that -- strike that.

When your lawyer asked you that question about how many reasons the Reaves Law Firm has given, it's a suggestion that they changed their reason.  Is that what you're trying to do?

A.   They've added and -- I wasn't trying to do that.

Q.   On the date your termination letter came to you, you would agree with me that it says this active insurbor -- in addition to other missteps and unprofessional behavior?

A.   Yes.

Q.   That's a plural sentence, right?  That's not talking about a single thing.  It's talking about multiple things.

A.   According to that, yes.

Q.   Thank you.

        **MR. HANCOCK:**  No more questions, Your Honor.

        **THE COURT:**  Thank you, Ms. Mosby.  You may step

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

down.

THE WITNESS:  Thank you.

(The witness was excused from the stand.)

THE COURT:  Mr. Ryan.

MR. RYAN:  The only thing before we rest, Your Honor, is we move for the admission under Rule 32 of the Federal Rules of Civil Procedure of the deposition of Neva Reaves to come in as substantive proof.

MR. HANCOCK:  Your Honor, she's testifying. There's no reason for that.

MR. RYAN:  Rule 32 doesn't -- I've done this in other cases.  Rule 32 doesn't preclude offering the deposition testimony in addition to the live testimony if it can be offered under Rule 32.

THE COURT:  Well --

MR. RYAN:  Because Rule 32 doesn't exclude the deposition if the person is also testifying.

MR. HANCOCK:  It doesn't exclude it, but it does not make it something we have to -- we've had Mrs. Reaves up on the stand.  She's coming back on the stand.  There's no need to offer her testimony in her deposition.

THE COURT:  How long do you want to argue?

MR. RYAN:  Not long.

THE COURT:  Why don't you come up here.  If we take too long, ladies and gentlemen, you'll get another

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF JAYE MOSBY**

break.

(At sidebar on the record.)

**THE COURT:** What's the point?

**MR. RYAN:** Rule 32(a)(3).

**THE COURT:** (a)(3). An adverse party may use for any purpose the deposition of a party or anyone who when deposed was the party's officer, director, managing agent, or designee under 30(b)(6) or 31(a)(1)(4).

You can use it for any purpose. The purposes ordinarily intended isn't the deposition as a whole, I think, where the party has been called on the plaintiff's case-in-chief and will be called on the defendant's case-in-chief. I'm not sure the purpose of the deposition.

**MR. RYAN:** I've done it before in other cases, and the rule doesn't exclude it. And --

**THE COURT:** No, it puts it in my discretion.

**MR. RYAN:** Yeah. Maybe you say it's cumulative and it doesn't come in. And then to that I'd say, well, I'm going to put one page in. And then they can do whatever --

**THE COURT:** Well, a couple of things. It's almost certainly cumulative. There's not -- let me finish. The testimony of Neva Reaves, I suspect I've heard everything that she has to say. And I believe the parties have had ample opportunity to elicit anything she knows. So I have trouble introducing the deposition. But then when we come

**UNREDACTED TRANSCRIPT**

back I suppose the paradox is if you want to introduce one page from the deposition, the jury has no context for that page.

MR. RYAN:  Well, I can always cross-examine her and impeach her with that page.

THE COURT:  You can.

MR. RYAN:  Yeah.  But I would prefer to introduce it substantively under Rule 32.

THE COURT:  I understand your preference, but I'm trying to figure out what the purpose is that would outweigh the cumulative effect of it and also that would outweigh the context if you're trying to get a page in.  What do you want to say?

MR. RYAN:  It's a short deposition.

THE COURT:  The issue isn't if it's short or long.  Let me see the page.

MR. RYAN:  Starting at Page 11, Line 15.

THE COURT:  You've already asked her about all this.

MR. RYAN:  I examined her -- yeah.

THE COURT:  On direct examination about this very passage.

MR. RYAN:  Yeah.  I want it to come in substantively like --

THE COURT:  How is it different?  I mean, it's

**UNREDACTED TRANSCRIPT**

the exact same language that you asked her about and that she was reluctant to admit.  But she finally more or less admitted, and then she got into explaining you didn't have the full context for it and other things and so forth and so on.  But this horse is dead.  It's not even whinnying.

Now, Mr. Anxious, what did you have to say?

MR. HANCOCK:  All the things you said.  Your Honor, I still don't even know what we're talking about.  I haven't seen what they're offering --

THE COURT:  Look at it.  Does it look familiar to you?

MR. HANCOCK:  Yes.

THE COURT:  It might look familiar.  It looks familiar to me.

MR. HANCOCK:  We covered this 17 times.

MR. RYAN:  Okay.  I respect your ruling.  Can't say I didn't try.

THE COURT:  I have another question though since the two of you are -- in the proposed, now adopted, pretrial order, the parties have a section of stipulations.  The introduction to the stipulations is ambiguous.  I have come down on the side of ambiguity that says the parties have stipulated to those, and I've included them in my instructions.  Is that accurate?

MR. RYAN:  Yes, I think so.

**UNREDACTED TRANSCRIPT**

**MR. HANCOCK:** I expected that, yes.

**MR. RYAN:** I'd like to see them again and make sure they match up.

**THE COURT:** You will have ample opportunity to see the Court's instructions, at least when I finish my next draft.

**MR. RYAN:** Okay.

**MR. HANCOCK:** While we're here, if this is going to close the plaintiff's proof --

**MR. RYAN:** Yes.

**MR. HANCOCK:** -- we'd like to go ahead and do something to keep moving. We're going to move the Court for a directed verdict. But we can do that at a break or something else if that's more efficient.

**THE COURT:** You have to do it as soon as the proof is over -- I don't say that you have to. You know --

**MR. RYAN:** We'll waive that you can argue whenever you want to argue.

**MR. HANCOCK:** Thank you.

**THE COURT:** The rule is a party -- 32, let me get rid of 32.

**MR. HANCOCK:** Fifty.

**THE COURT:** The party has to be heard on the issue. Find a reasonable jury -- blah, blah, blah. A party has to be fully heard on the issue, and then I have to find

**UNREDACTED TRANSCRIPT**

that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.

In a case like this with credibility issues, I'm not likely to grant a Rule 50 motion. What I'm likely to do is not grant a motion and defer it and let you have the opportunity later to address it under 50(b). That's what's probably going to happen.

**MR. RYAN:** And we'll agree --

**MR. HANCOCK:** I'm looking to streamline that as much as we can.

**THE COURT:** It's going to have to happen at the conclusion of --

**MR. HANCOCK:** We'll just do it quickly then.

**THE COURT:** Well, just a minute. I think we're at the conclusion of plaintiff's proof.

**MR. RYAN:** We have concluded. And we will agree that you've preserved the issue.

**THE COURT:** Well, first, do we want to submit the stipulations through you, or do you just want me to read them as part of the instructions?

