1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____
                                 |
UNITED STATES OF AMERICA,        |
                                 |
             Plaintiff,          |
                                 |
vs.                              |   NO. 2:23-CV-2099
                                 |
REAVES LAW FIRM, PLLC,           |
                                 |
             Defendant.          |
                                 |
_____


TRIAL, DAY 3

BEFORE THE

HONORABLE SAMUEL H. MAYS, JUDGE



WEDNESDAY

MAY 7, 2025




POLLY WARDLAW, CCR, LCR
OFFICIAL REPORTER
FOURTH FLOOR FEDERAL BUILDING
MEMPHIS, TENNESSEE 38103


**UNREDACTED TRANSCRIPT**

2

A P P E A R A N C E S

Appearing on behalf of the Plaintiff:

WILLIAM RYAN, ESQ.
JANELLE OSOWSKI, ESQ.
Donati Law Firm, LLP
1545 Union Avenue
Memphis, Tennessee  38104
(901) 278-1004
Billy@donatilaw.com
Janelle@donatilaw.com

Appearing on behalf of the Defendant:

JONATHAN C. HANCOCK, ESQ.
DEAN J. SHAUGER, ESQ.
Baker Donelson, Bearman, Caldwell & Berkowitz, PC
165 Madison Avenue
Suite 2000
Memphis, Tennessee 38103
(901) 526-2000
Jhancock@bakerdonelson.com
Dshauger@bakerdonelson.com

**UNREDACTED TRANSCRIPT**

**WEDNESDAY**

**MAY 7, 2025**

----------------------

THE COURT:  Good morning.  Good morning.  Good morning.  Do we have Mr. Hancock with us?  There he is.  Rushing in as usual.  So I hope everyone has the jury instructions and the verdict form.  Do you have the jury instructions in this case, Mr. Ryan?

MR. RYAN:  Yes, sir.

THE COURT:  How about you, Mr. Hancock?

MR. HANCOCK:  Yes, Your Honor.

THE COURT:  Have you had the opportunity to review them, Mr. Ryan?

MR. RYAN:  Yes, Your Honor.

THE COURT:  Have you had the opportunity to review them, Mr. Hancock?

MR. HANCOCK:  I have, Your Honor.

THE COURT:  Do you both have the verdict form?  Do you have the verdict form, Mr. Ryan?

MR. RYAN:  Yes, Your Honor.

THE COURT:  How about you, Mr. Hancock?

MR. HANCOCK:  Yes, Your Honor.

THE COURT:  Have you had the opportunity to review the verdict form, Mr. Ryan?

**UNREDACTED TRANSCRIPT**

**MR. RYAN:** Yes.

**THE COURT:** How about you, Mr. Hancock?

**MR. HANCOCK:** We have, Your Honor.

**THE COURT:** Now, let's begin by working our way through the jury instructions. We're going to begin with you, Mr. Ryan, and we'll just go page by page.

**MR. RYAN:** Okay. So no changes on the first page. No changes on the second page.

**THE COURT:** You don't have to say every page.

**MR. RYAN:** Oh, okay. Thank you for that.

**THE COURT:** We'll go page by page with pages you have changes.

**MR. RYAN:** Okay. Page 6 will be the first change.

**THE COURT:** Page 6. Page 6 is part of the contention of the plaintiff. And of course I'd like the plaintiff's contentions to be as close to what the plaintiff's contentions actually are as possible. So tell me, Mr. Ryan.

**MR. RYAN:** The paragraph that starts, "shortly afterwards", if you scroll down to about --

**THE COURT:** Shortly afterwards is up at the top on Page 6.

**MR. RYAN:** Yep.

**THE COURT:** All right.

**UNREDACTED TRANSCRIPT**

**MR. RYAN:**  Scroll down.  There's a sentence that says, "Mr. Reaves explained."    09:44:20 09:44:22

**THE COURT:**  Yeah.    09:44:24

**MR. RYAN:**  Change the next sentence -- or next line down change "one month" to "several weeks".    09:44:25 09:44:28

**THE COURT:**  Explained that the process would take one month to several weeks.    09:44:32 09:44:35

**MR. RYAN:**  No.  It will now read, "Mr. Reaves explained that the process would take three or four months and that Ms. Mosby would have to work for several weeks in each department."    09:44:37 09:44:41 09:44:47 09:44:51

**THE COURT:**  Okay.  Several weeks.    09:44:52

**MR. RYAN:**  And then down at the bottom, strike the sentence that says, "Plaintiff continues to lose." That's a front page for Your Honor after --    09:44:55 09:44:58 09:45:01

**THE COURT:**  Slow down and tell me where you are. You're still on Page 6.    09:45:04 09:45:07

**MR. RYAN:**  At the very bottom.    09:45:08

**THE COURT:**  Yeah.    09:45:10

**MR. RYAN:**  Strike through that sentence, "Plaintiff continues to lose 192.31 in pay per week."    09:45:11 09:45:15

**THE COURT:**  Okay.    09:45:19

**MR. RYAN:**  And if we are fortunate enough, we'll address that with you afterwards, after trial.  The next page over --    09:45:21 09:45:24 09:45:27

**UNREDACTED TRANSCRIPT**

THE COURT:  Page 7.

MR. RYAN:  Yeah.  "She also seeks".  Strike through "liquidated damages".  That's a decision for the Court.  So it will now read --

THE COURT:  Page 6 on your -- you want, "She also seeks compensatory damages and punitive damages."

MR. RYAN:  Exactly.

THE COURT:  Okay.  So we'll leave liquidated --

MR. RYAN:  For you.

THE COURT:  Compensatory damage and punitive damages will now be determined by the jury.  Okay.  Let's keep going.

MR. RYAN:  On Page 12, just a baby typo.

THE COURT:  Uh-oh.  You mean I missed a typo?

MR. RYAN:  Mr. Hancock caught it.  He wanted me to bring it up.

THE COURT:  Well, Mr. Hancock specializes in typos.  I specialize in typos too.  I believe if you take care of the small things, the large things will take care of themselves.  Judge Gibbons used to have a policy -- I don't know if she still has it -- when she received a clerkship application, if there's a typo in it, she threw it out.

MR. RYAN:  Uh-oh.  That's why I never got a clerkship.

MR. HANCOCK:  I'll never forget that.

**UNREDACTED TRANSCRIPT**

THE COURT: Just keep that for your next job application, Mr. Hancock.

MR. HANCOCK: With Judge Gibbons, I will.

THE COURT: Maybe somebody else is like that. I don't think she ever threw out a brief that had a typo. Then she would never have to read a brief.

All right. Where's my typo?

MR. RYAN: The second full paragraph that starts, "The defendant Reaves Law Firm is a legal entity. The fact that a legal entity is a party must not affect -- your."

THE COURT: Your. Okay.

MR. RYAN: And then Mr. Hancock wanted to add --

THE COURT: Are we going to let Mr. Hancock speak for himself?

MR. RYAN: Do you want to address Page 17?

MR. HANCOCK: Sure.

THE COURT: No, I'm going to go through you first, Mr. Ryan, and then I'm going to get to Mr. Hancock.

MR. RYAN: Okay. The rest of it we're good with.

THE COURT: That's it?

MR. RYAN: Yeah.

THE COURT: All right. Mr. Hancock, we'll assign the blame to you from now on.

MR. HANCOCK: I'll accept that. It's pretty brief, Your Honor. It is, as Mr. Ryan suggested, only on

**UNREDACTED TRANSCRIPT**

Page 17 that we have suggestions, and there are two.          09:47:48

**THE COURT:** Okay. I'm speeding along to Page 17.          09:47:51
And Page 17 is going to be FLSA and EPA claims, which -- I          09:47:54
don't know. I guess I should have put an "S" there. So          09:48:03
there's one of my own corrections. Go ahead.          09:48:07

**MR. HANCOCK:** In the paragraph that begins on          09:48:10
Page 17, the second sentence, "Defendant contends that          09:48:14
plaintiff was fired for insubordination among other things."          09:48:17

**THE COURT:** Okay. Among other things.          09:48:23

**MR. HANCOCK:** And the paragraph following that.          09:48:26
"Plaintiff need not prove that her protected activity was the          09:48:30
only reason for her termination, but plaintiff must prove by          09:48:33
a preponderance of the evidence --." And we suggest an          09:48:37
addition here. "-- that her termination was because of her          09:48:40
engaging in protected activity and that she would not have          09:48:44
faced the adverse employment action."          09:48:47

I would like to insert the "because of" --          09:48:51

**THE COURT:** Let's slow down. Plaintiff need not          09:48:54
prove that her protected activity was the only reason for her          09:48:56
termination, but plaintiff must prove by a preponderance of          09:49:01
the evidence that her termination was because of." Is that          09:49:11
what you're saying?          09:49:11

**MR. HANCOCK:** Yes.          09:49:11

**THE COURT:** Let me get what you want, and then
we'll talk about it.

**UNREDACTED TRANSCRIPT**

**MR. HANCOCK:** Okay. Probably the smoothest way to say it would be, "because of her protected activity and that." 09:49:14 09:49:16

**THE COURT:** Well, that doesn't really work. 09:49:23

**MR. HANCOCK:** The other way we could -- 09:49:27

**THE COURT:** Let me be sure I've got what you're proposing. Because of is the standard, so I don't have any problem with that. I worried about that line, so I don't want to worry about it anymore. Tell me where we're going. 09:49:30 09:49:33 09:49:37 09:49:40

Plaintiff need not prove that her protected activity was the only reason for her termination, but plaintiff must prove by a preponderance of the evidence what? 09:49:45 09:49:47 09:49:53

**MR. HANCOCK:** That action -- "that her termination was because of her protected activity." 09:49:57 09:50:00

**THE COURT:** Slow down. And then you want to continue with the remainder "and that" and through the remainder of the sentence; is that correct? 09:50:04 09:50:57 09:51:00

**MR. HANCOCK:** Yes, Your Honor, unless you think that's too long a sentence, and then we could -- 09:51:02 09:51:04

**THE COURT:** It's too long a sentence, but I don't know how you break it up without dividing in an inappropriate way the two requirements you're stating. 09:51:05 09:51:07 09:51:16

**MR. HANCOCK:** I agree. And I'm fine with the end. The way we could break it up would be to put a period after the protected activity, and then say "put another way", 09:51:20 09:51:22 09:51:26

**UNREDACTED TRANSCRIPT**

and then that would make sense.

THE COURT:  Well, I don't think it's putting it another way.  In other words, if it reads, "but plaintiff must prove by a preponderance of the evidence that her termination was because of her protected activity and that she would not have faced the adverse employment action if she had not engaged in protected activity", it's two sides of the same coin, but not precisely stated the same way.

What about it, Mr. Ryan?

MR. RYAN:  Wholly unnecessary.  Look right above it.  It said, "You must decide whether plaintiff faced an adverse action because of her protected activity."

THE COURT:  One reason one could add it -- at the most it's surplusage to put it in there, which is harmless.  As far as any addition --

MR. RYAN:  It makes it sound like she's got to prove more than she has to.

THE COURT:  Well, she does have to prove by preponderance of the evidence that she faced an adverse employment because of her protected activity.

MR. RYAN:  Right.

THE COURT:  Well, I can say that she has the burden of proving by a preponderance of the evidence that she faced an adverse employment action because of her protected activity.

**UNREDACTED TRANSCRIPT**

**MR. RYAN:**  That's fine.

**THE COURT:**  Do you have any objection to that, Mr. Hancock?  I want you to be -- instead of Jonathan Hancock or John Hancock, which you don't prefer for obvious reasons, I want you to be Alexander Hamilton for some reason, and I don't know why.

**MR. HANCOCK:**  That will engage me to sing my closing argument, and I'm afraid I'm not quite up for that.

The problem is that the second sentence explains the but-for standard.  And I think taking that out leaves the jury without the explanation for what "because of" means.  So I don't think it's complete.

**THE COURT:**  I'm happy with the fourth element as stated.  And if I'm happy with the fourth element as stated, I should be happy with stating that she has to prove the fourth element by a preponderance of the evidence.  If you're with me.  So I'm happy saying, "Plaintiff need not prove that her protected activity was the only reason for her termination, but plaintiff must prove by a preponderance of the evidence that plaintiff faced an adverse employment action because of her protected activity."  Which is the state of the law as I understand it.

Do you have any problem with that?

**MR. HANCOCK:**  No, Your Honor.  Could we move the but-for sentence up into the fourth element paragraph?  I'm

**UNREDACTED TRANSCRIPT**

12

trying to keep --

THE COURT:  I'm happy with it.  It's part of the same -- I mean, I can eliminate the paragraphing there, but it's a different thought.

MR. HANCOCK:  Okay.

THE COURT:  From my perspective.  Let me see if I've got this down right.  I like that because it's congruent.  The two fit together comfortably here, and it also unifies the existing sentence.

So it now reads, "Plaintiff need not prove that her protected activity was the only reason for her termination, but plaintiff must prove by a preponderance of the evidence that she faced an adverse employment action because of her protected activity."

So I'm happy with that.  What else do we have, Mr. Hancock?

MR. HANCOCK:  Page 14.

THE COURT:  Page 14.  We're going backward.

MR. HANCOCK:  We just missed one.  It's the exact same as Mr. Ryan raised on Page 17 in the second to last paragraph, last sentence.

THE COURT:  Second to last paragraph:  Defendant denies plaintiff's claim and asserts that she cannot -- okay.

MR. HANCOCK:  The last three words are "her alleged insubordination", and we would like to add, "among

**UNREDACTED TRANSCRIPT**

other things" there as well.

THE COURT: All right. So plaintiff's employment -- "for terminating plaintiff's employment, colon, her alleged insubordination among other things."

MR. HANCOCK: Yes, Your Honor.

THE COURT: Mr. Hancock, what's next?

MR. HANCOCK: That's our last thing.

THE COURT: That's it? Okay. Are you satisfied with the jury instructions at this point, Mr. Ryan?

MR. RYAN: Yes, Your Honor.

THE COURT: And how about you, Mr. Hancock?

MR. HANCOCK: I am, Your Honor.

THE COURT: Verdict form, Mr. Ryan?

MR. RYAN: We don't have any problem with it, Your Honor.

THE COURT: Mr. Hancock?

MR. HANCOCK: I renew this, though I suspect it may not be -- we would like -- we spent a lot of time during the trial putting on proof about in particular some of the specific elements of these claims. And I think we would rather the verdict form include the elements.

THE COURT: I've done it both ways, but I don't think it's necessary here when I've given them lengthy instruction about the elements. And we also have three different claims. So I would be inserting four elements for

UNREDACTED TRANSCRIPT

14

each of three different claims, and it would be 12 elements in there. And there's some tweaks also to the elements in terms of the definitions in the elements. And I think that unnecessarily lengthens and complicates the verdict form. That's why I didn't. I thought about it.

The last discrimination case I tried I included the elements. It was a case I think against Light, Gas, and Water, but they only had one claim, and it fit. In this one it doesn't fit.

**MR. HANCOCK:** We can instruct in our arguments the jury how to read this. That's fine. I think it gets us --

**THE COURT:** Well, they'll have in front of them -- and each juror will have -- I mean, you'll have, I hope, if we finish typing in time which we may not. But you'll have some copy of the instructions, and you'll probably have clean pages to show, if you want, what the elements are when you talk about them. Each juror will have a copy of the instructions in the jury room during the deliberations. And the elements are set forth in detail in the instructions with discussions of each element for each of the three claims.

However, of course, they're essentially the same except when you get into the FLSA/EPA issue of a human resources officer and what we've been talking about. I think Ms. Mosby testified about the fine line between the roles of

**UNREDACTED TRANSCRIPT**

15

a human resource officer.  So I'm not inclined to do that.                    09:59:26

What else do we have, Mr. Hancock?                    09:59:34

**MR. HANCOCK:**  That's it, Your Honor.  We are                    09:59:34
otherwise happy with the verdict form.                    09:59:35

**THE COURT:**  Well, do you want to take a minute                    09:59:37
and be sure you have a clean copy of the instructions before                    09:59:38
argument, or do you want to just roll right into argument?                    09:59:43

**MR. HANCOCK:**  Your Honor, we talked about it, and                    09:59:49
if the Court will indulge us, we would prefer that the jury                    09:59:50
be instructed before we argue.                    09:59:53

**THE COURT:**  No.                    09:59:56

**MR. HANCOCK:**  Not going to happen?                    09:59:57

**THE COURT:**  Not going to happen.  I'm not saying                    09:59:58
that I would never do it, but I have never done it.  And the                    10:00:01
reason is the last voice I want the jury to hear is mine                    10:00:05
telling them what the law is.                    10:00:10

**MR. HANCOCK:**  Okay.                    10:00:12

**THE COURT:**  That's the definitive part of the                    10:00:12
case, and I want to do it that way.                    10:00:14

**MR. HANCOCK:**  Our only logic in suggesting that                    10:00:17
is we do plan to speak to the instructions.                    10:00:21

**THE COURT:**  The instructions will be exactly as                    10:00:24
we agreed on them.  However, I will say this, occasionally,                    10:00:27
and I like to think on rare occasions, I -- substantively in                    10:00:31
delivering the instructions, I sometimes interpolate as I go                    10:00:43

**UNREDACTED TRANSCRIPT**

16

this word or that word or this address or that address.  I'm not worried about that.  But I can think of one occasion when I either inserted a "not" or left a "not" out, which completely changed the meaning of the sentence.