**MR. RYAN:** As part of the instructions.

**MR. HANCOCK:** Yeah, I agree.

**THE COURT:** Then if you rest, we can resolve the 50 thing. Do you want to waive --

**MR. RYAN:** I'll waive that -- I mean, I'll agree

**UNREDACTED TRANSCRIPT**

that they have preserved their Rule 50(a) motion at the conclusion of plaintiff's proof to be heard by you whenever you want to actually hear it.  I think you've already heard it though.

THE COURT:  Well, basically it comes down to figuring out what the jury decides.

MR. HANCOCK:  There's one issue we're taking up. Has the plaintiff rested?

MR. RYAN:  Yes.

THE COURT:  No.  You haven't rested until you've rested in front of the jury.

MR. RYAN:  Yeah, yeah.

MR. HANCOCK:  I'd rather take it up after they rest.

THE COURT:  All right.

                (End of sidebar.)

THE COURT:  Mr. Ryan?

MR. RYAN:  Plaintiff rests, Your Honor.

THE COURT:  Plaintiff rests.  Ladies and gentlemen, that concludes the plaintiff's case-in-chief. You've heard all the proof you're going to hear on behalf of the plaintiff.

        Mr. Hancock.

MR. HANCOCK:  Thank you, Your Honor.  We'd like to move the Court for a directed verdict.

**UNREDACTED TRANSCRIPT**

**THE COURT:**  You are making a Rule 50 motion?    15:49:33

**MR. HANCOCK:**  I am, Your Honor.    15:49:35

**THE COURT:**  You're not making a substantive argument, so I'm probably not going to make a substantive response except that I'll exercise my authority under Rule 50 to decide that matter at a later time.    15:49:37 15:49:40 15:49:43 15:49:48

**MR. HANCOCK:**  Thank you, Your Honor.    15:49:53

**THE COURT:**  Thank you.  Now, are you ready to proceed with the defendant's case-in-chief?    15:49:54 15:49:57

**MR. SHAUGER:**  Yes, Your Honor.  The defendant calls Neva Reaves.    15:50:04 15:50:07

                    (Witness sworn.)    15:50:37

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

* * *

**NEVA REAVES,**

called as a witness on behalf of the Defendant, having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. SHAUGER:**

Q.   Good afternoon, Mrs. Reaves.

A.   Good afternoon.

Q.   Thank you for coming back today.  I know you testified at great length yesterday.  We'll try to keep this pretty short.  I know yesterday was a little chaotic.  We'll try to streamline this and let you be able to explain some things from your perspective.

Can you tell me what you do for a living?

A.   Currently I'm the chief experience officer at the Reaves Law Firm.

Q.   And can you tell the jury a little bit about what you do as a chief experience officer?

A.   So as the chief experience officer -- my husband actually created that position and the title because what I just naturally do is just care for people.  So I take care of the clients' experience and the employees' experience.

Q.   When did you start at the Reaves Law Firm?

A.   I officially started in 2017.  In 2011, we opened the

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

firm.  In our daughter's nursery I would take calls from clients after I came home from teaching.

Q.   So before you started full time at the Reaves Law Firm in 2017, what did you do?

A.   I was a teacher for ten years.  I taught kindergarten for eight years.  Four years in Frayser, four years in South Memphis.

Q.   Do you have any degrees?

A.   I do.  I have an associate's degree in liberal arts, a bachelor's degree in liberal studies, and a master's of science in elementary education.

Q.   When you joined the firm full time in 2017, did you start out as the chief experience officer?

A.   I did not.  We didn't have a role for this at the time.

Q.   So can you just tell the jury a little bit about your career progression starting in 2017?

A.   So when I started in June of 2017, a month after I finished my last kindergarten class, I was the receptionist, and then I was an intake specialist.  After I was an intake specialist I was the intake manager.  And then I was a client care representative, and then I was a client care manager.  Then I was in negotiations, and then I was a negotiations manager.  And I did those positions until we were able to fill those positions.  And after I was a negotiations manager

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

is when I became a member of the C-Suite.

Q.   So is there any department at the Reaves Law Firm that you haven't worked in?

A.   I've done everything except being an attorney.

Q.   And how do you think that experience kind of shaped your role as the chief experience officer today?

A.   I mean, I think it's everything to me because I'm able to help the clients when they call no matter what phase of the case that they're in.  I'm able to talk to them about their concerns.  I'm able to answer their complaints, assist them with their complaints.  And it also helps me with the employees because I don't feel like I can manage them without knowing actually what they're doing.

Q.   Were you involved in the decision to hire the plaintiff?

A.   No, I was not.

Q.   Do you recall when you first met her?

A.   Over a Zoom call after she was hired.

Q.   Do you recall the first time you met Ms. Mosby in person?

A.   I believe I met her in person at our state-of-the-firm event on May 15.  Every year in May we always have a barbecue tent so that we can come together with our remote employees together with our employees that work here in Memphis, and it was at that time that Henry introduced her to the firm.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   Do you recall when you first met -- sorry.  Do you recall when Ms. Mosby started at the Reaves Law Firm?

A.   I believe her start date was May 2nd.

Q.   So you just testified you didn't meet Ms. Mosby until May 15th.  So what was she supposed to be doing, I guess, between the 2nd and when you met her on the 15th?

A.   May 2nd she was supposed to begin orientation, complete the orientation and the departmental training.  We had also -- we had already tasked her with going to the orientation and the training and seeing how it can be improved.

Q.   And did she attend those orientations to the best of your knowledge?

A.   No, she didn't attend.

Q.   At that time, May 2022, who at the Reaves Law Firm would have had access to payroll information?  So who could have seen the employees' salary information?

A.   Our HR team which consisted of Bill and Jamie at that time.  Our CFO and Henry and myself had access to a portal.

Q.   Did Ms. Mosby have access to that information?

A.   Yes.  She was granted access by Bill and Jamie.

Q.   And how do you know that she was granted access by Bill and Jamie?

A.   Bill and Jamie e-mailed me and asked for permission to give her access.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   Can you tell the jury who Sheena Payne is?

A.   Sheena was our attorney supervising the pre-litigation attorneys.

Q.   Did she have access?

A.   She did not.  The managers did not have access.

Q.   Were you aware that Ms. Mosby hired her mother to work at the Reaves Law Firm?

A.   I was.

Q.   And did you understand whether it was to be a full-time or a part-time position?

A.   It was to be a part-time position.  We never discussed pay.  I found out after she was hired and probably had worked a few days that she was paying her mother $72,000 more than our senior paralegal who we've had for maybe six years at that time.

Q.   And was there a reason that the job was supposed to be part time?

A.   Well, after I found out that she was making 72,000, I thought, well, she's already here so I'll just move her down to 20 hours so I don't have to pay her $72,000.

Q.   Now I have a question for you about the operations of the firm.  So if you and Mr. Reaves ever had a disagreement about him wanting to fire an employee, whether there is sufficient reason to fire an employee, what those reasons were, if you disagreed about that, who would make the

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

ultimate decision?