Should I do that, then I expect to hear from the parties.  Do not hesitate to stand up and say, Judge, on Page 7 here you left out the "not", or your forgot Paragraph 7, the business judgment paragraph, or whatever I do wrong.  And I'll tell the jury to expect that, so that they don't think you are being impertinent in any way.  I need that support.  However, in terms of the instructions, they'll come after the argument.

**MR. HANCOCK:**  Thank you, Your Honor.

**THE COURT:**  What else?  Now, do you want to wait a minute and get a clean copy of the instructions?  Are you going to plan on putting the instructions up during your argument?  If you're not, we could go right into closing argument now, and I can produce a clean copy later.

**MR. RYAN:**  I'm ready to go.

**MR. HANCOCK:**  Ready to go, Your Honor.  We would like to argue the directed verdict, if we could, before the closing arguments because one of the things -- it could have a little impact.

**THE COURT:**  You can.  I probably will hear the verdict before I rule.

**UNREDACTED TRANSCRIPT**

**MR. HANCOCK:** That's fine. We just wanted to get one quick argument out. I don't think it will take us more than five minutes.

**THE COURT:** And what is it?

**MR. SHAUGER:** Your Honor, we're moving for directed verdict on two grounds. After presenting her proof, we believe a reasonable jury will not have a legally sufficient basis to find that plaintiff either engaged in a protected activity or put forth sufficient evidence for finding punitive damages.

With respect to the protected activity, the proof did not show that plaintiff acted in a dual HR role or otherwise stepped out of her CPO role as required for the FLSA EPA claim. We also believe the proof did not show that plaintiff had a reasonable, good-faith belief that she was engaging in protected activity under Title VII.

And then with respect to punitive damages --

**THE COURT:** Let's pause on that. I think there's ample proof in the record. Some of it comes through the plaintiff herself that she was advocating. That she had ceased to perform a function protective of the employer and was advocating for the two individuals. So to that extent, the motion is denied.

As to a good-faith belief, having heard the plaintiff's testimony, she doesn't have to be right. She may

**UNREDACTED TRANSCRIPT**

18

well have been wrong.  But it doesn't matter.  It's a matter for the jury as to whether she had a good-faith belief.  And for the Court to intervene and try to decide that would be improper in my view.  So to that extent, your motion is denied.

What about punitive damages?

**MR. SHAUGER:**  Your Honor, we've put forth that there was no proof of malice or reckless indifference of the plaintiff's federally protected rights.  Nothing certainly sufficient to meet the independent egregiousness requirement.  And we also argue that there is no evidence of defendant's financial condition which is an essential element for punitive damages.

**THE COURT:**  As to malice, that could be inferred.  As to the amount of punitive damages -- I'm sorry, the financial situation of the defendant, the proof is it was a highly successful 100-person law firm, and that could be a basis for the jury to go forward.  So that's denied.

If the jury should award punitive damages in this case, I will revisit that.

**MR. SHAUGER:**  Thank you, Your Honor.

**THE COURT:**  Either in terms of admit or in terms of denial.  I'd want more time to think about that.  If you look at my definition of punitive damages, of the basis for punitive damages, in the instructions there would be some

**UNREDACTED TRANSCRIPT**

significant questions about the appropriateness of punitive damages in this case based not on inferences about malice but attempting to arrive at an appropriate amount of punitive damages based on the proof. So there's that.

Punitives are always tough on those issues because if you get too far into the proof, it makes the defendant look like a worthy target. This is probably not that case. This is not a major international corporation. It's a local law firm. However, it could make jurors engage in a little nullification.

**MR. SHAUGER:** Thank you, Your Honor.

**THE COURT:** You're welcome. Anything you want to say, Mr. Ryan?

**MR. RYAN:** Yeah. Just that's the reason why I didn't try to get into, well, what were your gross revenues in 2022 and 2023, and go down that road. I will remind the Court you heard Mr. Reaves testify. He said $10 million.

**THE COURT:** I wasn't going to refer to that. I assumed that that was rhetorical and not based on an ability to pay.

**MR. RYAN:** Look, I've never had a punitive damage award that I've received that hadn't been challenged on one basis or the other on the back end after the fact. And so it just comes with the territory if we get that far. And I am not suggesting we will. But if we do, we'll deal with

**UNREDACTED TRANSCRIPT**

20

whatever motion they file.

**THE COURT:** I'm not suggesting we will either.

**MR. RYAN:** Exactly.

**THE COURT:** The issue may take care of itself.

So are we ready for closings? Are you ready to close, Mr. Ryan?

**MR. RYAN:** Yes, Your Honor.

**THE COURT:** How about you, Mr. Hancock?

**MR. HANCOCK:** I'm ready, Your Honor.

**THE COURT:** So let's bring in the jury and we will proceed with closing arguments.

(Jurors entered courtroom.)

**THE COURT:** Welcome back, ladies and gentlemen. I hope everyone is rested and ready. We are ready to begin or continue the trial in this case, which is *Andrea Jaye Mosby against Reaves Law Firm, PLLC*. As you will recall, I told you the next order of business is the closing arguments of the attorneys.

In their closing arguments, the attorneys will tell you what they believe the proof has shown and what conclusions you can draw from the proof. Remember the closing arguments are not themselves evidence in the case. The evidence in the case is over. You heard all the proof you are going to hear to support any factual determinations you may make.

**UNREDACTED TRANSCRIPT**

Because the plaintiff has the burden of proof, the plaintiff will begin the closing argument.  The defendant will have the opportunity then to address you through counsel, and then counsel for plaintiff will offer a rebuttal argument.  That's the order of the argument.  On behalf of the plaintiff, Ms. Andrea Jaye Mosby, Mr. Billy Ryan.

Mr. Ryan.

**MR. RYAN:**  Thank you, Judge.  Thanks for being patient with us.  The thing that drives all jurors crazy is when the lawyers object and when we go up there for sidebar and you're just sitting around waiting for us to hash out our differences so we can get on with the business at hand. Fortunately, you're done having to listen to us argue about the finer points of evidence.  And now you get to hear us present our closing arguments, and you get to deliberate and go decide the case.  So thanks for your service.  We shouldn't be too much longer.

When I was first starting out many, many years ago, it wasn't so much a fear of public speaking, it was just a fear of wanting to be able to convey on behalf of my client everything that I possibly could convey to make sure that when the jurors went back in the deliberation room, that they were equipped and armed with everything that I could possibly come up with evidence-wise to give my client the best chance to get the best outcome that I thought my client deserved.

**UNREDACTED TRANSCRIPT**

And 25 years later I'm still nervous.  Still am.

I want to do the best I can for Jaye Mosby.  There was a lot of attacks on Jaye.  That she's a liar and a manipulator.  There were veiled references to her doing deceitful and dishonest things.  And you see how she conducted herself in this proceeding for two days.  She carries herself with class.  She owns her mistakes.  She's not perfect, but she does own it, and she does take responsibility for any, quote, missteps that may have occurred at Reaves, even though she was only there for less than a month.

I think it's also abundantly clear, when you compare Jaye to Mr. Reaves and Mrs. Reaves, who owns it and who doesn't own it.  Who accepts responsibility and who doesn't accept responsibility.

You know, my ex-wife is still my law partner, which is kind of a crazy thing, and we won't digress and get into all that.  And she's not a courtroom lawyer, but she's got something that's very powerful that she would use and say with our kids.  Jack, tell me what happened.  Jack would tell her what happened.  And then she'd say now walk me through that again.  Walk me through that again.  And if Jack's story wasn't the same the first time as when he said what happened, well, let's talk about what you just told me.  Let's dig.

If this man behind me, Mr. Reaves, successful

**UNREDACTED TRANSCRIPT**

attorney here in town, grew a law firm to where it is today, if he had the same story and it was a truthful story, he'd be sticking to it.  If he had the same story and a truthful story, he'd be sticking to it and we wouldn't have to get into this business now walk me through what you just said again.

Jaye Mosby from the stand versus what you remember from Mr. Reaves and Mrs. Reaves from the stand.  I don't even have to go down that road.  You remember what I was dealing with, and you remember how she answered Mr. Hancock's questions.  What does that tell you right there?

Why do you have to be so combative with me and struggle to answer and acknowledge and admit and just own that you testified, for example, Mrs. Reaves, that if she had just reported to intake and not submitted the transition document, quote, she would still be employed.

That's not me.  That's not some lawyer trick I'm trying to play on anybody.  That's literally what she testified to under oath.  And so when you go back in the deliberation room and if somebody were to say, you know, Jaye didn't turn in that transition document, Tennessee is an employment-at-will state, they had a right to fire her because of that, remind them that Mrs. Reaves herself said that it didn't matter whether she turned in the transition document.  Remind them that Mrs. Reaves' testimony under oath

**UNREDACTED TRANSCRIPT**

24

was that she would still be employed had she just showed up for intake.

So that is the case. When I was in my opening statements talking about whether she showed up for intake, that is the case. Because not me and not Jaye, we're not trying to play a trick on you. This is from Mrs. Reaves herself. She would still be employed had she reported to intake.

Now, we know she reported to intake on the day after Memorial Day on May 31st. We know she reported to intake on June 1st, Wednesday, June 1st. And on June 2nd she called Tina Adams, told her she was sick. Followed the process that they put in place. Followed the process they put in place and didn't come into the office that day but worked -- was working on the transition document. So we've got them right there. They cannot run from this.

So if somebody says, well, he said submit that transition document immediately and she failed to do that, so that was insubordination at some level, please remind them how do they explain Mrs. Reaves' testimony herself when she said she would still be employed if she had just reported to intake.

And oh, by the way, Mr. Reaves -- you might have not remembered me questioning him about this. I actually didn't have a copy of his declaration that he submitted in

**UNREDACTED TRANSCRIPT**

this case.  A declaration is just like an affidavit.  It's under oath.  In this case his declaration was upon penalty of perjury, okay?  I took my iPad up and I had him look at my iPad because I had it pulled up on my iPad.  His declaration said that Jaye did not report to intake on May 30th, which was Memorial Day, the office was closed, nor May 31st, which we know is untruthful.  And he also said she didn't report on June 1st, which was again untruthful.

Upon penalty of perjury he's now perjured himself on three dates.  And it's true she didn't physically go into work on the 2nd.  But how is he going to say this whole narrative that she didn't report to intake, she didn't report to intake?  How are they going to get away from that?  The only way they can get away from it is to try to confuse you and say the real reason was insubordination and all these other things.  Insubordination because she didn't timely produce a transition document even though he didn't give her a deadline.

Before I even go down that road, does anybody really think that he was sincere and hopeful that Jaye would work out after she had complained to him about Jakira Davis not -- equal pay for equal work and about PaQuita Redmond for overtime?  Does anybody really think he was genuinely and sincerely interested in helping the very person that literally two days before he had called disloyal and

**UNREDACTED TRANSCRIPT**

basically said I can't trust you?

It's interesting -- Janelle, she said, Billy, if you don't tell them anything else, make sure you tell them this. That's my partner. She said, quote, make sure you mention to them his phrase or his reference to he must be the dumbest lawyer in America to retaliate against her.

Well, he knew that he couldn't terminate her right then and there on Friday the 27th. So what did he do? As Janelle pointed out, he demoted her. He didn't affect her pay but basically said I am going to strip your title, I am going to strip your duties, and I'm going to now send you to seven weeks of immersion training. And if you don't like it, you can resign. You'll see that e-mail. If you want to resign, go ahead.

That's not him being sincere about helping her. He is not the dumbest lawyer in America. You don't just fire somebody immediately on the spot and say you retaliated against them without really having to face the music in court. You try to come up with -- you hatch a plan in your own mind, and that's what he did.

If you look at the e-mails, you'll see where on Friday, May 27th, he e-mails: Let's raise Ms. Davis' pay. And there's an exchange. She's out that day for her grandmother's funeral. It was the day before on May 26th where she had confronted Mr. Reaves.

**UNREDACTED TRANSCRIPT**

27

So literally on Thursday, May 26th, she confronts him and complains in advocating for those two individuals, Ms. Davis and Ms. Redmond. He then on the 27th knows he has to do equal pay for equal work, and that's why he's saying we need to raise her. And there's this exchange with his payroll people, and Jaye's not even copied on that, curiously enough. You would think if she's over HR, the chief people officer, she would be copied on the e-mail where he's saying raise Ms. Davis up.

And they say, well, Ms. Davis is at 85. And he says, well, pay her 90, what we're going to pay this man. So if Jaye hadn't have spoken up, does anybody believe Mr. Reaves would have voluntarily taken it upon himself to make sure that Ms. Davis got paid -- who has three more years' experience -- got paid the same as this fellow they were hiring in?

And then literally at midnight or early morning hours of the 28th, literally less than 36 hours after she confronts him and he calls her disloyal, he's then doing this elaborate we're going to remove you from your role, and we're going to put you over here, and we're going to embarrass you and humiliate you, and we're going to make you sit in on intake, and we're going to make you do all this other stuff.

I guarantee you the people at International Paper -- the HR people at International Paper are not going to go

**UNREDACTED TRANSCRIPT**

out into the plant -- they're not going to go into the IT office, and they're not going to do all those things.  And nobody would -- in a law firm it's the same.  He can sit up here and say, well, I wanted her to be exposed to all this and make it sound all great and you've got to know the business.  This is a transparent attempt to get her to quit.  Which she doesn't.  And then she reports to intake.

So literally less than 36 hours after she complains about these two, unequal pay for equal work and failure to pay overtime properly, he's putting her in a position to quit hopefully.  That way he doesn't have to face a lawsuit if she quits.  But instead she doesn't.  And they don't even communicate on Tuesday, May 31st.  Jaye says they have a conversation on May 31st where he's actually telling her we're going to even roll you out of intake.

This is the way that he operates -- Mr. Reaves.  Mr. Reaves doesn't operate strategically.  He operates out of emotion.  We know he operates out of emotion based on what you saw.  He's not a regulated individual in the way -- I am not saying he's not successful, but he's not emotionally regulated where he thinks about things and he measures twice and cuts once.  That's not the way he operates.  If you're disloyal and you're not on the team, you're gone in his mind.  You're gone.  It's how he's going to do it is what remains to be seen.

**UNREDACTED TRANSCRIPT**

She says he's going to already transition me out of intake. And of course everybody can see that that's exactly the kind of sort of spot decision that he would make. Just go on over here, you know. You're not getting your money's worth out of somebody sitting in intake literally observing -- and no disrespect to intake, but it's like they call in, you listen to their situation, you take down data and you send it to the attorneys to decide whether they meet with a client or not. I mean, it's just not a genuine attempt to do what he said which was to really get her to know about the business.

He calls this lawsuit frivolous. He calls her a manipulator or a liar. He throws up everything he can to try to get away from the fact that his own wife, who sent the termination e-mail on June 2nd, said that if she had just shown up to intake, she'd still be employed. But none of that stuff matters.

You know, I had to make a tactical decision as her attorney how much do I get into the mud with these people. How much do I get into the weeds? I mean, Mrs. Reaves is talking about you didn't even remember people's names. You didn't even -- you thought you were above us or whatever. I mean, anything. Do I have to address everything, you know? When the real truth is she was viewed as disloyal. She was viewed as untrustworthy. Not because of anything else she

**UNREDACTED TRANSCRIPT**

did, but literally because she advocated for Ms. Davis and for Ms. Redmond. They didn't even deny that.

And then they say themselves that if she had just reported to intake, she'd still be there. But they make us spend all this time having to address the transition document. And then they come in and say we win all these awards and we're these great people and, you know, I've been chosen -- I believe I'm the chosen one to lead and do all this. Okay, great. More power to you. I don't have anything against you personally. I do have something against you when you're not truthful. That's when I have a problem.

I do have a problem when people will say one thing in declarations which we know aren't true. He knew when he submitted that declaration to court in December of this year, 2024, whether she reported to intake or not. Think about that. This is two years after the fact, and he's still trying to perpetuate a lie to get out of it.