A.   Oh, he would.

Q.   Did you send the e-mail to Ms. Mosby terminating her employment?

A.   I did.

    **MR. SHAUGER:**   Your Honor, may I publish Exhibit 1 to the jury?

    **THE COURT:**   You have an exhibit?

    **MR. SHAUGER:**   Exhibit 1, Your Honor.

    **THE COURT:**   Exhibit 1.  Go ahead.

**BY MR. SHAUGER:**

Q.   We've looked at this e-mail a lot today, but is this the e-mail that you sent Ms. Mosby?

A.   Yes, it is.

Q.   Looking back on this e-mail in hindsight, is there anything that is not correct?

A.   Yes.

Q.   And what's that?

A.   On May 31st, a subsequent e-mail.

Q.   And when was the transition document due?

A.   It was due immediately.  We expected it before we were going to miss any community events that she had signed us up for.

Q.   So immediately?

A.   Yes.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   Do you recall when she was informed that it was due immediately?

A.   On the 28th.

Q.   So five days later on June 2nd, when you sent this e-mail at I believe 6:36 p.m., you had still not received the transition document?

A.   That's correct.

Q.   And the first paragraph of this e-mail, can you read that for us, please?

A.   On May 28th the CEO requested a transition document that listed everything you've done and are doing as well as all future actions in order for RLF to keep commitments and maintain momentum.  The CEO stated that this action was to take place immediately and listed as number one on a list of immediate actions.

Q.   And is the Reaves Law Firm pretty active in the community?

A.   Oh, yes.

Q.   A lot of commitments?

A.   Yes.

Q.   And then I think we're down in the fourth paragraph. Can you read that for the jury, please?

A.   With you having knowledge of our commitment to the students being served through the SLIP, you chose not to prepare a transition document with this commitment, as

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

requested by the CEO, and simply e-mailed Bill not to act as CPO less than 24 hours before the commitment.  This lag in communication with the acting CPO has caused unnecessary hardships in coverage of this commitment.  An inability to meet this commitment will cause harm to our stellar reputation in the community.

Q.   Can you tell the jury what the SLIP program is?

A.   So SLIP is a law school program for high school students through the Memphis Bar Association.  And they did reach out to us and ask if we wanted to be a part, and we did commit to that.

Q.   And do you know what type of high school students the SLIP program is designed for?

A.   It's underserved high school students.

Q.   And so did the Reaves Law Firm miss a commitment that they had made to the SLIP program --

A.   We did miss a commitment.

Q.   After Ms. Mosby's employment with the Reaves Law Firm was terminated, she sent a couple of e-mails.  They've been admitted into evidence in this case.  Do you need to take a look at those?

A.   No.

Q.   What were your thoughts about those e-mails?

A.   I was --

        **MR. RYAN:**  Your Honor, lack of relevance.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Objection.  Her subjective belief about what an e-mail means or says is not relevant.

**MR. SHAUGER:**  Your Honor, I think that her reaction to receiving the e-mail, which we've established had relevance to Ms. Mosby's subjective belief about the reasons for her termination, is sufficient to be admitted in this case and for Mrs. Reaves to be able to testify about that.

**THE COURT:**  Which e-mail is it?

**MR. SHAUGER:**  It's the redacted e-mail, Your Honor.

**THE COURT:**  Which exhibit number?

**MR. SHAUGER:**  14, I believe.

**THE COURT:**  Repeat your question.

**MR. RYAN:**  It's just not relevant to any issue to be determined by the jury, Your Honor.

**THE COURT:**  Well, let me hear his question again.

**MR. SHAUGER:**  I asked Mrs. Reaves what her thoughts about the e-mail were when she received it.

**THE COURT:**  That objection is sustained.  Go ahead.

**MR. SHAUGER:**  I have no further questions, Your Honor.  I'll keep this quick.

**THE COURT:**  Thank you, Mr. Shauger.

**MR. RYAN:**  Good news is this should be a lot shorter than yesterday.  I'll jump right in.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

**CROSS-EXAMINATION**

**BY MR. RYAN:**

Q.   You don't have any proof that she was ever granted access to the payroll system, do you?

**MR. SHAUGER:**  Objection, Your Honor.

**THE COURT:**  What?

**MR. SHAUGER:**  Objection.  She testified that Ms. Mosby had access to the payroll information.

**THE COURT:**  She testified to what?

**MR. SHAUGER:**  Objection, Your Honor.  Mrs. Reaves testified that Ms. Mosby had access to payroll information. That is proof in this case.

**THE COURT:**  That's overruled.  He's asking a different question.  Go ahead.

**BY MR. RYAN:**

Q.   You don't have any documentary evidence where Bill sent credentials to Ms. Mosby and said Ms. Mosby, you can access the payroll system by using these credentials, do you?

A.   Our People Process has records of that.

Q.   But you didn't bring those records to court now, did you?

A.   I didn't bring anything.  I hired an attorney.

Q.   And those records that you say would support the fact that she was given access you don't have to present to the jury, do you?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

A.   Am I supposed to have things?

Q.   Do you have them to present to the jury to back up your testimony, yes or no, ma'am?

A.   We can look it up.  Do you want to look it up?  I have People Process on my phone.  We can look it up.

Q.   Yeah, I'd love for you to look it up.

A.   Okay.

Q.   Yeah, look it up.

A.   You know I don't have my phone in here.

Q.   Just say you don't have proof.

A.   Because we do.  I'm not going to say we don't have proof.  I'm under oath.  I'm not going to lie.  We do have proof.  She has a People Process account.

        **MR. SHAUGER:**  Your Honor, I'm going to object to this line of questioning.  He's asking a nonparty to produce evidence in this case.  Any evidence would have to come through the attorneys and parties in this lawsuit. Mrs. Reaves is here as an individual witness.

        **THE COURT:**  The objection is overruled at this point.  The explanation I think is, is there -- the initial question at least was is there any objective evidence for -- that supports her testimony.  That's not a question of did you bring it to court or can you bring it to court.  Insofar as the question is did you bring it to court or are you going to produce it, that's not her business.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

      **MR. SHAUGER:**  And that's been answered.  Thank you, Your Honor.

**BY MR. RYAN:**

   Q.   Let me ask you this way.  My client has testified under oath that she was never granted access, never given any credentials, is willing to go to jail for perjury.  Are you willing to go to jail?

   A.   I'm not going to jail.  I'm telling the truth.  The truth doesn't change.  She had access to the payroll.

   Q.   And the only way she would have been given access would have been if Bill communicated credentials to her, correct?

   A.   That's incorrect.

   Q.   Who else would have had to have communicated credentials and given her credentials to access it?

   A.   People Process, like I already said.

   Q.   You'd have to have credentials to get into People Process.

   A.   That's correct.

   Q.   Exactly.  So what human beings on the face of the Earth other than Bill would have been the ones to give her the credentials to access?