She has nowhere to go but court, and she has nowhere to go but to present her case to you because you're the only ones that can make it right. You literally are the only ones that can make it right.

Now, there's a jury verdict form that you'll be presented with. Economic damages, we presented proof of 258,000 and change. And that's what she lost because he put her on the street. And it's not easy. These jobs don't just

**UNREDACTED TRANSCRIPT**

31

hang on trees to where she could just pick up the phone and call. Hey, I just got terminated; can you reemploy me at 185? It took her 15 months. You'll get to see all the stack of job search efforts that she made, if you want to get into the weeds, if you want to look into that.

So if somebody suggests back there in the jury room that she didn't try to look for work -- and you'll be instructed that she's got a duty not to take some lesser job, but she can -- the judge will instruct you that her duty is to find alternative work, same or similar employment. She testified to about a hundred places.

At the end it was getting down to, well, I'm a practicing attorney for 25 years; I'll go to work as a paralegal if I can. Finally, one of the nation's biggest media companies, Scripps Howard, hires her thankfully. But in that 15-month interim it's $258,000. And that's just math. That's not us making a number and -- you know. But that's the consequential harm that flowed from his illegal action.

He wouldn't be facing that number if he wasn't the one to have violated the law. If he had said honestly in good faith at some point in time, you know what, Jaye, it's just not working out because of a bad fit -- and every one of y'all have been in situations where you know employers have to make true tough decisions about whether to keep somebody

**UNREDACTED TRANSCRIPT**

on the team.  You know?  Everybody's experienced that.  And you know what it looks like when it's done honestly and there isn't some effort to disguise or cover up the person's true motive.

But he shouldn't get a break on her backpay to any degree because he's the one that put her on the street illegally.  And he needs to feel the effects and be held accountable for what he has done in the 15 months that it took her to get a job and then the difference in pay that she's had to feel since she got reemployed by Scripps.

Compensatory damages.  I'll spend some time later on that because I want to sit down.  But that's for humiliation, embarrassment, just the indignity of being put on the street when you really didn't do anything wrong.  You may not have been perfect, but you were retaliated against intentionally in violation of the law.

If the Jaye Mosbys of the world don't speak up for the Ms. Davises and Ms. Redmonds, what happens?  They continue to get taken advantage of unbeknownst to them.  Because a lot of people just don't talk about these pay issues at work.  They can, but they don't.  And they're discouraged often from doing so.  And so without the Jaye Mosbys of the world speaking up and advocating for them, Ms. Davis doesn't get raised, and Ms. Redmond doesn't get overtime.  And that's money in their pockets that was going

**UNREDACTED TRANSCRIPT**

in to enrich Mr. Reaves' pockets.

It's kind of ironic and rich of him to call her a manipulator and to call her a liar when he's the one that has literally lied to the Court and lied to you.  So you'll have to decide on the compensatory damages what's a sufficient amount of money to compensate Jaye.  If we get that far, what's a sufficient amount of money to compensate Jaye for all that she had to go through non economically.

She was going through a custody dispute at that time.  It doesn't look good with a custody dispute when you don't have any income.  And then when she does get a job, it's in Atlanta and she has to move over there.  She has to go back to court to try to get the court to approve removing the kid from this jurisdiction and being able to go to Atlanta.  All of that she had to do because he retaliated against her.  His firm retaliated against her illegally.  All of it.

And I don't even have to get into the Deneice Davis, that lady who quit her job and before she even worked a day that offer got rescinded.  I don't even have to talk about that fallout.  And I don't have to talk about the fact that we put on proof of her mom being hired on a temporary, part-time basis, and then they try to come in say, oh, she -- you know, after she got their approval and after they're the ones who told her what to pay her, 35 an hour.  I don't even

**UNREDACTED TRANSCRIPT**

have to get into that because it's just mud on the wall.  And everybody's heard that phrase:  You just throw it up and see what sticks.  And that's literally what it is.  Because if you go back -- if you walk back and somebody says what about this and what about that, remind them that she'd still be employed had she just shown up to intake.

And they're covering that up.  If they're being false about that, then it's just a bedrock principle of evidence law.  You can infer guilt from the dishonesty of a person.  You can infer guilt from the dishonesty of a person.  Because why are they trying to cover up?  Why are they not being truthful?

If they can't just tell you once and repeatedly and stick to the same story, why can't they do that?  Because they're trying to cover it up.  And they're going to do and say whatever they can to win.

Now, the last kind of damages in addition to the backpay, in addition to the emotional distress damages, are punitive damages.  You heard what he said yesterday.  He wants a jury to give her every cent she's entitled to if you find against him.  He also said -- and I don't know if he was being funny or really meant this $10 million.  I'm not going to be asking you for $10 million as far as punitive damages.

But punitive damages, you'll hear Your Honor, twin purposes.  To deter other companies from illegally

retaliating against folks and to punish the wrongdoer. He needs to be punished. He punished her illegally. You get to punish him legally.

Now, I'll get to come back up here and say some concluding remarks. I appreciate y'all. I tried to keep it short. Again, the one thing you want to do is just, you know, you want to let it all hang out and do your best for your client. I probably forgot some stuff. I hope I hit on the big things. I may go back and look at my notes and go oh, God. But I will have some five, ten minutes closing remarks you with in a little bit. Okay? Thanks.

THE COURT: On behalf of the defendant Reaves Law Firm, PLLC, Mr. Jonathan Hancock. Mr. Hancock.

MR. HANCOCK: Thank you, Your Honor. We got to the end. This case is nowhere near that complicated. I'm not going to need nearly that much time. This is really pretty easy. And one of the reasons it's easy is because we're not pushing a false narrative on you. We're not asking you to believe something that's not credible and then building our case around it. Instead we've given you a really easy case that I think every one of you will understand. And it's exactly what I told you when we got together on Monday. The very first thing I told you at the beginning of the opening statement --

THE COURT: Is your microphone on?

**UNREDACTED TRANSCRIPT**

36

**MR. HANCOCK:**  It says it is.    10:38:51

**THE COURT:**  Can the court reporter hear?

**MR. HANCOCK:**  I can talk louder.

**THE COURT:**  I know you can, but I don't want you to strain your voice.  Although, I might want you to strain it.  I was just having a little trouble hearing.

**THE COURT REPORTER:**  I was too.  If you can move it up a little bit.

**MR. HANCOCK:**  I will move it up and I will increase my volume, and if that's too much, tell me.

**THE COURT:**  Thank you.

**MR. HANCOCK:**  Y'all tell me if I'm yelling.  I don't want to yell at you.

You remember when we met on Monday I said what    10:38:51
this case is about is about the point where Ms. Mosby decided    10:38:54
the things that Mr. Reaves and the Reaves Law Firm wanted her    10:38:58
to do were beneath her.  And when she got to that point, she    10:39:03
checked out, she quit doing her job, and she lost it.  She    10:39:06
was there for one month.  I could sit down now.  That's the    10:39:10
case.  That's really all you're being asked to decide is why    10:39:14
was she terminated.  Why did she lose her job?  That's the    10:39:19
question.    10:39:22

But there are some things that we have to do to    10:39:23
do our job to get to that point.  So bear with me, and we're    10:39:25
going to walk through those.  Most importantly there are two    10:39:28

**UNREDACTED TRANSCRIPT**

really important things I want to keep coming back to. First of all, the burden of proof in this case. And we're going to get into the jury instructions. We're going to look at them in a second.

The burden of proof only stays with Ms. Mosby the whole time. It never shifts to the Reaves Law Firm. What that means is if we had come in here and decided that she didn't prove her case, we didn't have to do anything. Mr. Reaves and the Reaves Law Firm and Mrs. Reaves didn't have to put on witnesses. They don't have that burden. If what you do is find that she's failed to prove her case, then it's over. And that's how the verdict form works. She's got to prove each of her three claims, each of the elements. And if she does not carry that burden, the case is over.

That's very important because when you think about how many witnesses came in and how many people came to court to back her case up, think about that burden of proof. She's asking you to give her a lot of money, but nobody else is here testifying that things actually happened the way she says they did. That's an important element when you're looking at burden of proof.

I also want you to remember what we said on Monday. Nod your head. And I want you to do it one more time at the end. Only base your verdict on the evidence, not on what I say, not on what Mr. Ryan says, and even on what

Judge Mays says. That's not evidence. And you're going to get some really good stuff. We'll look at it in a minute.

Also if a witness is testifying and they're assuming something or they're speculating, that's not evidence either. So you've got to be careful, and that's one of the hardest parts of being a juror. You've got to weed through what you heard in here and what you decide is true. And to get there you only look at the evidence. And that's hard. You're going to have to decide in this case that what somebody is saying isn't right. Because everything that everybody says can't be put together in one cohesive story. Sometimes it's easier if it can, but in this case it just can't.

So we're going to do three things this morning. It's still this morning. Hopefully pretty quick. First, I want to walk through the jury instructions. I want you to know what they are. You're going to get a copy. You'll have it with you back there. And I want to show you this verdict form that we're talking about.

I don't know if you ever read choose-your-own-adventure books when you were younger. It's like, you know, you say what you're going to do, and then you go to the next page based on what you're going to do. That's what a verdict form is. It helps you decide.

I don't know if any of you have ever

(indiscernible) where they were governed Robert's Rules of Order.  But the history behind that is kind of funny.  It's interesting actually if you have.  It was a gentleman -- I can't remember if his first name or his last was Robert, but he had this real long name.  And he was working at a church, and they were trying to make a decision and they couldn't get to the end.  And when they couldn't get to the end, Robert went back and he did some research, and he came up with Robert's Rules of Order.  And they're designed to help a group reach a decision.

Well, that's exactly what these jury instructions are.  They're your Robert's Rules of Order because they govern everything you do.  So I want to look at them for just a minute so when you see them it won't be the first time.

The jury instructions, they're a set of paper.  You'll get them.  They include a number of things, and they walk through things like -- just like Robert's Rules of Order -- what are you supposed to do when you get back there?  How are you supposed to deal with things like evidence that doesn't necessarily add up or make sense?  And there's some parts of this that are really helpful.  One of the parts that's helpful is what you don't have to decide.

The first section in the jury instructions is stipulated facts.  It might surprise you to learn that we agreed on ten facts, and they're in here.  And the reason

**UNREDACTED TRANSCRIPT**

that's important, you don't have to decide those.  These facts have already been decided.  They are stipulated, and the parties have already agreed that they are the case.  And interestingly, you will see one that makes it very clear that as CPO -- remember that chief people officer -- Ms. Mosby was responsible for building an HR infrastructure, managing all HR and employment matters, recruiting and interviewing prospective employees, the hiring and firing of employees, and handling all employee-related matters.  Plaintiff was also responsible for ensuring compliance with all state and federal laws as they relate to employees.

We spent a lot of time over these last few days talking about what was and wasn't her job.  That's her job.  We'll come back to that.  But this is not a disputed fact.  It's stipulated.

Then you're going to get into something that won't be very new to you.  There are several pages in here that are the contentions of the parties.  What does Ms. Mosby say is the case?  What do we say is the case?  None of this is going to be new.  This is stuff you've already heard.  And you're going to see very prominently the first sentence -- and just like I promised, I'm going to be short.

Ours is one page.  It's easy.  And it starts with the defendant contends that it terminated plaintiff's employment as chief people officer because the plaintiff

**UNREDACTED TRANSCRIPT**

refused to comply with simple, reasonable directives.  That's what I told you on Monday was what led to the termination of her employment.  And it's exactly what you heard today -- not today, sorry.  What you heard yesterday and Monday from the witnesses that did come, Mr. and Ms. Reaves.

And one of the false narratives that we can go ahead and just deflate real quick before I get to the next instruction, Mr. and Mrs. Reaves were clear with you who was the decision -- who is the decisionmaker.  Who was the CEO?  It's Mr. Reaves.  Mr. Reaves has owned that decision every single time he got put up there.  He's never said that somebody else made the decision.  He's never tried to pass that buck.

But whose testimony do you keep seeing?  Neva Reaves, who told you she's not even the decisionmaker.  And all she said was, in an out-of-context comment, that maybe Ms. Mosby would not have lost her job had she done those things we asked her to do.  First of all, that's a hypothetical.  She didn't do them, so that doesn't matter.  But most importantly, he's beating up on Mrs. Reaves for what she said in her deposition despite the fact that she's told you, and Mr. Reaves has told you, he's the decisionmaker.  That's a false narrative.  It's like if I do this, I'm trying to get you to look at this hand so you don't listen to what I'm saying.  That's what that is.

**UNREDACTED TRANSCRIPT**

When you keep going in these jury instructions, you're going to get next to the burden of proof and the preponderance of the evidence.  I'm not going to spend quite as much time on that because I've talked about it a lot.  But we haven't spent too much time on preponderance of the evidence.  You'll be able to understand this.  You'll read it.  But it's an easy concept.

If I prove something to you by the preponderance of the evidence, it's more likely than not.  Fifty-one percent.  If two of us disagree about a fact and I convince you that I'm probably right, that's preponderance of the evidence.  That's what Ms. Mosby has to do in this case is convince you of each of the elements of each of her claims by a preponderance of the evidence.  And she can't do that.

The next instruction you're going to get to deals with credibility.  And credibility is a big deal in this case.  And actually the instruction says it in a very interesting way.  For you to determine what the true facts are, you are called upon to weigh the testimony of each witness who has appeared before you, and you give the testimony of each witness the weight, faith, credit, and value to which you think it is entitled.  That's your job here to make that really hard decision who's right, how much weight am I going to give that testimony, who's not telling me the truth.  If you weed through that, you're going to get

**UNREDACTED TRANSCRIPT**

to the end of this with an answer.

When you're looking at credibility, the instruction also gives you a lot that you can go by. One of the things you can go by is the reasonableness and unreasonableness of the testimony. That's two hard words to say together. But if you look at that, what it means is did you kind of have to sit there and when you heard her story go how is that right? I just can't follow this. It doesn't make sense to me that somebody would be told to do something immediately and yet they would think that they were still working on it on Thursday and that's due. It just doesn't make sense. It's not credible. It's not reasonable.

Okay. That's how you walk down the path to deciding I don't believe her. That person is not telling me the truth. And that's the decision this instruction is going to help you make.

There's also an instruction that comes after that that says you must never speculate to be true any insinuation suggested or asked by a witness. There are a lot of insinuations in this case. In fact, her whole case is an insinuation or suggestion about what her opinions are about the motives undermining Mr. Reaves' decision to terminate her employment when she didn't do her job. That's her assumption is what's going on in his head.

He put it in paper. Remember when we looked at the

**UNREDACTED TRANSCRIPT**

e-mails and they didn't say demotion and they didn't have any negative language?  In fact, they were very positive and uplifting and sort of encouraging.  Well, she's asking you to read that and infer a retaliatory motive.  It's kind of hard to get there.  Those dots don't connect.  It takes us right back to the word we talked about a minute ago.  It's unreasonable.

You're also going to a set -- the next set in here is the law as to liability.  What that means is this is what the law says she has to prove to carry her burden to prevail on a claim.  Two claims -- well, three claims, but they arise out of laws that have two standards.  They're very similar, but they're not the same.

In order for Ms. Mosby to prevail on what's called her Title VII claim -- Title VII is Title VII of the Civil Rights Act of 1964.  That's the same Civil Rights Act that we sometimes just call the Civil Rights Act.  It's also referred to as Title VII.  There's some of the history in the instruction.

To prevail on her claim there, she has to show first that she engaged in protected activity.  That means -- and this is all in here.  I'm not going to regurgitate it right now for you, but that means she had a good-faith belief when she came and talked about Ms. Davis' salary that she really did think that Ms. Davis was being paid less, because

**UNREDACTED TRANSCRIPT**

45

she was a female, than this attorney who was interviewed coming from Mississippi. Well, that's going to be pretty hard for her to show because she didn't even know what was going on. She didn't know what Ms. Davis' real salary was. And remember, she is the one developing the pay scale that suggests they should be paid 90,000.

So not only did she have to allege that she really thought that was something that she was complaining about or that she believed was a violation of the law, she's also got to convince you that she thought he was doing that because he was trying to violate the law. And that's not possible. Her exercise of that protected activity has to be known by the defendant. It was.

The defendant subsequently took an adverse employment action. She lost her job, but she was never demoted. And one of the things you heard over and over and over about how she should have had to go to do intake, client care, and negotiations, have y'all ever heard the phrase "on-the-job training"? Because that's what that is. She went -- they didn't come up with that at the Reaves Law Firm. That's a concept.

The way you learn things on the job is on-the-job training. There are a few ways you can learn. You can read a book, or you can go get your hands dirty. She didn't know it to his satisfaction, so he went with the latter.