   A.   Jamie.

   Q.   Okay.  If she testifies upon penalty of perjury that you can throw me in jail if you can prove that Jamie or Bill

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

gave me that access, what are you going to say to that?

   A.   Her words aren't trustworthy to me, so that doesn't mean anything to me.

   Q.   All right.  Let's call Bill and Jamie.  You can call them.  We'll be here tomorrow.

            **MR. SHAUGER:**  Your Honor --

   A.   I'm not an attorney.

            **MR. SHAUGER:**  -- objection.

            **THE COURT:**  Stop.  It's sustained.  We aren't going to talk about who she can call.  She can't -- get over this, Mr. Ryan.  She doesn't have the authority to call anybody at this point.

**BY MR. RYAN:**

   Q.   Bill and Jamie still work for you and your husband, right?

   A.   That's incorrect.

   Q.   Where are they?

   A.   Ask them.

   Q.   You don't know?

   A.   Bill works for us.

   Q.   Okay.  He can come and testify in court tomorrow, right?

   A.   So why don't you call him?

            **MR. SHAUGER:**  Objection, Your Honor.

            **THE COURT:**  Just a minute.  We don't need to go

<b>UNREDACTED TRANSCRIPT</b>

**TESTIMONY OF NEVA REAVES**

down this line.  I think I've already made it clear what the    16:04:50

limitations of the witness's ability might be to call    16:04:54

witnesses.    16:04:57

**BY MR. RYAN:**    16:04:58

Q.    You swore to tell the truth in your deposition on    16:04:58
September 19, 2024, correct?    16:05:02

A.    That's correct.    16:05:03

Q.    And read Line 15 question that I asked you.    16:05:04

A.    You asked me this yesterday.    16:05:12

Q.    No, I asked you to read Line 15 right now to the jury.    16:05:14

A.    So was she going to be terminated whether she    16:05:20
submitted the transition document or not?    16:05:26

Q.    And when you were under oath and swore to tell the    16:05:28
truth, what did you say?    16:05:30

A.    You asked me a hypothetical question.    16:05:30

Q.    But now I'm asking you what you actually testified.
Tell us what your testimony --

A.    Well, if she hadn't hired her mother and paid her
$72,000 --

        THE COURT:  Wait a minute.

        THE COURT REPORTER:  Can you back away from the
microphone a little bit?

        THE WITNESS:  Sorry.  Like this?

        THE COURT REPORTER:  Yes.

**BY MR. RYAN:**

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

Q.   Can we get anybody from your side to just answer a direct question?

MR. SHAUGER:  Your Honor, please.  He's testifying.

THE COURT:  A couple of things we need to do. One, Mr. Ryan, you don't need to make a speech.

MR. RYAN:  I apologize.

THE COURT:  Two, Mrs. Reaves, you need to answer questions.  Listen to the question, answer it, and you don't need to make a speech either.  This is not an allocution contest.  We're in a court of law.  Question asked, question answered.  Let's go.

**BY MR. RYAN:**

Q.   What did you -- when I asked you, so was she going to be terminated whether she submitted the transition document or not, tell the ladies and gentlemen of the jury what you said under oath.

A.   If she had reported to intake and not submitted the document, she would still be employed.  It was a hypothetical answer for a hypothetical question.  If she hadn't hired her mother for $72,000 --

THE COURT:  Wait, wait, wait.

MR. RYAN:  None of that -- move to strike all of that.  You've answered my question.

THE COURT:  Ladies and gentlemen, listen to the

**TESTIMONY OF NEVA REAVES**

questions as I told you.  The questions are not evidence.
Listen to the answers.  The answers are evidence.  You don't
need to listen to or you can evaluate as you wish any
statements made in response to a question that are
unresponsive to the question.

**BY MR. RYAN:**

Q.    I didn't ask you a hypothetical here.  I asked you a
legitimate question trying to seek the truth in the case.
And the question that I asked you was:  So was she going to
be terminated whether she submitted the transition document
or not?  And you very clearly said if she had reported to
intake and not submitted the document, she would still be
employed.  Correct?

**MR. SHAUGER:**  Objection, Your Honor.  This has
been asked and answered multiple times yesterday and today.

**THE COURT:**  Overruled.

**BY MR. RYAN:**

Q.    Is that what you --

A.    Yes.

Q.    All right.  Thank you so much.

**MR. RYAN:**  No further questions.

**THE COURT:**  Do you have any additional questions
for this witness, Mr. Shauger?

**MR. SHAUGER:**  I do not.  Thank you, Your Honor.

**THE COURT:**  Thank you, Mr. Shauger.  You're

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF NEVA REAVES**

excused, Mrs. Reaves.

THE WITNESS:  Thank you.

(The witness was excused from the stand.)

MR. HANCOCK:  Is it okay if Mrs. Reaves joins us in the courtroom now that she's testified?

THE COURT:  Yes.

MR. HANCOCK:  I thought so.  Thank you, Your Honor.

THE COURT:  Yes, you can.  She's excused from her responsibilities.  If she wants to go home, she can go home. If she wants to sit at the counsel table, she can sit at the counsel table.

MR. RYAN:  It would be better if she wants to answer a question.

THE COURT:  What's that?

MR. RYAN:  No, strike it.

THE COURT:  You just can't sit in the jury box. We may have some volunteer witnesses in the jury box.  Who knows?

Now, Mr. Hancock, I believe we're ready to proceed with your case.

MR. HANCOCK:  Thank you, Your Honor.  I've got one more witness.  With the Court's permission, I'd like to call Mr. Reaves back to the stand.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

* * *                                                    16:09:41

**HENRY REAVES,**

called as a witness on behalf of the Defendant, having been

first duly sworn, testified as follows:

**DIRECT EXAMINATION**

**BY MR. HANCOCK:**

Q.   Mr. Reaves, you and I are both lawyers.  Let's see if     16:09:43
we can avoid treading ground that we've already covered.        16:09:47

A.   Let's do it.                                               16:09:51

Q.   Okay.  Mr. Reaves, just because we've got to have the     16:10:00
record right, will you state your name one more time?          16:10:03

A.   Henry Eugene Reaves, III.                                  16:10:07

Q.   And are you currently the CEO of the Reaves Law Firm?      16:10:09

A.   Yes, sir.                                                  16:10:11

Q.   When did you start the Reaves Law Firm?  When did you      16:10:11
open it?                                                        16:10:15

A.   2011.                                                      16:10:15

Q.   And did anybody else help you open the Reaves Law          16:10:16
Firm?                                                           16:10:20

A.   My wife helped me with everything I did.                   16:10:20

Q.   Can you tell the jury a little bit about how your wife     16:10:22
helped you structure the firm?                                  16:10:27

A.   Yeah.  I mean, for one, she was bank rolling it            16:10:29
because her kindergarten teacher salary was the only money      16:10:33

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

that we had starting out.  So she was doing that.  She was also taking care of our five children.  And when she came to the office, she did basically everything that I had from the beginning to the end.