**UNREDACTED TRANSCRIPT**

On-the-job training, though, is not something Mr. Reaves created.

And then after that claim she's also got to show that that adverse employment action, her termination, was causally connected -- you know these lawyer words -- causally connected to her engaging in protected activity. There's a sentence in here that explains that. And that is you must decide whether the plaintiff faced an adverse employment action because of. That's actually the word in the statute, because of. The two words in the statute. Because of her federally protected activity.

Defendant contends plaintiff was fired for insubordination among other things. It keeps going. Plaintiff need not prove that that protected activity was the only reason for her termination, but she must prove by a preponderance of the evidence that she would not have lost her job but for engaging in that protected activity.

That's impossible. That means that she would not have been fired had she not complained for the Title VII claim about that difference in the attorneys' pay. There's no way.

You've seen all the other things she didn't do. You've heard over and over from Mr. Reaves and from Mrs. Reaves about how unhappy they were with her performance and even how long he took on May 28th to come up with a

**UNREDACTED TRANSCRIPT**

17-week -- I think it's more than that -- a 24-week training course. This isn't the sort of thing that's the product of having an upset retaliatory motive for one thing. They were unhappy with the whole way she did her job. She won't be able to prove that claim. She can't show she engaged in protected activity. She can't show there's a causal connection.

You get a little bit different when you get into the standard. The next two claims are alleged under different statutes. The first one is the acronym you keep seeing, FLSA. That is the law. FLSA is the Fair Labor Standards Act. It's the one that requires you to be paid overtime if you work more than 40 hours. Requires minimum wage. And for her to show that she was retaliated for complaining about that one, she has to show that she engaged again in a protected activity.

This one is different. This is the one -- and there's a lot in here. There's a legal distinction meaning the law draws a line, not that we do, but the law draws a line between the performance of HR job duties and the assertion of one's own FLSA or EPA rights and the rights of others. The employer -- employee must step outside of her role or otherwise make clear to the employer that she is taking a position adverse to the employer for the employer's activity to be protected.

**UNREDACTED TRANSCRIPT**

There are a lot of ways you can do that.  She could have gone with these employees and taken them to the EEOC.  She could have gone with these employees and taken them to the Department of Labor.  She could have written a demand letter and said, Mr. Reaves, you need to pay these people backpay.  She could have taken them to another lawyer she knew in town.  She could have done a lot of things if she was really advocating for the employees.  She wasn't.  She was doing her job.

And if she was just doing her job, then under this claim, unlike the either one, she cannot establish that she was engaging in protected activity.  There's no doubt she was doing her job.  Go back and look at the exhibits.  Look how she described -- I've got to slow down so that she can get this all.  Sorry.

Look how she describes it in the EEOC charge.  Look how she describes her job when she speaks about it.  Look how she describes it in the stipulated facts.  It's exactly what I am saying it is.  It's her job.

Then the rest of the elements do sort mirror the others.  She has to show that the protected activity was known by the defendant that she suffered an adverse employment action.  And then again you've got that causal connection.  You're going to have time to read these.  I don't want to just waste a lot of your time this morning

**UNREDACTED TRANSCRIPT**

49

talking about it.  But the elements are what she has to prove   10:54:58
to you, not beyond a reasonable doubt, by a preponderance of   10:55:01
the evidence.  It's impossible.  She just can't do it.   10:55:04

So what I want to show you next is the verdict   10:55:07
form.  The verdict form -- oh, we don't have a screen.  Can I   10:55:10
do this, or can I do it up here?   

**THE COURT:**  You can just pull the screen down.   10:55:27
You can pull the screen down or you can put it on the ELMO.

**MR. HANCOCK:**  I don't want to delay this.  It   10:55:29
will be just fine.  Y'all bear with me.  I don't have a
screen, so we're going to do it right here.  In this it says   10:55:32
-- and you will be filling this out.  You'll have this back   10:55:33
there with you, and you'll have the jury instruction as well.   10:55:37

It says:  We find by a preponderance of the   10:55:40
evidence that the defendant, Reaves Law Firm, retaliated   10:55:46
against plaintiff, Andrea Jaye Mosby, in violation of Title   10:55:49
VII of the Civil Rights Act of 1964.  What you do is you put   10:55:52
that "no" there, and you're finished with that claim.   10:55:57

Then you are asked the next one:  We find by a   10:55:59
preponderance of the evidence that the defendant, Reaves Law   10:56:04
Firm, retaliated against plaintiff, Andrea Jaye Mosby, in   10:56:06
violation of the Fair Labor Standards Act.  You go back   10:56:09
through those same four elements.  And when you conclude like   10:56:14
we think you should that she did not have any protected   10:56:17
activities and that there is no causal connection, you come   10:56:22

**UNREDACTED TRANSCRIPT**

back and you put a no there too.

Same thing with this third one:  We conclude by the preponderance of the evidence that the defendant, Reaves Law Firm, retaliated against plaintiff, Andrea Jaye Mosby, in violation of the Equal Pay Act.  I think you know where I'm going.  You put a no there too, and this is finished.

All the things on the back deal with damages.  And you only give damages if you answered yes to one of those claims.  And we submit you can't answer -- you should not answer yes because there has not been any proof in this case to satisfy the four elements.

If you do get to the point where you're looking at damages, I will remind you her compensatory damages when she described them were garden variety.  I don't know what that means.  What I do know is what you want to do is convince the people sitting in this box that you've suffered injuries and you've suffered, you bring witnesses in, and they sit up here and they talk about it.

And I'm sorry that Ms. Mosby was going through some other hard parts in her life when this all happened.  Nobody wants somebody to have a tough time.  But that's not Mr. Reaves' fault, and it shouldn't be something he gets tagged with it.  You should never get there because we're not talking about damages, but her ability to claim compensatory damages is gone.

**UNREDACTED TRANSCRIPT**

Credibility is really the key here.  At the end of the day -- I've said that too many times probably -- Ms. Mosby is simply not credible.  If you want to go back there and find some examples for how do we really get our foothold on she's not credible, probably the best one is the June 2nd.  If you go back into her deposition, which is under oath -- and I am talking about (sic) her about the case.  The whole purpose of -- one of the purposes of taking a deposition is so that I'll hear from you under oath what you're going to go on trial and tell the jurors.

So when she was under oath, she told me that on June 2nd -- not on June 2nd -- at intake starting in June, she showed up for three or four weeks.  Three or four weeks.  And then she had this really nice story about how Mr. Reaves came in, and he told her she was doing such a good job she could move on to client care.

Remember a minute ago we said you don't have to believe things if they are not reasonable?  Why would Mr. Reaves tell her that she can move on to client care and then go home and fire her?  That doesn't make any sense.  There's no way to connect those dots because they're not true.  That's why.

But you've also got another interesting piece. When she told me about that, no PTO, no sickness, no illness. So then we file a motion for summary judgment, which is a

**UNREDACTED TRANSCRIPT**

motion we file with the Court.  And in support of it -- in support of her response to it, rather, she gives the Court an affidavit.  In her affidavit, now she changes her story.  It's not the same.  Because she realized after her deposition that two weeks wasn't possible.  Three or four weeks, whatever she said, wasn't possible.  You have emails that prove you're lying.  And so she changes her story.  She says she's just there a few days.  And now in an affidavit the story changed a little bit.

But, again, no discussion of being sick, nothing about a migraine, nothing about being at home working on the transition document.  In fact, what she told me in her deposition was she didn't know if she had started the transition document.  She thought she might have started the spreadsheet.  When she talked to you folks, she took the day off to work on it.  Those are not the same thing.

And when you look at her story about what happened on June 2nd, all she's trying to do is keep up with it.  As we point out the holes in her story, she tries to plug them.  That is not credible.  When somebody's story changes -- how many times has Mr. Ryan said that -- that is not credible.  The difference is my client's story didn't change.  They just took pieces of them and used them in isolation, which is different.  Her story that she told that Mr. Reaves told her she was finished in intake, it can't even be reconciled with

**UNREDACTED TRANSCRIPT**

any of the other facts in the case.  It just sticks out as how would you even say that.

She also said to you that there are two types of employees in HR.  That's the most convenient theory I think I've ever heard.  If there were two types of employees in HR, if that was a thing, then we would have seen some articles from people about how that's a thing in the industry that we need to be aware of and think about when we're dealing with HR professionals.

We could have had an expert witness come in and talk about how this is what HR professionals do.  She's been in the HR community forever.  She could have found a colleague to explain this theory.  She didn't because she just came up with it and made it up.  In fact, that never came out in her deposition.  I never heard anything about two types of HR until Mr. Ryan brought it up in his opening statement.  First time that ever came up.

Her story about the e-mail is equally -- it's not incredible.  That's a different word.  It lacks credibility.  The fact she's going to send an e-mail that has that many paragraphs, whether it's 37 or some of them are duplicative, it doesn't matter.  That's not the point.

The point is you've got a lawyer who's practiced labor and employment law for 25 years, and she's sending an email about dozens of paragraphs about her experience at an

**UNREDACTED TRANSCRIPT**

employer, and she doesn't mention retaliation at all.  She doesn't just not use the word, she doesn't talk about the fact that she lost her job because she engaged in what she's now telling you was protected activity.  She knew how to say that.  She said everything else.

She talked about the legal claim standard for insubordination.  She just didn't forget that, and she didn't do what she told you and go to Mr. Ryan's office and come up with a theory.  She went to Mr. Ryan's office, and they came up with a claim that was not true.  It lacks credibility.

I also think it's interesting she's got to assign Mr. Reaves -- it's inevitable.  He has to have a retaliatory motive.  Jakira Davis is the best example of that.  That's the attorney.  The attorney -- when Mr. Reaves found out wrongly, when he learned from Ms. Mosby that there was a difference in their pay, he wasn't retaliating against her and fire her.  Instead what did he do?  He went to the people in power and said, wait a second, is that right?  Is she only making 85 (sic)?  Bump her up.  And they said, no, she's already making that.  You've already done that.  And so he said, okay, let's raise her to 90.

That's not the actions of an angry person.  That's the actions of somebody who's got their arm twisted up behind them and having to do something.  That's the action of somebody who said I wanted to hire you for good advice.

**UNREDACTED TRANSCRIPT**

Thank you for giving it to me.  I took it.  You don't have to stretch out to believe that.  It's obvious.

It's also obvious that at some point as the owner of this business -- you heard a lot about what Mr. Reaves has done since 2011.  That didn't just fall out of the sky.  That's tough work.  And you heard about how Ms. Reaves, she's got three degrees.  And in 2017 she quit teaching kindergarten so she could come help.  They've worked hard to develop a firm.  It has their name on it.  And that's important because when they decided she wasn't doing things their way, they didn't fire her, they didn't take her job and cut the salary in half, they said we want to figure out a solution.

Go back and look when you get back there.  Read that May 28th email.  It's not a demotion, and there's just no way to see it as a demotion.  He's encouraging her.  He's explaining the value of the things he wants her to do in the immersion training.  He's actually even explaining that this is what he thinks is going to set her up to be a long-term strategic leader in the firm.

Is that what you say when you're mad at somebody?  I don't think it is.  I don't think you can reconcile the words he uses in that e-mail and her concept that she'd been demoted.  She just didn't understand the business, and that was the solution.

**UNREDACTED TRANSCRIPT**

So that's when she quit.  She decided it was a demotion.  She decided it was beneath her.  She decided that she had 25 years of experience being a lawyer.  She didn't have to go do intake.  Intake wasn't lawyers.  She knew when she got assigned to intake, go sit in intake.  She stayed in her office because she didn't want to have to be like that.

So that's not the only thing she did.  She also checked out.  When you tell your boss -- you know, she's told you how tough this was being unemployed when she was going through a custody battle.  And I believe her on that.  I suspect if you're going through a custody battle everything about your life goes under a microscope.  Which is why if I had a job and somebody told me to do something immediately, and knowing my job was important, I would go ask when do you need that.

If I was being taken and put in immersion training until I learned something, I'd make sure that I reacted right if I didn't want to lose that job.  And if I'd been asked for a transition document that I understood was supposed to help the leadership team keep my ball rolling and nothing fall through the cracks, I'd do it.

But what has she done?  She's not taking any ownership of that at all.  She's only blaming him for not giving her a defined date and time.  That's her responsibility.  Where do you see the ownership from her of,

**UNREDACTED TRANSCRIPT**

gosh, I could have done a better job?  Where do you also see the ownership from her that at the point on June 2nd when he terminates her employment, he doesn't have a transition document.  Who cares when the date was.

When he made the decision to terminate her employment, he would be perfectly within his rights to say I thought that e-mail should have woken her up.  I thought she should have gotten me that transition document two days later or at least told me why she couldn't.

He's totally right for deciding that's not an acceptable performance.  He's also totally right because we've now heard -- whatever version of this there is, third version, she's now admitted that on June 2nd she didn't come to work.  She also admitted on June 2nd she didn't tell either of these two people where she was.

We know by the undisputed testimony -- nobody's disagreeing with this -- by the time June 2nd gets to Mr. Reaves, he knows she's not there.  She may say it's because she's somewhere else, but she didn't take the initiative to make it clear to the person that's in charge of her employment decisions.

So on June 2nd, she doesn't have a transition document.  She's not at work.  And at some point if you were paying her $185,000 to do something that other employees are being paid a much lower hourly salary, how long are you --

**UNREDACTED TRANSCRIPT**

58

how long is that going to be?  How big a leash do you have to give her?  How hard does it have to be to fire somebody for not doing their job?  We're in an at-will state.

This lawsuit is frivolous.  She knew she didn't have a claim.  She knew she didn't have a claim when she sent off that e-mail.  She knows she doesn't have a claim now.  And I do think you've seen some agitation in this case.  I want you to ask yourself:  Why did you see maybe Mr. Reaves get his temperature up a little bit and Mrs. Reaves?  Because they've been attacked.  They been attacked by somebody who's not telling the truth.  You've heard about how important his community standing is and what he's done to work hard and preserve it.  And now you've got a public filing where somebody is saying you did something that's very different than the way you wanted to run your law firm and the way you wanted to run your life.

But he can't defend himself.  There's only so much you can do as a witness.  And he can't be his lawyer.  I'm his lawyer.  So yeah, this is a frustrating thing.  And you know who he needs to protect him and his law firm and his wife and their reputation?  You.  That's what your verdict can do.

When we started this I told you I just wanted one promise, and I'll stop with it.  Promise me you'll decide this case based on the evidence.  Because if you do, I'm

**UNREDACTED TRANSCRIPT**

59

asking you, the Reaves Law Firm is asking you, Mr. and Mrs. Reaves are asking you, go back there, do what's right, evaluate the evidence, and return a verdict in their favor on all three counts. Thank you. I know you had somewhere else to be, and I appreciate it.

**THE COURT:** Mr. Ryan.

**MR. RYAN:** Despite the fact that Mr. Hancock literally just told you that she went to my office and I made up a claim, implying that I was dishonest and don't have integrity, I still love him. Despite that fact. Despite the fact that he just said that Jaye came to my office and we created a claim. I know he's fighting hard for his client, and I understand that. They go low, I go high.

Guess what Mr. Hancock didn't acknowledge? He didn't acknowledge that Henry Reaves said she was disloyal. He didn't acknowledge, didn't even mention the fact that Henry Reaves from the stand said that he didn't trust her. And both the disloyalty and the distrust came from her about speaking out for Ms. Davis and Ms. Redmond. And it wasn't like she was wrong.

Ms. Davis' pay got increased to 90,000 , which it wouldn't have if she hadn't have spoken out. Why would he go so far to view her as disloyal for speaking about Ms. Davis and Ms. Redmond? Think about that. Why would he go so far -- why wouldn't he say, thank you. That's what we hired you

**UNREDACTED TRANSCRIPT**

to do, to advise us.  Good job.  Already making a difference three to four weeks in?  Why wouldn't he say that?  Why would he immediately go to that emotional place inside of him, which we have all seen?  Why would he go to that place and accuse her of being disloyal and untrustworthy?

And then -- and that happened on May 26th.  She's at her grandmother's funeral on May 27th.  And then I had to look back, it was at 4:15 a.m. on Saturday, May 28th, that he then tells her these are your new duties.  If that was in good faith, how come he didn't say I've got this plan for you on May 24th or May 25th or May 26th?  This only happens as a result of her complaint and speaking out.

If he was really that disappointed with her performance, where was the e-mail the week before she spoke out on behalf of those employees?  Where is anything to suggest that she wasn't doing a good job?  Nothing.  They talk about proof.  Where's that proof, Mr. Reaves, Mrs. Reaves?  Where's the proof that she was doing anything other than a good job for you hiring people, putting out fires.