At the very early stages they called her the grim reaper because I couldn't fire people because -- it was just something I just couldn't fire nobody because I was thinking about they had families and stuff like that.  So if I had to get someone to fire, I brought her in because she could do it.  I was easily manipulated.

Q.   When you first opened the Reaves Law Firm, how many people worked there?

A.   Just myself.

Q.   And then about a year later how many people worked -- do you think worked there?

A.   I probably had a -- I think I had a paralegal, so maybe two.

Q.   Fast forward about five years.  How many people worked at the Reaves Law Firm.

A.   About 40.

Q.   And then when you get to May 2022 when Ms. Mosby comes as chief people officer, how many people worked there?

A.   Close to a hundred.

Q.   And to what do you attribute the success of your law firm?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

A.   One hundred percent I personally attribute it to my Lord and Savior, Jesus Christ.  I think that my steps were ordered and I was put in a position that God wanted me to be in, in the city that God wanted me to be in.  So that's ultimately what I believe, you know, all of my success is dedicated to.

As far as apart from that, I feel the processes and systems and structures that I created along with a client-centered focus, I think that's something that rung true because it's an industry where, you know, a lot of these attorneys are cheesy and they just care about money and rap songs and jingles, and it's a very poor reflection on attorneys in my opinion.

Q.   How has the Reaves Law Firm been recognized in this community for just that, its success?

MR. RYAN:  Your Honor, this has nothing to do -- how great the Reaves Law Firm has nothing to do with anything.  Objection, relevance.

MR. HANCOCK:  I don't have much, Your Honor.  But this is a party to the lawsuit.  Who they are is relevant. But I don't have much left, sir.

THE COURT:  I can think of one way it's relevant.

MR. HANCOCK:  Part of our directed verdict, yes.

THE COURT:  What's that?

MR. HANCOCK:  That was the subject for our motion

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

earlier.  We'll come back to that.  I believe I have two more 16:13:05

questions about it.  No, that's the last question I have 16:13:10

about the history of the firm. 16:13:12

          **THE COURT:**  Okay.

          **MR. HANCOCK:**  But I don't believe he's been 16:13:14

allowed to answer it yet. 16:13:16

          **THE COURT:**  I think I'm going to overrule the 16:13:18

objection, and he can tell us what the reputation in his view 16:13:21

of the law firm is in the community. 16:13:24

          **MR. HANCOCK:**  Thank you, Your Honor. 16:13:26

**BY MR. HANCOCK:**

  Q.    I'm going to reask it just a little different.  Can 16:13:30

you tell the jury about what successes the community has 16:13:31

recognized you in the law firm? 16:13:33

  A.    Yes.  The Ben F. Jones Bar recognized me as 16:13:34

humanitarian of the year.  I've also been recognized by the 16:13:40

Memphis Business Journal as the executive of the year.  I've 16:13:44

been recognized by Africa in April as international executive 16:13:48

of the year. 16:13:51

     The Congress of Tennessee did a special resolution for 16:13:52

me congratulating me and thanking me for the things that

we've done as far as from a charity contribution.  We gave

over $100,000 when we did Feed the Furlough when federal 16:14:05

employees were on a furlough.  We donated $150,000 to the new 16:14:09

science building that we have out in Whitehaven Elementary. 16:14:17

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

We have Glasses and Classes where we help underprivileged schools.  We send optometrists out there, and we help them get glasses.  Because if you've got astigmatism and stuff like that, those glasses would be -- it will be like $500.

In addition to that, like, we've done -- there's a lot of other things.

Q.   Let's switch gears just a little bit.  Tell the jury about prior to 2022 what you did to develop the executive team that would support the Reaves Law Firm.

A.   Okay.  Prior to 2022, the thing also that kind of separated the Reaves Law Firm when I had it designed, processed the system and C-Suite is there's a problem, an issue that we spotted in the industry that we were trying to solve.  For personal injury and for trial attorneys, it seems that there's really two types.  There's those that are the boutique litigation-type firms.  They handle not many cases, but they're big cases.  And then there's the settlement mills where they sign up a whole bunch of cases.

And so we wanted to figure out a way how could we do high volume and extrapolate maximum value out of each case.  So in order for us to do that, like, we had to design processes and systems.  And so when we looked at the C-Suite, we knew that we were going to have a marketing department, and that's not only external but internal marketing.  We knew that we needed to have a finance department.  We knew that we

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

needed to have a human resources department.  We knew we had    16:15:59

to have a department that was over technology.  We knew we    16:16:01

had to have a department that was over operations.  So all of    16:16:03

those departments we went out and we tried to hire a C-Suite    16:16:06

member who would be basically almost like the CEO of their    16:16:10

department and visionary of their department.    16:16:15

Q.    The departments in your law firm, do they also include    16:16:20

intake and client care and negotiation?    16:16:23

A.    Yes.  And the intake department, it fell under the    16:16:24

marketing.  So it fell under our CMO, our chief marketing    16:16:26

officer.    16:16:29

Q.    Okay.  We'll switch gears again.  When do you recall    16:16:29

Ms. Mosby actually starting?  Do you remember what her first    16:16:33

day was with Reaves?    16:16:36

A.    No, I do not recall her first day.  I know that when    16:16:38

she was supposed to be there, like some of the days she was    16:16:42

gone, but I just really assumed that she was, you know,    16:16:46

working on our behalf --    16:16:49

**MR. RYAN:**  Your Honor, may we approach?    16:16:53

**THE COURT:**  Come on.    16:16:55

(At sidebar on the record.)    16:17:05

**MR. RYAN:**  He can't be trusted.  He's literally    16:17:07

getting ready to talk about her working for ML --    16:17:11

**MR. HANCOCK:**  No, I'm not.    16:17:13

**MR. RYAN:**  -- his belief.  His belief -- he just    16:17:13

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

alluded to it.

THE COURT:  He's not saying you're getting ready.

MR. RYAN:  I can trust you.  We can't trust him. He's literally getting ready to say that she was working for -- he learned after the fact, after the lawsuit was over that she was working for -- or after he terminated her that she was allegedly working for MLG&W.

THE COURT:  This is not something that I can anticipate.  In other words, I can't anticipate what his testimony might be.  Maybe you can, but I can't.

MR. RYAN:  It hasn't worked out very well for me when we just let him just --

THE COURT:  Mr. Hancock, I assume you've instructed your witness --

MR. HANCOCK:  Exactly.

THE COURT:  -- not to discuss other litigation, particularly after he began to do so previously.

MR. HANCOCK:  I did.

THE COURT:  Is that true?

MR. HANCOCK:  It is.

THE COURT:  And do you have some confidence as an officer of the court that he's not going to do that?