You've all heard the phrase "drinking water out of a fire hose."  That's what she encountered.  But we know that she wasn't doing a bad job and she wasn't viewed as disloyal or untrustworthy until she spoke out about some things that he didn't like speaking out about.  Now, why he did, we can't

**UNREDACTED TRANSCRIPT**

get into the man's mind.  I know it's common for people to be defensive sometimes, but if you actually self reflect and you step back, then you go, hey, thank you for doing that. That's exactly why we hired you instead of emotionally going to you're disloyal and untrustworthy.

And then literally within 36 hours, at 4:15 in the morning, you take away your title, you take your job duties, and you say this is what you're going to be doing in intake, and this is what you're going to be doing the rest of the seven weeks.

Yes, he didn't put demotion in there.  That would have only been more evidence of retaliation.  He is not the dumbest lawyer in America.  I will give him that.

Criticizing Jaye for not calling other witnesses?  How about calling Tina Adams to contradict Jaye. Why didn't they call Tina Adams to contradict Jaye about coming in to work and reporting to intake because that's why -- because Tina Adams knows that Jaye reported to intake. Tina Adams still works there.  They could have literally had her come in:  Here's how we can prove that Jaye didn't report to intake.  Where's Tina Adams?  They didn't bring her to the courtroom to testify.  Why?  Because Jaye was telling the truth.  They know she reported to intake.

Remember on June 2nd on that e-mail, there wasn't even a mention -- remember how I mentioned like where in that

**UNREDACTED TRANSCRIPT**

June 2nd e-mail is her failure to report to intake the cause of her termination? It's not there. Look at it. The EEOC position statement that they submitted a few months later. Where is there a mention about her not reporting to intake as being the cause of termination? It's not in there.

Then I take Mrs. Reaves' deposition and she says it's not the transition document. If she had just reported to intake, she'd still be employed. And then to back that up Mr. Reaves jumps on that same train, that same narrative and submits a false declaration under penalty or perjury saying that she did not report to intake when we know that she did, and Tina Adams knows that she did.

And Jaye did get approval from Tina Adams to miss work on the 2nd because she wasn't feeling well. How come they don't call Tina Adams to say Jaye didn't reach out to me? They control Tina Adams. The reason they didn't is because Jaye is telling the truth. Why did they even have to bring intake in, her failure to report to intake in as a basis for termination if the real reason for termination is insubordination for the transition document? Ask that.

If somebody says -- again, if somebody says about this transition document, remind them, remind your fellow jurors, then why are they saying under oath that she's missing work from intake and not going to intake and that was the reason she was terminated.

**UNREDACTED TRANSCRIPT**

Differing reasons disguise a coverup of retaliation. We know he had motive. We know he had the means, and we know he had the opportunity. They're not even contesting that she engaged in protected activity because they know that she spoke out on behalf of those ladies and that the pay got changed so it actually had a beneficial effect.

We know that she was terminated, so there was an adverse action. Literally you just have to decide did he terminate her truthfully for insubordination, or did he have a retaliatory motive and cover it up. And it's pretty transparent you cover it up when you say that if she had just reported to intake she'd still be there. And of course, once we prove that she did report to intake, then they're stuck and then they're having to reverse course and come up with whatever they can to throw up on the wall to make it stick.

It's funny. Mr. Hancock now tries to distance Mrs. Reaves from the decision. She's the grim reaper? Who says that? The grim reaper. You remember that testimony? She's the hatchet person? She typed up that e-mail based on what he told her to put in that e-mail. She typed up that e-mail based on what he told her. He admitted to reviewing that e-mail or to knowing about its contents before it was sent. It doesn't just get sent out without them going over it.

**UNREDACTED TRANSCRIPT**

Again, Mrs. Reaves wrote the e-mail.  She knew on June 2nd what the true story was.  Well, then why is she saying down the road in a deposition -- when I get to take her deposition, why did she even mention intake?  Why not just say, Mr. Ryan, the reasons for termination are in that e-mail?  I have nothing else to add.  Then why would she even say in that deposition that the real reason was failure to report to intake?  Why wouldn't she just stick with the story?  Why is she changing it?  What is she trying to cover up?  What are they trying to cover up?  It's obvious.  They don't want to get hit with a retaliation verdict.  Nobody does.

Everybody want to preserve their good reputation.  Everybody wants to be viewed by the public -- if you're asking for the public's business and you're asking for the public's money, which they are, you want to be viewed positively.  You want to be viewed positively.  But behind the curtain where you really get to see what's going on, Henry Reaves can portray himself and his wife can portray themselves and the name of their law firm one way, but you get to see how they really operate and what really is going through their minds.

Again, if they were so unhappy with her performance, how come there's nothing before she's complaining and speaking out on behalf on those ladies?

**UNREDACTED TRANSCRIPT**

65

There's zero.  Look through the evidence.  There's nothing that predates her complaints.

Two types of HR people, yeah, there are.  And everybody knows that.  And again, with all due respect to my colleague, Mr. Hancock, I didn't make that up.  That's just common knowledge.  Everybody's worked for a company where HR really can't be trusted and you don't want to go to HR.  Other companies HR are good-faith partners.  And you can feel confident that if you raise a concern to them, they'll address it.

That's what she was saying.  She chooses to be somebody that employees can trust, and they can go and take care of things.  And she saved Henry Reaves a lawsuit from Ms. Davis ironically.  He would have been facing another one.  Same from Ms. Redmond and her overtime claim.

Jaye didn't decide she was beneath it.  Anything -- had he honestly come to her and talked to her and sat her down and said, Jaye, I think it would be helpful for you to do X, Y, and Z because this is going to be benefit you down the road, and this is how it's going to benefit you, instead of sending a 4:15 e-mail that ends with if you don't like it, you can resign.  He wasn't operating in good faith ever.

Now, Mr. Hancock talked about the verdict form.  I'm going to talk about it.  There are three questions.  These deal with liability.  The liability questions are:  Did

**UNREDACTED TRANSCRIPT**

he break the law when he terminated her?  Did he retaliate against her?  We say that on all three counts it's an easy yes.  They're the ones that are lying about her termination.  A lie can be used and inferred as a coverup for the true reason, which was retaliation.  Again, retaliation flows from him saying and admitting she's disloyal and untrustworthy.

So once you -- if -- hopefully you will check yes to those three boxes, you go to Question Number 4.  And Question Number 4 is backpay.  They don't even really dispute what she lost.  It is math.  $258,269.27.  That's what we would like for you to ask.

Compensatory damages.  Mr. Hancock makes fun of her calling them garden variety.  No, she didn't go to a counselor.  No, she didn't go to a psychiatrist.  She dealt with it like human beings do.  But he's the one that caused the pain.  This isn't something she did to herself.  It's offensive for him to even suggest whether through his attorneys or otherwise that he didn't cause the pain of another human being when he broke the law and retaliated against her.

We think backpay should be doubled for her compensatory damages, and that would be north of $500,000.  But that's the kind of pain that a person suffers, not because they did it to themselves but because somebody intentionally harmed her and authored the trajectory of her

**UNREDACTED TRANSCRIPT**

life for a period of time through his intentional retaliation. And he knew she was vulnerable, but he still did it and didn't care and still doesn't care.

And punitive damages, that's to punish, to deter. That's where you literally have the power to hold him accountable. I will remind you and I'll close with his own words: Award her every cent. He said 10 million. We want you to award her $2.5 million. That will punish him appropriately. That will punish him in a way that he will know you cannot violate a person's legal rights. 258 in backpay. Double that for compensatory damages. And 2.5 is our request.

You get to deliberate. You get to decide. Those are suggestions. You could do more, you could do less. But as far as the liability questions, he's already answered them yes for us by the lies and by the admissions that she was disloyal and dishonest and not trustworthy about doing what she was hired to do, which was to get him to comply with the law and to wear that other hat and be an advocate for his employees and to speak up when they themselves were having their own rights violated.

Thank you very much.

**THE COURT:** Ladies and gentlemen, we've reached that point where, as you will recall the procedure, I instruct you on the law. It takes a little while to do that.

**UNREDACTED TRANSCRIPT**

Does anyone want a break before I start?  Once I start I'll run straight through.  So if you want a break say -- I sense that at least one individual wants a break.  Let's take a couple of minutes.  Don't talk about the case while you're out.  The moment is going to come, but don't talk about the case.  And then when we come back, I'll instruct you on the law.  Thank you for your patience.

(Jurors exited the courtroom.)

THE COURT:  We're in recess.

(Recess taken at 11:26 a.m. until 11:38 a.m.)

THE COURT:  Are we ready to go forward, Mr. Ryan?

MR. RYAN:  Yes, Your Honor.

THE COURT:  Are we ready to go forward, Mr. Hancock?

MR. HANCOCK:  Yes, Your Honor.

THE COURT:  Let's bring in the jury.

(Jurors entered courtroom.)

THE COURT:  Let me see counsel just a minute.

(At side bar on the record.)

THE COURT:  I don't have any difficulty obviously with Mrs. Reaves being in the courtroom, but I would prefer for her not to sit in the jury's line of sight when it enters and leaves the courtroom.  She could sit over to the right.

MR. HANCOCK:  Okay.

THE COURT:  Because it becomes awkward for the

UNREDACTED TRANSCRIPT

jurors.

MR. HANCOCK: Would you like me to ask her to move now?

THE COURT: Yes.

MR. HANCOCK: Any row just as far as she's on the other side?

THE COURT: Yeah. I don't care where she sits as long as she doesn't sit in that area in the jury's line of sight. That's the problem I have. It's awkward for the jurors, and I don't think it's a good thing.

MR. HANCOCK: Okay.

THE COURT: I think that's all. They're only probably going to walk through there one more time I hope, assuming I get through my instructions.

MR. HANCOCK: Do you want me to do it now?

THE COURT: Yes, I think now because I don't want you to have to get up during the instructions. The jury might misinterpret that as disrespectful.

MR. HANCOCK: So that I can hide it a little bit, is it okay if I ask him and her to walk out with me and then walk back in?

THE COURT: No. Here's what I think we might do. I will be making some initial remarks. And maybe when I start speaking to the jury, you just slip around, and she can move. The jury will be focused on me.

**UNREDACTED TRANSCRIPT**

MR. HANCOCK: Will it be okay if we send some others who may come and sit there if you announce that as a reason?

THE COURT: Sitting on that side?

MR. HANCOCK: I just don't want the jury to wonder why she has to move.

THE COURT: I don't think they will.

MR. HANCOCK: Okay. I'll walk over there during your comments.

THE COURT: Yeah, when I make the initial comments to the jury about the -- before I start reading is a good time. Or you could have -- I'm trying to think of some other way to do it. I didn't think of it until I just sat there and watched it.

MR. HANCOCK: I can bring her to the table. I could ask her to sit with us. Is that okay?

MR. RYAN: I don't care.

THE COURT: I said earlier she could sit anywhere. I'm now amending that. However, I'm not saying she can't sit at counsel table because the factual part of the trial is over, and she's a representative of the company. So, yes. In fact, you could go ahead and move her to the counsel table if she wishes to do so. She can sit anywhere she wants in this courtroom as long as she's not where she is right now.

**UNREDACTED TRANSCRIPT**

MR. HANCOCK:  I can handle this.

THE COURT:  Go ahead.  Thank you.

MR. HANCOCK:  Thank you, Your Honor.

(End of side bar.)

THE COURT:  Welcome back, ladies and gentlemen. I'm going to instruct you on the law in this case, and as I instruct you, I sometimes make a mistake.  I know this will surprise you.  However, sometimes I either misstate something -- unintentionally, of course.  But either I leave something out or -- I was telling counsel earlier one time there was a "not" that should have been there that I didn't put in or a "not" that was in there -- anyway, it totally changed the meaning of the sentence.

The short of this is that counsel for both parties have been instructed to interrupt me if I make a substantive error like that so I don't keep going and come back to try to correct it later.  They are not being disrespectful.  They are doing what I have instructed them to do so that the instructions are not only clear but accurate.

Now, ladies and gentlemen, I have the duty to instruct you now on the law that applies in this case.  You must follow the law as I state it to you whether you agree with the law or not.  As jurors, it's your duty to decide all questions of fact that are submitted to you.  And for that purpose, to decide the effect and value of the evidence.  You

**UNREDACTED TRANSCRIPT**

must not be influenced by sympathy, prejudice, or passion. You are not to single out any particular part of these instructions and ignore the rest. You're to consider all the Court's instructions as a whole and regard each in the light of all the others.

Why is the screen down?

**THE CASE MANAGER:** I lowered it just in case, Judge. Do you want me to raise it back up?

**THE COURT:** Yes. Although the seal of the Court is attractive, I feel it may be distracting.

You should not assume from anything I may have said or done that I have any opinion about any of the issues in this case. Except for my instruction to you on the law, you should disregard anything I may have said or done in arriving at your own decision about the facts.

Let me outline for you the parts of the instructions so that you can follow them more easily. First, I will describe the stipulated facts and the contentions of the parties. Second, I will instruct you on the burden of proof, on which party the law places that burden on each issue in the case, and on some rules to help you consider the evidence.

Third, I will discuss the applicable law for determining liability or fault. Fourth, I will describe the law of damages. Finally, I will explain the process of your

**UNREDACTED TRANSCRIPT**

deliberations and the format of your verdict.

Let's begin with the stipulated facts. The parties have entered into a stipulation in which they have agreed that a certain fact can be taken as true without either party presenting further proof on that matter. The parties have stipulated to the following facts:

One, defendant Reaves Law Firm is a Memphis, Tennessee-based personal injury law firm dedicated to helping innocent accident victims fight for their rights as they cope with serious injuries.

Two, plaintiff was hired as defendant's chief people officer, CPO, in May 2022.

Three, prior to being hired as defendant's CPO, plaintiff had not previously held a CPO role.

Four, plaintiff has been a labor and employment attorney for 27 years and has consulted and advised on employees, personnel, and disciplinary issues and directed and managed employment litigation.

Five, plaintiff understood her employment with defendant was at will.

Six, plaintiff's salary was $185,000.

Seven, as CPO, plaintiff was responsible for building an HR infrastructure managing all HR and employment-related matters, recruiting and interviewing prospective employees, the hiring and firing of employees,

**UNREDACTED TRANSCRIPT**

and handling all employee-related matters.  Plaintiff was also responsible for ensuring compliance with all state and federal laws as they related to employees.

Number eight, plaintiff's job also included ensuring that defendant was in compliance with the laws that govern employee compensation.

Nine, at the time entry-level attorneys working with defendant were paid $65,000.

Ten, on June 2nd, 2022, defendant terminated plaintiff's employment.

Now, I'm going to discuss with you the contentions of the parties.  These contentions are the parties' individual viewpoints about the facts.  These contentions are not binding on you, the members of the jury.

Contentions of plaintiff:  Plaintiff Andrea Jaye Mosby started working at Reaves Law Firm as its chief people officer, CPO, in May 2022.  Prior to working at the firm she worked at Memphis Light, Gas, and Water for 18 years performing labor and employment in-house counsel work and then worked as the labor engagement diversity and inclusion manager with the HR department.  Prior to that she also worked for the City of Memphis as an EEO/labor relations attorney in the human resources division.

Henry Reaves, CEO of Reaves Law Firm, interviewed Ms. Mosby and quickly offered her the position of

**UNREDACTED TRANSCRIPT**

CPO at a salary of $185,000.  Ms. Mosby understood that she would be helping to change the image of the firm, make it a better place to work, assist with recruitment and retention, and other HR responsibilities with an emphasis on culture.  This seemed to fit Ms. Mosby's skill set, and decided to leave her 18-year career with Memphis Light, Gas, and Water to go to work with Mr. Reaves and the Reaves Law Firm.

Soon after she started working as Reaves Law Firm's CPO, Ms. Mosby participated in a panel hiring interview of a young male attorney with Sheena Payne and Mark Schirmer.  The male candidate was highly sought after by Mr. Reaves who was impressed by his resume.  After the panel interviewed the candidate, they brought the candidate to meet with Mr. Reaves.

Ms. Mosby asked the candidate typical questions about how much time he would need before starting and his salary expectations.  Mr. Reaves then interjected and offered the male candidate a position as an attorney with the starting salary of $85,000.

Ms. Mosby then learned that a female attorney in the same role was paid $65,000.  Ms. Mosby asked Mr. Reaves why he offered the male candidate this salary when a comparable female attorney was being paid less.  Upon hearing this information, Mr. Reaves challenged Ms. Mosby's complaint explaining that the male attorney had more experience and

**UNREDACTED TRANSCRIPT**

76

that he was relocating to Memphis. Ms. Mosby explained that these assertions were false. Mr. Reaves became angry and called Ms. Mosby disloyal.