MR. HANCOCK:  I do.  That's exactly why we pre-cleared that question that Your Honor told me not to ask. And we did that right in front of my client.  We've handled

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

this very delicately since we were told to, and we have no     16:18:26

intention of running afoul with this Court's ruling.  We're     16:18:29

not going to do it.     16:18:32

THE COURT:  Well, I don't want him to get into     16:18:32

trouble.     16:18:34

MR. HANCOCK:  I wasn't asking that.  That's not     16:18:34

where we're going.     16:18:37

THE COURT:  All right.  I'm not going to preclude     16:18:38

it at this point.  I just want the assurance that it's not     16:18:42

going to happen.     16:18:47

MR. HANCOCK:  Can I say it again to him right now     16:18:48

just to be sure?     16:18:51

THE COURT:  I don't want you talking to him in     16:18:52

front of the jury.     16:18:55

MR. HANCOCK:  We're okay.  We don't need to.     16:18:55

(End of sidebar.)     16:18:59

**BY MR. HANCOCK:**     16:18:59

Q.   Let's go back.  You were just talking -- I think you     16:19:00

finished your answer about what Ms. Mosby's first day of work     16:19:07

was.  My question for you was:  When Ms. Mosby first reported     16:19:09

to work, what was your plan for giving her training and     16:19:11

providing her an orientation to how you did things?     16:19:12

A.   We wanted her to go through training and orientation     16:19:15

not only just to make sure that she learned the procedural     16:19:19

steps as far as our processes at Reaves Law Firm, which is     16:19:22

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

unlike any other law firm, any other personal injury law firm or any other law firm period because they're all custom made. So we wanted her to come in, learn about the processes, learn a little bit more about the substantive law of exactly what it is we do, as well as our core values and the culture and things that we want to have done at the Reaves Law Firm.

Q.   So between that date when Ms. Mosby first got to work and the May 28th e-mail, what was your evaluation of her performance?  How did you preliminarily think she was doing?

A.   I felt that she was very intelligent, that she's a smart individual; however, she lacked the substantive and procedural knowledge needed for her to be in her position.  I felt like she had the ability.  I felt like she had the capacity if she could be humble enough to learn the things that she needed to learn in order to be the person who she needed to do.  But as opposed to, you know, having humility and learning these different departments similar -- pretty much the way that my wife did -- and my wife is extremely smart.  She has three degrees and things like that.  But she still had to go step by step.

And so instead of her being willing to do that, she looked at it as being beneath me.  She looked at being in intake as this is beneath me.  I got these degrees.  Client care is beneath me and negotiations is beneath me.  And so, you know, had she been willing to do that, we were going to

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

give additional training on some other stuff, you know, that she had but --

Q.   Let me help you with that.  Would you conclude that she just needed additional training?

A.   I felt like if she had the additional training that that can make her a piece of our C-Suite that she wouldn't be a liability.  I feel like if you're over human resources, if you're over the people, I feel it is very important that you know what the job entails, that you know what are they doing from day to day.  Not only is this to help make sure that we are hiring the right people with the right background, with the right capacity, and with the right skills, I feel that, like, if you actually do what you're supervising people to do, now you can have empathy for your employees.

Like, if you don't know what they're doing and what their everyday is, you can just work the heck out of them. You can just be a slave driver not knowing that you're asking them to produce X amount of widgets in an hour.  And if you don't have experience producing widgets, you might think you could produce a hundred widgets in an hour.  But if you sit in that seat and you know that you sweating and it's hard for you to produce 25, now when you come to the meetings you're not coming to the CEO and saying, well, we should have -- this person should get this for us and do this for us and that for us and that for us when you don't even know what

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

they do.

Q.    Okay.  You may have jumped ahead of me a little bit.

MR. HANCOCK:  Your Honor, if I may, I'd like to publish Exhibit 4 to the jury.

THE COURT:  You may.

BY MR. HANCOCK:

Q.    Mr. Reaves, you just explained why or some of why you thought Ms. Mosby would benefit from training.  Did you send this e-mail?

A.    Yes, I did.

Q.    And did you decide that this was the training she needed?

A.    Yes, I did.

Q.    Who came up with all of the things in this e-mail?

A.    I did.

Q.    Who was the person that typed this e-mail?

A.    It was myself.

Q.    And who was the person that came up with the -- strike that -- the tone you used?

A.    I did.

Q.    You decided that.  And we've been through this with the jury.  I don't think we need to read the whole thing again.  But if you will just outline -- and I'll move this as we go -- how long you thought it was going to take based on your experience creating this firm for her to understand

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

what's going on and get the training she needed in these departments?

A.    I thought that -- intake, that was the entry level, you know, first coming in.  I felt that within four weeks that's something that could be mastered.  The client care, that's basically our paralegals.  I felt like that's something that's more complex, more complicated.  I said eight weeks.

And then for the negotiations, which at that time -- now we have a negotiations and a subrogation department, but at that time the subrogation and negotiations department were merged.  And so she would have had negotiations as well as subrogation responsibilities and things to learn.  And this is where we have most of our senior -- you know, our senior staff, so I felt like 16 weeks would have been a sufficient amount of time for her to sit in seat and learn how to do that.

Q.    Okay.  I'm trying to get the top of the e-mail at the top of the screen.  Okay.  After you finish that you go a few paragraphs down and you explain the logic.  That I believe is what you were sort of talking about a minute ago.  Is there anything else that led you to send this e-mail?

A.    Yes.  That's what I intended, exactly what's said there, the logic behind it.

Q.    And when you typed this on May 28th, when did you

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

think these actions that you've identified needed to be taken immediately would be done?

A.   I imagined that if I took everything, all the responsibilities off her plate, I'm thinking immediately.  So I would think -- you know, it's not someone who's like a clock-in, I work 40 hours.  This is someone who is making 185, 175,000 or whatever.  When I say immediately, you know, and coming from the CEO, like I would think probably the same day.  If not the same day, you know, maybe a few days later or something like that.

Q.   Did Ms. Mosby ever check with you to see what you meant by immediately?

A.   No.

Q.   After you received -- well, did Ms. Mosby reply to this e-mail that we've just looked at that you sent on May 28th?

A.   She did and she said that it was forthcoming.  So she acknowledged that she received it.  I know that she knew what I wanted, and she said it is forthcoming.

Q.   Did she provide the recruitment info requested?

A.   I believe so.  She may have.  I'm not sure.

Q.   Did you know before you sent this e-mail that Ms. Mosby had taken bereavement leave?

A.   No, I did not.

Q.   Did you know that her grandmother had passed?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

A.   No, I did not.

Q.   Did Ms. Mosby do anything at all to explain to you the delay in producing the transition document?

A.   The only thing that Ms. Mosby did do is she began actually going around the firm verbally saying that she was demoted and claiming that this was some type of punishment.