Thereafter, Ms. Mosby began advocating for PaQuita Redmond, Mr. Reaves' executive assistant, to be properly compensated explaining that Ms. Redmond was not properly classified under the FLSA, which is the Fair Labor Standards Act. Mr. Reaves again told Ms. Mosby in response to her advocacy that she was disloyal and accused her of setting him up for a lawsuit and stated that she didn't have his best interest at heart.

Shortly afterward, Mr. Reaves informed Ms. Mosby that she obviously did not understand how the law firm operated, and she was immediately and humiliatingly demoted from an executive position to an intake specialist position. Mr. Reaves explained the process would take three or four months and that Ms. Mosby would have to work for several weeks in each department of the firm. He informed employees not to talk to Ms. Mosby to anything related to HR and that she was now an intake clerk.

Based on timing and Mr. Reaves' hostility to her advocacy, Ms. Mosby felt that the demotion was payback for raising the pay discrepancy between the male and female attorneys and FLSA compensation issue related to Ms. Redmond.

On June 2nd, 2022, Neva Reaves, the wife of

**UNREDACTED TRANSCRIPT**

Henry Reaves and chief experience officer at Reaves Law Firm, sent Ms. Mosby an e-mail abruptly terminating her employment after only a month at the firm.  This termination was illegal under federal law as it was in retaliation for her protected activity.

Plaintiff seeks economic damages of $258,269.27 in lost pay as a result of defendant's actions.  Despite applying for over 100 jobs, it took plaintiff more than a year to find comparable employment, and she was forced to move to Atlanta, Georgia.  She also seeks compensatory damages and punitive damages in an amount to be determined by you, the members of the jury.

That concludes the contentions of the plaintiff.

The contentions of the defendant are as follows: Defendant contends that it terminated plaintiff's employment as chief people officer because plaintiff refused to comply with simple, reasonable directives.  Defendant seeks judgment on plaintiff's Title VII retaliation claim because plaintiff cannot establish that she engaged in the required protected activity, and even if she could, defendant had legitimate, nondiscriminatory, and not pretextual reason for terminating plaintiff's employment that eliminates even a possibility of a causal connection:  Plaintiff's insubordination and her failure to perform the job duties assigned to her.

Similarly, defendant seeks judgment on plaintiff's

**UNREDACTED TRANSCRIPT**

FLSA and EPA retaliation claims because plaintiff's fulfilling her job duties as chief people officer is not a protected activity.  Even without relying on those job duties, plaintiff has no actionable claim.  Even if plaintiff did engage in a protected activity, which she did not, defendant had multiple legitimate, nondiscriminatory, and non-pretextual reasons for terminating her employment.

Defendant contends that plaintiff will not be able to prevail on any claim and is, therefore, not entitled to recover damages of any kind in any amount.

Now I'm going to instruct you on the burden of proof and your consideration of the evidence.  In this case the plaintiff has the burden of proving each and every element of her claims by a preponderance of the evidence.  If you find that any one of the elements of any of the plaintiff's claims has not been proven by a preponderance of the evidence, you must return a verdict for the defendant on that claim.

The term preponderance of the evidence means that amount of evidence that causes you to conclude an allegation is probably true.  To prove an allegation by preponderance of the evidence, a party must convince you that it is more likely true than not true.  If the evidence on a particular issue is equally balanced, that issue has not been proven by a preponderance of the evidence, and the party having the

**UNREDACTED TRANSCRIPT**

duty of proving that issue has failed.  You must consider all of the evidence on each issue.

The preponderance of the evidence is not decided in favor of the side that brings the greater number of witnesses or presents the greater quantity of evidence.  You should make your own decision based on which witness or witnesses and what evidence appear to you the most accurate and trustworthy.

As members of the jury, you're the judges of the facts.  For you to determine what the true facts are, you are called upon to weigh the testimony of each witness who has appeared before you and to give that testimony, that is the testimony of each witness, the weight, faith, credit, and value to which you think the testimony is entitled.

You will note the manner and demeanor of the witness while on the stand.  You must consider whether the witness impresses you as one who is telling the truth or one who is telling a falsehood.  You will consider the reasonableness or unreasonableness of the testimony of the witness, the opportunity or lack of opportunity that witness had to know the facts about which he or she testifies, and the intelligence or lack of intelligence of the witness, whether the witness seemed to have a good memory, the interest of the witness in the result of the lawsuit, if any, and finally, the relationship of the witness to any of the

**UNREDACTED TRANSCRIPT**

parties in the lawsuit, if any.

These are the rules that should guide you along with your common judgment, your common experience, and the common observations you have made in your various walks of life in weighing the testimony of the witnesses.

If there is a conflict in the testimony of the witnesses, it is your duty to reconcile that conflict if you can because the law presumes that every witness has attempted to and has testified to the truth. If, however, there is a conflict that you are unable to reconcile, it is up to you to decide which witnesses you believe have testified truthfully and which have not.

Differences between witnesses' testimony do not necessarily mean a witness is intentionally untruthful. Sometimes when two people observe an event, they will see or hear it differently. Sometimes a witness may have an innocent lapse of memory. Witnesses may testify honestly but simply be wrong about what they saw or remember. You should consider whether a discrepancy relates to an important fact or only to an unimportant detail.

Remember the preponderance of the evidence standard is not alone determined by the number of witnesses testifying to a particular fact or a particular set of facts. Rather, it depends on the weight, credit, and value of the total evidence on either side of the issue. And of this, you, the

**UNREDACTED TRANSCRIPT**

members of the jury, are the sole judges.

There are two kinds of evidence:  Direct and indirect.  Indirect evidence may be also referred to as circumstantial evidence.  Direct evidence is the testimony by a witness about what that witness personally saw, heard, or did.  Circumstantial or indirect evidence is proof of one or more facts from which you can conclude the existence of another fact.  You may consider both direct and circumstantial evidence in deciding this case.  The law permits you to give equal weight to both, but it is up to you to decide how much weight to give to any evidence.

You must not consider as evidence any statement made by counsel during the trial.  If, however, facts are admitted by counsel, you may regard those facts as true.  You must never speculate to be true any insinuation suggested by a question asked of a witness.  A question is not evidence, and it may be considered only insofar as it supplies meaning to the answer.

As to any questions as to which an objection was sustained, you must not speculate about what the answer might have been or as to the reason for the objection.  You must assume that the answer would be of no value to you during your deliberations.

From time to time the Court's been called upon to pass upon the admissibility of certain evidence.  You have no

**UNREDACTED TRANSCRIPT**

concern with the reasons for any such rulings, and you are not to draw any inferences from them.  You must not consider for any purpose any offer of evidence that was rejected or any evidence that was stricken by the Court.  Such matters are to be treated by you as if you had never known them.

A witness may be discredited or impeached by contradictory evidence or by evidence that the witness has said or done something or failed to say or do something at some other time that is inconsistent with the witness's present testimony.  If you believe any witness has been impeached and thus discredited, you may give the testimony of that witness such credibility, if any, as you think it deserves.

If a witness is shown to have knowingly testified falsely about any material matter, you have a right to distrust that witness's other testimony, and you may reject all of the testimony of that witness or give it such credibility as you think it deserves.  An act or omission is knowingly done if the act is done voluntarily and intentionally and not because of a mistake or accident or any innocent reason.

You have heard deposition testimony during this trial.  A deposition is testimony taken under oath before the trial.  You are to consider that testimony as if it had been given in court.  It should not be given more or less weight

**UNREDACTED TRANSCRIPT**

because of the format in which it was presented to you. Rather, as I told you before, you must give that evidence the weight, faith, credit, and value to which you think it is entitled.

The defendant Reaves Law Firm, PLLC is a legal entity. The fact that a legal entity is a party must not affect your decision in any way. A legal entity and all individuals stand equal before the law and must be dealt with as equals in a court of justice. When a legal entity is involved, it may only act through people as its employees. In general, a legal entity is responsible under the law for the acts, omissions, and statements of its employees that are made within the scope of their duties as employees of the legal entity.

Reaves Law Firm is an employer. As an employer, the law entitles the firm to a certain amount of discretion when making and implementing legitimate business decisions. That includes discretion in the supervision and management of its employees, their work assignments, and discipline. It is not your role as members of the jury to second guess a lawful business decision even if you believe that decision was incorrect, unfair, or unwise. The question is not whether the defendant's decisions, actions, or inaction were sound judgment but whether defendant violated the law.

Tennessee is an employment-at-will state. That

**UNREDACTED TRANSCRIPT**

means either an employer or employee can choose to end their employment relationship at any time with or without cause or reason, with or without notice, with no further obligation to the other.  Generally, an employer can legally discharge an employee at will for a good cause, for a bad cause, or for no cause at all.  However, the reason for termination cannot be otherwise unlawful.  In this case, unlawful under Title VII, the Fair Labor Standards Act or the Equal Pay Act, the EPA.

Now, I'm going to instruct you on the law as to liability.  Plaintiff has alleged violations of her federal civil rights under Title VII of the Civil Rights Act of 1964, Title VII.  The Fair Labor Standards Act, the FLSA, and the Equal Pay Act, the EPA, which amended the FLSA. Specifically, plaintiff alleges she was retaliated against for raising complaints of gender-based pay discrimination and misclassification of an employee for overtime purposes under the FLSA.

Title VII entitles employees to equal pay for equal work, outlaws pay discrimination based on gender, and prohibits employers from retaliating against employees for raising complaints about an employer's violation of Title VII.  Other things being equal, an employer may not pay one employee more or less than another on the basis of sex or gender.

Federal law prohibits employers from retaliating

**UNREDACTED TRANSCRIPT**

against employees from making a complaint under Title VII. In this case, plaintiff claims that defendant retaliated against her because she took steps to enforce her lawful acts under Title VII of the Civil Rights Act of 1964. Plaintiff claims that defendant terminated her employment because plaintiff complained about an alleged illegal pay disparity between a female attorney, who plaintiff believed was being paid less, and a male attorney who had been offered employment by defendant.

Defendant denies plaintiff's claim and asserts that plaintiff cannot establish that she engaged in the required protected activity, and that even if she could, defendant had legitimate, non-retaliatory reason for terminating plaintiff's employment, that is, her alleged insubordination among other things.

Plaintiff must establish four elements to succeed on her Title VII claim. Plaintiff must show by a preponderance of the evidence that: One, she engaged in protected activity. Two, her exercise of that protected activity was known by defendant. Three, defendant subsequently took an adverse employment action against plaintiff. And four, a causal connection existed between the protected activity and the adverse employment action.

For the first element, an employee engages in protected activity when she has opposed any practice made on

**UNREDACTED TRANSCRIPT**

an unlawful employment practice by Title VII.  Plaintiff alleges that she engaged in protected activity when she complained to Henry Reaves about an allegedly unlawful pay disparity between a female attorney, who plaintiff believed was being paid less, and a male attorney who had been offered employment by defendant.

Plaintiff must have an honest good-faith belief that defendant's conduct was unlawful, and a reasonable person in the same factual circumstances with the same training and experience as plaintiff would also have believed that the conduct complained of was unlawful.  This inquiry depends on the totality of the circumstances known or reasonably if mistakenly perceived by plaintiff.

Plaintiff need not prove that defendant actually engaged in gender-based pay discrimination, only that plaintiff had a good-faith belief that the discrimination had occurred, and a reasonable person in plaintiff's position would have shared that belief.

For the second element, plaintiff must prove by a preponderance of the evidence that defendant knew plaintiff had engaged in protected activity.  Plaintiff contends that her protected activity took the form of a complaint directly to defendant's chief executive officer.  As a legal entity, defendant's knowledge of any protected activity would be acquired by its officers, employees, and agents who are

**UNREDACTED TRANSCRIPT**

natural persons.

For the third element, you must decide whether defendant took an action that was materially adverse to plaintiff after the alleged protected activity took place. In this case, plaintiff alleges that she was both demoted and fired due to her protected activity. Defendant denies that she was demoted and contends that her termination was not because of any protected activity.

In considering whether plaintiff suffered an adverse employment action, you may consider evidence of termination of employment, significantly diminished material responsibilities, material loss of benefits, changes in wages or salary, less distinguished title, or other unique factors. Plaintiff need only demonstrate that defendant's action would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

Can I get something for you? Are you okay? I mean Ms. Brown. Not Ms. Courtney Brown. Ms. Francine Brown. You seemed you were searching for something

**JUROR:** I'm okay.

**THE COURT:** You're okay. All right.

For the fourth element, you must decide whether plaintiff faced an adverse employment action because of her protected activity. Defendant contends that plaintiff was fired for her insubordination among other things. Plaintiff

**UNREDACTED TRANSCRIPT**

argues the defendant's stated reason is false, not the actual reason for its actions, or is insufficient to explain the adverse action taken against plaintiff.

Plaintiff need not prove that her protected activity was the only reason for her termination, but plaintiff must prove by a preponderance of the evidence that she faced an adverse employment action because of her protected activity.

Now we're going to move on from Title VII to two additional claims:  One under the FLSA and one under the EPA. FLSA being the Fair Labor Standards Act, and the EPA being the Equal Pay Act.  As I've explained, plaintiff has brought retaliation claims in this case arising from three statutes: Title VII, the Fair Labor Standards Act, the FLSA, and the Equal Pay Act, the EPA.  I have just instructed you on the law applicable to the Title VII claim.

I'm now going to instruct you on the law that is applicable to the FLSA and EPA claims.  The FLSA governs the compensation classification of employees and overtime pay rules that employees must follow.  The FLSA also prohibits retaliation against employees who raise complaints about misclassification of employees or noncompliance with overtime pay requirements.

The EPA entitles employees to equal pay for equal work without regard to sex or gender.  The EPA also prohibits

**UNREDACTED TRANSCRIPT**

retaliation against employees who raise complaints about gender-based unequal pay. The elements applicable to all three of plaintiff's claim are identical. Importantly, however, the definition of a protected activity that applies to the FLSA and EPA claims is different from the Title VII definition. The facts that you apply to these elements will also differ among the claims.

To succeed on her FLSA and EPA claims, plaintiff must show by a preponderance of the evidence that: One, she engaged in a protected activity. Two, her exercise of that protected activity was known by defendant. Three, defendant subsequently took an adverse employment action against plaintiff. And four, a causal connection existed between the protected activity and the adverse employment action.

Under the FLSA and the EPA, a different standard of protected activity applies to employees who have human resources, HR, duties as part of their job. An employee carrying out HR duties acts in the interest of her employer. Asserting rights under the FLSA or EPA, however, is adverse to the employer.

There is a legal distinction between the performance of HR duties, that is HR job duties, and the assertion of one's own FLSA or EPA rights and the rights of others. For an HR employee to assert FLSA or EPA rights -- and HR here means human resources -- the employee must step

**UNREDACTED TRANSCRIPT**

outside her role or otherwise make clear to the employer that she was taking a position adverse to the employer for the employee's activity to be protected activity.

You are charged with deciding whether plaintiff acted only in the interest of her employer in line with her HR duties or if she stepped outside her role and asserted the FLSA and EPA rights of herself or other employees.

For the FLSA claim, the Fair Labor Standards Act claim, plaintiff alleges that she engaged in protected activity when she complained to Mr. Reaves about the FLSA classification of Mr. Reaves' assistant, PaQuita Redmond, believing Redmond had been unlawfully denied overtime compensation in violation of the FLSA. For the EPA claim, plaintiff claims that she engaged in protected activity when she complained to Mr. Reaves about the alleged pay disparity between a female and a male attorney.

Defendant denies that plaintiff engaged in protected activity arguing that she never stepped outside her role as chief people officer, which included HR duties, when she raised these issues with Mr. Reaves. The definition for elements two through four of these claims, that is the FLSA and EPA claims, are the same as those for the Title VII claim that I've already given to you.

Now, I'm going to discuss the issue of damages which you will consider only if you find that the plaintiff

**UNREDACTED TRANSCRIPT**

has proven one or more of her three claims against the defendant. The fact that I am instructing you on the proper measure of damages should not by considered as any indication of my view as to which party is entitled to your verdict. Instructions as to the measure of damages are given for your guidance if you should find in favor of plaintiff based on a preponderance of the evidence in keeping with the other instructions I have given you. These instructions on damages are in no way meant to imply that the plaintiff is entitled to recover.

The plaintiff is seeking backpay and compensatory and punitive damages from defendant. I'm going to give you instructions on each of these three types of damages. At the outset, however, I instruct you that you cannot award damages more than once for the same loss, harm, or detriment. For example, if a plaintiff were to prevail on two claims and establish a total injury of $10, you could not award her $10 compensatory damages on each claim. In other words, you couldn't award her $20. The plaintiff is only entitled to be made whole again, not to recover more than she lost for purposes of backpay for example. So the message here is she could only recover $10 instead of $20 even though she recovers on two claims.