Q.   Did you intend this e-mail to be a demotion?

A.   Absolutely not.  I don't feel that I have to play games.  I fire people all the time.  I would just fire her. I don't have to play games to pay you.  I'm not going to pay you 175, $185,000 for seven months if I think that I'm not going to be able to use you in a way that's going to benefit the Reaves Law Firm.

Q.   Did you intend -- let me show you this first, and then I'll ask the question.  Your very last sentence:  It's my desire you put in the work and develop into the CPO we need. Did you intend for this to be an encouraging e-mail?

A.   I intended this to be an encouraging e-mail and a direction and the steps needed for her to take in order for her to sit in the seat that she was sitting in.

Q.   And after you sent the May 28th e-mail --

       **MR. HANCOCK:**  Your Honor, I'd like to publish Exhibit 2 to the jury, please.

       **THE COURT:**  You may.

**BY MR. HANCOCK:**

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

Q.   Did you send an e-mail to your C-Suite, to your executive team?

A.   Yes, I did.

Q.   Is this that e-mail?

A.   Yes, it is.

Q.   I'm not really looking for you to read it.  I think everybody has read it a few times.  But what was the purpose of this?

A.   The purpose of this e-mail was -- it was twofold.  It was, one, just to let the C-Suite kind of know about what the process is.  If she's, you know, sitting in intake, I didn't want it to look like it was a demotion.  I didn't want people to think that, you know, that it's something that's negative about her that is doing that.  Because you have to think. Like, I still wanted her to be a leader.  I can't have her as a leader in an organization if I destroy her character.

And so I wanted to do this to try to preserve her character.  In addition to that, I wanted to lay out what our plans were because this is the entire -- this is a C-Suite member who had responsibilities, and we had to delegate and divvy out the responsibilities, you know, in her absence.

So those were the two things I wanted to do is I wanted to, one, you know, try to protect her image and reputation within the firm.  And, two, I wanted to make sure that we delegated and we were issuing out all the work that

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

had to take place.

Q.   And you told -- we just saw a second ago you that you indicated to Ms. Mosby in the May 28th e-mail that you hoped she'd return to the CPO position.

A.   I told her she will return once she's done.  I didn't say you might return, maybe you'll return, let's interview again, let's review.  If she would have done what I asked her to do and taken these steps, then she would have returned to that CPO.

Q.   And is that also what you told your executive team?

A.   That's also what I told my executive team.

Q.   So when did you make the decision that Ms. Mosby would not come back as CPO but instead her employment was going to be terminated?

A.   I want to say June 2nd.  Her action and behavior towards the assignment and what I prepared along with the fact that now it's five days and I said immediately let's do this, immediately send over the transition document.  That, combined with the fact that we missed our obligation to some intercity kids, like, it was time to go.

At that point I felt like what I proposed, it only works to someone who is willing to accept it, someone who is humble enough to be like, okay, I can get better.  There is more that I can learn.  There is stuff that I don't know.

So like her response and her reaction with how she

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

handled it, I mean, it let me know that it was no use of going through the process because she didn't have faith in me.  She didn't have faith in RLF.  She didn't have faith in the leadership.  So, you know, that could be my fault, something I did or something I didn't do or whatever.

But when you get to a point as a manager, as a CEO, like regardless of what happened for us to get there, like when you have an employee, especially someone who is in leadership who is showing you they are not going to follow your direction, like they don't think what you're saying is right, they don't think you're doing it, and not only that, like, they're not going to do it, I think a separation at that point is the only way.  It's not anyone's responsibility to force or make someone to do anything.  I have no desire to control somebody.

Q.   Did you terminate Ms. Mosby -- did you make the decision to terminate Ms. Mosby's employment because she made the complaints about the way other people were paid?

A.   Absolutely not.  For one, the complaint that she made about Jakira Davis, we have an e-mail that you will see.  As soon as she came out, I e-mailed my payroll to have them move her up to 85.  Apparently she was already at 85.

We had discussed that we're going to start moving them up to 90.  The stuff in the writing, and that 90 is a base pay.  And that is not in addition to salary.  But at 90 -- we

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

were going to move it to 90 because we were looking at

attracting -- you know, we had primarily a lot of University

of Memphis -- you know, no disrespect to University of, great

school.  You know, we had a lot of a graduates from there,

but we wanted to start looking at -- let's look at the top 50

schools.  So that starting base pay of 90,000, that's what we

agreed on in that Monday morning meeting.

And so when she came in and she did the theatric --

she did the episode about Jakira Davis making 65, I

immediately e-mailed Jamie and said, hey, let's get her 85.

Jamie said she's at 85.  And then I moved her up to 90

because we were talking about it, like we were going to put

people at 90.  So she got moved up to 90.

Q.   So did you consider those comments she made to you

just her doing her job?

A.   That's literally -- that's literally what she was

hired for, is to go through, find any abnormalities, find any

anomalies and standardize our way so we can grow and expand

the way we want to expand.

Q.   One last question, Mr. Reaves.  In hindsight, would

you have terminated Ms. Mosby's employment?

A.   One hundred percent.  Definitely.  I definitely would

have done it.  And I have to take the blame.  The reason that

we're here is because I hired her in a vacuum.  And hindsight

being 20/20, I would not have hired her in the first place.

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

**MR. HANCOCK:**  Thank you, Mr. Reaves.  I pass the witness, Your Honor.

**THE COURT:**  Mr. Ryan.

**CROSS-EXAMINATION**

**BY MR. RYAN:**

Q.  Mr. Reaves, you reviewed your wife's e-mail before she sent it -- the termination e-mail -- before she sent it to Jaye on June 2nd, 2022 at 6:36, correct?

A.  Probably so.  May have.  I know I told her to send it. I told her to get it done, to do it.  So how much I reviewed it, I mean, I don't know.

Q.  I mean, you provided the information --

A.  Correct.

Q.  -- that got into the substance of the e-mail, correct?

A.  Yes, sir.

Q.  Can we agree that prior to Ms. Mosby coming to you about Jakira Davis' equal pay for equal work issue and PaQuita Redmond's overtime issue, there was no plan to put her in a seven-month immersion training program?  Can we agree with that?

A.  No.

Q.  You do agree that she complained about those pay issues for those two women before you sent the May 28th e-mail to her stating that she was going to be in a seven-month immersion plan?

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

A.   Yes.

Q.   Thank you.  So she complains first, and then she's told for seven months she's going to be stripped of her title, she's going to be stripped of all of her duties, she's going to be doing intake, negotiations, and everything else.  And then you say very importantly in that e-mail -- and I know the ladies and gentlemen of the jury see it -- if you don't like it and you want to resign, go ahead and resign.

A.   Yes, I did.  If she didn't want to follow to the T, I would accept her resignation because it wasn't an option.  She also -- some of the things she was doing --

**MR. RYAN:**  Your Honor, again, he just can't help himself.  I didn't ask a question.

You answered the question, sir.

**THE COURT:**  I think at this juncture he was explaining his answer which, Mr. Reaves, you can do within the limits of an explanation of your answer.