To recover damages for any injury, plaintiff must prove that the defendant's acts were a proximate cause of the

**UNREDACTED TRANSCRIPT**

92

harm sustained by the plaintiff.  Proximate cause means that there must be a sufficient causal connection between the acts of the defendant and any injuries sustained by the plaintiff. An act is a proximate cause if it was a substantial factor in bringing about or actually causing injury.  That is, if the injury or damage was a reasonable foreseeable consequence of the defendant's act.  If an injury was a direct result or a reasonable probable consequence of the defendant's acts, it was proximately caused by those acts.  In other words, if defendant's act had such an effect in producing the injury that reasonable persons would regard it as being a cause of the injury, the act is proximate cause.

A proximate cause need not always be the nearest cause in time or space.  In addition, there may be more than one proximate cause of an injury or damage, many factors, or the conduct of two or more people may operate at the same time either independently or together to cause an injury.

You may not award damages based simply on speculation or guesswork.  Any award must fairly compensate the plaintiff for her injury but must have a basis in the evidence and be reasonable in the light of the evidence.

Backpay.  If you find for plaintiff on any or all of her claims, you may award backpay.  Backpay includes any wages and employee benefits plaintiff would have received between the date of her termination to the date of the trial.

**UNREDACTED TRANSCRIPT**

The plaintiff bears the burden of proving the existence and amount of backpay by a preponderance of the evidence. Plaintiff also has a duty to undertake reasonable measures to mitigate or minimize her damages. However, it is defendant who bears the burden of proving by a preponderance of the evidence that plaintiff avoided or reasonably could have avoided a specific amount of damages.

If the defendant shows by preponderance of the evidence that the plaintiff could have done something to lessen the harm, if any that she suffered, the plaintiff is entitled only to damages sufficient to compensate her for the injury she would have suffered if she had taken action to reduce the harm.

If you determine that the plaintiff is entitled to damages and that defendant has proven a failure to mitigate, you must reduce plaintiff's damages by, one, what plaintiff earned, and two, what plaintiff could have earned by exerting reasonable efforts to seek employment until the date of the trial.

You must decide whether plaintiff was not reasonable in not seeking or accepting a particular job. However, plaintiff must only accept employment that is of a like nature. In determining whether employment is of a like nature you may consider: One, the type of work. Two, the hours worked. Three, the compensation. Four, the job

security.  Five, the working conditions.  And six, other conditions of employment.  Remember the burden is on the defendant to prove that the plaintiff failed to mitigate her damages for loss of compensation.

Compensatory damages are meant to provide compensation to a plaintiff for the actual injuries caused by the defendant's unlawful conduct.  If you find that the defendant retaliated against the plaintiff in violation of federal law during the events about which you have heard proof, you may award compensatory damages for injuries that plaintiff has proved by a preponderance of the evidence were caused by defendant's wrongful conduct.

You may award damages for emotional distress, pain, suffering, inconvenience, mental anguish, embarrassment, or humiliation plaintiff experienced because of defendant's wrongful conduct.

No evidence of monetary value of such intangible things as emotional injuries has been or need be introduced into evidence.  There is no exact standard for setting the compensation to be awarded for these elements of damages.  I reiterate that you may only award damages for injuries that are proved to have been caused by a defendant's wrongful conduct during the events about which you have heard proof.

You are not to award damages based on speculation or guesswork.  In determining the amount, you should be

**UNREDACTED TRANSCRIPT**

95

guided by dispassionate common sense and not permit feelings of sympathy to influence your decision. Although mathematical precision is not expected of you, any damages that you award must be fair compensation. No more and no less.

In addition to backpay and compensatory damages, the law permits but does not require a jury to award punitive damages when a plaintiff proves by a preponderance of the evidence that the defendant acted with malice or with reckless indifference to the plaintiff's federally-protected rights. A person acts recklessly when that person is aware of but consciously disregards a substantial or unjustifiable risk of injury or damage to another. Disregarding the risk must be a gross deviation from the standard of care that an ordinary person would use under the circumstances.

A person acts maliciously when the person is motivated by ill will, hatred, or personal spite. The purpose of punitive damages is not to further compensate the plaintiff but to punish the wrongdoer and deter others from committing similar wrongs in the future. If you find by a preponderance of the evidence that the defendant acted with malice or reckless indifference toward the plaintiff's federally-protected rights, you may consider the following factors in determining an amount of punitive damages to award.

**UNREDACTED TRANSCRIPT**

One, how reprehensible the defendant's conduct was. In this regard you may consider whether the harm suffered by the plaintiff was physical or economic or both, whether there was violence, deceit, intentional malice, reckless disregard for human health or safety, whether the defendant's conduct that harmed the plaintiff also posed a risk of harm to others.  Whether there was any repetition of the wrongful conduct and past conduct of the sort that harmed the plaintiff.

Two, how much harm the defendant's wrongful harm caused the plaintiff and could cause the plaintiff in the future.

Three, what amount of punitive damages in addition to the other damages already awarded is needed considering the defendant's financial condition, to punish the defendant for its wrongful conduct toward the plaintiff and to deter the defendant and others from wrongful conduct in the future. The amount of any punitive damages awarded should bear a reasonable relationship to the harm caused by the plaintiff.

Last, I want to discuss with you the process of your deliberations and the form of your verdict.  After you retire to the jury room, you will select a foreperson to preside over your deliberations and to be your spokesperson in court.  Do not begin to deliberate and do not discuss the case at any time until all eight of your are present together

**UNREDACTED TRANSCRIPT**

in the jury room.  If someone leaves the jury room for any reason, do not talk about the case while that person is gone.  If someone like a court security officer should come into the jury room while you are deliberating, stop your deliberations immediately, and do not begin deliberations again until that third party has left the jury room.

During your deliberations you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device such as a cell phone or a computer.  You may not convey any information about this case to others or conduct any outside research about this case by using an Internet service or other form of electronic communication such as Google search, instant messaging, texting, blogging, Facebook, Instagram, LinkedIn, TikTok, YouTube, Reddit, Bluesky, Threads, or X.  These restrictions remain in place until the Court has accepted your verdict.

If you took notes, they're for your use only.  Your notes are to be only to refresh your own recollection about the case.  They're not to be shown to others or otherwise used as a basis for discussion.  Your verdict must represent the considered judgment of each of you.  To return a verdict it is necessary that each of you agree, that is, your verdict must be unanimous.

It is your duty as jurors to consult with one

another and to deliberate with a view to reaching an agreement if you can do so without violence to your individual judgment. Each of you must decide the case for yourself but only after an impartial consideration of all the evidence with your fellow jurors.

In the course of your deliberations do not hesitate to reexamine your own views and change your mind if you are convinced that you are wrong. But do not surrender your honest belief as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.

You'll have a single verdict form that reflects your findings. The verdict form will be placed in a folder and handed to you by the court security officer whenever you're not deliberating. For example, during lunch or a break in deliberations, the folder and the verdict form should be delivered to the court security officer who will deliver it to the courtroom clerk for safekeeping.

This is the verdict form that you will have and that your foreperson will complete in the jury room. It recites: Andrea Jaye Mosby, plaintiff, versus Reaves Law Firm, PLLC, defendant. We, the duly empanelled and sworn jury, after careful consideration and deliberation, unanimously find as follows:

One, we find by a preponderance of the evidence the

**UNREDACTED TRANSCRIPT**

defendant, Reaves Law Firm, retaliated against plaintiff, Andrea Jaye Mosby, in violation of Title VII of the Civil Rights Act of 1964.

When you have deliberated to a unanimous decision on Number 1, your foreperson will reflect that decision on the verdict form, yes or no.  Do you agree with that statement, yes; do you disagree with that statement, no.

Two, we find by a preponderance of the evidence that defendant, Reaves Law Firm, retaliated against plaintiff, Andrea Jaye Mosby, in violation of the Fair Labor Standards Act.  The same issue.  When you deliberate to a verdict on that point, your foreperson will fill in yes or no depending on your verdict.

Three, we find by a preponderance of the evidence that defendant, Reaves Law Firm, retaliated against plaintiff, Andrea Jaye Mosby, in violation of the Equal Pay Act.  Again, you will deliberate to a unanimous verdict on that claim, and when you have done so, your foreperson will fill in yes or no.

If the answer to all three of those numbers that I've just read to you, one through three, is no, your deliberations are over.  Your foreperson will sign the verdict form and return to the courtroom to render your verdict.  If you answer yes to one or more of those three, you must determine whether Ms. Mosby is entitled to any

**UNREDACTED TRANSCRIPT**

damages.

And you'll find that at Number 4: We find by a preponderance of the evidence that plaintiff, Andrea Jaye Mosby, is entitled to backpay as a result of defendant Reaves Law Firm's conduct. The answer to that will be yes or no. If the answer to that Number 4 is no, you're going on to Number 5. If the answer is yes, your foreperson fills that in, and you proceed to enter the appropriate amount of backpay to which plaintiff is entitled and proceed on then to Number 5.

So here is a space for backpay. It says backpay with a dollar sign. You fill that out.

Number five, we find by a preponderance of the evidence that plaintiff, Andrea Jaye Mosby, has suffered compensatory damages as a result of defendant Reaves Law Firm's conduct. You will then make a determination, a unanimous determination, yes or no. If the determination is no, you go on to Number 6; if the determination is yes, you're going on to enter the approximate amount of compensatory damage to which you believe plaintiff is entitled. So there's a line, compensatory damages, dollar sign, blank.

Six, we find by a preponderance of the evidence that plaintiff, Andrea Jaye Mosby, be awarded punitive damages as a result of defendant Reaves Law Firm's conduct.

**UNREDACTED TRANSCRIPT**

Again, at Number 6 you will unanimously decide yes or no. 12:40:02
And whichever you decide, your foreperson will complete that 12:40:08
blank.  If you decide no, that's the end of your work and 12:40:14
your foreperson will date and sign the verdict form, and you 12:40:19
will return to the courtroom to render your verdict.  If your 12:40:22
answer is yes, you will then enter the amount of punitive 12:40:27
damages appropriate.  And that is punitive damages with a 12:40:31
dollar sign and a blank.  And at that point your work will be 12:40:36
over and your foreperson will sign and date the verdict form 12:40:39
and return to the courtroom to render your verdict.  All of 12:40:42
you will actually come back to the courtroom. 12:40:46

If you need to communicate with me at any time 12:40:51
during your deliberations, write down your message or your 12:40:53
question, pass the note to the court security officer, and 12:40:57
that person will bring it to my attention.  I'll respond as 12:41:01
quickly as possible either in writing or by having you return 12:41:06
to the courtroom so I can address you orally. 12:41:10

My practice is to have you back in the courtroom. 12:41:13
So if you do send me a message with a question, I will take a 12:41:17
few minutes because first I will share with counsel what your 12:41:23
question is.  We'll discuss the answer.  I'll have you come 12:41:28
back, and in the presence of both counsel, all counsel and 12:41:33
the parties if they're here, I will then answer your 12:41:37
question. 12:41:43

If you do send a message to me or a question, don't 12:41:43

**UNREDACTED TRANSCRIPT**

102

tell me anything about an individual juror's voting, and don't tell me the tally of the votes or how many votes are here or there at the time you send a message.

I'll have a copy of these instructions and the exhibits admitted into evidence sent to you in the jury room. Your time becomes your own once you start deliberating. And that means if you're going to lunch, if you take a recess, you don't need to tell me. You do need to tell me if you haven't reached a verdict by the end of the day and you want to go home because that's my opportunity to tell you again not to talk about the case and so forth.

You could escape from here without my seeing you escape, and so don't do that. I want to know where you are if you're leaving the federal building at the end of the day.

It's going to take us a minute, so you probably want to have lunch, which has probably been sitting around back there for a while. And we have to get everything together to give to you. So just remember to take your time. You've already learned that. You've learned patience if you've learned nothing else during the course of this trial.

Any questions about the procedure? I can't answer any questions about the law as I've told you what I know about the law. And I can't answer any questions about the facts because you're the sole judges of the facts. But does anyone have any questions about the procedure that I've

**UNREDACTED TRANSCRIPT**

described?  All right.  Did I hear a sound?  No.    12:43:48

**JUROR:**  No.    12:43:53

**THE COURT:**  Everyone is lying low.  A unanimous    12:43:54
no.  There were no sounds coming from the jury.  All right.    12:43:57

Ladies and gentlemen, I just want you to remember    12:44:01
one thing.  You are judges.  You are absolutely judges.    12:44:04
You're judges of the facts.  Your only interest is to seek    12:44:08
the truth from the evidence in this case.  You may now retire    12:44:12
to begin your deliberations.    12:44:17

(Jurors exited the courtroom.)    12:44:38

**THE COURT:**  Mr. Ryan, do you have any objections    12:44:52
to the charge as delivered?    12:44:53

**MR. RYAN:**  No, sir.    12:44:55

**THE COURT:**  How about you, Mr. Hancock?    12:44:56

**MR. HANCOCK:**  Yes, sir?    12:44:59

**THE COURT:**  Do you have any objections to the    12:44:59
charge as delivered?    12:45:01

**MR. HANCOCK:**  I do not have any, Your Honor.    12:45:03

**THE COURT:**  I made three changes.  Let me see if    12:45:05
I can locate them.  At Paragraph 7.  Mr. Hancock, although    12:45:07
you're obviously alert to typographical errors, at the bottom    12:45:15
of the paragraph it refers to legitimate, nondiscriminatory,    12:45:21
and non-pretextual reasons.  For some reasons that went past    12:45:30
me, and I changed that when I delivered the instructions.    12:45:36

On Page 12, the last full paragraph, I somehow    12:45:46

**UNREDACTED TRANSCRIPT**

104

let the word "corporation" appear here.  And while the Reaves Law Firm is an entity, I don't believe it's a corporation.  I think it's a professional limited liability company.

MR. HANCOCK:  Yes, that's correct.

THE COURT:  So I changed it from the corporation to the legal entity, to be consistent with the other references in that paragraph.  And some other mistake I made that I had to correct.  Oh, well.  It's just me.

Paragraph 18, at the bottom where I refer to a different standard of protected activity that applies to employees who have human resources duties who refers to a person.  And I don't like the word "that".  So it's no longer that.

I think that exhausts my changes.  Obviously, I interpolate occasionally as I go.  I can usually find something I've left out.

Now, I suspect the jury is going to -- we'll make those changes -- those three changes.  The jury will get eight copies of the jury instructions, one copy of the verdict form.  I want both of you to go over with Mr. Mendez the exhibits to be certain that nothing goes to the jury room that has not been admitted but that everything that has been admitted gets into the jury room.  That's our goal.  So you just go over those with Mr. Mendez.  Be sure everything is in order.

**UNREDACTED TRANSCRIPT**

I never know how long it takes a jury to deliberate. You know, the old lawyer used to say you know what it means when a jury takes a long time to deliberate, and the answer is nothing. They just take their time sometimes. And sometimes they come right back. The point is I need you near the federal building. So don't go far. And be sure Mr. Mendez has your contact information, your cell information. And when I say don't go far, if you could be within five or ten minutes from here that will be good. That may be easier for you, Mr. Hancock, if you want to go back to the office. Although, if Mr. Ryan drives -- I'm not going to comment about Mr. Ryan's driving of which I know nothing, but he might be able to get from Union Avenue here in five or ten minutes.

Anyway, I'll need you here. There may be a question. Obviously my response to a question is usually not much. I point them back to the instructions on the law, and I tell them I can't tell them anything about the facts. But I still get questions. And when we have a verdict, I want you here obviously so I can take the verdict.

So what else do we have? Question, comments, what do we need to do, Mr. Ryan?

**MR. RYAN:** Nothing, Your Honor.

**THE COURT:** Mr. Hancock?

**MR. HANCOCK:** Appreciate it, Your Honor.

**UNREDACTED TRANSCRIPT**

106

**THE COURT:** If you'll fulfill your duties, we'll get this -- I assume they're going to eat first. We'll get the exhibits back there. We'll get the updated instructions back there. I can't think of anything else.

**MR. HANCOCK:** Happy that's the case.

**THE COURT:** What?

**MR. HANCOCK:** I'm happy to say that's the case.

**THE COURT:** Well, we're going to stand in recess before I tell anymore war stories.

(Recess taken at 12:50 p.m. until 2:13 p.m.)

**THE COURT:** I received a note from the jury, and it reads as follows: EX-4 -- which I take to be Exhibit 4 -- e-mail sent on May 28th at 4:15 a.m. On second page of e-mail, question: What was number three?

My proposed answer: Subject to consultation with counsel, is the e-mail speaks for itself. There's nothing I can add to it and nothing I can subtract from it.