**BY MR. RYAN:**

Q.   Let me ask you this:  The handbook says employment at will, right?

A.   Yes.

Q.   But that's subject to employment laws that prohibit retaliation, correct?

A.   It is illegal to retaliate.  And if the jury feels that I retaliated, I want them to give every single dime that

**UNREDACTED TRANSCRIPT**

**TESTIMONY OF HENRY REAVES**

you ask them to give.  If they think that I fired her because of that, I want the jury to give you $10 million.

**MR. RYAN:**  No further questions.

**THE COURT:**  Do you have any additional questions for this witness?

**MR. HANCOCK:**  Your Honor, we'll bring Mr. Reaves down, and the defense will rest.

**THE COURT:**  I think you're excused Mr. Reaves.

(The witness was excused from the stand.)

**THE COURT:**  The defendant rests.  Anything further, Mr. Ryan?

**MR. RYAN:**  No rebuttal proof, Your Honor.

**THE COURT:**  All right.  Let me see counsel up here for a minute.

(At sidebar on the record.)

**THE COURT:**  I'm sending the jury home.  Proof's over.  The question is when do they come back tomorrow.  I'm still drafting the -- well, I'm redrafting the instructions. And we can proceed depending on how long you want to be here until I finish and you can read them, and we can talk about them tonight.  I can't tell you when I'll finish.

**MR. RYAN:**  Why don't we come back at like nine so everybody can --

**THE COURT:**  Nine tonight?

**MR. RYAN:**  No.  Nine tomorrow.  I mean, I'm

**UNREDACTED TRANSCRIPT**

tired.  Aren't you?

    THE COURT:  I'm just getting my second wind.

    MR. HANCOCK:  Is this on the record because I was about to agree with you.  I'm not --

    THE COURT:  You're tired too.

    MR. RYAN:  If you had some coffee back there --

    THE COURT:  I don't drink coffee.

    MR. RYAN:  What about coming back at nine and telling the jury to come back at ten?

    THE COURT:  I'm okay with that.  The only question I would have would be can we finish in that length of time.  In other words, how accurate would my -- it may take us some time to work through the instructions.  I don't mind.

    By this point heading into day three we'll not -- fully understand that when I say a time, it may not be the time.  They may be able to wait for a while and come in at ten.  And then if we're very efficient maybe we can knock out the instructions, you do your closings, and I'll instruct them, and off they'll go.  That may be the answer.  And if we can get it done in an hour --

    MR. RYAN:  I think we can get it done.

    MR. HANCOCK:  I do too.  I don't think we have that much --

    THE COURT:  You haven't seen the instructions

**UNREDACTED TRANSCRIPT**

yet.

MR. HANCOCK:  Good point, Your Honor.

THE COURT:  Sometimes they're just right, but sometimes they require some work.  And I think you've contributed everything you've got to contribute to the instructions and the verdict form at this point.

MR. HANCOCK:  I'm sure I can come up with more if that was a request.

THE COURT:  I'm sure you could.  But I think you've given me everything I need.  So okay.  We'll come back at 9:00 and the jury will come back at 10.  And we'll try to be on time.  I'll try to get everything done so that you have what you need.  I usually go off the record quickly -- as quickly as can be -- and then we go back on the record for any objections that any party may have to the instructions or the verdict form.

MR. HANCOCK:  Okay.

THE COURT:  All right.

MR. RYAN:  Thanks.

THE COURT:  That's what we'll do.

(End of sidebar.)

THE COURT:  It's like they used say, there's good news and bad news.  Now the bad news is something you already know.  And that is this case didn't finish in two days.  Now, we got the proof done in two days, but we haven't finished

**UNREDACTED TRANSCRIPT**

the case.  You may recall when I thanked you for being here and told you about the timing, I said the estimate is two days, but two days is not a promise.  So we're going into day three.

The good news is you get to go home now while we work on legal issues.  And you can come back in the morning at 10:00.  Now, I hope by 10:00 tomorrow morning we have completed our legal work, but it's always possible that you might have to wait a few minutes.  I am not defining "a few".  So that's the plan.  Leave early today, come back at 10 in the morning.

When you come back and when we get started, you will hear what I have told you previously is the closing arguments of the parties.  And you'll hear plaintiff, defendant, plaintiff.  I'll instruct you on the law, and you'll retire to begin your deliberations.

There's no particular limit on your deliberations.  Sometimes a jury reaches a unanimous agreement quickly.  Sometimes it takes a while.  It just depends on you.  And you don't hurry it up.  Take as much time as you need.  Be as efficient as you can be.

So when you go home tonight, don't talk about the case.  Don't do any research.  Don't brag about jury duty.  Don't complain about jury duty.  Just don't talk about the case.  When we come back, you'll hear what I've said, and

**UNREDACTED TRANSCRIPT**

when you deliberate with all of you in the jury room, you can talk about the case. So that's something to look forward to.

Any questions about how we're proceeding? Not about the law, which I'll give you, not about the facts, which you're going to decide, but any question about the procedure? Hearing none, thank you for your patience. Thank you for your attention. Thank you for your service. It is deeply appreciated with. I'll see you back here at 10:00 in the morning.

(Jurors exited the courtroom.)

**THE COURT:** What else, Mr. Ryan?

**MR. RYAN:** Nothing, Your Honor.

**THE COURT:** What else, Mr. Hancock?

**MR. HANCOCK:** Nothing today.

**THE COURT:** Well, the two of you need to be rejuvenated. I, on the other hand, am feeling feisty. Well, I'll try to have my part done by 9:00. I think I can. Did anybody ever read that children's book?

**MR. RYAN:** The Little Engine that Could.

**THE COURT:** The Little Engine that Could. I think I can, I think I can. You know, it gets in your mind and you never get rid of it.

**MR. HANCOCK:** He chugged and he chugged and he chugged.

**THE COURT:** And he did and he did and he did.

**UNREDACTED TRANSCRIPT**

Anyway, I'll try to have it all done by 9:00.  We'll try to get the thing wrapped up then.  I have no pride in authorship except I love every one I write.

                **MR. HANCOCK:**  Thanks, Your Honor.  Appreciate it.

                **THE COURT:**  Thank you.

                (Proceedings concluded at 4:45 p.m.)

**UNREDACTED TRANSCRIPT**

# C E R T I F I C A T E

I, POLLY W. WARDLAW, do hereby certify that the foregoing 232 pages are, to the best of my knowledge, skill and abilities, a true and accurate transcript from my stenotype notes of the TRIAL, DAY 2, on the 6th day of May 2025, in the matter of:

Andrea Jaye Mosby

vs.

Reaves Law Firm, PLLC

Dated this 27th day of May 2025.

*S/* Polly W Wardlaw

_____
POLLY W. WARDLAW, CCR
Official Court Reporter
United States District Court
Western District of Tennessee

**UNREDACTED TRANSCRIPT**