**MR. RYAN:** We're fine with that.

**THE COURT:** My understanding is this is the e-mail that was sent by Mr. Reaves to Ms. Mosby, who was then Ms. Mosby-Meachem, on that day and at that time. And if I remember the content of the e-mail, there were a series of numbered paragraphs and statements, one, two, and so forth. Number three was blank.

**MR. HANCOCK:** That's exactly what it is. And he

**UNREDACTED TRANSCRIPT**

testified he just typed it through it.  So maybe we tell the jury that there was no redaction, if that's what they may be asking.

THE COURT:  That's not what I think they're asking.  They want the Court to tell them what was number three, and there wasn't anything.

MR. HANCOCK:  There wasn't.  And he testified to that on the stand.  That paragraph was inadvertently left blank.

THE COURT:  That apparently was either not understood by the jury or the jury thinks there's something more there.  I don't know.  I'm not a juror.  But I'm very reluctant to go into a redaction on an e-mail that wasn't redacted.  So I still think I ought to say it speaks for itself.  I can't add to it, I can't subtract from it.  The only thing additionally I could say is you should consider it in light of all the other proof.  But I think that's too much.

MR. HANCOCK:  I think it speaks for itself is fine.

THE COURT:  Do you think there's any issue with what I'm proposing to say?

MR. HANCOCK:  No, we're comfortable with it.

THE COURT:  Okay.  Both parties agree.

MR. RYAN:  Yes, Your Honor.

**UNREDACTED TRANSCRIPT**

**THE COURT:**  I will say one other thing while I'm thinking about it.  Based on this question, don't stay too far from the federal building.  And I say that because there may be other questions, and if there are other questions, I don't want to have to wait long to answer them.  Sometimes juries stop deliberating while they're waiting the answer to the question.

Now, I have had juries that have continued to deliberate after they sent a question.  And at least in one instance, I had a jury that reached a verdict before I answered their question.  So that tells you something.  Do Mr. and Ms. Reaves want to be here during this process?

**MR. HANCOCK:**  (Shakes head negatively.)

**THE COURT:**  They're fine with being away?

**MR. HANCOCK:**  They are.

**THE COURT:**  Okay.  Let's bring in the jury.

(Jurors entered courtroom.)

**THE COURT:**  Welcome back, ladies and gentlemen.  I have received a question from you.  It says Exhibit 4, e-mail sent on May 28th at 4:15 a.m.  On second page of e-mail, question:  What was number three?

Ladies and gentlemen, the e-mail is an exhibit in this case.  It speaks for itself.  There is nothing I can add to it or subtract from it.  It is what it is.  Thank you very much.  You may resume your deliberations.

**UNREDACTED TRANSCRIPT**

(Jurors exited the courtroom.)

**THE COURT:** Don't go too far. There may be other questions. Anyway, we're in recess. If there's something you want to add, let me know; otherwise, we'll send for you insofar as I have additional questions of any sort. Thank you.

**MR. HANCOCK:** Thank you, Your Honor.

(Recess taken at 2:19 p.m. until 3:00 p.m.)

**THE COURT:** I have another note from the jury, which is in two parts. The first part is can we get a copy of deposition Neva Reaves, Jaye Mosby, Mr. Reaves?

Answer: No. And there's more to it than that. I can say you have the complete record in the case; therefore, there's no additional evidence coming into the case. I can also say portions of those depositions have been read, and you have to rely on your own memory of what you heard. But the short answer is they can't get copies of those depositions if they're not in evidence, which they're not.

What do you say, Mr. Ryan?

**MR. RYAN:** I agree with that response.

**THE COURT:** What do you say, Mr. Hancock?

**MR. HANCOCK:** Completely agree.

**THE COURT:** So what shall I say? No? Or should I say something more?

**UNREDACTED TRANSCRIPT**

**MR. HANCOCK:**  The fact that they weren't made an exhibit means they can't go back in the jury room.

**THE COURT:**  I'll just say no, you can't; they're not in evidence.

**MR. HANCOCK:**  That's acceptable to us.

**THE COURT:**  What do you say, Mr. Ryan?

**MR. RYAN:**  Yes.

**THE COURT:**  The copies of the deposition.  I'm not going to get into reading them and that sort of thing.

And then I have a question:  How, specifically, how comma specifically comma -- would an HR employee in asserting protected FLSA or EPA rights step outside her role or make clear to the employer that she was taking a position adverse to the employer?

The only thing I can do in response to that is direct them to those pages of the instructions that address that, which are Pages 18 and 19.  I can't get into any further discussion with them of specifics of how one acts. I've instructed them.  Anything you want to say, Mr. Ryan?

**MR. RYAN:**  No, sir.

**THE COURT:**  Well, say something anyway.

**MR. RYAN:**  I believe the instructions -- it's appropriate to point them to the instructions.

**THE COURT:**  All right.  What do you say, Mr. Hancock?

**UNREDACTED TRANSCRIPT**

**MR. HANCOCK:** I believe it's appropriate to point them to the instructions too. 15:04:23 15:04:34

**THE COURT:** What? 15:04:36

**MR. HANCOCK:** I also agree that it is appropriate to point them to that part of the instructions. 15:04:37 15:04:39

**THE COURT:** Should I simply point them to the instruction, or should I read it again? 15:04:42 15:04:46

**MR. HANCOCK:** I would think that reading it may help some. I don't know why, but I think hearing it from you may be helpful. 15:04:49 15:04:50 15:04:54

**THE COURT:** What do you think, Mr. Ryan? 15:04:55

**MR. RYAN:** Umm -- 15:04:57

**THE COURT:** Regardless of whether I read it or not, I have to point out to them that my instructions must be considered as a whole. They can't single out, and I am not singling out, any portion of the instructions to emphasize them, but I am trying to answer their question by referring them to this language. 15:04:59 15:05:01 15:05:07 15:05:09 15:05:12 15:05:17

**MR. RYAN:** I'm fine with you either referring or reading. Your call. 15:05:19 15:05:22

**THE COURT:** Then what portion should I read? What I have is a paragraph that begins: Under the FLSA and EPA, a different standard of activity applies. And so forth. And that paragraph goes over to Page 19. And after that we get into contentions, which I would prefer not to do. So I 15:05:23 15:05:28 15:05:33 15:05:37 15:05:45

**UNREDACTED TRANSCRIPT**

112

would just read that paragraph, and that would be all I would read.

MR. HANCOCK:  No objection.  We're in agreement with that, Your Honor.

MR. RYAN:  No objection.

THE COURT:  All right.  Let's bring in the jury.

(Jurors entered courtroom.)

THE COURT:  Welcome back, ladies and gentlemen.  I have another note from you, and it is in two parts.  The first is:  Can we get a copy of deposition Neva Reaves, Jaye Mosby, and Mr. Reaves?  And the answer is no.  The evidence is closed.  You have all the evidence you're going to receive in the case.  You have all the exhibits you're going to see in the case.  And you have to make of them what you make.  So you can't have copies of those depositions.

The second question is:  How, specifically, would an HR employee, in asserting protected FLSA or EPA rights, step outside her role or otherwise make clear to the employer that she was taking a position adverse to the employer?

The only advice I can give you is in the instructions.  And it's Pages 18 and 19.  There's a full paragraph, which I will read to you:

Under the FLSA and EPA, a different standard of protected activity applies to employees who have human resources, HR, duties as part of their job.  An employee

**UNREDACTED TRANSCRIPT**

carrying out HR duties acts in the interest of her employer. Asserting rights under the FLSA or EPA, however, is adverse to the employer. There's a legal distinction between the performance of HR job duties and the assertion of one's own FLSA or EPA rights and the rights of others. For an HR employee to assert FLSA or EPA rights, the employee must step outside her role or otherwise make clear to her employer that she was taking a position adverse to the employer for the employee's activity to be protected activity.

You are charged with deciding whether plaintiff acted only in the interest of her employer in line with her HR duties or if she stepped outside her role and asserted the FLSA and EPA rights of herself or other employees. Those are my instructions to you on the law.

I want to emphasize, however, by simply reading those instructions to you is not intended to emphasize those instruction as opposed to other instructions in the Court's overall jury instructions. In other words, you are to consider all the Court's instructions as a whole, and you should regard each in the light of all the others. So although I have read it to you, I have read it to you considering the context of the instructions as a whole.

Thank you very much.

(Jurors exited the courtroom.)

**THE COURT:** Was that satisfactory, Mr. Ryan?

**UNREDACTED TRANSCRIPT**

114

**MR. RYAN:**  Yes, Your Honor.                    15:10:36

**THE COURT:**  Was that satisfactory, Mr. Hancock?   15:10:38

**MR. HANCOCK:**  It is, Your Honor.             15:10:42

**THE COURT:**  Don't go too far.               15:10:43

**MR. HANCOCK:**  We're staying.                15:10:46

**THE COURT:**  There may be additional questions.   15:10:47

**MR. HANCOCK:**  That was less fun than it looked.   15:10:49

**THE COURT:**  What did you say?

**MR. HANCOCK:**  I said it was less fun than it looked making it all the way back to the office that time.  I   15:10:55 think I made it inside the door and turned back around.   15:10:58

**THE COURT:**  Well, at a distance, the jury is   15:11:02 reviewing carefully the exhibits and is thinking.  And while   15:11:04 it's thinking, it's thinking of questions, which at least are   15:11:08 not illegitimate questions like, for example, how   15:11:12 specifically --   15:11:16

**MR. HANCOCK:**  What's for dinner?             15:11:16

**THE COURT:**  I'm hoping they don't ask that   15:11:19 question.   15:11:21

**MR. HANCOCK:**  That was my concern.          15:11:23

**THE COURT:**  I'm counting on an earlier verdict   15:11:25 than dinner.  Although, I once had a case that the jury   15:11:28 deliberated into the early morning hours, and I never heard   15:11:33 the end of it from some of my colleagues.   15:11:37

**MR. HANCOCK:**  I think we had one here that lasted   15:11:41

**UNREDACTED TRANSCRIPT**

115

till about eight or nine.

THE COURT: I've done that. But one or two in the morning. We actually asked the jury if they wanted -- we were sending out for pizza and asked if they wanted any pizza, and they didn't.

MR. HANCOCK: They were busy.

THE COURT: They were busy. There's more to that story, but I'm not going to tell it. An interesting trial.

MR. HANCOCK: Sounds like it.

THE COURT: Well, we will hope that we're moving on, but don't go anywhere.

MR. HANCOCK: We'll be here.

THE COURT: Good. Well, you can give up your gym membership if you keep hiking back and forth to your office.

MR. HANCOCK: There's a silver lining to everything.

THE COURT: Yeah, look on the bright side.

(Recess taken at 3:12 p.m. until 4:36 p.m.)

THE COURT: I've received a note from the jury saying it has reached a verdict. Are you prepared to receive the verdict, Mr. Ryan?

MR. RYAN: Yes, Your Honor.

THE COURT: Are you prepared to receive the verdict Mr. Hancock?

MR. HANCOCK: Yes, Your Honor.

**UNREDACTED TRANSCRIPT**

116

**THE COURT:** Let's bring in the jury.

(Jurors entered courtroom.)

**THE COURT:** Welcome back, ladies and gentlemen. I've received a note saying you have reached a verdict. Who speaks for the jury as its foreperson?

**THE FOREPERSON:** That would be me.

**THE COURT:** Mr. Brown. Mr. Brown, has the jury unanimously agreed on its verdict?

**THE FOREPERSON:** Yes, sir.

**THE COURT:** Will you pass the verdict form forward for inspection, please?

Ladies and gentlemen, I'm going to publish your verdict. That means I am going to read your verdict aloud in open court. After I have read the verdict aloud in open court, I am going to poll the jury. That is, I'm going to ask each of you if the verdict as I have published it or read it is your individual verdict in all respects. I will not be asking you if the verdict is the collective verdict of the jury. I will be asking you if the verdict is your verdict.

If you agree with the verdict as I have read it, the answer to my question will be yes. If for any reason you disagree with the verdict as I have read it, the answer to my question will be no. Does everyone understand?

**THE JURY:** (Nods heads affirmatively.)

**THE COURT:** Andrea Jaye Mosby, plaintiff, versus

**UNREDACTED TRANSCRIPT**

Reaves Law Firm, PLLC, defendant.  We, the duly empanelled and sworn jury, after careful consideration and deliberation unanimously find as follows:

We find by a preponderance of the evidence that defendant, Reaves Law Firm, retaliated against plaintiff, Andrea Jaye Mosby, in violation of Title VII of the Civil Rights Act of 1964.  Answer:  Yes.

Two.  We find by a preponderance of the evidence that defendant, Reaves Law Firm, retaliated against plaintiff, Andrea Jaye Mosby, in violation of the Fair Labor Standards Act?  Answer:  Yes.

Three.  We find by a preponderance of the evidence that defendant, Reaves Law Firm, retaliated against plaintiff, Andrea Jaye Mosby, in violation of the Equal Pay Act.  Answer:  Yes.

Four.  We find by a preponderance of the evidence that plaintiff, Andrea Jaye Mosby, is entitled to backpay as a result of defendant Reaves Law Firm's conduct.  Answer: Yes.

If you answered yes to Number 4, enter the appropriate amount of backpay to which plaintiff is entitled.  Backpay:  $258,269.27.

Five.  We find by a preponderance of the evidence that plaintiff, Andrea Jaye Mosby, has suffered compensatory damages as a result of defendant Reaves Law Firm's conduct?

**UNREDACTED TRANSCRIPT**

118

Answer:  Yes.

If you answered yes to Number 5, enter the appropriate amount of compensatory damage to which plaintiff is entitled.  Compensatory damages:  $516,538.54.

Six.  We find by a preponderance of the evidence that plaintiff, Andrea Jaye Mosby, should be awarded punitive damages as a result of defendant Reaves Law Firm's conduct.  Answer: Yes.  If you answered yes to Number 6, enter the amount of punitive damages you find appropriate, sign the verdict form, and return to the courtroom.

Punitive damages:  $2.5 million.

Ms. Courtney Brown, you have heard the verdict published by the Court.  Does the verdict as published constitute your individual verdict in all respects?

**JUROR:**  Yes.

**THE COURT:**  Ms. Clayton, you have heard the verdict published by the Court.  Does the verdict as published constitute your individual verdict in all respects?

**JUROR:**  Yes.

**THE COURT:**  Mr. Payne, you have heard the verdict published by the Court.  Does the verdict as published constitute your individual verdict in all respects?

**JUROR:**  Yes.

**THE COURT:**  Mr. Thornton, you have heard the verdict published by the Court.  Does the verdict as

**UNREDACTED TRANSCRIPT**

published constitute your individual verdict in all respects?

**JUROR:**  Yes.

**THE COURT:**  Ms. Isom, you have heard the verdict published by the Court.  Does the verdict as published constitute your individual verdict in all respects?

**JUROR:**  Yes.

**THE COURT:**  Ms. Francine Brown, you have heard the verdict published by the Court.  Does the verdict as published constitute your individual verdict in all respects?

**JUROR:**  Yes.

**THE COURT:**  Mr. Clark, you have heard the verdict published by the Court.  Does the verdict as published constitute your individual verdict in all respects?

**JUROR:**  Yes.

**THE COURT:**  Mr. Leon Brown, you have heard the verdict published by the Court.  Does the verdict as published constitute your individual verdict in all respects?

**JUROR:**  Yes.

**THE COURT:**  The polling verifies unanimity.  I direct the clerk to file and record the verdict.  Ladies and gentlemen, you are discharged.  If you will return to the jury room and remain there, someone will come in and excuse you in a moment.  Thank you for your service.

(Jurors exited the courtroom.)

**THE COURT:**  Is there anything further, Mr. Ryan?

**UNREDACTED TRANSCRIPT**

120

MR. RYAN: No, sir.                                        16:46:08

THE COURT: Mr. Hancock?                                   16:46:08

MR. HANCOCK: No, sir.                                     16:46:09

THE COURT: Thank you, we are adjourned.                   16:46:10

(Proceedings concluded at 4:46 p.m.)                      16:46:16

**UNREDACTED TRANSCRIPT**

121

**C E R T I F I C A T E**

I, POLLY W. WARDLAW, do hereby certify that the foregoing 120 pages are, to the best of my knowledge, skill and abilities, a true and accurate transcript from my stenotype notes of the TRIAL, DAY 3, on the 7th day of May 2025, in the matter of:

Andrea Jaye Mosby

vs.

Reaves Law Firm, PLLC

Dated this the 27th day of May 2025.

*S/* Polly W Wardlaw
_____
POLLY W. WARDLAW, CCR
Official Court Reporter
United States District Court
Western District of Tennessee

**UNREDACTED TRANSCRIPT**